DICONZA TRAURIG KADISH LLP
630 Third Avenue
New York, New York 10017
Gerard DiConza
Lance A. Schildkraut
Tel:  (212) 682-4940
Email:  gdiconza@dtklawgroup.com
          las@dtklawgroup.com

*Proposed Counsel for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
In re                                                    :
                                                         :          Chapter 11
HI-TEMP SPECIALTY METALS, INC.,            :          Case No. 16-_____
                                                         :
                              Debtor.               :
--------------------------------------------------------------x

### MOTION OF HI-TEMP SPECIALTY METALS, INC. FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION AND (III) SCHEDULING A FINAL HEARING

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Hi-Temp Specialty Metals, Inc. ("Hi-Temp" or the "Debtor"), as a debtor and debtor in possession in the above-captioned chapter 11 cases, by its proposed attorneys, DiConza Traurig Kadish LLP, hereby submits this motion (the "Motion") seeking entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Cash Collateral Order"), and a final order (the "Final Cash Collateral Order," together with the Interim Cash Collateral Order, the "Cash Collateral Orders") (a) authorizing Hi-Temp to use Cash Collateral (as defined herein) pursuant to sections 361 and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); (b) approving the form of adequate protection provided to Wells Fargo Bank, National Association ("Wells Fargo"), pursuant to Bankruptcy Code sections 361 and 363;

(c) scheduling a final hearing ("Final Hearing") on the Motion; and (d) granting related relief.  In support of this Motion, the Debtor respectfully represents as follows:

## Jurisdiction and Venue

1.        The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.        The statutory bases for the relief requested herein are sections 361 and 363 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002, 4001(b), (d) and 9014 and Local Bankruptcy Rule 4001-2.

## Background

3.        On the date hereof (the "Petition Date"), Hi-Temp commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The factual background regarding the Debtor, including its current and historical business operations and the events precipitating the chapter 11 filing, is set forth in detail in the Declaration of Joseph Smokovich Pursuant to Rule 1007-4 of the Local Bankruptcy Rules (the "Smokovich Declaration"), and is incorporated herein by reference.[1]

4.        The Debtor continues in possession of its property and continues to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1]        Capitalized terms shall have the meanings ascribed to them in the Smokovich Declaration unless otherwise defined herein.

2

5.      No trustee or committee has been appointed in the case.

### **Hi-Temp's Business Operations**

6.      Hi-Temp is a privately-held Delaware corporation with its principal place of business located in Yaphank, New York.  Hi-Temp was founded in 1982 as a recycler and provider of specialty recycled metals for the then-burgeoning super alloy industry.  The material provided was primarily tungsten and molybdenum, two of the heaviest metals on earth.  They are used in areas where high heat tolerances, stress and durability are required.   In the late 1980s, tantalum, another refractory metal, was added to the product mix.

7.      The original model, which still holds true today, is to recycle these metals in a manner that eliminates the need to source material from ore (in mines), and then upgrade the material into pure forms.  Hi-Temp obtained and maintains material approvals from many of the world's largest manufacturers of super alloys where it is authorized and approved to provide scrap and recycled material instead of virgin material.  In this industry, Hi-Temp is the largest manufacturer of such material in the world, and is an essential part of the supply chain for many domestic U.S. manufacturers of precision cast parts.

## The Wells Fargo Financing Transactions

8.      The Debtor and Wells Fargo are parties to an Amended and Restated Credit and Security Agreement dated as of July 16, 2010 (as amended, the "Credit Agreement").  A copy of the Credit Agreement (as well as Financing Statements filed by Wells Fargo or its predecessors) are annexed hereto as **Exhibit B**.

9.      Pursuant to the Credit Agreement, Wells Fargo provided the Debtor with a revolving line of credit for working capital purposes and to facilitate the issuance of letters of credit up to the maximum amount of $22.5 million.  As of June 2, 2016, the aggregate outstanding principal amount of the indebtedness due Wells Fargo under the Credit Agreement is approximately $13 million (the "Prepetition Obligations").

10.     To secure the Prepetition Obligations, Hi-Temp granted to Wells Fargo security interests in, and liens on (the "Prepetition Liens"), among other things, substantially all of its assets, whether then or thereinafter existing or then owned or thereafter acquired including, but not limited to, accounts, inventory, equipment and all products and proceeds of all of the foregoing (the "Prepetition Collateral").

11.     As a result of dramatic decrease in commodity prices, Hi-Temp experienced a slump in profitability in fiscal year ending 2015 (May 31, 2015) and for the first time experienced a loss.  As a result of weakness in the market, Hi-Temp failed to meet a fixed charge coverage ratio and in the fall 2014, Wells Fargo declared a default under the Credit Agreement.  Since December 2014, the Debtor and Wells Fargo have entered into a series of amendments and forbearance agreements to the Credit Agreement.

4

12.     Notwithstanding great strides by the Debtor in its transition back to profitability, Wells Fargo has decreased availability under the line of credit by more than $7 million and has requested Hi-Temp's consent to additional restrictions on access to financing as well as personal guarantees from the Debtor's president.  Liquidity and free cash has decreased to a point where Hi-Temp is having trouble paying key suppliers, employees and other creditors.

13.     The Debtor filed this chapter 11 case to preserve and maximize its asset values for all its creditors, preserve the jobs of Hi-Temp's employees and afford Hi-Temp the necessary time and statutory tools to reorganize its financial affairs.

## Relief Requested

14.     All cash in the Debtor's possession or control as of the Petition Date and all cash coming into the Debtor's possession after the Petition Date constituting proceeds of the Prepetition Collateral may be cash collateral of Wells Fargo within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").  Accordingly, Hi-Temp respectfully requests that the Court (i) enter the Interim Cash Collateral Order Pursuant to 11 U.S.C. § 363(c) and Granting of Adequate Protection Pursuant to 11 U.S.C. § 361 in the form attached hereto as **Exhibit A** authorizing the interim use of Cash Collateral on the terms and conditions set forth in the Interim Cash Collateral Order, and scheduling a Final Hearing on the Motion; (ii) at the Final Hearing, enter an order authorizing the continued use of Cash Collateral on the terms and conditions set forth in the proposed order to be filed by the Debtor with the Court; and (iii) grant such other and further relief as is just and proper.

5

## Summary of Interim Cash Collateral Order

15.    The Interim Cash Collateral Order provides, among other things, that Hi-Temp shall be entitled to use the Cash Collateral to pay its ordinary and necessary business and operating expenses in accordance with and subject to the terms and conditions set forth therein. Generally, the proposed use of Cash Collateral shall be consistent with and for the purposes described in the budget attached to the Interim Cash Collateral Order as *Exhibit A* (the "Budget"), prepared by the Debtor.  The Debtor seeks seek authority to use the Cash Collateral for, among other things:  (a) working capital requirements; (b) general corporate purposes; and (c) the costs and expenses of administering the chapter 11 case (including payment of the allowed fees and expenses of professionals retained by the Debtor's estate).

16.    Other key provisions of the Interim Cash Collateral Order are set forth below. Without access to Cash Collateral, the Debtor's ability to operate and ultimately restructure as a going concern will be jeopardized to the detriment of ***all*** of the Debtor's stakeholders.

A.    Adequate Protection

17.    As adequate protection for any diminution in the value of the Prepetition Collateral resulting from (i) the use of the Cash Collateral pursuant to Bankruptcy Code § 363(e), (ii) the use, sale or lease of the Prepetition Collateral (other than the Cash Collateral) pursuant to Bankruptcy Code § 363(c) and (iii) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a), the Interim Cash Collateral Order provides that Wells Fargo shall be granted (upon Court approval and effective as of the Petition Date and without the necessity of the execution by Hi-Temp of any other security agreement or pledge agreement), pursuant to

6

Bankruptcy Code §§ 361 and 363(e), to the same extent, priority and validity as the Prepetition

Liens existing with respect to the Prepetition Collateral as of the Petition Date, valid and

perfected, replacement security interests in, and liens on ("Replacement Liens"), all of Hi-

Temp's right, title and interest in and to all of Hi-Temp's existing and after-acquired tangible and

intangible personal property in existence on or acquired or created at any time after the Petition

Date (the "Postpetition Collateral"), junior only to the Carve-Out (as defined below); provided

however, that the Postpetition Collateral shall not include the proceeds of any claims or causes of

action of the Debtor or its estate that may later be commenced under chapter 5 of the Bankruptcy

Code.

B.      Carve-Out

        18.     Pursuant to the Interim Cash Collateral Order, the Prepetition Liens and any

Replacement Liens shall be subject to a carve-out (the "Carve-Out") for (i) all fees required to be

paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under

section 1930(a) of title 28 of the United States Code plus interest pursuant section 3717 of title

31 of the United States Code, (ii) the costs and administrative expenses not to exceed $15,000 in

the aggregate that are permitted to be incurred by any chapter 7 trustee pursuant to an order of

this Court following any conversion of any of the Cases pursuant to section 1112 of the

Bankruptcy Code, and (iii) the payment of allowed and reasonable professional fees and

disbursements (the "Professional Fees and Disbursements") incurred by the professionals

retained by the Debtor.  Courts have regularly held that carve outs for professional fees are

reasonable and necessary to ensure that a debtor may retain assistance from counsel of its choice.

7

*See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).  In addition,

the Carve Out ensures that Cash Collateral may be used for the payment of U.S. Trustee fees.

C.    Extraordinary Provisions

19.    The Debtor believes that the proposed Interim Cash Collateral Order does not

include any Extraordinary Provisions.

20.    The Interim Cash Collateral Order reserves all rights of the Debtor, any committee

appointed in the case and any creditor's right to contest the validity and extent of the purported

Wells Fargo liens.

**Basis for Relief**

21.    Pursuant to court order, a debtor in possession may be authorized to use cash

collateral in the ordinary course of its business operations under Bankruptcy Code §§ 363(c) and

1107.  The Court may condition such use, pursuant to Bankruptcy Code § 363(e), as is necessary

to provide adequate protection of any interest held therein by any entity other than the debtor in

possession.

22.    Courts repeatedly have recognized that use of cash collateral is appropriate where

necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for

all interested parties. *See In re Realty Southwest Assoc.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y.

1992); H.R. Rep. No. 595, 95th Cong., 1st Sess. 344 (1977); *see also In re Dynaco*, 162 B.R.

389, 396; *In re Stein*, 19 B.R. 458 (Bankr. E.D. Pa. 1982).  Bankruptcy Rule 4001(b) governs

authorization for utilizing cash collateral and provides that the court may permit the debtor-in-

possession to use cash collateral prior to a final hearing to the extent necessary to avoid

immediate and irreparable harm.  After a final hearing held on at least fifteen days' notice, the

court may grant the authority to use cash collateral on a permanent basis and other permanent

relief requested herein.

23.    Courts determine the means for providing adequate protection on a case-by-case

basis.  *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Beker Indus. Corp.*,

58 B.R. 725 (Bankr. S.D.N.Y. 1986); *see also In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir.

1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  Adequate protection is provided to protect a

secured creditor from any diminution in the value of its interest in the particular collateral during

the period of use. *See In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996); *see

also In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re

Beker Indus. Corp.*, 58 B.R. at 736.

24.    The concept of adequate protection is designed to shield a secured creditor from

diminution in the value of its interest in collateral during the period of a debtor's use. *See In re

Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured

party's interest is protected from diminution or decrease as a result of the proposed use of cash

collateral."); *see also In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The

legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate

protection may be provided under section 363, makes clear that the purpose is to insure that the

secured creditor receives the value for which the creditor bargained for prior to the debtor's

bankruptcy."). "However, neither the legislative history nor the Bankruptcy Code requires the

Court to protect a creditor beyond what was bargained for by the parties." *Id.* at 619; *see Beker*, 58 B.R. at 741 ("Adequate protection, not absolute protection, is the statutory standard.").

25.    Pursuant to Section 363(c) of the Bankruptcy Code, Hi-Temp requests authorization to use Cash Collateral during the period from the Petition Date through the middle of September 2016, subject to further court-approved extensions of such period (the "Specified Period") to pay those actual, necessary ordinary course operating expenses set forth in the Budget.  In exchange for the use of Cash Collateral, Hi-Temp proposes to grant Wells Fargo adequate protection in the form of Replacement Liens on the Postpetition Collateral.

26.    The use of the Cash Collateral is essential to Hi-Temp's operations and rehabilitation efforts.  Hi-Temp requires the ability to pay expenses to preserve the going concern value of its operations.  Authorization to utilize Cash Collateral will provide Hi-Temp with the liquidity necessary to operate its business and pay the various expenses associated therewith. Without authorization to utilize the Cash Collateral, Hi-Temp's business operations will be severely interrupted, if not completely terminated, and serious and irreparable harm to Hi-Temp and its estate would occur.  *See In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).  Continued operations of the Debtor's business are far more likely to maintain, or even increase, the value of the underlying collateral as compared with the catastrophic loss of value that could result from denial of this Motion.  *See In re Jim Kelly Ford of Dundee, Ltd.*, 14 B.R. 812 (N.D. Ill. 1980) (lender was adequately protected and debtor was authorized to use cash

10

collateral to fund operations because the lender benefited from the difference between the average sale price of car sold at retail and the average sale price if the same vehicle was sold at a wholesale auction).

27.    To avoid immediate and irreparable harm, pending the Final Hearing, Hi-Temp respectfully requests the Court allow use of the Cash Collateral pursuant to the terms and conditions of the Interim Cash Collateral Order, to make payments of necessary ordinary-course expenses, as identified in Budget.

28.    At the Final Hearing, Hi-Temp will seek final authority from the Court to use Cash Collateral through the Specified Period for the payment of ordinary course expenses in accordance with the Budget.  If Hi-Temp anticipates a need to use additional Cash Collateral beyond the Specified Period, Hi-Temp may seek a further order of this Court.

29.    Based on the foregoing, it is respectfully submitted, that this Court should authorize Hi-Temp's use of Cash Collateral.

### Interim Relief and Notice of Final Hearing

30.    Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 may not be commenced earlier than 14 days after the service of such motion.  However, the Court is authorized to conduct a preliminary expedited hearing on the Motion and authorize the Debtor's proposed use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Fed. R. Bankr. P. 4001(b)(2).

31.    The Debtor has an immediate postpetition need to use Cash Collateral.  The Debtor cannot maintain the value of its business and estate during the pendency of the chapter 11

case without access to Cash Collateral.  The Debtor will use Cash Collateral to, among other things, procure goods from vendors, pay employees, and satisfy other working capital needs during the chapter 11 case.  The Debtor will, therefore, be unable to operate its business as a going concern or finance the costs of administering the chapter 11 estate without the ability to use Cash Collateral.

32.     The Debtor, therefore, seeks immediate authority to use Cash Collateral on an interim basis and as set forth in this Motion and to prevent immediate and irreparable harm to its estate pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).  The Debtor respectfully submits that it has satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

33.     Notice of this Motion and proposed Interim Cash Collateral Order will be provided by email, facsimile or overnight delivery of a copy to (a) Wells Fargo; (b) the twenty (20) largest unsecured creditors of the Debtor; (c) all known creditors who have or assert liens against the Debtor's assets; (d) the Debtor's taxing authorities; (e) the Office of the United States Trustee; and (f) all parties filing a notice of appearance in this case (the "Notice Parties").

34.     Pursuant to Bankruptcy Rule 4001, Hi-Temp respectfully requests that it be authorized to serve notice of the Final Hearing and a proposed Final Cash Collateral Order upon the Notice Parties, on or before a date to be set by the Court, and upon counsel to any official committee appointed herein, within one day after the Debtor receives notice of the appointment of such counsel.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

35.     To implement the foregoing successfully, the Debtor requests that the Court find and order that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## No Prior Request

36.     No previous request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE the Debtor respectfully request that the Court enter an order granting the relief requested herein, and such other and further relief as may be just.

Dated: New York, New York
        June 22, 2016

                              Respectfully submitted,

                              DICONZA TRAURIG KADISH LLP
                              *Proposed Attorneys to Debtor and Debtor in Possession*


                              By:    /s/ Gerard DiConza
                                     Gerard DiConza
                                     Lance A. Schildkraut
                                     630 Third Avenue
                                     New York, New York 10017
                                     Telephone: (212) 682-4940

**Exhibit A**

**Proposed Cash Collateral Order**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re                                                   :
                                                        :        Chapter 11
HI-TEMP SPECIALTY METALS, INC.,                         :        Case No. 16-_____
                                                        :
                        Debtor.                         :
----------------------------------------------------------------x

### INTERIM ORDER (A) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c); (B) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § 361 AND (C) SCHEDULING FINAL HEARING ON USE OF CASH COLLATERAL

Upon the Motion dated June __, 2016 (the "Motion")[1] of Hi-Temp Specialty

Metals, Inc. ("Hi-Temp" or the "Debtor"), for entry of interim and final orders (a) authorizing

the Debtor to use Cash Collateral pursuant to sections 361 and 363 of chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code"); (b) approving the form of adequate protection

provided to Wells Fargo Bank, National Association ("Wells Fargo"), pursuant to Bankruptcy

Code sections 361, 362, 363 and 364; (c) scheduling a final hearing ("Final Hearing") on the

Motion; and (d) granting related relief; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration

of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. §

157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided; and it appearing that no other or

further notice need be provided; and the Court having determined that the relief sought in the

Motion is in the best interests of the Debtor and its estate and creditors; and the Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the

---

[1]        Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefore;

IT HAVING BEEN FOUND AND DETERMINED by this Court that:

A.      On June __, 2016 (the "Petition Date"), Hi-Temp commenced the above-captioned chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

B.      The Debtor continues to operate its business and manage its property as debtor in possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in either of the Debtor's case (the "Case").

C.      As of the date of this Motion, the United States Trustee has not yet appointed an official committee of unsecured creditors in the Case.

D.      A full recitation of the factual background relating to the Case may be found in the Local Rule 1007 Declaration of Joseph Smokovich, dated as of June __, 2016.

E.      Prior to the Petition Date, pursuant to the terms, conditions and limitations set forth in that certain Amended and Restated Credit and Security Agreement dated as of July 16, 2010 (as amended, the "Credit Agreement"), Wells Fargo extended financing to the Debtor.

F.      As of the Petition Date, outstanding obligations under the Credit Agreement are approximately $13,000,000.00 (the "Prepetition Obligations").

G.      The Debtors dispute the amount of the Prepetition Obligations due to Wells Fargo.

H.      To secured the Prepetition Obligations, Wells Fargo was granted a security interests in, and liens on (the "Prepetition Liens") substantially all of Hi-Temp's property and fixtures, in each case whether then or thereinafter existing or then owned or thereafter acquired

and whether subject to the Uniform Commercial Code including, but not limited to, all goods, money, contract rights, instruments, accounts, inventory, equipment, documents, chattel paper, securities and general intangibles; and all replacements and substitutions for, and all accessions and additions to, and all products and proceeds of all of the foregoing (collectively, the "Prepetition Collateral").

I.      Hi-Temp requires the continued use of cash and cash collateral to operate its business and pay its necessary and ordinary operating expenses.

J.      Wells Fargo has a security interest in Hi-Temp's cash collateral.

K.      Hi-Temp seeks Court authorization pursuant to sections 361 and 363(c) of the Bankruptcy Code and Rules 4001(b) and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), to, *inter alia*, use the Cash Collateral (as defined below) and to provide adequate protection to Wells Fargo to the extent of any diminution in value of Wells Fargo's interests in the Prepetition Collateral resulting from the use of Cash Collateral, the use, sale or lease of the Prepetition Collateral (other than the Cash Collateral) and the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a).

L.      Hi-Temp does not have sufficient available sources of working capital and financing to operate its business in the ordinary course of business or maintain its property without the use of the Cash Collateral.  Hi-Temp's ability to maintain business relationships with its vendors, suppliers and customers, to pay employees and otherwise finance its operations, is essential to Hi-Temp's continued viability and to maintain the value of its assets.  In the absence of the use of Cash Collateral, the continued operation of Hi-Temp's business would be in doubt, and serious and irreparable harm to Hi-Temp and its estate would occur.

Accordingly, it is hereby ORDERED, ADJUDGED AND DECREED that:

1.      Cash in Hi-Temp's possession or control as of the Petition Date and all cash coming into Hi-Temp's possession after the Petition Date constituting proceeds of the Prepetition Collateral is cash collateral of Wells Fargo within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral") and Wells Fargo is entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of its interest in the Prepetition Collateral for the use of Cash Collateral, the use, sale or lease of the Prepetition Collateral (other than the Cash Collateral), and the imposition of the automatic stay.

2.      Hi-Temp shall be entitled to use the Cash Collateral in accordance with and subject to the terms and conditions of this Order and pursuant to the Budget attached hereto as Exhibit 1 (the "Budget").

3.      The Budget is hereby approved.

4.      The proposed use of Cash Collateral shall be consistent with and for the purposes described in the Budget, or in the event the Debtor finds it necessary to deviate from the approved Budget, then as approved by the Court or Wells Fargo upon prior written request.

5.      As adequate protection for any diminution in the value of the Prepetition Collateral resulting from (i) the use of the Cash Collateral pursuant to section 363(e) of the Bankruptcy, (ii) the use, sale or lease of the Prepetition Collateral (other than the Cash Collateral) pursuant to section 363(c) of the Bankruptcy Code, and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, Wells Fargo shall be granted (effective as of the Petition Date and without the necessity of the execution by Hi-Temp of any other security agreement or pledge agreement), pursuant to sections 361 and 363(e) of the Bankruptcy Code, to the same extent, priority and validity as the Prepetition Liens existing with respect to the Prepetition Collateral as of the Petition Date, valid and perfected, replacement

security interests in, and liens on (collectively, the "Replacement Liens"), all of Hi-Temp's right, title and interest in and to all of Hi-Temp's existing and after-acquired tangible and intangible personal property in existence on or acquired or created at any time after the Petition Date (collectively, the "Postpetition Collateral"), junior only to the Carve-Out (as defined below); provided however, that the Postpetition Collateral shall not include the proceeds of any claims or causes of action of the Debtor or its estate that may later be commenced under chapter 5 of the Bankruptcy Code.

6.      The Prepetition Liens and any Replacement Liens shall be subject to a carve-out (the "Carve-Out") for (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest pursuant section 3717 of title 31 of the United States Code, (ii) the costs and administrative expenses not to exceed $15,000 in the aggregate that are permitted to be incurred by any chapter 7 trustee pursuant to an order of this Court following any conversion of any of the Cases pursuant to section 1112 of the Bankruptcy Code, and (iii) the payment of allowed professional fees and disbursements (the "Professional Fees and Disbursements") incurred by the professionals retained by the Debtor.

7.      The Replacement Liens granted pursuant to this Order shall constitute valid and duly perfected security interests and liens as of the Petition Date, and Wells Fargo shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by Hi-Temp to execute any other documentation relating to the Replacement Liens shall in no way affect the validity, perfection or priority of such Replacement Liens.

8.      Nothing contained herein is intended to grant Wells Fargo any rights, claims or liens in the Prepetition Collateral to the extent it is later determined Wells Fargo does not have valid liens on any of the Prepetition Collateral.

9.      To the extent that as of the Petition Date, there existed any validly existing, properly perfected and enforceable lien on any of the Prepetition Collateral that is senior in priority to the security interest of Wells Fargo, nothing contained herein is intended to impair or modify such priority.

10.      This Order shall be binding upon all parties in interest, including, without limitation, the Debtor and any statutory committee appointed in the Case.  The Debtor and any statutory committee appointed in the Case may investigate and if they deem appropriate, commence an adversary proceeding pursuant to Bankruptcy Rule 7001 or contested matter as required by the Bankruptcy Code and Bankruptcy Rules (an "Adversary Proceeding") challenging the amount, validity, enforceability, perfection or priority of the Prepetition Obligations or the Prepetition Liens on or related to the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action against Wells Fargo.

11.      Entry of this Order shall be without prejudice to any and all rights, remedies, claims and causes of action that the Debtor has against Wells Fargo or third parties relating to the Prepetition Obligations and Credit Agreement.

12.      Hi-Temp's authority to use Cash Collateral pursuant to this Order will terminate on June ___, 2016, which date may be extended upon entry of the Final Order by this Court.

**Exhibit 1**

**Budget**

## HI-TEMP SPECIALTY METALS, INC.

| Hi-Temp Specialty Metals 13-Week Cash Flow Forecast USD | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Scenario: | | | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
| Week Ending: | | | 6/24/2016 | 7/1/2016 | 7/8/2016 | 7/15/2016 | 7/22/2016 | 7/29/2016 | 8/5/2016 | 8/12/2016 | 8/19/2016 | 8/26/2016 | 9/2/2016 | 9/9/2016 | 9/16/2016 |
| Period #: | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| **Account Type** | **Account Catego** | **Account** | | | | | | | | | | | | | |
| **RECEIPT** | | | | | | | | | | | | | | | |
| | Cash Collections | Domestic Accounts Receivable (Existing) | $311,534 | $120,250 | $271,864 | $494,810 | $0 | $73,500 | $16,900 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | Domestic Accounts Receivable (Future) | $956 | $956 | $91,819 | $215,080 | $252,014 | $184,494 | $411,991 | $370,084 | $370,084 | $502,799 | $593,240 | $404,254 | $404,254 |
| | | Foreign Accounts Receivable (Existing) | $531,257 | $130,981 | $11,402 | $0 | $0 | $136,575 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | Foreign Accounts Receivable (Future) | $0 | $0 | $136,462 | $136,462 | $236,462 | $372,893 | $238,159 | $238,159 | $253,505 | $253,505 | $389,936 | $253,505 | $253,505 |
| | | Other Non-Trade Cash Inflows | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | **TOTAL RECEIPTS:** | $843,747 | $252,187 | $500,145 | $657,754 | $488,476 | $767,462 | $667,050 | $608,243 | $623,589 | $756,304 | $983,177 | $657,760 | $657,760 |
| **DISBURSEMENT** | | | | | | | | | | | | | | | |
| | Cash Payments | Trade Accounts Payable Vendors | $298,000 | $298,000 | $298,000 | $298,000 | $298,000 | $298,000 | $298,000 | $298,000 | $298,000 | $298,000 | $298,000 | $298,000 | $298,000 |
| | | Critical Trade Vendors | $73,296 | $73,296 | $73,296 | $73,296 | $73,296 | $73,296 | $73,296 | $73,296 | $73,296 | $73,296 | $73,296 | $73,296 | $73,296 |
| | | Conversion Costs Related To Baghouse S | $117,600 | $0 | $0 | $100,000 | $0 | $117,600 | $100,000 | $0 | $150,000 | $0 | $100,000 | $0 | $0 |
| | | Non-Inventory Expenses, Other Than Be | $18,175 | $15,075 | $79,318 | $15,075 | $19,075 | $16,005 | $75,093 | $18,080 | $17,575 | $17,505 | $45,093 | $49,300 | $17,575 |
| | | Freight & Duties | $15,019 | $30,439 | $16,495 | $19,283 | $16,711 | $17,580 | $20,564 | $12,112 | $14,056 | $15,577 | $18,639 | $14,913 | $16,692 |
| | | Payroll, Taxes & Benefits | $0 | $0 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 |
| | | Commissions | $2,386 | $2,349 | $2,358 | $2,358 | $2,395 | $2,454 | $1,953 | $1,953 | $1,978 | $1,991 | $1,953 | $2,338 | $2,363 |
| | | Interest & Bank Charges | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | Bankruptcy Professional Fees | $2,500 | $20,000 | $16,000 | $3,000 | $5,000 | $0 | $20,000 | $16,000 | $2,500 | $19,000 | $5,000 | $20,000 | $16,000 |
| | | US Trustee Fees | | $5,000 | | | | | | | | | | | $5,000 |
| | | Insurance Payments | $246 | $0 | $23,161 | $21,054 | $0 | $246 | $19,733 | $0 | $21,054 | $0 | $133,896 | $9,750 | $19,733 |
| | | Utilities | $2,525 | $37,025 | $4,525 | $6,905 | $2,525 | $37,025 | $4,525 | $7,655 | $2,525 | $2,525 | $39,025 | $6,905 | $2,525 |
| | | Rent, Auto & Equipment Leases | $3,061 | $2,244 | $41,804 | $2,168 | $2,461 | $1,829 | $43,519 | $0 | $2,868 | $3,061 | $41,713 | $2,335 | $2,168 |
| | | Timing Contingency | $39,961 | $36,257 | $44,338 | $43,302 | $34,176 | $46,519 | $51,647 | $35,315 | $34,914 | $55,280 | $43,776 | $46,428 | $35,992 |
| | | **TOTAL DISBURSEMENTS:** | $572,768 | $519,685 | $635,511 | $620,657 | $489,854 | $666,769 | $740,566 | $506,180 | $500,427 | $792,346 | $627,461 | $665,462 | $515,880 |
| **NET CASH FLOW** | | | $ 270,979 | $ (267,498) | $ (135,365) | $ 237,098 | $ (1,378) | $ 100,693 | $ (73,516) | $ 102,063 | $ 123,162 | $ (36,042) | $ 355,716 | $ (7,702) | $ 141,879 |
| **CUMMULATIVE CASH FLOW** | | | $ 270,979 | $ 3,481 | $ (131,884) | $ 105,213 | $ 103,835 | $ 204,528 | $ 131,013 | $ 233,076 | $ 356,237 | $ 320,195 | $ 675,911 | $ 668,209 | $ 810,088 |

**<u>Exhibit B</u>**

**<u>Wells Fargo Loan Documents</u>**

## WELLS FARGO BUSINESS CREDIT AMENDED AND RESTATED
## CREDIT AND SECURITY AGREEMENT

**THIS AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (the "Agreement") is dated **July 16, 2010**, and is entered into between **Hi-Temp Specialty Metals, Inc.,** a Delaware corporation ("Company"), and **Wells Fargo Bank, National Association** (as more fully defined in Exhibit A, "Wells Fargo"), acting through its Wells Fargo Business Credit operating division.

## RECITALS

Company and Wells Fargo are parties to a Loan and Security Agreement dated as of December 27, 1999, as amended (collectively, the "Existing Credit Agreement"), pursuant to which Wells Fargo has agreed to make certain loans, advances and extensions of credit available to Company.

Company has requested that Wells Fargo amend and restate the terms and conditions of the Existing Credit Agreement as set forth herein, including without limitation, to provide it with a $18,500,000 revolving line of credit (the "Line of Credit") for working capital purposes and to facilitate the issuance of documentary and standby letters of credit. Wells Fargo is agreeable to meeting Company's request, subject to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, Company and Wells Fargo agree that the Existing Credit Agreement is amended and restated in its entirety to read as follows:

For purposes of this Agreement, capitalized terms not otherwise defined in the Agreement shall have the meaning given them in Exhibit A.

## 1.    AMOUNT AND TERMS OF THE LINE OF CREDIT

**1.1    Line of Credit; Limitations on Borrowings; Termination Date; Use of Proceeds.**

(a)    <u>Line of Credit and Limitations on Borrowing</u>.  Wells Fargo shall make Advances to Company under the Line of Credit that, together with the L/C Amount, shall not at any time exceed in the aggregate the <u>lesser</u> of (i) $18,500,000 (the "Maximum Line Amount"), or (ii) the Borrowing Base limitations described in Section 1.2.  Within these limits, Company may periodically borrow, prepay in whole or in part, and reborrow. Wells Fargo has no obligation to make an Advance during a Default Period or at any time Wells Fargo believes that an Advance would result in an Event of Default.

(b)    <u>Maturity and Termination Dates</u>.  Company may request Advances from the date that the conditions set forth in Section 3 are satisfied until the earliest of: (i) May 29, 2013 (the "Maturity Date"), (ii) the date Company terminates the Line of Credit, or (iii) the date Wells Fargo terminates the Line of Credit following an Event of Default. (The earliest of these dates is the "Termination Date.")

(c)    <u>Use of Line of Credit Proceeds</u>.  Company shall use the proceeds of each Advance and each Letter of Credit for ordinary working capital purposes.

(d)    <u>Revolving Note</u>.  Company's obligation to repay Line of Credit Advances, regardless of how initiated under Section 1.3, shall be evidenced by a revolving promissory note (as renewed, amended, substituted or replaced from time to time, the "Revolving Note").

**1.2    Borrowing Base; Mandatory Prepayment.**

(a)    Borrowing Base.  The borrowing base (the "Borrowing Base") is an amount equal to:

　　　　(i)    the sum of (1) 85% of the net amount of Eligible Accounts, other than Eligible Accounts which arise from sales to account debtors located outside of the United States, plus (2) 90% of the net amount of Eligible Accounts, which arise from sales to account debtors located outside of the United States; provided that these advance rates may be reduced at any time by Wells Fargo's in its sole discretion by one (1) percent for each percentage point by which Dilution on the date of determination is in excess of five percent (5.0%), plus

　　　　(ii)    the lesser of (1) $12,500,000, (2) 60% of Eligible Inventory, or (3) 80% of the Net Orderly Liquidation Value of Eligible Inventory; provided, however, at no time shall advances against Eligible Consigned Inventory exceed $3,000,000 and at no time shall advances against Eligible In-Transit Inventory exceed $2,500,000, less

　　　　(iii)    the Borrowing Base Reserve, less

　　　　(iv)    Indebtedness that Company owes Wells Fargo that has not been advanced on the Revolving Note, less

　　　　(v)    Indebtedness that is not otherwise described in Section 1, including Indebtedness that Wells Fargo in its sole discretion finds on the date of determination to be equal to Wells Fargo's net credit exposure with respect to any Rate Hedge Agreement, derivative, foreign exchange, deposit, treasury management or similar transaction or arrangement extended to Company by Wells Fargo and any Indebtedness owed by Company to Wells Fargo Merchant Services, L.L.C.

(b)    Mandatory Prepayment; Overadvances.  If unreimbursed Line of Credit Advances evidenced by the Revolving Note plus the L/C Amount exceed the Borrowing Base or the Maximum Line Amount at any time, then Company shall, within two (2) days, prepay the Revolving Note in an amount sufficient to eliminate the excess, and if payment in full of the Revolving Note is insufficient to eliminate this excess and the L/C Amount continues to exceed the Borrowing Base, then Company shall, within two (2) days, deliver cash to Wells Fargo in an amount equal to the remaining excess for deposit to the Special Account, unless in each case, Wells Fargo has delivered to Company an Authenticated Record consenting to the Overadvance prior or after to its occurrence, in which event the Overadvance shall be temporarily permitted on such terms and conditions as Wells Fargo in its sole discretion may deem appropriate, including the payment of additional fees or interest, or both.

**1.3    Procedures for Line of Credit Advances.**

(a)    Advances Credited to Operating Account.  All Advances, accruing interest at the Floating Rate ("Floating Rate Advances"), shall be credited to Company's demand deposit account maintained with Wells Fargo (the "Operating Account"), unless the parties agree in an Authenticated Record to disburse to another account.

(b)    Advances upon Company's Request.  Company may request one or more Advances on any Business Day.  Each request shall be deemed a request for a Floating Rate Advance.  No request for an Advance will be deemed received until Wells Fargo acknowledges receipt, and Company, if requested by Wells Fargo, confirms the request

2

in an Authenticated Record.  Company shall repay all Advances made by Wells Fargo in response to any requests, executions of any instructions, authorizations or agreements or in reliance on any reports communicated to it and purporting to have been sent to Wells Fargo by Company, and Wells Fargo shall have no duty to verify the origin of any communication or the authority of the Person sending it.

(c)   <u>Advances through Loan Manager</u>.  If Wells Fargo has separately agreed that Company may use the Wells Fargo Loan Manager service ("Loan Manager"), Line of Credit Advances will be initiated by Wells Fargo and credited to the Operating Account as Floating Rate Advances as of the end of each Business Day in an amount sufficient to maintain an agreed upon ledger balance in the Operating Account, subject only to Line of Credit availability as provided in Section 1.1(a).  If Wells Fargo terminates Company's access to Loan Manager, Company may continue to request Line of Credit Advances as provided in Section 1.3(b).  Wells Fargo shall have no obligation to make an Advance through Loan Manager during a Default Period, or in an amount in excess of Line of Credit availability, and may terminate Loan Manager at any time in its sole discretion.

(d)   <u>Protective Advances; Advances to Pay Indebtedness Due</u>.  Wells Fargo may initiate a Floating Rate Advance on the Line of Credit in its sole discretion for any reason at any time, without Company's compliance with any of the conditions of this Agreement, and (i) disburse the proceeds directly to third Persons in order to protect Wells Fargo's interest in Collateral or to perform any of Company's obligations under this Agreement, or (ii) apply the proceeds to the amount of any Indebtedness then due and payable to Wells Fargo.

**1.4    Floating Rate Advances.**  Company may request an Advance at the Floating Rate no later than 11:59 a.m. Central Time on the Business Day on which Company wants the Floating Rate Advance to be funded.  Rate Hedges may not be used with respect to any Advance that utilizes the Floating Rate.

**1.5    Reserved.**

**1.6    Collection of Accounts and Application to Revolving Note.**

(a)   <u>The Collection Account</u>.  Company has granted a security interest to Wells Fargo in the Collateral, including without limitation, all Accounts. Except as otherwise agreed by both parties in an Authenticated Record, all Proceeds of Accounts and other Collateral, upon receipt or collection, shall be deposited each Business Day into the Collection Account. Funds so deposited ("Account Funds") are the property of Wells Fargo, and may only be withdrawn from the Collection Account by Wells Fargo, subject Sections 1.6(b) and (c).

(b)   <u>Payment of Accounts by Company's Account Debtors</u>.  Company shall instruct all account debtors to make payments either directly to the Company for deposit directly to the Collection Account, or instruct them to deliver such payments to Wells Fargo by wire transfer, ACH, or other means as Wells Fargo may direct for deposit to the Collection Account or for direct application to the Line of Credit. If Company receives a payment or the Proceeds of Collateral directly, Company will promptly deposit the payment or Proceeds into the Collection Account. Until deposited, it will hold all such payments and Proceeds in trust for Wells Fargo without commingling with other funds or property.  All deposits held in the Collection Account shall constitute Proceeds of Collateral and shall not constitute the payment of Indebtedness.

(c)     Application of Payments to Revolving Note.  Wells Fargo will withdraw Account Funds deposited to the Collection Account and pay down borrowings on the Line of Credit by applying them to the Revolving Note on the first Business Day following the Business Day of deposit to the Collection Account, or, if payments are received by Wells Fargo that are not first deposited to the Collection Account pursuant to any treasury management service provided to Company by Wells Fargo, such payments shall be applied to the Revolving Note as provided in the Master Agreement for Treasury Management Services and the relevant service description.  All payments shall be applied first to any unpaid Floating Rate Advances.

**1.7     Interest and Interest Related Matters.**

(a)     Interest Rates Applicable to Line of Credit.  Except as otherwise provided in this Agreement, the unpaid principal amount of each Line of Credit Advance evidenced by the Revolving Note shall accrue interest at an annual interest rate calculated as follows:

**Floating Rate Pricing**

The "Floating Rate" for Line of Credit Advances = An interest rate equal to Daily Three Month LIBOR plus the applicable Margin which interest rate shall change whenever Daily Three Month LIBOR changes.

The Margins through and including the first adjustment occurring as specified below shall be three and three-quarters percent (3.75%) per annum.  The Margins shall be adjusted on the basis of the Debt Service Coverage Ratio of Company as of the end of the fiscal years ending May 31, 2011 and May 31, 2010, as applicable, in accordance with the following table:

| Debt Service Coverage Ratio | Margin Adjustments |
| --- | --- |
| (i)  Debt Service Coverage Ratio is determined by Wells Fargo to be 1.10 or higher as of May 31, 2011. | 0.25% (i.e., from 3.75% to 3.50%) |
| (ii) Debt Service Coverage Ratio is determined by Wells Fargo to be to be 1.15 or higher as of May 31, 2012. | 0.25% (i.e., from 3.75% to 3.50% or from 3.50% to 3.25%, as applicable) |

Each Margin change shall become effective on the first calendar day of the month following the month of receipt by Wells Fargo of the audited financial statements delivered pursuant to Section 5.1(a).  If Company fails to timely deliver such financial statements as agreed, no reduction in Margin shall be made pending receipt of such financial statements until such financial statements are received (and provided no other Event of Default has occurred and is continuing) and Wells Fargo may notify Company that an Event of Default has occurred and increase any Margin to the highest agreed upon Margin and impose the Default Rate.

If amended or restated financial statements would change previously calculated Margins, or if Wells Fargo determines that any financial statements have materially misstated Company's financial condition, then Wells Fargo may, in the reasonable exercise of its judgment, and using the most accurate information available to it, recalculate the financial test or tests governing the Margins and retroactively reduce or

increase the Margins from the date of receipt of such amended or restated financial statements and charge Company additional interest, which may be imposed on them from the beginning of the applicable reporting period to which the restated statements or recalculated financial tests relate or to the beginning of the fiscal year in which any Event of Default has occurred, as Wells Fargo in its sole discretion deems appropriate.

(b)    <u>Reserved</u>.

(c)    <u>Default Interest Rate</u>.  Commencing on the day an Event of Default occurs, through and including the date identified by Wells Fargo in a Record as the date that the Event of Default has been cured or waived (each such period a "Default Period"), or during a time period specified in Section 1.10, or at any time following the Termination Date, in Wells Fargo's sole discretion and without waiving any of its other rights or remedies, the principal amount of the Revolving Note shall bear interest at a rate that is two percent (2.0%) above the contractual rate set forth in Section 1.7(a) (the "Default Rate"), or any lesser rate that Wells Fargo may deem appropriate, starting on the first day of the month in which the Default Period begins through the last day of that Default Period, or any shorter time period to which Wells Fargo may agree in an Authenticated Record.

(d)    <u>Interest Accrual on Payments Applied to Revolving Note</u>.  Payments received by Wells Fargo shall be applied to the Revolving Note as provided in Section 1.6(c), but the principal amount paid down shall continue to accrue interest through the end of the Business Day that the payment was applied to the Revolving Note.

(e)    <u>Usury</u>.  No interest rate shall be effective which would result in a rate greater than the highest rate permitted by law.  Payments in the nature of interest and other charges made under any Loan Documents or any other document or agreement described in or related to this Agreement that are later determined to be in excess of the limits imposed by applicable usury law will be deemed to be a payment of principal, and the Indebtedness shall be reduced by that amount so that such payments will not be deemed usurious.

**1.8    Fees.**

(a)    <u>Origination Fee</u>.  Company shall pay Wells Fargo a one time origination fee of $20,000, which shall be fully earned and payable upon the execution of this Agreement.

(b)    <u>Unused Line Fee</u>.  Company shall pay Wells Fargo an unused line fee equal to one-half of one percent (0.50%) per annum of the daily average of the Maximum Line Amount reduced by outstanding Advances and the L/C Amount (the "Unused Amount"), from the date of this Agreement to and including the Termination Date, which unused line fee shall be payable quarterly in arrears on the first day of each calendar quarter and on the Termination Date.

(c)    <u>Reserved</u>.

(d)    <u>Collateral Exam Fees</u>.  Company shall pay Wells Fargo fees in connection with any collateral exams, audits or inspections conducted by or on behalf of Wells Fargo at the current rates established from time to time by Wells Fargo as its collateral exam fees (which fees are currently $1,000 per day per collateral examiner), together with all actual out-of-pocket costs and expenses incurred in conducting any collateral examination or inspection. The Company's obligation to reimburse Wells Fargo for payment of fees, costs and expenses under this Section 1.8(d) shall be limited to 4 collateral exams,

audits and inspections per calendar year, provided, however, Company shall also be obligated to reimburse Wells Fargo for any such fees, costs and expenses incurred during a Default Period.

(e) <u>Collateral Monitoring Fees</u>.  Company shall pay Wells Fargo a fee at the rates established from time to time by Wells Fargo as its Collateral monitoring fees (which fees are currently $200 per month), due and payable monthly in arrears on the first day of the month and on the Termination Date.

(f) <u>Line of Credit Termination and/or Reduction Fees</u>.  If (i) Wells Fargo terminates the Line of Credit during a Default Period, or if (ii) Company terminates the Line of Credit on a date prior to the Maturity Date, or if (iii) Company and Wells Fargo agree to reduce the Maximum Line Amount, then Company shall pay Wells Fargo as liquidated damages a termination or reduction fee in an amount equal to a percentage of the Maximum Line Amount (or the reduction of the Maximum Line Amount, as the case may be) calculated as follows: (A) one and one half percent (1.5%), if the termination or reduction occurs on or before May 29, 2011; (B) one percent (1.0%), if the termination or reduction occurs after May 29, 2011 but on or before on or before May 29, 2012; and (C) one-half percent (0.50%), if the termination or reduction occurs after May 29, 2012.

(g) <u>Overadvance Fees</u>.  Company shall pay a $500 Overadvance fee for each day that an Overadvance exists which was not agreed to by Wells Fargo in an Authenticated Record prior to its occurrence; provided that Wells Fargo's acceptance of the payment of such fees shall not, except as herein otherwise provided, constitute either consent to the Overadvance or waiver of any resulting Event of Default.  Company shall pay the Overadvance fee and interest on the Overadvance and on such terms as Wells Fargo in its reasonable discretion may consider appropriate for any Overadvance to which Wells Fargo has specifically consented in an Authenticated Record prior to its occurrence, but in no event at an interest rate that is higher than the Default Rate.

(h) <u>Treasury Management Fees</u>.  Company will pay service fees to Wells Fargo for treasury management services provided pursuant to the Master Agreement for Treasury Management Services or any other agreement entered into by the parties, in the amount prescribed in Wells Fargo's current service fee schedule.

(i) <u>Letter of Credit Fees</u>.  Company shall pay a fee with respect to each Letter of Credit issued by Wells Fargo of two and three-quarters percent (2.75%) of the aggregate undrawn amount of the Letter of Credit (the "Aggregate Face Amount") accruing daily from and including the date the Letter of Credit is issued until the date that it either expires or is returned, which shall be payable monthly in arrears on the first day of each month and on the date that the Letter of Credit either expires or is returned; and following an Event of Default, this fee shall increase to four and three-quarters percent (4.75%) of the Aggregate Face Amount, commencing on the first day of the month in which the Default Period begins and continuing through the last day of such Default Period, or any shorter time period that Wells Fargo in its sole discretion may deem appropriate, without waiving any of its other rights and remedies.

(j) <u>Letter of Credit Administrative Fees</u>.  Company shall pay all administrative fees charged by Wells Fargo in connection with the honoring of drafts under any Letter of Credit, and any amendments or transfers of any Letter of Credit, and any other activity with respect to the Letters of Credit at the current rates published by Wells Fargo for such services rendered on behalf of its customers generally.

(k)    <u>Other Fees and Charges</u>.  Wells Fargo may impose additional fees and charges during a Default Period for (i) waiving an Event of Default, or for (ii) the administration of Collateral by Wells Fargo. All such fees and charges shall be imposed at Wells Fargo's sole discretion following oral notice to Company on either an hourly, periodic, or flat fee basis, and in lieu of or in addition to imposing interest at the Default Rate, and Company's request for an Advance following such notice shall constitute Company's agreement to pay such fees and charges.

(l)    <u>Reserved.</u>

(m)    <u>Reserved</u>.

**1.9    Interest Accrual; Principal and Interest Payments; Computation.**

(a)    <u>Interest Payments and Interest Accrual</u>.  Accrued and unpaid interest under the Revolving Note on Floating Rate Advances shall be due and payable on the first day of each month (each an "Interest Payment Date") and on the Termination Date, and shall be paid in the manner provided in Section 1.6(c).  Interest shall accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of Advance to the Interest Payment Date.

(b)    <u>Payment of Revolving Note Principal</u>.  The principal amount of the Revolving Note shall be paid from time to time as provided in this Agreement, and shall be fully due and payable on the Termination Date.

(c)    <u>Payments Due on Non-Business Days</u>.  If an Interest Payment Date or the Termination Date falls on a day which is not a Business Day, payment shall be made on the next Business Day, and interest shall continue to accrue at the Interest Rate then in effect during that time period.

(d)    <u>Computation of Interest and Fees</u>.  Interest accruing on the unpaid principal amount of the Revolving Note and fees payable under this Agreement shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(e)    <u>Liability Records</u>.  Wells Fargo shall maintain accounting and bookkeeping records of all Advances and payments under the Line of Credit and all other Indebtedness due to Wells Fargo in such form and content as Wells Fargo in its sole discretion deems appropriate.  Wells Fargo's calculation of current Indebtedness shall be presumed correct unless proven otherwise by Company.  Upon Wells Fargo's request, Company will admit and certify in a Record the exact principal balance of the Indebtedness that Company then believes to be outstanding.  Any billing statement or accounting provided by Wells Fargo shall be conclusive and binding unless Company notifies Wells Fargo in a detailed Record of its intention to dispute the billing statement or accounting within 60 days of receipt.

**1.10    Termination, Reduction or Non-Renewal of Line of Credit by Company; Notice.**

(a)    <u>Termination by Company after Advance Notice</u>.  Company may terminate or reduce the Line of Credit at any time prior to the Maturity Date, if it (i) delivers an Authenticated Record notifying Wells Fargo of its intentions at least 60 days prior to the proposed Termination Date, (ii) pays Wells Fargo the termination fee set forth in Section 1.8(f), and (iii) pays the Indebtedness in full or down to the reduced Maximum Line Amount. Any reduction in the Maximum Line Amount shall be in multiples of $100,000.00, with a

minimum reduction of at least $500,000.00 or the outstanding principal amount of the Indebtedness at such time.

(b)  <u>Termination by Company without Advance Notice</u>.  If Company fails to deliver Wells Fargo timely notice of its intention to terminate the Line of Credit or reduce the Maximum Line Amount as provided in Section 1.10(a), Company may nevertheless terminate the Line of Credit or reduce the Maximum Line Amount and pay the Indebtedness in full or down to the reduced Maximum Line Amount if it (i) pays Wells Fargo the termination fee set forth in Section 1.8(f), and (ii) pays the Default Rate on the Revolving Note commencing on the 60th day prior to the proposed Termination Date or reduction date and continuing through the date that Wells Fargo receives delivery of an Authenticated Record giving it actual notice of Company's intention to terminate or reduce the Line of Credit.

(c)  <u>Non-Renewal by Company; Notice</u>.  If Company does not wish Wells Fargo to consider renewal of the Line of Credit on the next Maturity Date, Company shall deliver an Authenticated Record to Wells Fargo at least 60 days prior to the Maturity Date notifying Wells Fargo of its intention not to renew. If Company fails to deliver to Wells Fargo such timely notice, then the Revolving Note shall accrue interest at the Default Rate commencing on the 60th day prior to the Maturity Date and continuing through the date that Wells Fargo receives delivery of an Authenticated Record giving it actual notice of Company's intention not to renew.

**1.11    Letters of Credit.**

(a)  <u>Issuance of Letters of Credit; Amount</u>.  Wells Fargo, subject to the terms and conditions of this Agreement, shall issue, on or after the date that Wells Fargo is obligated to make its first Advance under this Agreement and prior to the Termination Date, one or more irrevocable standby or documentary letters of credit (each, a "Letter of Credit", and collectively, "Letters of Credit") for Company's account.  Wells Fargo will not issue any Letter of Credit if the face amount of the Letter of Credit would exceed the lesser of: (i) $1,000,000 less the L/C Amount, or (ii) the Borrowing Base, less an amount equal to aggregate unreimbursed Line of Credit Advances plus the L/C Amount.

(b)  <u>Additional Letter of Credit Documentation</u>.  Prior to requesting issuance of a Letter of Credit, Company shall first execute and deliver to Wells Fargo a Standby Letter of Credit Agreement or a Commercial Letter of Credit Agreement, as applicable, an L/C Application, and any other documents that Wells Fargo may request, which shall govern the issuance of the Letter of Credit and Company's obligation to reimburse Wells Fargo for any related Letter of Credit draws (the "Obligation of Reimbursement").

(c)  <u>Expiration</u>.  No Letter of Credit shall be issued that has an expiry date that is later than one (1) year from the date of issuance, or the Maturity Date in effect on the date of issuance, whichever is earlier.

(d)  <u>Obligation of Reimbursement During Default Periods</u>.  If Company is unable, due to the existence of a Default Period or for any other reason, to obtain an Advance to pay any Obligation of Reimbursement, Company shall pay Wells Fargo on demand and in immediately available funds, the amount of the Obligation of Reimbursement together with interest, accrued from the date presentment of the underlying draft until reimbursement in full at the Default Rate.  Wells Fargo is authorized, alternatively and in its sole discretion, to make an Advance in an amount sufficient to discharge the Obligation of Reimbursement and pay all accrued but unpaid interest and fees with respect to the Obligation of Reimbursement.

NJ226,808,752v9

1.12    <u>Special Account.</u>  If the Line of Credit is terminated for any reason while a Letter of Credit is outstanding, or if after prepayment of the Revolving Note the L/C Amount continues to exceed the Borrowing Base, then Company shall promptly pay Wells Fargo in immediately available funds for deposit to the Special Account, an amount equal, as the case may be, to either (a) the L/C Amount plus any anticipated fees and costs, or (b) the amount by which the L/C Amount exceeds the Borrowing Base.  If Company fails to pay these amounts promptly, then Wells Fargo may in its sole discretion make an Advance to pay these amounts and deposit the proceeds to the Special Account.  The Special Account shall be an interest bearing account maintained with Wells Fargo or any other financial institution acceptable to Wells Fargo.  Wells Fargo may in its sole discretion apply amounts on deposit in the Special Account to the Indebtedness.  Company may not withdraw amounts deposited to the Special Account until the Line of Credit has been terminated and all outstanding Letters of Credit have either been returned to Wells Fargo or have expired and the Indebtedness has been fully paid.

2.    **SECURITY INTEREST AND OCCUPANCY OF COMPANY'S PREMISES**

2.1    **Grant of Security Interest**. Company hereby pledges, assigns and grants to Wells Fargo, for the benefit of Wells Fargo and as agent for Wells Fargo Merchant Services, L.L.C., a Lien and security interest (collectively referred to as the "Security Interest") in the Collateral, as security for the payment and performance of all Indebtedness. Following request by Wells Fargo, Company shall grant Wells Fargo, for the benefit of Wells Fargo and as agent for Wells Fargo Merchant Services, L.L.C., a Lien and security interest in all commercial tort claims that it may have against any Person.  Company acknowledges that the Security Interest granted to Wells Fargo pursuant to this Section 2.1 is and continues to be a first Lien and Security Interest upon the Collateral.  This Agreement is not intended to create a new lending relationship between Wells Fargo and the Company, but rather to restate and supplement the terms, conditions, and provisions of an existing relationship.  The provisions of this Section 2.1 shall be deemed to ratify the existing Security Interest of Wells Fargo in the Collateral to the extent such Security Interest existed prior to the date hereof, and to create a Security Interest to the extent that no Security Interest therein existed in favor of Wells Fargo.

2.2    **Notifying Account Debtors and Other Obligors; Collection of Collateral.**  Wells Fargo may at any time during a Default Period, deliver a Record giving an account debtor or other Person obligated to pay an Account, a General Intangible, or other amount due, notice that the Account, General Intangible, or other amount due has been assigned to Wells Fargo for security and must be paid directly to Wells Fargo.  Company shall join in giving such notice and shall Authenticate any Record giving such notice upon Wells Fargo's request.  After Company or Wells Fargo gives such notice, Wells Fargo may, but need not, in Wells Fargo's or in Company's name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, such Account, General Intangible, or other amount due, or grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including collateral obligations) of any account debtor or other obligor.  During a Default Period, Wells Fargo may, in Wells Fargo's name or in Company's name, as Company's agent and attorney-in-fact, notify the United States Postal Service to change the address for delivery of Company's mail to any address designated by Wells Fargo, otherwise intercept Company's mail, and receive, open and dispose of Company's mail, applying all Collateral as permitted under this Agreement and holding all other mail for Company's account or forwarding such mail to Company's last known address.

**2.3    Assignment of Insurance.**  As additional security for the Indebtedness, Company hereby assigns to Wells Fargo and to Wells Fargo Merchant Services, L.L.C., all rights of Company under every policy of insurance covering the Collateral and all business records and other documents relating to it, and all monies (including without limitation all proceeds and refunds) that may be payable under any policy, and Company hereby directs the issuer of each policy to pay all such monies directly to Wells Fargo.  At any time, whether or not a Default Period then exists, Wells Fargo may (but need not), in Wells Fargo's or Company's name, receive payment of proceeds and endorse checks and other instruments representing payment of the policy of insurance.  During a Default Period, Wells Fargo may (but need not), in Wells Fargo's or Company's name, execute and deliver proofs of claim and adjust, litigate, compromise or release claims against the issuer of any policy.  Any monies received under any insurance policy assigned to Wells Fargo, other than liability insurance policies, or received as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid to Wells Fargo and, as determined by Wells Fargo in its sole discretion, either be applied to prepayment of the Indebtedness or disbursed to Company under staged payment terms reasonably satisfactory to Wells Fargo for application to the cost of repairs, replacements, or restorations which shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed.

**2.4    Company's Premises**

(a)    <u>Wells Fargo's Right to Occupy Company's Premises</u>.  Company hereby grants to Wells Fargo the right, at any time during a Default Period and without notice or consent, to take exclusive possession of all locations where Company conducts its business or has any rights of possession, including without limitation the locations described on Exhibit B (the "Premises"), until the earlier of (i) payment in full and discharge of all Indebtedness and termination of the Line of Credit, (ii) final sale or disposition of all items constituting Collateral and delivery of those items to purchasers, or (iii) the expiration of any such Default Period.

(b)    <u>Wells Fargo's Use of Company's Premises</u>.  During a Default Period, Wells Fargo may use the Premises to store, process, manufacture, sell, use, and liquidate or otherwise dispose of items that are Collateral, and for any other incidental purposes deemed appropriate by Wells Fargo in good faith.

(c)    <u>Company's Obligation to Reimburse Wells Fargo</u>.  Wells Fargo shall not be obligated to pay rent or other compensation for the possession or use of any Premises, but if Wells Fargo elects to pay rent or other compensation to the owner of any Premises in order to have access to the Premises, then Company shall promptly reimburse Wells Fargo all such amounts, as well as all taxes, fees, charges and other expenses at any time payable by Wells Fargo with respect to the Premises by reason of the execution, delivery, recordation, performance or enforcement of any terms of this Agreement.

**2.5    License.**  Without limiting the generality of any other Security Document, Company hereby grants to Wells Fargo a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property Rights of Company during any Default Period for the purpose of: (a) completing the manufacture of any in-process materials during any Default Period so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by Company for its own manufacturing and subject to Company's reasonable exercise of quality control; and (b) selling, leasing or otherwise disposing of any or all Collateral during any Default Period.

NJ226,808,752v9

**2.6**    **Financing Statements.**

(a)    <u>Authorization to File</u>.  Company authorizes Wells Fargo to file financing statements describing Collateral to perfect Wells Fargo's Security Interest in the Collateral, and Wells Fargo may describe the Collateral as "all personal property" or "all assets" or describe specific items of Collateral including without limitation any commercial tort claims.  All financing statements filed before the date of this Agreement to perfect the Security Interest were authorized by Company and are hereby re-authorized.  Following the termination of the Line of Credit and payment of all Indebtedness, Wells Fargo shall, at Company's expense, promptly, but not later than the expiration of the time periods required under applicable law, release or terminate any filings or other agreements that perfect the Security Interest.

(b)    <u>Termination</u>.  Wells Fargo shall, at Company's expense, release or terminate any filings or other agreements that perfect the Security Interest, provided that there are no suits, actions, proceedings or claims pending or threatened against any Indemnitee under this Agreement with respect to any Indemnified Liabilities, upon Wells Fargo's receipt of the following, in form and content satisfactory to Wells Fargo: (i) cash payment in full of all Indebtedness and a completed performance by Company with respect to its other obligations under this Agreement, (ii) evidence that the commitment of Wells Fargo to make Advances under the Line of Credit or under any other facility with Company has been terminated, (iii) a release of all claims against Wells Fargo by Company relating to Wells Fargo's performance and obligations under the Loan Documents, and (iv) an agreement by Company and any new lender to Company to indemnify Wells Fargo for any payments received by Wells Fargo that are applied to the Indebtedness as a final payoff that may subsequently be returned or otherwise not paid for any reason.

**2.7**    **Setoff.**  Wells Fargo may at any time, in its sole discretion and without demand or notice to anyone, setoff any liability owed to Company by Wells Fargo against any Indebtedness, whether or not due.

**2.8**    **Collateral Related Matters.**  This Agreement does not contemplate a sale of Accounts or chattel paper, and, as provided by law, Company is entitled to any surplus and shall remain liable for any deficiency.  Wells Fargo's duty of care with respect to Collateral in its possession (as imposed by law) will be deemed fulfilled if it exercises reasonable care in physically keeping such Collateral, or in the case of Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or third Person, and Wells Fargo need not otherwise preserve, protect, insure or care for such Collateral.  Wells Fargo shall not be obligated to preserve rights Company may have against prior parties, to liquidate the Collateral at all or in any particular manner or order or apply the Proceeds of the Collateral in any particular order of application.  Wells Fargo has no obligation to clean-up or prepare Collateral for sale.  Company waives any right it may have to require Wells Fargo to pursue any third Person for any of the Indebtedness.  The foregoing shall not release Wells Fargo from its obligation to otherwise comply with applicable law.

**2.9**    **Notices Regarding Disposition of Collateral.**  If notice to Company of any intended disposition of Collateral or any other intended action is required by applicable law in a particular situation, such notice will be deemed commercially reasonable if given in the manner specified in Section 7.4 at least ten calendar days before the date of intended disposition or other action.

**3.**    **CONDITIONS PRECEDENT**

H

**3.1** **Conditions Precedent to Initial Advance and Issuance of Initial Letter of Credit.** Wells Fargo's obligation to make the initial Advance or issue the first Letter of Credit shall be subject to the condition that Wells Fargo shall have received this Agreement and each of the Loan Documents, and any document, agreement, or other item described in or related to this Agreement, and all fees and information described in Exhibit C, executed and in form and content satisfactory to Wells Fargo.

**3.2** **Additional Conditions Precedent to All Advances and Letters of Credit.** Wells Fargo's obligation to make any Advance (including the initial Advance) or issue any Letter of Credit shall be subject to the further additional conditions: (a) that the representations and warranties described in Exhibit D are correct on the date of the Advance or the issuance of the Letter of Credit, except to the extent that such representations and warranties relate solely to an earlier date; and (b) that no event has occurred and is continuing, or would result from the requested Advance or issuance of the Letter of Credit that would result in an Event of Default.

**4.** **REPRESENTATIONS AND WARRANTIES**

To induce Wells Fargo to enter into this Agreement, Company makes the representations and warranties described in Exhibit D. Any request for an Advance will be deemed a representation by Company that all representations and warranties described in Exhibit D are true, correct, and complete as of the time of the request, unless they relate exclusively to an earlier date. Company shall promptly deliver a Record notifying Wells Fargo of any change in circumstance that would affect the accuracy of any representation or warranty, unless the representation and warranty specifically relates to an earlier date.

**5.** **COVENANTS**

So long as the Indebtedness remains unpaid, or the Line of Credit has not been terminated, Company shall comply with each of the following covenants, unless Wells Fargo shall consent otherwise in an Authenticated Record delivered to Company.

**5.1** **Reporting Requirements.** Company shall deliver to Wells Fargo the following information, compiled where applicable using GAAP consistently applied, in form and content acceptable to Wells Fargo:

(a) <u>Annual Financial Statements</u>. As soon as available and in any event within 90 days after Company's fiscal year end, Company's unqualified audited financial statements prepared by an independent certified public accountant acceptable to Wells Fargo, which shall include Company's balance sheet, income statement, and statement of retained earnings and cash flows prepared on a consolidated and consolidating basis to include Company's Affiliates; provided that any exception or qualification taken as to the non-consolidation with Valerie Realty LLC shall not be deemed a qualification for purposes of this Agreement. The annual financial statements shall be accompanied by the unqualified opinion of such accountant and a certificate (the "Compliance Certificate") in the form of Exhibit E that is signed by Company's chief financial officer, provided that any exception or qualification taken as to the non-consolidation with Valerie Realty LLC shall not be deemed a qualification for the purposes of this Agreement.

Each Compliance Certificate that accompanies an annual financial statement shall also be accompanied by (i) copies of all management letters prepared by Company's

accountants; and (ii) a report signed by the accountant stating that in making the investigations necessary to render the opinion, the accountant obtained no knowledge, except as specifically stated, of any Event of Default under the Agreement, and a detailed statement, including computations, demonstrating whether or not Company is in compliance with the financial covenants of this Agreement.

(b)   Monthly Financial Statements.  As soon as available and in any event within 30 days after the end of each month, a Company prepared balance sheet, income statement, and statement of retained earnings prepared for that month and for the year–to-date period then ended, prepared on a consolidated and consolidating basis to include Company's Affiliates, and stating in comparative form the figures for the corresponding date and periods in the prior fiscal year, subject to year-end adjustments.  The financial statements shall be accompanied by a Compliance Certificate in the form of Exhibit E that is signed by Company's chief financial officer.

(c)   Collateral Reports.  No later than 15 days after each month end (or more frequently if Wells Fargo shall request same during any Default Period), detailed agings of Company's accounts receivable and accounts payable, a detailed inventory report, an inventory certification report, and a calculation of Company's Accounts, Eligible Accounts, Inventory and Eligible Inventory as of the end of that month or shorter time period requested by Wells Fargo.

(d)   Projections.  No later than 15 days prior to each fiscal year end, Company's projected balance sheet and income statement and statement of cash flows and statement of retained earnings and cash flows for each month of the next fiscal year, together with projections of Company's availability under the Line of Credit for each month of the next fiscal year, certified by Company's chief financial officer and accompanied by a statement of assumptions and supporting schedules and information, together with a certificate of Company's chief financial officer, in form and substance acceptable to Wells Fargo, to the effect that such projections are reasonable estimates of the future financial performance of Company subsequent to the date thereof based upon the historical performance of Company.

(e)   Supplemental Reports.  On the first Business Day of each calendar week, or more frequently if Wells Fargo requests during any Default Period, Wells Fargo's standard form of "daily collateral report", together with receivables schedules, collection reports, and copies of invoices in excess of $10,000, shipment documents and delivery receipts for goods sold to account debtors in excess of $500,000.

(f)   Litigation.  No later than three Business Days after discovery, a Record notifying Wells Fargo of any litigation or other proceeding before any court or governmental agency which seeks a monetary recovery against Company in excess of $100,000.

(g)   Intellectual Property.  (i) No later than 30 days before it acquires material Intellectual Property Rights, a Record notifying Wells Fargo of Company's intention to acquire such rights; (ii) except for transfers permitted under Section 5.18, no later than 30 days before it disposes of material Intellectual Property Rights, a Record notifying Wells Fargo of Company's intention to dispose of such rights, along with copies of all proposed documents and agreements concerning the disposal of such rights as requested by Wells Fargo; (iii) promptly upon discovery, a Record notifying Wells Fargo of (A) any Infringement of Company's Intellectual Property Rights by any Person, (B) claims that Company is Infringing another Person's Intellectual Property Rights and (C) any threatened cancellation, termination or material limitation of Company's Intellectual

Property Rights; and (iv) promptly upon receipt, copies of all registrations and filings with respect to Company's Intellectual Property Rights.

(h)    <u>Defaults</u>.  No later than three Business Days after learning of the probable occurrence of any Event of Default, a Record notifying Wells Fargo of the Event of Default and the steps being taken by Company to cure the Event of Default.

(i)    <u>Disputes</u>.  Promptly upon discovery, a Record notifying Wells Fargo of (i) any disputes or claims by Company's customers exceeding $25,000 individually or in the aggregate; (ii) credit memos not previously reported in Section 5.1(e); and (iii) any goods returned to or recovered by Company outside of the ordinary course of business or in the ordinary course of business but with a value in an amount in excess of $25,000.

(j)    <u>Changes in Officers and Directors</u>.  Promptly following occurrence, a Record notifying Wells Fargo of any change in the persons constituting Company's Officers and Directors.

(k)    <u>Collateral</u>.  Promptly upon discovery, a Record notifying Wells Fargo of any loss of or material damage to any Collateral or of any substantial adverse change in any Collateral or the prospect of its payment.

(l)    <u>Commercial Tort Claims</u>.  Promptly upon discovery, a Record notifying Wells Fargo of any commercial tort claims brought by Company against any Person, including the name and address of each defendant, a summary of the facts, an estimate of Company's damages, copies of any complaint or demand letter submitted by Company, and such other information as Wells Fargo may request.

(m)    <u>Reports to Owners</u>.  Promptly upon distribution, copies of all financial statements, reports and proxy statements which Company shall have sent to its Owners.

(n)    <u>Tax Returns of Company</u>.  No later than twenty (20) days after they are required to be filed, copies of Company's signed and dated state and federal income tax returns and all related schedules, and copies of any extension requests.

(o)    <u>Reserved</u>.

(p)    <u>Violations of Law</u>.  No later than three days after discovery of any violation, a Record notifying Wells Fargo of Company's violation of any law, rule or regulation, the non-compliance with which could have a Material Adverse Effect on Company.

(q)    <u>Pension Plans</u>.  (i) Promptly upon discovery, and in any event within 30 days after Company knows or has reason to know that any Reportable Event with respect to any Pension Plan has occurred, a Record authenticated by Company's chief financial officer notifying Wells Fargo of the Reportable Event in detail and the actions which Company proposes to take to correct the deficiency, together with a copy of any related notice sent to the Pension Benefit Guaranty Corporation; (ii) promptly upon discovery, and in any event within 10 days after Company fails to make a required quarterly Pension Plan contribution under Section 412(m) of the IRC, a Record authenticated by Company's chief financial officer notifying Wells Fargo of the failure in detail and the actions that Company will take to cure the failure, together with a copy of any related notice sent to the Pension Benefit Guaranty Corporation; and (iii) promptly upon discovery, and in any event within 10 days after Company knows or has reason to know that it may be liable or may be reasonably expected to have liability for any withdrawal, partial withdrawal, reorganization or other event under any Multiemployer Plan under Sections 4201 or

4243 of ERISA, a Record authenticated by Company's chief financial officer notifying Wells Fargo of the details of the event and the actions that Company proposes to take in response.

(r)    Other Reports.  From time to time, with reasonable promptness, all customer lists, receivables schedules, inventory reports, collection reports, deposit records, equipment schedules, invoices to account debtors, shipment documents and delivery receipts for goods sold, and such other materials, reports, records or information as Wells Fargo may reasonably request.

**5.2    Financial Covenants.**  Company agrees to comply with the financial covenants described below, which shall be calculated using GAAP consistently applied, except as they may be otherwise modified by the following capitalized definitions:

(a)    Minimum Tangible Net Worth.  Company shall maintain its Tangible Net Worth in an amount not less than $6,100,000 at all times determined as of the end of each fiscal quarter.

(b)    Debt Service Coverage Ratio.  Company shall maintain a Debt Service Coverage Ratio determined as of the end of each fiscal quarter described below, in an amount not less than the amount set forth for each such period (numbers appearing between "< >" are negative):

| Period | Debt Service Coverage Ratio |
|---|---|
| Three months ending August 31, 2009 | 1.00 to 1.00 |
| Six months ending November 30, 2009 | 1.00 to 1.00 |
| Nine months ending February 28, 2010 | 1.00 to 1.00 |
| Twelve months ending May 31, 2010 | 1.00 to 1.00 |
| Twelve months ending August 31, 2010 | 1.00 to 1.00 |
| Twelve months ending November 30, 2010 | 1.00 to 1.00 |
| Twelve months ending February 28, 2011 | 1.00 to 1.00 |
| Twelve months ending May 31, 2011 | 1.00 to 1.00 |
| Twelve months ending August 31, | 1.10 to 1.00 |

| Period | Debt Service Coverage Ratio |
|---|---|
| 2011 | |
| End of each fiscal quarter thereafter on a trailing twelve month basis | 1.10 to 1.00 |

(c)    <u>Capital Expenditures</u>.  Company may incur or contract to incur Unfinanced Capital Expenditures (including by the way of capitalized leases), only if such Capital Expenditures do not exceed, in the aggregate, as to Company and its Subsidiaries, on a consolidated basis, $750,000 during each twelve month period of Company commencing June 1 and ending on May 31 of the subsequent year, provided, however, that if the aggregate amount of Capital Expenditures actually made during any such fiscal year (or lesser period, if applicable) shall be less than the limit with respect thereto set forth above (such limit, without giving effect to any increase therein pursuant to this proviso, the "base amount"), then the amount of such short fall (the "rollover amount") may be added to the amount of Capital Expenditures permitted to be made for the immediately succeeding fiscal year; provided further that (i) any Capital Expenditures made during any fiscal year for which any rollover amount shall have been added shall be applied first, to the rollover amount for such year and second, to the base amount added to such fiscal year and (ii) such rollover amount, if any, must be used during the first six months of such fiscal year, it being understood that any portion of such rollover amount that is not so used during such time period shall be forfeited and may not be carried forward for use in any subsequent period.

**5.3    Other Liens and Permitted Liens.**

(a)    <u>Other Liens; Permitted Liens</u>.  Company shall not create, incur or suffer to exist any Lien upon any of its assets, now owned or later acquired, as security for any indebtedness, with the exception of the following (each a "Permitted Lien"; collectively, "Permitted Liens"): (i) In the case of real property, covenants, restrictions, rights, easements and minor irregularities in title which do not materially interfere with Company's business or operations as presently conducted; (ii) Liens in existence on the date of this Agreement that are described in Exhibit F and to secure indebtedness for borrowed money permitted under Section 5.4; (iii) The Security Interest and Liens created by the Security Documents; (iv) Purchase money Liens relating to the acquisition of Equipment not exceeding the lesser of cost or fair market value, not exceeding $1,000,000 in the aggregate at anytime outstanding, and so long as no Default Period is then in existence and none would exist immediately after such acquisition; and (v) Liens subject to a Subordination Agreement in form and substance acceptable to Wells Fargo in its sole discretion.

(b)    <u>Financing Statements</u>.  Except for Permitted Liens, Company shall not authorize the filing of any financing statement by any Person as Secured Party with respect to any of Company's assets, other than Wells Fargo.  Company shall not amend any financing statement filed by Wells Fargo as Secured Party except as permitted by law.

**5.4    Indebtedness.**  Company shall not incur, create, assume or permit to exist any indebtedness or liability on account of deposits or letters of credit issued on Company's behalf, or advances or any indebtedness for borrowed money of any kind, whether or not evidenced by an instrument, <u>except</u>: (a) Indebtedness described in this Agreement; (b)

indebtedness of Company described in Exhibit F; and (c) indebtedness secured by Permitted Liens.

**5.5    Guaranties.** Company shall not assume, guarantee, endorse or otherwise become directly or contingently liable for the obligations of any Person, except: (a) the endorsement of negotiable instruments by Company for deposit or collection or similar transactions in the ordinary course of business; and (b) guaranties, endorsements and other direct or contingent liabilities in connection with the obligations of other Persons in existence on the date of this Agreement and described in Exhibit F.

**5.6    Investments and Subsidiaries.** Company shall not make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any Person or Affiliate, including without limitation any partnership or joint venture, nor purchase or hold beneficially any stock or other securities or evidence of indebtedness of any Person or Affiliate, except:

(a)    Investments in direct obligations of the United States of America or any of its political subdivisions whose obligations constitute the full faith and credit obligations of the United States of America and have a maturity of one year or less, commercial paper issued by U.S. corporations rated "A-1" or "A-2" by Standard & Poor's Ratings Services or "P-1" or "P-2" by Moody's Investors Service or certificates of deposit or bankers' acceptances having a maturity of one year or less issued by members of the Federal Reserve System having deposits in excess of $100,000,000 (which certificates of deposit or bankers' acceptances are fully insured by the Federal Deposit Insurance Corporation);

(b)    Travel advances or loans to Company's Officers and employees, other than in the ordinary course of business.

(c)    Prepaid rent not exceeding two months or security deposits; and

(d)    Current investments in those Subsidiaries in existence on the date of this Agreement which are identified on Exhibit D.

**5.7    Dividends and Distributions.** Except as set forth in this Agreement, Company shall not declare or pay any dividends (other than dividends payable solely in stock of Company) on any class of its stock, or make any payment on account of the purchase, redemption or retirement of any shares of its stock, or other securities or evidence of its indebtedness or make any distribution regarding its stock, either directly or indirectly; provided, however, Company may declare or pay any dividends and distributions in cash with respect to its preferred stock and common stock, in amounts not to exceed, in the aggregate, during each twelve month period, the sum of $500,000 so long as (i) no Default Period is then in existence and none would exist immediately after the making of any proposed dividend or distribution and (ii) after the making of any proposed dividend or distribution and paying all trade payables older than 60 days from invoice date, availability under the Line of Credit is not less than $1,000,000.

**5.8    Reserved.**

**5.9    Key Person Life Insurance.** Company shall maintain insurance upon the life of Joseph Smokovich, its President, which shall have a death benefit in an amount not less than $2,000,000 (the "Life Insurance Policy"). The right to receive the proceeds of the Life Insurance Policy shall be assigned to Wells Fargo by the Life Insurance Assignment.

**5.10    Books and Records; Collateral Examination; Inspection and Appraisals.**

(a)    Books and Records; Inspection.  Company shall keep complete and accurate books and records with respect to the Collateral and Company's business and financial condition and any other matters that Wells Fargo may reasonably request, in accordance with GAAP.  Company shall permit any employee, attorney, accountant or other agent of Wells Fargo to audit, review, make extracts from and copy any of its books and records at any time during ordinary business hours, and to discuss Company's affairs with any of its Directors, Officers, employees, Owners or agents.  Any Confidential Information received by Wells Fargo and its agents shall be subject to the provisions of Section 7.11.

(b)    Authorization to Company's Agents to Make Disclosures to Wells Fargo.  Company authorizes all accountants and other Persons acting as its agent to disclose and deliver to Wells Fargo's employees, accountants, attorneys and other Persons acting as its agent, at Company's expense, all financial information, books and records, work papers, management reports and other information in their possession regarding Company.

(c)    Collateral Exams and Inspections.  Company shall permit Wells Fargo's employees, accountants, attorneys or other Persons acting as its agent, to examine and inspect any Collateral or any other property of Company at any time during ordinary business hours; provided, however, any Confidential Information received by Wells Fargo and its agents shall be subject to the provisions of Section 7.11.

(d)    Collateral Appraisals.  Wells Fargo may also obtain, from time to time, at Company's expense, an appraisal of Company's Inventory and Equipment, by an appraiser acceptable to Wells Fargo in its sole discretion.

**5.11    Account Verification; Payment of Permitted Liens.**

(a)    Account Verification.  Wells Fargo or its agents may (i) contact account debtors and other obligors at any time to verify Company's Accounts; and (ii) require Company to send requests for verification of Accounts or send notices of assignment of Accounts to account debtors and other obligors.

(b)    Covenant to Pay Permitted Liens.  Company shall pay when due each account payable due to any Person holding a Permitted Lien (as a result of such payable) on any Collateral; unless any such amount is being contested in good faith by appropriate proceedings which are sufficient to prevent imminent foreclosure of such Permitted Lien; provided, that Borrower shall immediately pay and satisfy such Permitted Lien in the event there are commenced enforcement proceedings which threaten forfeiture of any Collateral but may after paying and satisfying such Permitted Lien continue to prosecute any contest relating thereto.

**5.12    Compliance with Laws.**

(a)    General Compliance with Applicable Law; Use of Collateral.  Company shall (i) comply, and cause each Subsidiary to comply, with the requirements of applicable laws and regulations, the non-compliance with which would have a Material Adverse Effect on its business or its financial condition and (ii) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without violation of any federal, state or local law, statute or ordinance.

(b)    Compliance with Federal Regulatory Laws.  Company shall (i) prohibit, and cause each Subsidiary to prohibit, any Person that is an Owner or Officer from being listed on the

Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (ii) not permit the proceeds of the Line of Credit or any other financial accommodation extended by Wells Fargo to be used in any way that violates any foreign asset control regulations of OFAC or other applicable law, (iii) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act laws and regulations, as amended from time to time, and (iv) otherwise comply with the USA Patriot Act and Wells Fargo's related policies and procedures.

(c)    <u>Compliance with Environmental Laws</u>.  Company shall (i) comply and cause each Subsidiary to comply, with the requirements of applicable Environmental Laws and obtain and comply with all permits, licenses and similar approvals required by them, and (ii) not generate, use, transport, treat, store or dispose of any Hazardous Substances in such a manner as to create any material liability or obligation under the common law of any jurisdiction or any Environmental Law.

**5.13    Payment of Taxes and Other Claims.**  Company shall pay or discharge, when due, and cause each Subsidiary to pay or discharge, when due, (a) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties belonging to it (including without limitation the Collateral) or upon or against the creation, perfection or continuance of the Security Interest, prior to the date on which penalties attach, (b) all federal, state and local taxes required to be withheld by it, and (c) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any properties of Company, although Company shall not be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which proper reserves have been made.

**5.14    Maintenance of Collateral and Properties.**

(a)    Company shall keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective or broken parts, although Company may discontinue the operation and maintenance of any properties if Company believes that such discontinuance is desirable to the conduct of its business and not disadvantageous in any material respect to Wells Fargo.  Company shall take all commercially reasonable steps necessary to protect and maintain its Intellectual Property Rights.

(b)    Company shall defend the Collateral against all Liens, claims and demands of all third Persons claiming any interest in the Collateral. Company shall keep all Collateral free and clear of all Liens except Permitted Liens. Company shall take all commercially reasonable steps necessary to prosecute any Person Infringing its Intellectual Property Rights and to defend itself against any Person accusing it of Infringing any Person's Intellectual Property Rights.

**5.15    Insurance.**  Company shall at all times maintain insurance with insurers reasonably acceptable to Wells Fargo, in such amounts and on such terms (including deductibles) as Wells Fargo in its reasonable discretion may require and including, as applicable and without limitation, business interruption insurance (including force majeure coverage), hazard coverage on an "all risks" basis for all tangible Collateral, and theft and physical damage coverage for Collateral consisting of motor vehicles.  All insurance policies must contain an appropriate lender's interest endorsement or clause, and name Wells Fargo as an additional insured.

5.16    **Preservation of Existence.** Company shall preserve and maintain its existence and all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct its business in an orderly, efficient and regular manner.

5.17    **Delivery of Instruments, etc.** Upon request by Wells Fargo, Company shall promptly deliver to Wells Fargo in pledge all instruments, documents and chattel paper constituting Collateral, endorsed or assigned by Company.

5.18    **Sale or Transfer of Assets; Suspension of Business Operations.** Company shall not sell, lease, assign, transfer or otherwise dispose of (a) the stock of any Subsidiary, (b) all or a substantial part of its assets, or (c) any Collateral or any interest in Collateral (whether in one transaction or in a series of transactions) to any other Person other than the sale of Inventory in the ordinary course of business and shall not liquidate, dissolve or suspend business operations.  Company shall not transfer any part of its ownership interest in any Intellectual Property Rights and shall not permit its rights as licensee of Licensed Intellectual Property to lapse, except that Company may transfer such rights or permit them to lapse if it has reasonably determined that such Intellectual Property Rights are no longer useful in its business.  If Company transfers any Intellectual Property Rights for value, Company shall pay the Proceeds to Wells Fargo for application to the Indebtedness.  Company shall not license any other Person to use any of Company's Intellectual Property Rights, except that Company may grant licenses in the ordinary course of its business in connection with sales of Inventory or the provision of services to its customers.

5.19    **Consolidation and Merger; Asset Acquisitions.** Company shall not consolidate with or merge into any other entity, or permit any other entity to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all of the assets of any other entity.

5.20    **Sale and Leaseback.** Company shall not enter into any arrangement, directly or indirectly, with any other Person pursuant to which Company shall sell or transfer any real or personal property, whether owned now or acquired in the future, and then rent or lease all or part of such property or any other property which Company intends to use for substantially the same purpose or purposes as the property being sold or transferred.

5.21    **Restrictions on Nature of Business.** Company will not engage in any line of business materially different from that presently engaged in by Company, and will not purchase, lease or otherwise acquire assets not related to its business.

5.22    **Accounting.** Company will not adopt any material change in accounting principles except as required by GAAP, consistently applied.  Company will not change its fiscal year.  Nothing contained in this paragraph shall require the consolidation of Valerie Realty LLC with the Company for reporting purposes.

5.23    **Discounts, etc.** After notice from Wells Fargo given during a Default Period, Company will not, except in the ordinary course of business and in accordance with past practices, grant any discount, credit or allowance to any customer of Company or accept any return of goods sold.  Company will not at any time modify, amend, subordinate, cancel or terminate any Account.

5.24    **Pension Plans.** Except as disclosed to Wells Fargo in a Record prior to the date of this Agreement, neither Company nor any ERISA Affiliate will (a) adopt, create, assume or become party to any Pension Plan, (b) become obligated to contribute to any Multiemployer Plan, (c) incur any obligation to provide post-retirement medical or

20

insurance benefits with respect to employees or former employees (other than benefits required by law) or (d) amend any Plan in a manner that would materially increase its funding obligations.

**5.25**    **Place of Business; Name.**  Company will not transfer its chief executive office or principal place of business, or move, relocate, close or sell any business Premises without providing 30 days prior written notice to Wells Fargo.  Company will not permit any tangible Collateral or any records relating to the Collateral to be located in any state or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Security Interest.  Company will not change its name or jurisdiction of organization without providing 30 days prior written notice to Wells Fargo.

**5.26**    **Constituent Documents; S Corporation Status.**  Company will not amend its Constituent Documents.  Company will not become an S Corporation without the prior written consent of Wells Fargo, which consent shall not be unreasonably withheld.

**5.27**    **Performance by Wells Fargo.**  If Company fails to perform or observe any of its obligations under this Agreement at any time, Wells Fargo may, but need not, perform or observe them on behalf of Company and may, but need not, take any other actions which Wells Fargo may reasonably deem necessary to cure or correct this failure; and Company shall pay Wells Fargo upon demand the amount of all costs and expenses (including reasonable attorneys' fees and legal expense) incurred by Wells Fargo in performing these obligations, together with interest on these amounts at the Default Rate.

**5.28**    **Wells Fargo Appointed as Company's Attorney in Fact.**  To facilitate Wells Fargo's performance or observance of Company's obligations under this Agreement, (a) during a Default Period, Company hereby irrevocably appoints Wells Fargo and Wells Fargo's agents, as Company's attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) to create, prepare, complete, execute, deliver or file on behalf of Company any instruments, documents, assignments, security agreements, financing statements, applications for insurance and any other agreements or any Record required to be obtained, executed or delivered by Company in accordance with the terms of this Agreement and (b) at any time, whether or not a Default Period exists, to endorse checks and other instruments representing proceeds of Collateral.

**6.**    **EVENTS OF DEFAULT AND REMEDIES**

**6.1**    **Events of Default.**  An "Event of Default" means any of the following:

(a)    Company fails to pay any the amount of any Indebtedness on the date that it becomes due and payable, and such failure continues without cure for a period of more than two days after such due date; provided, however, that Company may exercise such right to cure only once in the 365 days period commencing on the closing date, and only once during each subsequent 365 day period, it being understood that any such failure which occurs after such exercise, during any referenced 365 days period, shall not be curable and shall constitute an immediate Event of Default;

(b)    Company fails to observe or perform any covenant or agreement of Company set forth in this Agreement, or in any of the Loan Documents, or in any other document or agreement described in or related to this Agreement or to any Indebtedness, or any covenant in Section 5.2 becomes inapplicable due to the lapse of time, and Company

and Wells Fargo fail to come to an agreement, acceptable to Wells Fargo in its sole discretion, to amend the covenant to apply to future periods;

(c)    An Overadvance arises as the result of any reduction in the Borrowing Base, or arises in any manner or on terms not otherwise approved of in advance by Wells Fargo in a Record that it has Authenticated and if such Overadvance arises solely as a result of Wells Fargo establishing a Borrowing Base Reserve such Overadvance is not eliminated within two (2) days;

(d)    An event of default or termination event (however defined) occurs under any Rate Hedge Agreement, derivative, foreign exchange, or similar transaction or arrangement entered into between Company and Wells Fargo;

(e)    A Change of Control shall occur;

(f)    Company becomes insolvent or admits in a Record an inability to pay debts as they mature, or Company makes an assignment for the benefit of creditors; or Company applies for or consents to the appointment of any receiver, trustee, or similar officer for the benefit of Company, or for any of their properties; or any receiver, trustee or similar officer is appointed without the application or consent of Company that is not dismissed within 60 days (provided, however, Wells Fargo shall have no obligation to grant any Advances during such 60 day period); or any judgment, writ, warrant of attachment or execution or similar process is issued or levied against a substantial part of the property of Company;

(g)    Company files a petition under any chapter of the United States Bankruptcy Code or under the laws of any other jurisdiction naming Company as debtor; or any such petition is instituted against Company that is not dismissed within 60 days (provided, however, Wells Fargo shall have no obligation to grant any Advances during such 60 day period); or Company institutes (by petition, application, answer, consent or otherwise) any bankruptcy, insolvency, reorganization, debt arrangement, dissolution, liquidation or similar proceeding under the laws of any jurisdiction; or any such proceeding is instituted (by petition, application or otherwise) against Company.

(h)    The Life Insurance Policy is terminated; or the Life Insurance Policy is scheduled to terminate and Company fails to deliver a renewal or substitute policy to Wells Fargo within 30 days before the scheduled termination date; or Company fails to pay any premium on the Life Insurance Policy when due; or Company takes any other action that impairs the value of the Life Insurance Policy;

(i)    Any representation or warranty made by Company in this Agreement, or by Company (or any of its Officers) in any agreement, certificate, instrument or financial statement or other statement delivered to Wells Fargo pursuant to this Agreement is untrue or misleading in any material respect when delivered to Wells Fargo;

(j)    A final, non-appealable arbitration award, judgment, or decree or order for the payment of money in an amount in excess of $100,000 which is not insured or subject to indemnity, is entered against Company which is not immediately stayed or appealed within two (2) Business Days after entry;

(k)    Company is in default beyond any applicable grace period with respect to any bond, debenture, note or other evidence of material indebtedness in excess of $100,000 issued by Company that is held by any third Person other than Wells Fargo, or under any instrument under which any such evidence of indebtedness has been issued or by

NJ226,808,752v9

which it is governed, or under any material lease or other contract, and the applicable grace period, if any, has expired;

(l)    Company liquidates, dissolves, terminates or suspends its business operations or otherwise fails to operate its business in the ordinary course, or merges with another Person; or sells or attempts to sell all or substantially all of its assets;

(m)    Company fails to pay any indebtedness or obligation owed to Wells Fargo which is unrelated to the Line of Credit or this Agreement as it becomes due and payable;

(n)    Reserved;

(o)    Company engages in any act prohibited by any Subordination Agreement, or makes any payment on Subordinated Indebtedness (as defined in the Subordination Agreement) that the Subordinated Creditor was not contractually entitled to receive;

(p)    Any event or circumstance occurs that Wells Fargo in good faith believes may impair the prospect of payment of all or part of the Indebtedness, or Company's ability to perform any of its material obligations under any of the Loan Documents, or any other document or agreement described in or related to this Agreement, or there occurs any material adverse change in the business or financial condition of Company.

(q)    Any Director, Officer, or Owner of at least 20% of the issued and outstanding common stock of Company is indicted for a felony offence under state or federal law, or Company hires an Officer or appoints a Director who has been convicted of any such felony offense, or a Person becomes an Owner of at least 20% of the issued and outstanding common stock of Company who has been convicted of any such felony offense.

(r)    Any Reportable Event, which Wells Fargo in good faith believes to constitute sufficient grounds for termination of any Pension Plan or for the appointment of a trustee to administer any Pension Plan, has occurred and is continuing 30 days after Company gives Wells Fargo a Record notifying it of the Reportable Event; or a trustee is appointed by an appropriate court to administer any Pension Plan; or the Pension Benefit Guaranty Corporation institutes proceedings to terminate or appoint a trustee to administer any Pension Plan; or Company or any ERISA Affiliate files for a distress termination of any Pension Plan under Title IV of ERISA; or Company or any ERISA Affiliate fails to make any quarterly Pension Plan contribution required under Section 412(m) of the IRC, which Wells Fargo in good faith believes may, either by itself or in combination with other failures, result in the imposition of a Lien on Company's assets in favor of the Pension Plan; or any withdrawal, partial withdrawal, reorganization or other event occurs with respect to a Multiemployer Plan which could reasonably be expected to result in a material liability by Company to the Multiemployer Plan under Title IV of ERISA.

**6.2    Rights and Remedies.**  During any Default Period, Wells Fargo may in its discretion exercise any or all of the following rights and remedies:

(a)    Wells Fargo may terminate the Line of Credit and decline to make Advances, and terminate any services extended to Company under the Master Agreement for Treasury Management Services;

(b)    Wells Fargo may declare the Indebtedness to be immediately due and payable and accelerate payment of the Revolving Note, and all Indebtedness shall immediately become due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which Company hereby expressly waives;

(c)    Wells Fargo may, without notice to Company, apply any money owing by Wells Fargo to Company to payment of the Indebtedness;

(d)    Wells Fargo may exercise and enforce any rights and remedies available upon default to a secured party under the UCC, including the right to take possession of Collateral (without posting a bond or other form of security, which Company hereby waives), to proceed with or without judicial process (without a prior hearing or notice of hearing, which Company hereby waives) and to sell, lease or otherwise dispose of Collateral for cash or on credit (with or without giving warranties as to condition, fitness, merchantability or title to Collateral, and in the event of a credit sale, Indebtedness shall be reduced only to the extent that payments are actually received), and Company will upon Wells Fargo's demand assemble the Collateral and make it available to Wells Fargo at any place designated by Wells Fargo which is reasonably convenient to both parties;

(e)    Wells Fargo may exercise and enforce its rights and remedies under any of the Loan Documents and any other document or agreement described in or related to this Agreement;

(f)    Company will pay Wells Fargo upon demand in immediately available funds an amount equal to the Aggregate Face Amount plus any anticipated costs and fees for deposit to the Special Account pursuant to Section 1.10;

(g)    Wells Fargo may for any reason apply for the appointment of a receiver of the Collateral (to which appointment Company hereby consents) without the necessity of posting a bond or other form of security (which Company hereby waives); and

(h)    Wells Fargo may exercise any other rights and remedies available to it by law or agreement.

**6.3    Immediate Default and Acceleration.**  Following the occurrence of an Event of Default described in Section 6.1(f) or (g), the Line of Credit shall immediately terminate and all of Company's Indebtedness shall immediately become due and payable without presentment, demand, protest or notice of any kind.

**7.    MISCELLANEOUS**

**7.1    No Waiver; Cumulative Remedies.**  No delay or any single or partial exercise by Wells Fargo of any right, power or remedy under the Loan Documents, or under any other document or agreement described in or related to this Agreement, shall constitute a waiver of any other right, power or remedy under the Loan Documents or granted by Company to Wells Fargo under other agreements or documents that are unrelated to the Loan Documents.  No notice to or demand on Company in any circumstance shall entitle Company to any additional notice or demand in any other circumstances.  The remedies provided in the Loan Documents or in any other document or agreement described in or related to this Agreement are cumulative and not exclusive of any remedies provided by law.  Wells Fargo may comply with applicable law in connection with a disposition of Collateral, and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

**7.2    Amendment; Consents and Waivers; Authentication.**  No amendment or modification of any Loan Documents, or any other document or agreement described in or related to this Agreement, or consent to or waiver of any Event of Default, or consent to or waiver of the application of any covenant or representation set forth in any of the Loan

24

Documents, or any other document or agreement described in or related to this Agreement, or any release of Wells Fargo's Security Interest in any Collateral, shall be effective <u>unless</u> it has been agreed to by Wells Fargo and memorialized in a Record that: (a) specifically states that it is intended to amend or modify specific Loan Documents, or any other document or agreement described in or related to this Agreement, or waive any Event of Default or the application of any covenant or representation of any terms of specific Loan Documents, or any other document or agreement described in or related to this Agreement, or is intended to release Wells Fargo's Security Interest in specific Collateral; and (b) is Authenticated by the signature of an authorized employee of both parties, or by an authorized employee of Wells Fargo with respect to a consent or waiver. The terms of an amendment, consent or waiver memorialized in any Record shall be effective only to the extent, and in the specific instance, and for the limited purpose to which Wells Fargo has agreed.

**7.3** **Execution in Counterparts; Delivery of Counterparts.** This Agreement and all other Loan Documents, or any other document or agreement described in or related to this Agreement, and any amendment or modification to them may be Authenticated by the parties in any number of counterparts, each of which, once authenticated and delivered in accordance with the terms of this Section 7.3, will be deemed an original, and all such counterparts, taken together, shall constitute one and the same instrument. Delivery by fax or by encrypted e-mail or e-mail file attachment of any counterpart to any Loan Document Authenticated by an authorized signature will be deemed the equivalent of the delivery of the original Authenticated instrument. Company shall send the original Authenticated counterpart to Wells Fargo by first class U.S. mail or by overnight courier, but Company's failure to deliver a Record in this form shall not affect the validity, enforceability, and binding effect of this Agreement or the other Loan Documents, or any other document or agreement described in or related to this Agreement.

**7.4** **Notices, Requests, and Communications; Confidentiality.** Except as otherwise expressly provided in this Agreement:

(a) <u>Delivery of Notices, Requests and Communications</u>. Any notice, request, demand, or other communication by either party that is required under the Loan Documents, or any other document or agreement described in or related to this Agreement, to be in the form of a Record (but excluding any Record containing information Company must report to Wells Fargo under Section 5.1) may be delivered (i) in person, (ii) by first class U.S. mail, (iii) by overnight courier of national reputation, or (iv) by fax, or the Record may be sent as an Electronic Record and delivered (v) by an encrypted e-mail, or (vi) through Wells Fargo's *Commercial Electronic Office®* ("*CEO®*") portal or other secure electronic channel to which the parties have agreed.

(b) <u>Addresses for Delivery</u>. Delivery of any Record under this Section 7.4 shall be made to the appropriate address set forth on the last page of this Agreement (which either party may modify by a Record sent to the other party), or through Wells Fargo's *CEO* portal or other secure electronic channel to which the parties have agreed.

(c) <u>Date of Receipt</u>. Each Record sent pursuant to the terms of this Section 7.4 will be deemed to have been received on (i) the date of delivery if delivered in person, (ii) the date deposited in the mail if sent by mail, (iii) the date delivered to the courier if sent by overnight courier, (iv) the date of transmission if sent by fax, or (v) the date of transmission, if sent as an Electronic Record by electronic mail or through Wells Fargo's *CEO* portal or similar secure electronic channel to which the parties have agreed; <u>except</u> that any request for an Advance or any other notice, request, demand or other

communication from Company required under Section 1, and any request for an accounting under Section 9-210 of the UCC, will not be deemed to have been received until actual receipt by Wells Fargo on a Business Day by an authorized employee of Wells Fargo.

(d)     Confidentiality of Unencrypted E-mail.  Company acknowledges that if it sends an Electronic Record to Wells Fargo without encryption by e-mail or as an e-mail file attachment, there is a risk that the Electronic Record may be received by unauthorized Persons, and that by so doing it will be deemed to have accepted this risk and the consequences of any such unauthorized disclosure.

**7.5     Company Information Reporting; Confidentiality.**  Except as otherwise expressly provided in this Agreement:

(a)     Delivery of Company Information Records.  Any information that Company is required to deliver under Section 5.1 in the form of a Record may be delivered to Wells Fargo (i) in person, or by (ii) first class U.S. mail, (iii) overnight courier of national reputation, or (iv) fax, or the Record may be sent as an Electronic Record (v) by encrypted e-mail, or (vi) through the file upload service of Wells Fargo's *CEO* portal or other secure electronic channel to which the parties have agreed.

(b)     Addresses for Delivery.  Delivery of any Record to Wells Fargo under this Section 7.5 shall be made to the appropriate address set forth on the last page of this Agreement (which Wells Fargo may modify by a Record sent to Company), or through Wells Fargo's *CEO* portal or other secure electronic channel to which the parties have agreed.

(c)     Date of Receipt.  Each Record sent pursuant to this Section will be deemed to have been received on (i) the date of delivery to an authorized employee of Wells Fargo, if delivered in person, or by U.S. mail, overnight courier, fax, or e-mail; or (ii) the date of transmission, if sent as an Electronic Record through Wells Fargo's *CEO* portal or similar secure electronic channel to which the parties have agreed.

(d)     Authentication of Company Information Records.  Company shall Authenticate any Record delivered (i) in person, or by U.S. mail, overnight courier, or fax, by the signature of the Officer or employee of Company who prepared the Record; (ii) as an Electronic Record sent via encrypted e-mail, by the signature of the Officer or employee of Company who prepared the Record by any file format signature that is acceptable to Wells Fargo, or by a separate certification signed and sent by fax; or (iii) as an Electronic Record via the file upload service of Wells Fargo's *CEO* portal or similar secure electronic channel to which the parties have agreed, through such credentialing process as Wells Fargo and Company may agree to under the *CEO* agreement.

(e)     Certification of Company Information Records.  Any Record (including without limitation any Electronic Record) Authenticated and delivered to Wells Fargo under this Section 7.5 will be deemed to have been certified as materially true, correct, and complete by Company and each Officer or employee of Company who prepared and Authenticated the Record on behalf of Company, and may be legally relied upon by Wells Fargo without regard to method of delivery or transmission.

(f)     Confidentiality of Company Information Records Sent by Unencrypted E-mail.  Company acknowledges that if it sends an Electronic Record to Wells Fargo without encryption by e-mail or as an e-mail file attachment, there is a risk that the Electronic Record may be received by unauthorized Persons, and that by so doing it will be deemed to have accepted this risk and the consequences of any such unauthorized disclosure.

26

Company acknowledges that it may deliver Electronic Records containing Company information to Wells Fargo by e-mail pursuant to any encryption tool acceptable to Wells Fargo and Company, or through Wells Fargo's *CEO* portal file upload service without risk of unauthorized disclosure.

7.6     **Further Documents.**  Company will from time to time execute, deliver, endorse and authorize the filing of any instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements that Wells Fargo may reasonably request in order to secure, protect, perfect or enforce the Security Interest or Wells Fargo's rights under the Loan Documents, or any other document or agreement described in or related to this Agreement (but any failure to request or assure that Company executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents, or any other document or agreement described in or related to this Agreement, and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

7.7     **Costs and Expenses.**  Company shall pay on demand all costs and expenses, including without limitation reasonable attorneys' fees, incurred by Wells Fargo in connection with the Indebtedness, this Agreement, the Loan Documents, or any other document or agreement described in or related to this Agreement, and the transactions contemplated by this Agreement, including without limitation all such costs, expenses and fees incurred in connection with the negotiation, preparation, execution, delivery, amendment, administration, performance, collection and enforcement of the Indebtedness and all such documents and agreements and the creation, perfection, protection, satisfaction, foreclosure or enforcement of the Security Interest.

7.8     **Indemnity.**  In addition to its obligation to pay Wells Fargo's expenses under the terms of this Agreement, Company shall indemnify, defend and hold harmless Wells Fargo, its parent Wells Fargo & Company, and any of its affiliates and successors, and all of their present and future Officers, Directors, employees, attorneys and agents (each an "Indemnitee") from and against any of the following (collectively, "Indemnified Liabilities"):

(a)     Any and all transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of the Loan Documents, or any other document or agreement described in or related to this Agreement or the making of the Advances;

(b)     Any claims, loss or damage to which any Indemnitee may be subjected if any representation or warranty contained in Exhibit D proves to be incorrect in any respect or as a result of any violation of the covenants contained in Section 5.12; and

(c)     Any and all other liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including without limitation the reasonable fees and disbursements of counsel) in connection with this Agreement and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party to such proceedings, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to or arising out of or in connection with the making of the Advances and the Loan Documents, or any other document or agreement described in or related to this Agreement, or the use or intended use of the proceeds of the Advances, with the exception of any Indemnified Liability caused by the gross negligence or willful misconduct of an Indemnitee.

27

If any investigative, judicial or administrative proceeding described in this Section is brought against any Indemnitee, upon the Indemnitee's request, Company, or counsel designated by Company and satisfactory to the Indemnitee, will resist and defend the action, suit or proceeding to the extent and in the manner directed by the Indemnitee, at Company's sole cost and expense.  Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding.  If this agreement to indemnify is held to be unenforceable because it violates any law or public policy, Company shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities to the extent permissible under applicable law.  Company's obligations under this Section shall survive the termination of this Agreement and the discharge of Company's other obligations under this Agreement.

**7.9**   **Retention of Company's Records.**  Wells Fargo shall have no obligation to maintain Electronic Records or retain any documents, schedules, invoices, agings, or other Records delivered to Wells Fargo by Company in connection with the Loan Documents, or any other document or agreement described in or related to this Agreement for more than 30 days after receipt by Wells Fargo.  If there is a special need to retain specific Records, Company must notify Wells Fargo of its need to retain or return such Records with particularity, which notice must be delivered to Wells Fargo in accordance with the terms of this Agreement at the time of the initial delivery of the Record to Wells Fargo.

**7.10**   **Binding Effect; Assignment; Complete Agreement.**  The Loan Documents, or any other document or agreement described in or related to this Agreement, shall be binding upon and inure to the benefit of Company and Wells Fargo and their respective successors and assigns, except that Company shall not have the right to assign its rights under this Agreement or any interest in this Agreement without Wells Fargo's prior consent, which must be confirmed in a Record Authenticated by Wells Fargo. To the extent permitted by law, Company waives and will not assert against any assignee any claims, defenses or set-offs which Company could assert against Wells Fargo. This Agreement shall also bind all Persons who become a party to this Agreement as a borrower.  This Agreement, together with the Loan Documents, or any other document or agreement described in or related to this Agreement, comprises the complete and integrated agreement of the parties on the subject matter of this Agreement and supersedes all prior agreements, whether oral or evidenced in a Record.  To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents other than this Agreement, or any other document or agreement described in or related to this Agreement, this Agreement shall control.

**7.11**   **Sharing of Information.**  Wells Fargo may share any Confidential Information that it may have regarding Company and its Affiliates with its accountants, lawyers, and other advisors, and with each business unit and line of business within Wells Fargo and each direct and indirect subsidiary of Wells Fargo & Company.

**7.12**   **Severability of Provisions.**  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining terms of this Agreement.

**7.13**   **Headings.**  Section and subsection headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**7.14**   **Definitional Terms and Rules of Interpretation.**  All accounting terms not otherwise defined in this Agreement shall have the meanings given them in accordance with GAAP.  Unless the context clearly requires otherwise, the word "or" has the inclusive

28

meaning represented by the phrase "and/or".  Reference to any agreement (including without limitation the Loan Documents), document or instrument means the agreement, document or instrument as amended or supplemented, subject to any restrictions on amendment contained therein (and, if applicable, in accordance with the terms of this Agreement and the other Loan Documents).  Unless otherwise specified, any reference to a statute or regulation means that statute or regulation as amended or supplemented from time to time, and any corresponding provisions of successor statutes or regulations.

7.15    **Governing Law; Jurisdiction, Venue; Waiver of Jury Trial**.  The Loan Documents (other than real estate related documents, if any) shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of New York. The parties to this Agreement (a) consent to the personal jurisdiction of the state and federal courts located in the State of New York in connection with any controversy related to this Agreement; (b) waive any argument that venue in any such forum is not convenient; (c) agree that any litigation initiated by Wells Fargo or Company in connection with this Agreement or the other Loan Documents may be venued in either the state or federal courts located in the City of New York, County of New York, State of New York, and (d) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

NJ226,808,752v9

COMPANY AND WELLS FARGO WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION AT LAW OR IN EQUITY OR IN ANY OTHER PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.

**COMPANY AND WELLS FARGO** have executed this Agreement through their authorized officers as of the date set forth above.

**WELLS FARGO BANK,**
**  NATIONAL ASSOCIATION**


By: _____
Robert Kruger, Vice President


**HI-TEMP SPECIALTY METALS, INC.**


By: _____
Joseph Smokovich, President


**Wells Fargo Bank, National Association**
119 West 40th Street
16th Floor
New York, New York 10018-2500
Fax:  (646) 728-3239
Attention: Relationship Manager for Hi-Temp Specialty Metals, Inc.
e-mail: Robert.Kruger@wellsfargo.com

**HI-TEMP SPECIALTY METALS, INC.**
100 Country Road 101
Yaphank, New York
Fax:  (631) 775-8748
Attention: Joseph Smokovich, President
e-mail:  joesmokov@aol.com

Federal Employer Identification No.
22-3696285


Organizational Identification No.
_3138587_____

**COMPANY AND WELLS FARGO WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION AT LAW OR IN EQUITY OR IN ANY OTHER PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT**

**COMPANY AND WELLS FARGO** have executed this Agreement through their authorized officers as of the date set forth above.

**WELLS FARGO BANK,**
**NATIONAL ASSOCIATION**                        **HI-TEMP SPECIALTY METALS, INC.**

By: _____              By: _____
    Robert Kruger, Vice President                    Joseph Smokovich, President


**Wells Fargo Bank, National Association**      **HI-TEMP SPECIALTY METALS, INC.**
119 West 40th Street                             100 Country Road 101
16th Floor                                       Yaphank, New York
New York, New York 10018-2500                    Fax:  (631) 775-8750
Fax:  (646) 728-3239                             Attention: Joseph Smokovich, President
Attention: Relationship Manager for Hi-Temp      e-mall: joesmokov@aol.com
Specialty Metals, Inc.                           Federal Employer Identification No.
e-mail: Robert.Kruger@wellsfargo.com             22-3696285
                                                 Organizational Identification No.
                                                 _____



# AMENDED AND RESTATED REVOLVING NOTE

$18,500,000                                                                July 16, 2010

    **FOR VALUE RECEIVED**, the undersigned, Hi-Temp Specialty Metals, Inc., a Delaware corporation (the "Company"), hereby promises to pay to the order of WELLS FARGO BANK, NATIONAL ASSOCIATION ("Wells Fargo"), acting through its WELLS FARGO BUSINESS CREDIT operating division, on the Termination Date described in the Amended and Restated Credit and Security Agreement dated July 16, 2010 (as amended from time to time, the "Agreement") and entered into between Wells Fargo and Company, at Wells Fargo's office at 119 West 40th Street, 16th Floor, New York, New York 10018-2500 or at any other place designated at any time by the holder, in lawful money of the United States of America and in immediately available funds, the principal sum of Eighteen Million Five Hundred Thousand Dollars ($18,500,000) or the aggregate unpaid principal amount of all Advances under the Line of Credit made by Wells Fargo to Company under the terms of the Agreement, together with interest on the principal amount computed on the basis of actual days elapsed in a 360-day year, from the date of this Revolving Note until this Revolving Note is fully paid at the rate from time to time in effect under the terms of the Agreement. Principal and interest accruing on the unpaid principal balance amount of this Revolving Note shall be due and payable as provided in the Agreement. This Revolving Note may be prepaid only in accordance with the Agreement.

    This Revolving Note is given in renewal of and replacement for that certain Amended and Restated Revolving Note dated as of September 19, 2008 and is the Revolving Note referred to in the Agreement, and is subject to the terms of the Agreement, which provides, among other things, for the acceleration of this Revolving Note. This Revolving Note is secured, among other things, by the Agreement and the Security Documents as defined in the Agreement, and by any other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements that may subsequently be given for good and valuable consideration as security for this Revolving Note.

    Company shall pay all costs of collection, including without limitation reasonable attorneys' fees and legal expenses, if this Revolving Note is not paid when due, whether or not legal proceedings are commenced.

    Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

[Signature Page Follows]

HI-TEMP SPECIALTY METALS, INC.

By: _____

Name: Joseph Smokovich

Title: President

**Exhibit A to Credit and Security Agreement**

## DEFINITIONS

"Account Funds" is defined in Section 1.6(a).

"Accounts" shall have the meaning given it under the UCC.

"Advance" and "Advances" means an advance or advances under the Line of Credit.

"Affiliate" or "Affiliates" means any Person controlled by, controlling or under common control with Company, including without limitation any Subsidiary of Company. For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Aggregate Face Amount" means the aggregate amount that may then be drawn under each outstanding Letter of Credit, assuming compliance with all conditions for drawing.

"Agreement" means this Credit and Security Agreement.

"Authenticated" means (a) to have signed; or (b) to have executed or to have otherwise adopted a symbol, or have encrypted or similarly processed a Record in whole or in part, with the present intent of the authenticating Person to identify the Person and adopt or accept a Record.

"Book Net Worth" means the aggregate of the Owners' equity in Company, determined in accordance with GAAP.

"Borrowing Base" is defined in Section 1.2(a).

"Borrowing Base Reserve" means, as of any date of determination, an amount or a percent of a specified category or item that Wells Fargo establishes in its sole discretion from time to time to reduce availability under the Borrowing Base (a) to reflect events, conditions, contingencies or risks which affect the assets, business or prospects of Company, or the Collateral or its value, or the enforceability, perfection or priority of Wells Fargo's Security Interest in the Collateral, as the term "Collateral" is defined in this Agreement, or (b) to reflect Wells Fargo's judgment that any collateral report or financial information relating to Company and furnished to Wells Fargo may be incomplete, inaccurate or misleading in any material respect.

"Business Day" means a day on which the Federal Reserve Bank of New York is open for business.

"Capital Expenditures" means for a period, any expenditure of money during such period for the purchase or construction of assets, or for improvements or additions to such assets, which are capitalized on Company's balance sheet.

"CEO" is defined in Section 7.4(a).

"Change of Control" means the occurrence of any of the following events:

(a)     Parent shall cease to own and control, beneficially and of record, all of the issued and outstanding shares of common stock of Company.

(b)     Joseph Smokovich, or any Person or "group" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934) owned or controlled by Joseph Smokovich, shall cease to own and control, beneficially and of record, at least thirty percent (30%) of the issued and outstanding shares of common stock of Parent.

(c)     Fifty-one percent (51%) or more of the shares of common stock of the Parent are or become subject to a Lien, security interest, charge or encumbrance, howsoever created or arising.

(d)     During any consecutive two-year period, individuals who at the beginning of such period constituted the board of Directors of Company (together with any new Directors whose election to such board of Directors, or whose nomination for election by the Owners of Company, was approved by a vote of two thirds of the Directors then still in office who were either Directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the board of Directors of Company then in office.

(e)     Joseph Smokovich shall cease to actively manage the Company's day-to-day business activities.

"Collateral" means all of Company's Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Equipment, General Intangibles, goods, instruments, Inventory, Investment Property, letter-of-credit rights, letters of credit, all sums on deposit in any Collection Account, and any items in any lockbox; together with (a) all substitutions and replacements for and products of such property; (b) in the case of all goods, all accessions; (c) all accessories, attachments, parts, Equipment and repairs now or subsequently attached or affixed to or used in connection with any goods; (d) all warehouse receipts, bills of lading and other documents of title that cover such goods now or in the future; (e) all collateral subject to the Lien of any of the Security Documents; (f) any money, or other assets of Company that come into the possession, custody, or control of Wells Fargo now or in the future; (g) Proceeds of any of the above Collateral; (h) books and records of Company, including without limitation all mail or e-mail addressed to Company; and (i) all of the above Collateral, whether now owned or existing or acquired now or in the future or in which Company has rights now or in the future.

"Collection Account" means "Collection Account" as defined in the Master Agreement for Treasury Management Services and related Collection Account Service Description, whichever is applicable.

"Compliance Certificate" is defined in Section 5.1(a) and is in the form of Exhibit E.

"Commercial Letter of Credit Agreement" means an agreement governing the issuance of documentary letters of credit entered into between Company as applicant and Wells Fargo as issuer.

"Confidential Information" means all non-public, confidential or proprietary information of Company that is disclosed to Wells Fargo prior to or during the term of this Agreement by

Company or any of its officers, employees, agents or representatives, and includes, without limitation, any trade secrets, research and development test results, marketing or business plans, strategies, forecasts, budgets, projections, customer and supplier information, and any other analyses, computations or studies prepared by or for Company.

"Consignment Letter" means a letter agreement between Company and a customer that purchases Inventory on a consignment basis, such agreement to be substantially in the form of Exhibit G attached hereto.

"Constituent Documents" means with respect to any Person, as applicable, that Person's certificate of incorporation, articles of incorporation, by-laws, certificate of formation, articles of organization, limited liability company agreement, management agreement, operating agreement, shareholder agreement, partnership agreement or similar document or agreement governing such Person's existence, organization or management or concerning disposition of ownership interests of such Person or voting rights among such Person's owners.

"Current Maturities of Long Term Debt" means, during a period beginning and ending on designated dates, the amount of Company's long-term debt and capitalized leases which become due during that period.

"Daily Three Month LIBOR" means, for any day, the rate of interest equal to LIBOR then in effect for delivery for a three (3) month period. When interest is determined in relation to Daily Three Month LIBOR, each change in the interest rate shall become effective each Business Day that Wells Fargo determines that Daily Three Month LIBOR has changed.

"Debt" means of a Person as of a given date, all items of indebtedness or liability which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of a balance sheet for such Person and shall also include the aggregate payments required to be made by such Person at any time under any lease that is considered a capitalized lease under GAAP.

"Debt Service Coverage Ratio" means (a) the sum of (i) Funds from Operations and (ii) Interest Expense minus the sum of (iii) Unfinanced Capital Expenditures and (iv) distributions and dividends divided by (b) the sum of (i) Current Maturities of Long Term Debt and (ii) Interest Expense.

"Default Period" is defined in Section 1.7(c).

"Default Rate" is defined in Section 1.7(c).

"Dilution" means, as of any date of determination, a percentage, based upon the prior six (6) months, which is the result of dividing (a) actual bad debt write-downs, discounts, advertising allowances, credits, and any other items with respect to the Accounts determined to be dilutive by Wells Fargo in its sole discretion during this period, by (b) Company's net sales during such period (excluding extraordinary items) plus the amount of clause (a).

"Director" means a director if Company is a corporation, or a governor or manager if Company is a limited liability company.

"Earnings Before Taxes" means pretax earnings from operations, excluding extraordinary gains, but including extraordinary losses.

"Electronic Record" means a Record that is created, generated, sent, communicated, received, or stored by electronic means, but does not include any Record that is sent, communicated, or received by fax.

"Eligible Accounts" means all unpaid Accounts of Company arising from the sale or lease of goods or the performance of services, net of any credits, but excluding any Accounts having any of the following characteristics:

(a)    That portion of Accounts unpaid for more than 60 days after the original due date shown on the invoice or more than 120 days after the original invoice date shown on the invoice;

(b)    That portion of Accounts related to goods or services with respect to which Company has received notice of a claim or dispute, which are subject to a claim of offset or a contra account, or which reflect a reasonable reserve for warranty claims or returns;

(c)    That portion of Accounts not yet earned by the final delivery of goods or that portion of Accounts not yet earned by the final rendition of services by Company to the account debtor, including with respect to both goods and services, progress billings, and that portion of Accounts for which an invoice has not been sent to the applicable account debtor;

(d)    Accounts constituting (i) Proceeds of copyrightable material unless such copyrightable material shall have been registered with the United States Copyright Office, or (ii) Proceeds of patentable inventions unless such patentable inventions have been registered with the United States Patent and Trademark Office;

(e)    Accounts owed by any unit of government, whether foreign or domestic (except that there shall be included in Eligible Accounts that portion of Accounts owed by such units of government for which Company has provided evidence satisfactory to Wells Fargo that (i) Wells Fargo's Security Interest constitutes a perfected first priority Lien in such Accounts, and (ii) such Accounts may be enforced by Wells Fargo directly against such unit of government under all applicable laws);

(f)    Accounts denominated in any currency other than United States Dollars;

(g)    Accounts owed by an account debtor located outside the United States which are not (i) backed by a bank letter of credit naming Wells Fargo as beneficiary or assigned to Wells Fargo, in Wells Fargo's possession or control, and with respect to which a control agreement concerning the letter-of-credit rights is in effect, and acceptable to Wells Fargo in all respects, in its sole discretion, or (ii) covered by a foreign receivables insurance policy acceptable to Wells Fargo in its sole discretion;

(h)    Accounts owed by an account debtor who is insolvent or is the subject of bankruptcy proceedings or who has gone out of business;

(i)    Accounts owed by an Owner, Subsidiary, Affiliate, Officer or employee of Company;

(j)    Accounts not subject to the Security Interest or which are subject to any Lien in favor of any Person other than Wells Fargo;

(k)     That portion of Accounts that has been restructured, extended, amended or modified;

(l)     That portion of Accounts that constitutes advertising, finance charges, service charges or sales or excise taxes;

(m)     Accounts owed by an account debtor (other than Thyssen Krupp VDM), regardless of whether otherwise eligible, to the extent that the aggregate balance of such Accounts exceeds 25% of the aggregate amount of all Accounts; Accounts owed by Thyssen Krupp VDM, regardless of whether otherwise eligible, to the extent that the aggregate balance of such Accounts exceeds 30% of the aggregate amount of all Accounts;

(n)     Accounts owed by an account debtor, regardless of whether otherwise eligible, if 50% or more of the total amount of Accounts due from such debtor is ineligible under clauses (a), (b), or (k) above; and

(o)     Accounts, or portions of Accounts, otherwise deemed ineligible by Wells Fargo in its sole discretion.

"Eligible Consigned Inventory" means Eligible Inventory which is sold on a consignment basis to a customer of the Company located within the continental United States, provided such customer has signed and delivered to Wells Fargo a Consignment Letter, a precautionary UCC-1 financing statement has been filed against such customer naming Company as assignor secured party and Wells Fargo as assignee secured party, and such other documents in form and substance as shall be reasonably acceptable to Wells Fargo in its sole discretion.

"Eligible In-Transit Inventory" means Inventory of Company that would constitute Eligible Inventory but for the fact that it is in-transit.  In general, Wells Fargo will deem in-transit Inventory to be Eligible In-Transit Inventory if:

      (i)     it has been in-transit for less than forty-five (45) days after its first having been loaded on board the cargo vessel;

      (ii)     Company has provided Wells Fargo with (1) proof, in form and substance acceptable to Wells Fargo, that the original bona fide bill of lading is in negotiable form and such bills of lading have been consigned to Wells Fargo or are in Wells Fargo's possession or control, (2) copies of invoices and packaging slips and (3) such other information as Wells Fargo may request from time to time; and

      (iii)     Wells Fargo, the Company and the broker or other agent handling any such in-transit Inventory are parties to an agreement, in form and substance acceptable to Wells Fargo with respect to such in-transit Inventory and confirming, among other things, that Wells Fargo's security interest thereon is first in priority.

"Eligible Inventory" means all Inventory of Company, valued at the lower of cost or market in accordance with GAAP; but excluding any such Inventory that would otherwise qualify as Eligible In-Transit Inventory and Inventory having any of the following characteristics:

(a)     Inventory that is: in-transit (unless such in-transit Inventory is Eligible In-Transit Inventory); located at any warehouse, job site or other premises not approved by Wells Fargo in an Authenticated Record delivered to Company; not subject to a perfected first priority Lien in Wells Fargo's favor; subject to any Lien or encumbrance that is

subordinate to Wells Fargo's first priority Lien; covered by any negotiable or non-negotiable warehouse receipt, bill of lading or other document of title; on consignment from any consignor; or on consignment to any consignee or subject to any bailment unless such Inventory is Eligible Consigned Inventory;

(b)     Supplies, packaging, maintenance parts or sample Inventory, or customer supplied parts or Inventory;

(c)     Work-in-process Inventory;

(d)     Inventory that is damaged, defective, obsolete, slow moving or not currently saleable in the normal course of Company's operations, or the amount of such Inventory that has been reduced by shrinkage;

(e)     Inventory that Company has returned, has attempted to return, is in the process of returning or intends to return to the vendor of the Inventory;

(f)     Inventory that is perishable or live;

(g)     Inventory manufactured by Company pursuant to a license unless the applicable licensor has agreed in a Record that has been Authenticated by licensor to permit Wells Fargo to exercise its rights and remedies against such Inventory;

(h)     Inventory that is subject to a Lien in favor of any Person other than Wells Fargo;

(i)     Inventory stored at locations holding less than 10% of the aggregate value of Company's Inventory; and

(j)     Inventory otherwise deemed ineligible by Wells Fargo in its sole discretion.

"Environmental Law" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

"Equipment" shall have the meaning given it under the Uniform Commercial Code in effect in the state whose laws govern this Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is a member of a group which includes Company and which is treated as a single employer under Section 414 of the IRC.

"Event of Default" is defined in Section 6.1.

"Floating Rate" is defined in Section 1.7(a).

"Floating Rate Advance" is defined in Section 1.3(a).

"Funds from Operations" means for a given period, the sum of (a) Net Income, (b) depreciation and amortization, (c) any increase (or decrease) in deferred income taxes, (d) any increase (or

decrease) in lifo reserves, and (e) other non-cash items, each as determined for such period in accordance with GAAP.

"GAAP" means generally accepted accounting principles, applied on a basis consistent with the accounting practices applied in the financial statements described on Exhibit D.

"General Intangibles" shall have the meaning given it under the UCC.

"Hazardous Substances" means pollutants, contaminants, hazardous substances, hazardous wastes, or petroleum, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law.

"Indebtedness" is used in its most comprehensive sense and means any debts, obligations and liabilities of Company to Wells Fargo, whether incurred in the past, present or future, whether voluntary or involuntary, and however arising, and whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and including without limitation all obligations arising under any Rate Hedge Agreement, derivative, foreign exchange, deposit, treasury management or similar transaction or arrangement however described or defined that Company may enter into at any time with Wells Fargo or with Wells Fargo Merchant Services, L.L.C., whether or not Company may be liable individually or jointly with others, or whether recovery upon such Indebtedness may subsequently become unenforceable.

"Indemnified Liabilities" is defined in Section 7.8.

"Indemnitee" is defined in Section 7.8.

"Infringement" or "Infringing" when used with respect to Intellectual Property Rights means any infringement or other violation of Intellectual Property Rights.

"Intellectual Property Rights" means all actual or prospective rights arising in connection with any intellectual property or other proprietary rights, including without limitation all rights arising in connection with copyrights, patents, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

"Interest Expense" means for a fiscal year-to-date period, Company's total gross interest expense during such period (excluding interest income), and shall in any event include (a) interest expensed (whether or not paid) on all Debt, (b) the amortization of debt discounts, (c) the amortization of all fees payable in connection with the incurrence of Debt to the extent included in interest expense, and (d) the portion of any capitalized lease obligation allocable to interest expense.

"Interest Payment Date" is defined in Section 1.9(a).

"Inventory" shall have the meaning given it under the UCC.

"Investment Property" shall have the meaning given it under the UCC.

"L/C Amount" means the sum of (a) the Aggregate Face Amount of any outstanding Letters of Credit, plus (b) the amount of each Obligation of Reimbursement that either remains unreimbursed or has not been paid through an Advance on the Line of Credit.

NJ226,808,752v9

"L/C Application" means an application for the issuance of standby or documentary Letters of Credit pursuant to the terms of a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, in form acceptable to Wells Fargo.

"Letter of Credit" and "Letters of Credit" are each defined in Section 1.11(a).

"Licensed Intellectual Property" is defined in Exhibit D.

"LIBOR" means the rate per annum (rounded upward, if necessary, to the nearest whole $1/8^{th}$ of one percent (1%)) determined pursuant to the following formula:

$$LIBOR = \frac{Base\ LIBOR}{100\% - LIBOR\ Reserve\ Percentage}$$

(a)     "Base LIBOR" means the rate per annum for United States dollar deposits quoted by Wells Fargo for the purpose of calculating the effective Floating Rate for loans that reference Daily Three Month LIBOR as the Inter-Bank Market Offered Rate in effect from time to time for three (3) month delivery of funds in amounts approximately equal to the principal amount of such loans. Company understands and agrees that Wells Fargo may base its quotation of the Inter-Bank Market Offered Rate upon such offers or other market indicators of the Inter-Bank Market as Wells Fargo in its discretion deems appropriate, including but not limited to the rate offered for U.S. dollar deposits on the London Inter-Bank Market.

(b)     "LIBOR Reserve Percentage" means the reserve percentage prescribed by the Board of Governors of the Federal Reserve System (or any successor) for "Eurocurrency Liabilities" (as defined in Regulation D of the Federal Reserve Board, as amended), adjusted by Wells Fargo for expected changes in such reserve percentage during the applicable term of the Revolving Note.

"Lien" means any security interest, mortgage, deed of trust, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device, including without limitation the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or subsequently acquired and whether arising by agreement or operation of law.

"Life Insurance Assignment" means an Assignment of Life Insurance Policy as Collateral to be executed by the owner and the beneficiary of the policy, in form and substance satisfactory to Wells Fargo, granting Wells Fargo a first priority Lien on the Life Insurance Policy, its cash surrender value, and any proceeds arising from its sale to secure payment of the Indebtedness.

"Life Insurance Policy" is defined in Section 5.9.

"Line of Credit" is defined in the Recitals.

"Loan Documents" means this Agreement, the Revolving Note, the Master Agreement for Treasury Management Services, each Subordination Agreement, each Standby Letter of Credit Agreement, each Commercial Letter of Credit Agreement, any L/C Applications, and the Security Documents, together with every other agreement, note, document, contract or instrument to which Company now or in the future may be a party and which may be required by Wells Fargo in connection with, or as a condition to, the execution of this Agreement. Any

A-8

documents or other agreements entered into between Company and Wells Fargo that relate to any Rate Hedge Agreement, derivative, foreign exchange, or similar product or transaction, or which are entered into with an operating division of Wells Fargo other than Wells Fargo Business Credit, shall not be included in this definition.

"Loan Manager" means the treasury management service defined in the Master Agreement for Treasury Management Services and related Loan Manager Service Description.

"Margin" means a rate per annum, expressed as a percentage, as more fully defined in Section 1.7(a).

"Master Agreement for Treasury Management Services" means the Master Agreement for Treasury Management Services, the related Acceptance of Services, and the Service Description governing each treasury management service used by Company.

"Material Adverse Effect" means any of the following:

(a)     A material adverse effect on the business, operations, results of operations, prospects, assets, liabilities or financial condition of Company;

(b)     A material adverse effect on the ability of Company to perform its obligations under the Loan Documents;

(c)     A material adverse effect on the ability of Wells Fargo to enforce the Indebtedness or to realize the intended benefits of the Security Documents, including without limitation a material adverse effect on the validity or enforceability of any Loan Document, or on the status, existence, perfection, priority (subject to Permitted Liens) or enforceability of any Lien securing payment or performance of the Indebtedness; or

(d)     Any claim against Company or threat of litigation which if determined adversely to Company would cause Company to be liable to pay an amount exceeding $100,000 or would result in the occurrence of an event described in clauses (a), (b) and (c) above.

"Maturity Date" is defined in Section 1.1(b).

"Maximum Line Amount" is defined in Section 1.1(a).

"Multiemployer Plan" means a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) to which Company or any ERISA Affiliate contributes or is obligated to contribute.

"Net Cash Proceeds" means the cash proceeds of any asset sale (including cash proceeds received as deferred payments pursuant to a note, installment receivable or otherwise, but only upon actual receipt) net of (a) attorney, accountant, and investment banking fees, (b) brokerage commissions, (c) amounts required to be applied to the repayment of debt secured by a Lien not prohibited by this Agreement on the asset being sold, and (c) taxes paid or reasonably estimated to be payable as a result of such asset sale.

"Obligation of Reimbursement" is defined in Section 1.11(b).

"Net Orderly Liquidation Value" means a professional opinion of the probable Net Cash Proceeds that could be realized at a properly advertised and professionally conducted

liquidation sale, conducted under orderly sale conditions for an extended period of time (usually six to nine months), under the economic trends existing at the time of the appraisal.

"OFAC" is defined in Section 5.12(b).

"Officer" means with respect to Company, an officer if Company is a corporation, a manager if Company is a limited liability company, or a partner if Company is a partnership.

"Operating Account" is defined in Section 1.3(a), and maintained in accordance with the terms of Wells Fargo's Commercial Account Agreement in effect for demand deposit accounts.

"Overadvance" means the amount, if any, by which the unpaid principal amount of the Revolving Note, plus the L/C Amount, is in excess of the then-existing Borrowing Base.

"Owned Intellectual Property" is defined in Exhibit D.

"Owner" means with respect to Company, each Person having legal or beneficial title to an ownership interest in Company or a right to acquire such an interest.

"Parent" means Hi-Temp Acquisition Corporation, a Delaware corporation.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) maintained for employees of Company or any ERISA Affiliate and covered by Title IV of ERISA.

"Permitted Lien" and "Permitted Liens" are defined in Section 5.3(a).

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision of a governmental entity.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) maintained for employees of Company or any ERISA Affiliate.

"Premises" is defined in Section 2.4(a).

"Proceeds" shall have the meaning given it under the UCC.

"Rate Hedge" means any interest rate swap or interest rate collar agreement applicable to borrowings advanced by Wells Fargo under the Line of Credit.

"Rate Hedge Agreement" is an agreement entered into between Wells Fargo (or any of its affiliates) and Company for purposes of providing Company with a Rate Hedge.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form, and includes all information that is required to be reported by Company to Wells Fargo pursuant to Section 5.1.

"Reportable Event" means a reportable event (as defined in Section 4043 of ERISA), other than an event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the Pension Benefit Guaranty Corporation.

"Revolving Note" is defined in Section 1.1(d).

"Security Documents" means this Agreement, the Life Insurance Assignment and any other document delivered to Wells Fargo from time to time to secure the Indebtedness.

"Security Interest" is defined in Section 2.1.

"Special Account" means a specified cash collateral account maintained with Wells Fargo or another financial institution acceptable to Wells Fargo in connection with each undrawn Letter of Credit issued by Wells Fargo, as more fully defined in Section 1.11.

"Standby Letter of Credit Agreement" means an agreement governing the issuance of standby letters of credit by Wells Fargo entered into between Company as applicant and Wells Fargo as issuer.

"Subordinated Creditors" means Claris Partners LLC and any other Person now or in the future subordinating indebtedness of Company held by that Person to the payment of the Indebtedness.

"Subordinated Debt" means indebtedness owed by Company that has been subordinated to Wells Fargo by a Subordinated Creditor pursuant to a Subordination Agreement.

"Subordination Agreement" means a subordination agreement executed by a Subordinated Creditor in favor of Wells Fargo (if more than one, the "Subordination Agreements").

"Subsidiary" means any Person of which more than 50% of the outstanding ownership interests having general voting power under ordinary circumstances to elect a majority of the board of directors or the equivalent of such Person, irrespective of whether or not at the time ownership interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency, is at the time directly or indirectly owned by Company, by Company and one or more other Subsidiaries, or by one or more other Subsidiaries.

"Tangible Net Worth" means the difference between (i) Book Net Worth plus Subordinated Debt minus (ii) intangible assets.

"Termination Date" is defined in Section 1.1(b).

"UCC" means the Uniform Commercial Code in effect in the state designated in this Agreement as the state whose laws shall govern this Agreement, or in any other state whose laws are held to govern this Agreement or any portion of this Agreement.

"Unfinanced Capital Expenditures" means for a period, any expenditure of money during such period for the purchase or construction of assets, or for improvements or additions to such assets, which are not financed with borrowed funds and are capitalized on Company's balance sheet.

"Unused Amount" is defined in Section 1.8(b).

"Wells Fargo" means Wells Fargo Bank, National Association in its broadest and most comprehensive sense as a legal entity, and is not limited in its meaning to the Wells Fargo

## SECOND AMENDMENT TO
## AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

THIS SECOND AMENDMENT TO AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT (the "Amendment"), is dated as of November 15, 2013 and is made by and between HI-TEMP SPECIALTY METALS, INC., a Delaware corporation (the "Company") and Wells Fargo Bank, National Association (as more particularly defined in Exhibit A of the Credit Agreement described below, "Wells Fargo").

### RECITALS

The Company and Wells Fargo are parties to an Amended and Restated Credit and Security Agreement dated as of July 16, 2010, as amended (collectively, the "Credit Agreement"). Capitalized terms used herein shall have the meanings given to them in the Credit Agreement unless otherwise specified.

The Company has requested that Wells Fargo amend certain terms and conditions of the Credit Agreement pursuant to the terms of this Amendment and Wells Fargo has agreed to such amendments, subject to the terms of this Amendment.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, it is agreed as follows:

1.     <u>Amendments to Credit Agreement</u>. As of the date hereof, the Credit Agreement is amended as follows:

1.1     <u>Section 1.2</u>. Section 1.2(a) of the Credit Agreement is amended and restated in its entirety to read as follows:

(a)     <u>Borrowing Base</u>. The borrowing base (the "Borrowing Base") is an amount equal to:

(i)     the sum of (1) 85% of the net amount of Eligible Accounts, other than Eligible Accounts which arise from sales to account debtors located outside of the United States, plus (2) 90% of the net amount of Eligible Accounts, which arise from sales to account debtors located outside of the United States; provided that these advance rates may be reduced at any time by Wells Fargo's in its sole discretion by one (1) percent for each percentage point by which Dilution on the date of determination is in excess of five percent (5.0%), plus

(ii)     the lesser of (1) the Inventory Sublimit, (2) the Inventory Advance Rate times Eligible Inventory, or (3) 80% of the Net Orderly Liquidation Value of Eligible Inventory; provided, however, at no time shall advances against Eligible Consigned Inventory exceed $3,000,000 and at no time shall advances against Eligible In-Transit Inventory exceed $3,500,000, plus

(iii)     the Temporary Overadvance, less

i49944v4

       (iv)     the Borrowing Base Reserve, <u>less</u>

       (v)     Indebtedness that Company owes Wells Fargo that has not been advanced on the Revolving Note, <u>less</u>

       (vi)     Indebtedness that is not otherwise described in Section 1, including Indebtedness that Wells Fargo in its sole discretion finds on the date of determination to be equal to Wells Fargo's net credit exposure with respect to any Rate Hedge Agreement, derivative, foreign exchange, deposit, treasury management or similar transaction or arrangement extended to Company by Wells Fargo and any Indebtedness owed by Company to Wells Fargo Merchant Services, L.L.C.

    1.2    <u>Exhibit A</u>.  Exhibit A is amended by the addition, or the amendment and restatement, as applicable, of the following definitions:

    (a)    Paragraph (m) of the definition of "Eligible Accounts" is amended and restated in its entirety to read as follows:

       (m)    Accounts owed by an account debtor (other than Precision Castparts Corporation), regardless of whether otherwise eligible, to the extent that the aggregate balance of such Accounts exceeds 30% of the aggregate amount of all Accounts; Accounts owed by Precision Castparts Corporation, regardless of whether otherwise eligible, to the extent that the aggregate balance of such Accounts exceeds 60% of the aggregate amount of all Accounts;

    (b)    "Inventory Sublimit" means (a) $14,500,000 through and including the Second Amendment Effective Date, (b) $18,400,000 from the Second Amendment Effective Date through and including the earlier of (i) ninety (90) days from the Second Amendment Effective Date or (ii) February 28, 2014, and (c) $14,500,000 thereafter.

    (c)    "Maximum Line Amount" means (a) $18,500,000 through and including March 30, 2012, (b) $21,000,000 from March 30, 2012 through and including the Second Amendment Effective Date, (c) $24,900,000 from the Second Amendment Effective Date through and including the earlier of (i) ninety (90) days from the Second Amendment Effective Date or (ii) February 28, 2014, and (d) $21,000,000 thereafter.

    (d)    "Second Amendment" means the Second Amendment to Amended and Restated Credit and Security Agreement dated November 15, 2013 between the Company and Wells Fargo.

    (e)    "Second Amendment Effective Date" means the effective date of the Second Amendment.

    (f)    "Temporary Overadvance" means (a) $1,500,000 from the effective date of the Second Amendment Effective Date through and including the earlier of (i) ninety (90) days from the Second Amendment Effective Date or (ii) February 28, 2014, and (b) $0 thereafter.

21549944v4

2.    No Other Changes.  Except as explicitly amended by this Amendment, all of the terms and conditions of the Credit Agreement shall remain in full force and effect and shall apply to any advance or letter of credit thereunder.

3.    Amendment Fee.  Company shall pay Wells Fargo as of the date hereof a fully earned and non-refundable amendment fee in the amount of $22,500 in consideration of Wells Fargo's execution and delivery of this Amendment.

4.    Conditions Precedent.  This Amendment shall be effective when Wells Fargo shall have received an original hereof executed by the Company, and each of the following, all in substance and form acceptable to the Wells Fargo in its sole discretion:

(a)    A Certificate of the Secretary of the Company certifying as to (i) the resolutions of the board of directors of the Company approving the execution and delivery of this Amendment, (ii) the fact that the articles of incorporation and bylaws of the Company which were certified and delivered to Wells Fargo pursuant to the Certificate of Authority of the Company's secretary or assistant secretary dated July 16, 2010 continue in full force and effect and have not been amended or otherwise modified except as set forth in the Certificate to be delivered, and (iii) certifying that the officers and agents of the Company who have been certified to Wells Fargo, pursuant to the Certificate of Authority of the Company's secretary or assistant secretary dated July 16, 2010, as being authorized to sign and to act on behalf of the Company continue to be so authorized or setting forth the sample signatures of each of the officers and agents of the Company authorized to execute and deliver this Amendment and all other documents, agreements and certificates on behalf of the Company.

(b)    The Second Amended and Restated Revolving Note.

(c)    Payment of the fee described in Paragraph 3.

(d)    Such other matters as the Wells Fargo may require.

5.    Representations and Warranties.  The Company hereby represents and warrants to Wells Fargo as follows:

(a)    The Company has all requisite power and authority to execute this Amendment and to perform all of its obligations hereunder and under the other documents, instruments, writings and agreements relating to this Amendment (collectively and individually referred to as the "Amendment Documents"), and this Amendment and the other Amendment Documents constitute the legal, valid and binding obligation of the Company, enforceable in accordance with their terms.

(b)    The execution, delivery and performance by the Company of this Amendment and the other Amendment Documents has been duly authorized by all necessary action and does not (i) require any authorization, consent or approval by any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, (ii) violate any provision of any law, rule or regulation or of any order, writ, injunction or decree

21549944v4

3

presently in effect, having applicability to the Company, or the organizational documents of the Company, or (iii) result in a breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease or instrument to which the Company is a party or by which it or its properties may be bound or affected.

(c)    All of the representations and warranties contained in Exhibit D of the Credit Agreement are correct on and as of the date hereof as though made on and as of such date.

6.    References.  All references in the Credit Agreement to "this Agreement" shall be deemed to refer to the Credit Agreement as amended hereby; and any and all references in the Loan Documents to the Credit Agreement shall be deemed to refer to the Credit Agreement as amended hereby.

7.    No Waiver.  The execution of this Amendment shall not be deemed to be a waiver of any Event of Default under the Credit Agreement or breach, default or event of default under any Loan Documents or other document held by Wells Fargo, whether or not known to Wells Fargo and whether or not existing on the date of this Amendment.

8.    Release.  The Company hereby absolutely and unconditionally release and forever discharge Wells Fargo, and any and all participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns thereof, together with all of the present and former directors, officers, agents and employees of any of the foregoing, from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which the Company has had, now has or has made claim to have against any such person for or by reason of any act, omission, matter, cause or thing whatsoever arising from the beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown.

9.    Costs and Expenses.  The Company hereby reaffirms its agreement under the Credit Agreement to pay or reimburse Wells Fargo on demand for all reasonable costs and expenses incurred by Wells Fargo in connection with the Loan Documents, including without limitation all reasonable fees and disbursements of legal counsel.  Without limiting the generality of the foregoing, the Company specifically agree to pay all reasonable fees and disbursements of counsel to Wells Fargo for the services performed by such counsel in connection with the preparation of this Amendment and the documents and instruments incidental hereto.  The Company hereby agrees that Wells Fargo may, at any time or from time to time in its sole discretion upon reasonable notice to the Company, make a loan to the Company under the Credit Agreement, or apply the proceeds of any loan, for the purpose of paying any such fees, disbursements, costs and expenses.

10.    Miscellaneous.    This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument.

[Signature page follows]

21549944v4

4

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first written above.

HI-TEMP SPECIALTY METALS, INC.

By: _____

Name:  Joseph Smokovich

Title:  President

WELLS FARGO BANK, NATIONAL ASSOCIATION

By: _____

Name: JAMES A. KELLY

Title: VICE President

Second Amendment to Loan and Security Agreement
21549944v4

FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT (this "*Agreement*"), dated as of January 19, 2016, is entered into by and among HI-TEMP SPECIALTY METALS, INC., a Delaware corporation (the "*Company*" or the "*Borrower*"), HI-TEMP ACQUISITION CORPORATION, a Delaware corporation ("*Parent*"), HT REALTY, INC., a Delaware corporation ("*HT Realty*"; Parent and HT Realty are collectively and individually referred to as the "*Guarantors*"), and WELLS FARGO BANK, NATIONAL ASSOCIATION ("*Wells Fargo*" or "*Lender*").

W I T N E S S E T H:

WHEREAS, Lender and Borrower have entered into financing arrangements pursuant to which Lender has made and may hereafter make loans and other financial accommodations to Borrower as set forth in (1) the Amended and Restated Credit and Security Agreement, dated July 16, 2010, as amended, by and among Lender and Borrower (as the same now exists and may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced, the "*Credit Agreement*") and (2) all other agreements, documents and instruments referred to therein or at any time executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Credit Agreement, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, being collectively referred to herein as the "*Loan Documents*");

WHEREAS, Parent has guaranteed the full and prompt payment, when due, of all Indebtedness pursuant to a certain Continuing Guaranty Agreement dated December 27, 1999, which guaranty was amended and restated pursuant to the Amended and Restated Continuing Guaranty dated March 30, 2012 of Parent in favor of Lender (the "*Parent Guaranty*");

WHEREAS, HT Realty has guaranteed the full and prompt payment, when due, of all Indebtedness pursuant to a certain Continuing Guaranty Agreement dated May 31, 2002, which guaranty was amended and restated pursuant to the Amended and Restated Continuing Guaranty dated March 30, 2012 of HT Realty in favor of Lender (the "*HT Realty Guaranty*");

WHEREAS, certain Specified Defaults (as defined below) have occurred and are continuing under the Loan Documents; and

WHEREAS, Borrower, Parent and HT Realty have requested that Lender forbear from exercising its rights and remedies under the Loan Documents due to the occurrence of the Specified Defaults and to make certain other amendments to the Loan Documents;

NOW, THEREFORE, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the parties hereto agree, covenant and warrant as follows:

SECTION 1.  DEFINITIONS.

1.1  Additional Definitions.  As used herein, the following terms shall have the respective meanings given to them below and the Loan Documents shall be deemed and are

hereby amended to include, in addition to and not in limitation of all other definitions, each of the following definitions:

(a)    *"Forbearance Termination Date"* shall mean the earlier to occur of (i) June 1, 2016 or (ii) the date of the occurrence of any Event of Default other than the Specified Defaults.

(b)    *"Specified Defaults"* shall mean the Events of Default arising under the Loan Documents due to:

(i)    the failure of Parent and its subsidiaries failure to deliver its May 31, 2015 fiscal year end financial statements within the time period required by Section 5.1(a) of the Credit Agreement, resulting in the occurrence of an Event of Default pursuant to Section 6.1(b) of the Credit Agreement;

(ii)    the failure of Parent and its subsidiaries failure to maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 for the twelve month period ending May 31, 2015 as required by Section 5.2(d) of the Credit Agreement, resulting in the occurrence of an Event of Default pursuant to Section 6.1(b) of the Credit Agreement;

(ii)    the failure of Parent and its subsidiaries failure to maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 for the twelve month period ending June 30, 2015 as required by Section 5.2(d) of the Credit Agreement, resulting in the occurrence of an Event of Default pursuant to Section 6.1(b) of the Credit Agreement;

(iii)    the failure of Parent and its subsidiaries failure to maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 for the twelve month period ending July 31, 2015 as required by Section 5.2(d) of the Credit Agreement, resulting in the occurrence of an Event of Default pursuant to Section 6.1(b) of the Credit Agreement;

(v)    the failure of Parent and its subsidiaries failure to maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 for the twelve month period ending August 31, 2015 as required by Section 5.2(d) of the Credit Agreement, resulting in the occurrence of an Event of Default pursuant to Section 6.1(b) of the Credit Agreement;

(vi)    the failure of Parent and its subsidiaries failure to maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 for the twelve month period ending September 30, 2015 as required by Section 5.2(d) of the Credit Agreement, resulting in the occurrence of an Event of Default pursuant to Section 6.1(b) of the Credit Agreement;

(vii)    the failure of Parent and its subsidiaries failure to maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 for the twelve month period ending October 31, 2015 as required by Section 5.2(d) of the Credit Agreement, resulting in the occurrence of an Event of Default pursuant to Section 6.1(b) of the Credit Agreement;

(viii)    the failure of Parent and its subsidiaries failure to maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 for the twelve month period ending November 30, 2015 as required by Section 5.2(d) of the Credit Agreement, resulting in

the occurrence of an Event of Default pursuant to Section 6.1(b) of the Credit Agreement; and

(ix)    Company having made loans and advances to Aurora Metals, Inc. in violation of Section 5.6 of the Credit Agreement, resulting in the occurrence of an Event of Default pursuant to Section 6.1(b) of the Credit Agreement.

1.2    Interpretation.  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

SECTION 2.    ACKNOWLEDGMENTS.

2.1    Acknowledgment of Indebtedness.  Borrower hereby acknowledges, confirms and agrees that (a) as of the close of business on January 15, 2016, the aggregate outstanding principal amount of the Indebtedness is $15,909,794.49, (b) such amount, together with all interest accrued and accruing thereon, and all fees, costs, expenses and other charges now or hereafter payable by Borrower to Lender under the Loan Documents, is unconditionally owing by the Borrower to Lender without offset, defense or counterclaim of any kind, nature or description whatsoever and (c) its obligation and liability for the payment and performance of the Indebtedness pursuant to the Loan Documents is unconditionally owing to Lender without offset, defense or counterclaim of any kind, nature or description whatsoever.

2.2    Acknowledgment of Security Interests.  Borrower hereby acknowledges, confirms and agrees that Lender has and shall continue to have valid, enforceable and perfected liens upon and security interests in the Collateral and all other assets and properties of Borrower upon or in which Lender has been granted or holds a lien or security interest.

2.3    Binding Effect of Documents.  Borrower and each Guarantor hereby acknowledges, confirms and agrees that: (a) each Loan Document to which Borrower or such Guarantor is a party has been duly executed and delivered by Borrower or such Guarantor to Lender and is in full force and effect as of the date hereof, (b) the agreements and obligations of Borrower or such Guarantor contained in the Loan Documents constitute the legal, valid and binding obligations of Borrower or such Guarantor, enforceable against Borrower or such Guarantor in accordance with the terms thereof, and Borrower or such Guarantor has no valid defense to the enforcement of such obligations, and (c) Lender is and shall be entitled to the rights, remedies and benefits provided for in the Loan Documents.

SECTION 3.    FORBEARANCE AS TO CERTAIN EVENTS OF DEFAULT.

3.1    Acknowledgment of Specified Default.  Borrower and each Guarantor hereby acknowledges, confirms and agrees that (a) each Specified Default has occurred and is continuing, (b) each Specified Default constitutes an Event of Default under the Loan Documents and (c) in the absence of this Agreement, the occurrence of the Specified Default entitles Lender to exercise its rights and remedies under the Loan Documents, applicable law and otherwise, including, without limitation, the right to declare all Indebtedness to be immediately due and payable.

3.2    Forbearance.

(a)    In reliance upon the representations, warranties and covenants of Borrower and each Guarantor contained in this Agreement, and subject to the terms and conditions of this Agreement, Lender agrees that Lender shall forbear, until the Forbearance Termination Date, from exercising its rights and remedies under the Loan Documents or applicable law due to the occurrence of the Specified Defaults.

(b)    Borrower and each Guarantor agrees that all of the Indebtedness shall, if not sooner paid in accordance with the Loan Documents, be absolutely and unconditionally due and payable in full in cash on the Forbearance Termination Date.

(c)    Upon the Forbearance Termination Date, the agreement of Lender to forbear with respect to the Specified Defaults shall automatically and without further action terminate and be of no force and effect, it being understood and agreed that the effect of such termination will be to permit Lender to immediately exercise, without any further notice or forbearance of any kind, all of its rights and remedies under the Loan Documents, applicable law or otherwise with respect to the Specified Defaults or any other Event of Default which shall exist or shall have occurred and be continuing at such time.

(d)    No termination of the Loan Documents shall relieve or discharge Borrower or any Guarantor of its duties, covenants and obligations under the Loan Documents until all Indebtedness have been indefeasibly paid and satisfied in full in immediately available funds on terms and conditions acceptable to Lender.  Borrower and each Guarantor hereby expressly waives any right to receive notification under Section 9-611 of the UCC or otherwise of any disposition of any Collateral by Lender or its designee, and waives any rights under Section 9-623 of the UCC.

3.3    No Waiver; Reservation of Rights.

(a)    Lender has not waived, is not by this Agreement waiving and has no intention of waiving the Specified Defaults or any other Event of Default that has occurred as of the date hereof, that may be continuing as of the date hereof or that may occur after the date hereof, whether the same or similar to the Specified Defaults.  Except with respect to the Specified Defaults as and to the extent expressly set forth in Section 3.2 above, Lender has not agreed to forbear from exercising any of its rights or remedies concerning any default or Event of Default that may have occurred as of the date hereof, that may be continuing as of the date hereof or that may occur after the date hereof.

(b)    Subject to Section 3.2 above, Lender reserve the right to exercise any or all of its rights and remedies under the Loan Documents or otherwise as a result of any Event of Default that may be continuing on the date hereof or that may occur after the date hereof.  Lender has not waived any of such rights or remedies and nothing in this Agreement, or any delay on its part in exercising any such rights or remedies, should be construed as a waiver of any such rights or remedies.

SECTION 4.    AMENDMENTS TO CREDIT AGREEMENT.  As of the effective date of this Agreement, the Credit Agreement is amended as follows:

(a)  <u>Exhibit A</u>. Exhibit A of the Credit Agreement is amended by the addition, in alphabetical order, or the amendment and restatement, as applicable, of the following definitions to read in their entirety as follows:

"<u>Applicable Margin</u>" means 3.50%.

"<u>Availability Reserve</u>" means the following amounts for the periods set forth in the table below:

| Period | Availability Reserve |
|---|---|
| January 11, 2016 through January 17, 2016 | $1,091,665 |
| January 18, 2016 through January 24, 2016 | $1,149,998 |
| January 25, 2016 through January 31, 2016 | $1,208,331 |
| February 1, 2016 through February 7, 2016 | $1,266,664 |
| February 8, 2016 through February 14, 2016 | $1,324,997 |
| February 15, 2016 through February 21, 2016 | $1,383,330 |
| February 22, 2016 through February 28, 2016 | $1,441,663 |
| February 29, 2016 and thereafter | $1,500,000 |

"<u>Forbearance Agreement</u>" means the Forbearance Agreement dated January 19, 2016 by and among Borrower, Parent and HT Realty, Inc.

"<u>Net Orderly Liquidation Value</u>" means a professional opinion of the probable Net Cash Proceeds that could be realized at a properly advertised and professionally conducted liquidation sale, conducted under orderly sale conditions, under the economic trends existing at the time of the appraisal.

(b)  <u>Section 1.8(b)</u>. Section 1.8(b) of the Credit Agreement is amended and restated in its entirety to read as follows:

(b)  <u>Unused Line Fee</u>.  Company shall pay Wells Fargo an unused line fee equal to one-half of one percent (0.50%) per annum of the Unused Amount, from the date of this Agreement to and including the Termination Date, which unused line fee shall be payable quarterly in arrears on the first day of each calendar quarter and on the Termination Date. For purposes of this Section 1.8(b), "Unused Amount" shall mean the daily average of the Maximum Line Amount reduced by outstanding Advances and the L/C Amount.

(c)    Section 1.8(f). Section 1.8(f) of the Credit Agreement is amended and restated in its entirety to read as follows:

(f)    Line of Credit Termination and/or Reduction Fees.

(i)    If Wells Fargo terminates the Line of Credit during a Default Period or if Company and Wells Fargo agree to reduce the Maximum Line Amount, then Company shall pay Wells Fargo as liquidated damages a termination or reduction fee in an amount equal to a percentage of the Maximum Line Amount (or the reduction of the Maximum Line Amount, as the case may be) calculated as follows: (A) one percent (1.0%), if the termination or reduction occurs on or before on or before May 30, 2016; and (B) one-half percent (0.50%), if the termination or reduction occurs after May 30, 2106.

(ii)    If Company terminates the Line of Credit on a date prior to the Maturity Date then Company shall pay Wells Fargo as liquidated damages a termination or reduction fee in an amount equal to a percentage of the Maximum Line Amount (or the reduction of the Maximum Line Amount, as the case may be) calculated as follows: (A) one percent (1.0%), if the termination or reduction occurs on or before on or before May 30, 2017; and (B) one-half percent (0.50%), if the termination or reduction occurs after May 30, 2017.

(iii)    Notwithstanding the foregoing, Lender shall have no obligation to extend the Forbearance Termination Date (as such term is defined in the Forbearance Agreement) beyond May 31, 2016 and if there shall be any such extension, it shall be made at Wells Fargo's sole discretion.

(d)    Section 5.2. Section 5.2 of the Credit Agreement is amended by the addition of new clause (e) to read in its entirety as follows:

(e)    Minimum EBITDA. Parent and its Subsidiaries, on a consolidated basis, shall achieve EBITDA, determined as of the end of each period described below, in an amount not less than the amount set forth for each such period (numbers appearing between "< >" are negative):

| Period | Minimum EBITDA |
| --- | --- |
| Six months ending November 30, 2015 | $59,000 |
| Seven months ending December 31, 2015 | <$35,000> |
| Eight months ending January 31, 2016 | $76,000 |
| Nine months ending February 29, 2016 | $176,000 |
| Ten months ending March 31, 2016 | $276,000 |
| Eleven months ending April 30, 2016 | $375,000 |
| Twelve months ending May 31, 2016 | $475,000 |

SECTION 5.  EQUIPMENT APPRAISAL

Pursuant to Section 5.10(c) of the Credit Agreement, Lender may obtain, from time to time, at Borrower's expense, an appraisal of Company's Inventory and Equipment, by an appraiser acceptable to Lender in its sole discretion. Borrower acknowledges that Lender will cause an updated appraisal of Borrower's Equipment to be conducted following execution and delivery of this Agreement and Borrower agrees to cooperate with Lender and the appraiser in the performance of that updated appraisal. Nothing in this Section 5 limits the rights of Lender under Section 5.10(c) of the Credit Agreement.

SECTION 6.  FINANCIAL COVENANTS UNDER CREDIT AGREEMENT.

During the term of this Agreement, the financial covenants set forth in Section 5.2(a) of the Credit Agreement (Minimum Tangible Net Worth) and in Section 5.2(d) of the Credit Agreement (Fixed Charge Coverage Ratio) shall be suspended and shall not be tested.

SECTION 7.  <u>ADDITIONAL EVENTS OF DEFAULT</u>.

Borrower and each Guarantor acknowledges, confirms and agrees that any failure of Borrower or any Guarantor to comply with the covenants, conditions and agreements contained in this Agreement shall constitute an Event of Default under this Agreement and the other Loan Documents and shall not be subject to any cure or grace period.

SECTION 8.  <u>FORBEARANCE FEE</u>.

In addition to all other fees, charges, interest and expenses payable by Borrower to Lender under the Loan Documents, as an inducement for Lender to enter into this Agreement and in consideration of the covenants and agreements of Lender contained herein, Borrower shall pay to Lender a forbearance and amendment fee in the amount of $15,000, which fee shall be fully earned as of and payable on the date of this Agreement and may be charged to any loan account of Borrower.

SECTION 9.  <u>REPRESENTATIONS, WARRANTIES AND COVENANTS</u>

In addition to the continuing covenants and agreements at any time made by the Borrower and Guarantors to Lender pursuant to the Loan Documents, Borrower and each Guarantor jointly and severally represents, warrants and covenants with and to Lender as follows (which representations, warranties and covenants are continuing and shall survive the execution and delivery hereof):

9.1  <u>Authorization, Execution and Delivery</u>.  This Agreement has been duly authorized, executed and delivered by all necessary action on the part of Borrower and such Guarantor, and the agreements and obligations of Borrower and such Guarantor contained herein constitute legal, valid and binding obligations of Borrower and such Guarantor, enforceable in accordance with their respective terms.

9.2  <u>Accuracy of Existing Representations and Warranties</u>.  All of the material representations and warranties set forth in the Loan Documents, each as amended hereby, are

true and correct in all material respects on and as of the date hereof as if made on the date hereof, except to the extent any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such date.

9.3   No Default.  As of the date of this Agreement and after giving effect hereto, no default or Event of Default exists or has occurred and is continuing other than the Specified Default.

SECTION 10. RELEASE AND COVENANT NOT TO SUE.

10.1 Release.

(a)   In consideration of the agreements of Lender contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and each Guarantor, on behalf of itself and its successors, assigns and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges the Lender, its successors and assigns, and its and their respective present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (the Lender and all such other parties being hereinafter referred to collectively as the "*Releasees*" and individually as a "*Releasee*"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "*Claim*" and collectively, "*Claims*") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Borrower or any Guarantor, or its or their successors, assigns or other legal representatives, may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, in connection with the Loan Documents, as amended and supplemented through the date hereof.

(b)   Borrower and each Guarantor understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)   Borrower and each Guarantor agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the release set forth above.

10.2 Covenant Not to Sue.  Borrower and each Guarantor, on behalf of itself and its successors, assigns and other legal representatives, hereby absolutely, unconditionally and irrevocably covenants and agrees with each Releasee that Borrower or such Guarantor will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged pursuant to Section 9.1 above.  If Borrower or any Guarantor violates the foregoing covenant, Borrower or such Guarantor agrees to pay, in

addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

SECTION 11. <u>CONDITIONS TO EFFECTIVENESS</u>

The effectiveness of the forbearance made pursuant to this Agreement shall be subject to the receipt by Lender of an original (or electronic copy) of this Agreement, duly authorized, executed and delivered by Borrower and each Guarantor and each of the following in form, scope and substance acceptable to Lender:

(a)    a Certificate of the Secretary of Borrower, Parent and HT Realty certifying as to (i) the resolutions of the governing body of such Person approving the execution and delivery of this Agreement, (ii) the fact that the organizational documents of such Person, which were certified and delivered to the Lender pursuant to the secretary's certificate of such Person previously delivered to Lender, continue in full force and effect and have not been amended or otherwise modified except as set forth in the Certificate to be delivered, and (iii) certifying that the officers and agents of such Person who have been certified to the Lender, pursuant to the secretary certificate of such Person previously delivered to Lender, as being authorized to sign and to act on behalf of such Person continue to be so authorized or setting forth the sample signatures of each of the officers and agents of such Person authorized to execute and deliver this Agreement and all other documents, agreements and certificates on behalf of such Person;

(b)    the letter agreement dated December 11, 2015, properly executed by the Borrower and Guarantors;

(c)    such other documents, instruments, writings and agreements as Lender may require.

SECTION 12. <u>PROVISIONS OF GENERAL APPLICATION</u>

12.1 <u>Effect of this Agreement</u>. Except as modified pursuant hereto, no other changes or modifications to the Loan Documents are intended or implied and in all other respects the Loan Documents are hereby specifically ratified, restated and confirmed by all parties hereto as of the effective date hereof. To the extent of conflict between the terms of this Agreement and the other Loan Documents, the terms of this Agreement shall control.

12.2 <u>Binding Agreement; No Third Party Beneficiaries</u>. This Agreement shall be binding upon and inure to the benefit of Lender, Borrower, Guarantors, and their respective successors and assigns and legal representatives. This Agreement is solely for the benefit of Lender, Borrower, Guarantors and their respective successors and assigns and legal representatives, and no other person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.

12.3 <u>Costs and Expenses</u>. In addition to all other fees and expenses payable by the Borrower to Lender under the Loan Documents, Borrower shall reimburse Lender for all costs and expenses, including legal fees and expenses, incurred by Lender in the structuring, negotiation, arrangement or preparation of this Agreement and the agreements, documents and/or instruments to be executed in connection herewith or contemplated hereby.

12.4 <u>Further Assurances</u>. The parties hereto shall execute and deliver such additional documents and take such additional action as may be necessary or desirable to effectuate the provisions and purposes of this Agreement.

12.5 <u>Governing Law</u>. The validity, interpretation and enforcement of this Agreement whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York.

12.6 <u>Waiver of Jury Trial</u>. Borrower and each Guarantor hereby irrevocably waives any right to trial by jury of any claim, demand, action or cause of action arising under this agreement or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this agreement or the transactions contemplated hereby, in each instance whether now existing or hereafter arising and whether in contract, tort, equity or otherwise.

12.7 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other method of electronic transmission shall have the same force and effect as the delivery of an original executed counterpart of this Agreement. In making proof of this Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties thereto.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their authorized officers as of the day and year first above written.

**BORROWER:**

**HI-TEMP SPECIALTY METALS, INC.**

By: _____

Name: _____

Title: _____

**GUARANTORS:**

**HI-TEMP ACQUISITION CORPORATION**

By: _____

Name: _____

Title: _____

**HT REALTY, INC.**

By: _____

Name: _____

Title: _____

**LENDER:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____

Name: JAMES A. KELLY

Title: Vice President

3883851.3

State of Delaware

## UNIFORM COMMERCIAL CODE - FINANCING STATEMENT - FORM UCC - 1

This FINANCING STATEMENT is presented to a Filing Officer for filing pursuant to the Uniform Commercial Code.

If to be filed with Recorder of Deeds indicate Tax Parcel No.(s)

No. of additional sheets presented.

| PARTIES | PARTIES |
|---|---|
| Debtor (or Assignor) (last name first if individual) and mailing address:<br><br>HTAC, Inc.<br>Industrial Drive<br>P.O. Box 2188<br>Willingboro, NJ  08046 | Secured Party (ies) (last name first if individual) and address:<br><br>Fleet Capital Corporation<br>200 Glastonbury Boulevard<br>Glastonbury, CT  06033 |
| Debtor (or Assignor) (last name first if individual) and mailing address: | Assignee (if any) of Secured Party(ies) and address of Assignee: |

This statement is filed without the Debtor's signature to perfect a security interest in collateral (check X in applicable box(es))

- Already subject to a security interest in another jurisdiction when it was brought into this state.
- Already subject to a security interest in another jurisdiction when the Debtor's location changed into this State.
- Which is proceeds of the original collateral described below  in which a security interest is perfected.
- Acquired after a change of name, identity or corporate structure of Debtor.

- As to which the filing has lapsed.

Fleet Capital Corporation

By: _____

Signature of Secured Party(ies)                    Title
(Required only if item is checked)

Special Types of Parties (check X in applicable box(es))

- The terms "Debtor" and "Secured Party" means "Lessee" and "Lessor", respectively.
- The terms "Debtor" and "Secured Party" means "Consignee" and "Consignor", respectively.
- Debtor is a Transmitting Utility.
- Debtor acting in representative capacity (e.g., as trustee).

Filed with: Secretary of State

Prepared By (Name and Address):

- Check to request Continuation Statement notice for additional fee.

This Financing Statement covers the following types (or items) of property: Check only if applicable:          Products of collateral are also covered.

All Accounts, Inventory, Equipment and General Intangibles whether now owned or existing or hereafter created, acquired or arising and wheresoever located, and all other kinds and types of property, in each case as further described in Exhibit A attached hereto and made a part hereof, and all proceeds and products thereof.

If the collateral is crops, the crops are growing or to be grown on the following described real estate:

If the collateral is (a) goods that are or are to become fixtures;  (b) timber to be cut; or (c) minerals or the like (including oil and gas) or accounts resulting from the sale thereof at the wellhead or minehead, the description of the real estate concerned is: (check X in applicable box(es))

Fixtures          Timber          Minerals or accounts resulting from sale thereof at wellhead or minehead

And this Financing Statement is to be filed in the real estate records where a mortgage on such real estate would be recorded. If the Debtor does not have an interest of record, the name of a record owner is:

HTAC, Inc.

By: _____            _____
Signature of Debtor (or Assignor)            Title

By: _____
Signature of Debtor (or Assignor)            Title
DEBTOR COPY

THIS SPACE FOR USE OF FILING OFFICER
(DATE, TIME, NUMBER, FILING OFFICER)

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 12:20 PM 12/30/1999*
*9969366 – 0000000*
*SRV: 991569194*

Printed by UCC Control - LibraSoft, Inc.
229 Johnson St., Suite C, Santa Fe, NM 87501

# EXHIBIT A

Name and Address of Debtor:

HTAC, Inc.
P.O. Box 2188
Willingboro, NJ 08046

Name and Address of Secured Party:

Fleet Capital Corporation
200 Glastonbury Boulevard
Glastonbury, CT 06033

## DESCRIPTION OF COLLATERAL

This Financing Statement covers each of the following kinds and types of property (collectively, the "Collateral") whether now owned or existing or hereafter created, acquired or arising and wheresoever located:

(a)    Accounts. All Debtor's accounts, contract rights, chattel paper, instruments and documents, whether now owned or hereafter created or acquired by Debtor or in which Debtor now has or hereafter acquires any interest;

(b)    Inventory. All of Debtor's inventory, whether now owned or hereafter acquired, including, but not limited to: all goods intended for sale or lease by Debtor, or for display or demonstration; all work in process; all raw materials and other materials and supplies of every nature and description used or which might be used in connection with the manufacture, printing, packing, shipping, advertising, selling, leasing or furnishing of such goods or otherwise used or consumed in Debtor's business; and all documents evidencing and General Intangibles, relating to any of the foregoing, whether now owned or hereafter acquired by Debtor;

(c)    Equipment. All Debtor's interest in all machinery, apparatus, equipment, fittings, furniture, fixtures, motor vehicles and other tangible personal property (other than Inventory) of every kind and description used in Debtor's operations or owned by Debtor whether owned by Debtor or in which Debtor has an interest, whether now owned or hereafter acquired by Debtor and wherever located, and all parts, accessories and special tools and all increases and accessions thereto and substitutions and replacements therefor;

DSN:69125.1

(d)    General Intangibles.  All personal property of Debtor (including things in action) other than Equipment, goods, Accounts, chattel paper, documents, instruments and money, whether now owned or hereafter created or acquired by Debtor;

(e)    All monies and other property of any kind of Debtor now or at any time or times hereafter in the possession or under the control of Secured Party or a bailee or any affiliate of Secured Party;

(f)    All accessions to, substitutions for and all replacements, products and cash and non-cash proceeds of (a) through (e) above, including, without limitation, proceeds of and unearned premiums with respect to insurance policies insuring any of the Collateral; and

(g)    All books and records (including, without limitation, customer lists, credit files, computer programs, print-outs, and other computer materials and records) of Debtor pertaining to any of (a) through (f) above.


Capitalized terms used herein have the meanings assigned to them in the Loan and Security Agreement dated as of December 27, 1999, by and between FLEET CAPITAL CORPORATION, and HTAC, Inc.

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 10:23 AM 03/15/2000
9969366 - 0015558
SRV: 001130565

State of Delaware

UNIFORM COMMERCIAL CODE FORM UCC - 3
STATEMENT OF CONTINUATION, ASSIGNMENT, TERMINATION, ETC.

This STATEMENT is presented to a Filing Officer for filing pursuant to the Uniform Commercial Code:

| 1A. Debtor (Last Name First and Address): | 2. Secured Party(ies) and Address(es)* | For Filing Officer (Date, Time and Filing Office) |
|---|---|---|
| HTAC, Inc. Industrial Drive P.O. Box 2188 Willingboro, NJ  08046 | Fleet Capital Corporation 200 Glastonbury Boulevard Glastonbury, CT  06033 | |

1B. Debtor (Last Name First and Address):

\* if other than the secured party of record is indicated, this Form UCC-3 must be accompanied by a separate written statement of assignment (on separate Form UCC-3 or substantially similar form) signed by the secured party of record, and the required fee paid.

3.  This statement refers to original Financing Statement bearing File No.  9969366

Filed with Secretary of State                                  Date Filed 12/30/99

4.  Put an "X" in the correct box. (Check only one box per form)

A.  Continuation. The original financing statement between the debtor and secured party, bearing file number shown above, is still effective.

B.  Assignment. The secured party's rights under the financing statement bearing file number shown above have been assigned to the assignee whose name and address appears in Item 5.

C.  Partial Assignment. The secured party's rights under the financing statement bearing file number shown above have been assigned in part to the assignee whose name and address appears in Item 5 (indicate in Item 5 the portion of collateral being assigned).

D.  **X**  Amendment. Financing Statement bearing file number shown above is amended as set forth in Item 5. (Assignment of rights of the secured party should be by written statement of assignment on a separate Form UCC-3 or substantially similar form, and not by amendment. Assignment of Debtor's interest should be by amendment using this form.)

E.  Release. The secured party releases all collateral from the financing statement bearing file number shown above.

F.  Partial Release. The secured party releases the collateral described in Item 5 from the financing statement bearing file number shown above.

G.  Termination. The secured party no longer claims a security interest under the financing statement bearing file number shown above.

5. The name and address of the Debtor is amended to read as follows:

Hi-Temp Specialty Metals, Inc.
Industrial Drive
P.O. Box 2188
Willingboro, NJ 08046

5694

HTAC, Inc.                                          Fleet Capital Corporation

By _Timothy Mohen_ , CFO and Sec.     By _Thoms Maul_  VP
Signature of Debtor    Title                    Signature of Secured Party    Title
(necessary only if Item 4D is applicable)

By                                                By
Signature of Debtor    Title                    Signature of Secured Party    Title
(necessary only if Item 4D is applicable)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Stacey Thomas  216-977-2543

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CSC *Corporation Service Company®*
P.O. Box 591
Wilmington, DE 19899
(800) 927-9800

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 03:14 PM 10/04/2004
INITIAL FILING NUM: 9969366
AMENDMENT    NUMBER: 4278231 8
SRV: 040716162

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
9969366 filed 12/30/99

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor _or_ ☐ Secured Party of record. Check only _one_ of these two boxes.
Also check _one_ of the following three boxes _and_ provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only _one_ box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Fleet Capital Corporation | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
DE SOS    000001-10205    BLU:149438                912732

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

**UCC FINANCING STATEMENT AMENDMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 04:01 PM 04/15/2005
INITIAL FILING NUM: 9969366
AMENDMENT    NUMBER: 5117064 7
SRV: 050307970

A. NAME & PHONE OF CONTACT AT FILER [optional]
Jeffrey M. Rosenthal, Esq.

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

**CT Columbus UCC Team 6**
**17 SOUTH HIGH STREET**
**COLUMBUS, OH 43215**
**Phone: 800-621-3216**
**Fax: 800-914-4240**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is |
|---|---|
| 9969366 dated 12/30/99 | to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☑ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor _or_ ☐ Secured Party of record. Check only _one_ of these two boxes.
Also check _one_ of the following three boxes _and_ provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of party.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR Wells Fargo Business Credit, Inc. | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 119 West 40th Street, 16th Floor | New York | NY | 10018 | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only _one_ box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR Fleet Capital Corporation | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 10. OPTIONAL FILER REFERENCE DATA | |
|---|---|
| File with Delaware Secretary of State | Hi-Temp Specialty |

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

UCC Division

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

FIRST AMERICAN TITLE INS. CO., UCC DIVISION

2501 CHATHAM RD., SUITE 110

SPRINGFIELD IL 62701

**DELAWARE DEPARTMENT OF STATE**
**U.C.C. FILING SECTION**
**FILED 03:31 PM 06/12/2009**
**INITIAL FILING # 9969366**
**AMENDMENT    # 2009 1884623**
**SRV: 090613861**

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 9969366 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial):  Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor _or_ ☒ Secured Party of record. Check only _one_ of these two boxes.

Also check _one_ of the following three boxes _and_ provide appropriate information in items 6 and/or 7.

☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| WELLS FARGO BUSINESS CREDIT, INC. | | | |

OR

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION | | | |

OR

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 119 WEST 40TH STREET, 16TH FLOOR | NEW YORK | NY | 10018 | US |

| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only _one_ box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**

Wells Fargo Bank, National Association

10. OPTIONAL FILER REFERENCE DATA

Hi-Temp Specialty Metals, Inc.

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

UCC Division

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

FIRST AMERICAN TITLE INS. CO., UCC DIVISION

2501 CHATHAM RD., SUITE 110

SPRINGFIELD IL 62701

**DELAWARE DEPARTMENT OF STATE**
**U.C.C. FILING SECTION**
**FILED 08:59 AM 06/30/2009**
**INITIAL FILING # 9969366**
**AMENDMENT # 2009 2085584**
**SRV: 090659749**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 9969366 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**
Wells Fargo Bank, National Association

10. OPTIONAL FILER REFERENCE DATA
Hi-Temp Specialty Metals, Inc.

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

UCC Division        2176988710

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

FIRST AMERICAN TITLE INSURANCE COMPANY

901 S. 2ND STREET

SUITE 201

SPRINGFIELD IL 62704

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:07 PM 10/22/2012
INITIAL FILING # 9969366
AMENDMENT # 2012 4056026
SRV: 121150801

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 9969366 | ☐ |

| 2. | ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement. |
|---|---|

| 3. | ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law. |
|---|---|

| 4. | ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9. |
|---|---|

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☒ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION | | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION | | | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| | | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 100 PARK AVENUE | NEW YORK | NY | 10017 | US |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

Wells Fargo Bank, National Association

10. OPTIONAL FILER REFERENCE DATA

Hi-Temp Specialty Metals, Inc.

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

UCC Division

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

FIRST AMERICAN TITLE INS. CO., UCC DIVISION

901 S. 2ND, SUITE 201

SPRINGFIELD IL 62704

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 02:57 PM 07/08/2014*
*INITIAL FILING # 9969366*
*AMENDMENT    # 2014 2687556*
*SRV: 140928964*

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 9969366 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only **one** of these two boxes.

Also check **one** of the following three boxes **and** provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 7c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | | | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only **one** box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**

Wells Fargo Bank, National Association

10. OPTIONAL FILER REFERENCE DATA

HSE Debtor: Hi-Temp Specialty Metals, Inc.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Stacey Thomas  216-977-2543

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

CSC *Corporation Service Company*®
P.O. Box 591
Wilmington, DE 19899
(800) 927-9800

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 03:15 PM 10/04/2004*
*INITIAL FILING NUM: 4278425 6*
*AMENDMENT    NUMBER: 0000000*
*SRV: 040716173*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | | |
| Hi-Temp Specialty Metals, Inc. | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| Industrial Drive, P.O. Box 2188 | Willingboro | NJ | 08046 | USA |

| 1d. TAX ID #:   SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Corporation | Delaware | 3138587 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. TAX ID #:   SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME | | | | |
| Fleet Capital Corporation | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4 Penn Center, 11th Floor, 1600 John F. Kennedy Blvd. | Philadelphia | PA | 19103 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All present and future assets of debtor and all products and proceeds thereof, wherever located.

This Financing Statement is being filed to continue the effectiveness of the following Financing Statements, which remain effective:

#262142 filed 12/30/99 in the office of the Secretary of State of New York;
#058182 filed 3/26/01 in the office of the Secretary of State of New York;
#1948890 filed 12/30/99 in the office of the Secretary of State of New Jersey;
#2032488 filed 3/26/01 in the office of the Secretary of State of New Jersey;
#31111672 filed 12/30/99 in the office of the Secretary of State of Pennsylvania;
#33751525 filed 3/26/01 in the office of the Secretary of State of Pennsylvania;

#CONTINUED ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF:

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA
DE SOS    000001-10205    BLU:149435      912732

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

EXHIBIT "A"
TO
UCC-1 FINANCING STATEMENT

**Debtor:**
**Hi-Temp Specialty Metals, Inc.**
**Industrial Drive**
**P.O. Box 2188**
**Willingboro, NJ 08046**

**Secured Party:**
**Bank of America**
**4 Penn Center, 11th Floor**
**1600 John F. Kennedy Boulevard**
**Philadelphia, PA  19103**

---

Continuation of listing of Financing Statements remaining effective:

#22921C filed 1/4/00 in the office of the Secretary of State of Michigan;
#09936C filed 3/26/01 in the office of the Secretary of State of Michigan;
#2298159 filed 12/30/99 in the office of the Secretary of State of Indiana;
#200100001054861 filed 3/26/01 in the office of the Secretary of State of Indiana;
#AP324514 filed 3/26/01 in the office of the Secretary of State of Ohio;
#AP0204279 filed 12/29/99 in the office of the Secretary of State of Ohio;
#495377 filed 4/30/01 in the office of the Secretary of State of Oregon;
#220590 filed 12/30/99 in the office of the Secretary of State of Oregon;
#0531658 filed 12/30/99 in the office of the Secretary of State of West Virginia;
#0557064 filed 3/26/01 in the office of the Secretary of State of West Virginia;
#011238 filed 3/26/01 in the office of Clerk of Oneida County, NY;
#996484 filed 12/30/99 in the office of the Clerk of Oneida County, NY;
#99-1110 filed 12/30/99 in the office of the Recorder of Carroll County, OH;
#00-219 filed 3/27/01 in the office of the Recorder of Carroll County, OH;
#44678 filed 3/27/01 in the office of the Prothonotary of Adams County, PA;
#43557 filed 12/30/99 in the office of the Prothonotary of Adams County, PA;
#2890 or 1999 filed 12/30/99 in the office of the Prothonotary of Westmoreland County, PA; and
#475 of 2001 filed 3/26/01 in the office of the Prothonotary of Westmoreland County, PA.

The Debtor's Name is "as amended" with respect to the following filings:

#262142 filed 12/30/99 in the office of the Secretary of State of New York;
#AP0204279 filed 12/29/99 in the office of the Secretary of State of Ohio;
#495377 filed 4/30/01 in the office of the Secretary of State of Oregon;

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 03:59 PM 04/15/2005
INITIAL FILING NUM: 4278425 6
AMENDMENT   NUMBER: 5117060 5
SRV: 050307951

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Jeffrey M. Rosenthal, Esq.

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT Columbus UCC Team 6
17 SOUTH HIGH STREET
COLUMBUS, OH 43215
Phone: 800-621-3216
Fax: 800-914-4240

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 42784256 dated 10/4/04 | |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☑ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR Wells Fargo Business Credit, Inc. | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 119 West 40th Street, 16th Floor | New York | NY | 10018 | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Fleet Capital Corporation | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 10. OPTIONAL FILER REFERENCE DATA | |
|---|---|
| File with Delaware Secretary of State   5j 6345422-109 5o | Hi-Temp Specialty |

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV 05/22/02)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

UCC Division

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

FIRST AMERICAN TITLE INS. CO., UCC DIVISION

2501 CHATHAM RD., SUITE 110

SPRINGFIELD IL 62701

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:14 PM 05/07/2009
INITIAL FILING # 4278425 6
AMENDMENT # 2009 1445078
SRV: 090441019

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 4278425 6 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☒ Secured Party of record. Check only **one** of these two boxes.

Also check **one** of the following three boxes **and** provide appropriate information in items 6 and/or 7.

☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| WELLS FARGO BUSINESS CREDIT, INC. | | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

OR

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

OR

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 119 WEST 40TH STREET | NEW YORK | NY | 10018 | US |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|
| | | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only **one** box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

**9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**

Wells Fargo Business Credit, Inc.

10. OPTIONAL FILER REFERENCE DATA

FINISH

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

UCC Division

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

FIRST AMERICAN TITLE INS. CO., UCC DIVISION

2501 CHATHAM RD., SUITE 110

SPRINGFIELD IL 62701

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:15 PM 05/07/2009
INITIAL FILING # 4278425 6
AMENDMENT # 2009 1445094
SRV: 090441025

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 4278425 6 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**

Wells Fargo Bank, National Association

10. OPTIONAL FILER REFERENCE DATA

FINISH

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

UCC Division                                    2176988710

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

┌─
│  FIRST AMERICAN TITLE INSURANCE COMPANY
│
│  901 S. 2ND STREET
│
│  SUITE 201
│
│  SPRINGFIELD IL 62704
└─

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 11:44 AM 10/22/2012
INITIAL FILING # 4278425 6
AMENDMENT     # 2012 4055309
SRV: 121150662

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 4278425 6 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☒ Secured Party of record. Check only **one** of these two boxes.

Also check **one** of the following three boxes **and** provide appropriate information in items 6 and/or 7.

| ☒ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable). |
|---|---|---|

6. **CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION | | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. **CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION | | | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| | | | | | |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 100 PARK AVENUE | NEW YORK | NY | 10017 | | US |
| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | | | | |
| | | | | | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only **one** box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**

Wells Fargo Bank, National Association

10. OPTIONAL FILER REFERENCE DATA

Hi-Temp Specialty Metals, Inc.

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

UCC Division                                           2176988710

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

FIRST AMERICAN TITLE INSURANCE COMPANY

901 S. 2ND STREET

SUITE 201

SPRINGFIELD IL 62704

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 03:37 PM 04/08/2014
INITIAL FILING # 4278425 6
AMENDMENT     # 2014 1382712
SRV: 140443921

---

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 4278425 6 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| | 7a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

---

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**

Wells Fargo Bank, National Association

10. OPTIONAL FILER REFERENCE DATA

Hi-Temp Specialty Metals, Inc.