**OTTERBOURG P.C.**
Jonathan N. Helfat
Daniel F. Fiorillo
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104
*Attorneys for Wells Fargo Bank, National Association*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**
─────────────────────────────────X
                                                          :
IN RE:                                                  :         Chapter 11
                                                          :         Case No. 16-72767 (LAS)
HI-TEMP SPECIALTY METALS, INC.,    :
                                                          :
                            Debtor.        :
                                                          :
─────────────────────────────────X

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO
DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING THE USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE
PROTECTION AND (III) SCHEDULING A FINAL HEARING**

Wells Fargo Bank, National Association ("Wells Fargo" or the "Bank"), by and through its undersigned counsel, hereby objects to and opposes the *Motion of Hi-Temp Specialty Metals, Inc. for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Scheduling a Final Hearing* [Docket No. 3] dated June 22, 2016 (the "Motion"). In support of its objection to the Cash Collateral Motion (the "Objection"), Wells Fargo states as follows:

1.      On the petition date, the Debtor requested authority to use Wells Fargo's cash collateral pursuant to the Motion and supported by the Declaration of Joseph Smokovich pursuant to Local Rule 1007-4 ("Smokovich Declaration"). The Debtor did not seek the Bank's

consent to use its cash collateral prior to filing the Motion, and the Bank does not now consent to such requested use. For the reasons more fully set forth below, the Motion should be denied.

2. The Bank learned of the Debtor's Chapter 11 filing on the Petition Date by randomly checking the Court's docket. On the following day, the Bank called Mr. Smokovich to ascertain the status of the Debtor's sales and collections, and asked Mr. Smokovich about the absence of the usual collection activity in the Bank's collection account, into which all of the Debtor's accounts receivable proceeds are deposited in accordance with the Bank's secured credit arrangements with the Debtor. Mr. Smokovich responded to the Bank's inquiry by stating that he did not "feel comfortable" answering the question without his counsel, and declined to provide further details on the matter.

3. On information and belief, the Debtor violated the terms of the Credit Agreement between the Bank and the Debtor by diverting the proceeds of the Bank's accounts receivable collateral prior to filing for bankruptcy, and now refuses to account to the Bank regarding the disposition of these diverted funds. The Bank presumes that these diverted funds were used to pay professional retainers and other expenses of the Debtor both prior to and possibly subsequent to the filing. To highlight this point, the Bank's collection account with the Debtor for the 3 weeks in June 2016 ending on June 10, June 17 and June 24, 2016 <u>totaled</u> approximately $52,000, but the cash collateral budget filed with the Motion shows the Debtor having collections for just the one week ending June 24, 2016 of $843,747. This gross disparity in collection balances of almost $800,000 means that either the budget is woefully short on its first week of anticipated collections (which raises obvious administrative solvency and related concerns), or pre-petition collateral collections were diverted by the Debtor in direct violation of the Credit Agreement.

4.      In an effort to prepare its opposition to the Debtor's Motion, the Bank served a deposition notices on Debtor's counsel seeking to depose three members of the Debtor's management team identified in the Debtor's pleadings and the Debtor's proposed investment banker; namely, Joseph Smokovich, Evan Smokovich (the head of Debtor's global sales), Kristin Dluginski (Debtor's controller) and Jeffrey Manning (the investment banker from CohnReznick who the Debtor seeks to retain in the Chapter 11 case).  Notwithstanding the Bank's repeated offers to accommodate the schedules of these individuals over the last 4 days in order to obtain critical evidence relative to the Debtor's requested relief, the Debtor steadfastly refused to make anyone available prior to the hearing on the Motion, and advised that only one of these individuals would be available for examination, but only after the cash collateral hearing.

5.      The Motion fails to establish a prima facie case demonstrating how Wells Fargo will be adequately protected for the requested, non-consensual use of its cash collateral as required under Section 363(c) of the Bankruptcy Code.  Given the Debtor's declining inventory values, which Mr. Smokovich has himself recently acknowledged to the Bank, Wells Fargo believes it is likely undersecured at present.  The Motion is conspicuously silent on this point, and the failure of the Debtor to offer the Bank adequate protection other than offering replacement liens on the same deteriorating collateral pool without offering any additional protection clearly begs the issue.

6.      The budget attached to the Motion provides that Debtor will operate with *negative* cumulative cash flow of over $131,884 for the first 3 weeks of this case.  Yet, the Debtor offers Wells Fargo only replacement liens in the same inadequate, deteriorating collateral securing the Bank's pre-petition debt, while asking this Court for permission to spend over $1.7 million in the Bank's cash collateral (collections) during the first 3 weeks, and to subordinate the Bank's liens

in favor of <u>all</u> professional fees incurred in this case.  Without submitting any evidence in the record either showing the extent to which the Debtor will replenish the Bank's collateral post-petition, or providing a plan to address the liquidity shortfalls and mounting operating losses that are plaguing the Debtor's business, the Motion effectively requests the unfettered use of the Bank's cash collateral without proposing to solve, or even address, any of the Debtor's financial problems that lead to the bankruptcy filing.

7.     Contrary to the Motion, the Debtor's inability to comply with its financial covenants under the Bank's credit facility has been ongoing throughout its 10 year lending relationship with the Bank.  The Bank will demonstrate at the interim hearing on the Motion that the Debtor has consistently failed to accurately project its sales and collection levels, as market volatility combined with the "spot" demand for the Debtor's specialty metals makes for an extremely uneven and unpredictable financial performance—and as a result over the last two years the Debtor has operated at a net loss.

8.     Compounding matters, the Debtor has been stockpiling slow moving inventory (i.e., inventory that has been on hand at the Debtor's facility for over 12 months) that cannot be sold in real time to produce sufficient sale proceeds to break even, let alone sustain the Debtor's business operations during the Chapter.  It is only through new sales of inventory that the Debtor claims it can return to profitability, thereby ascribing almost no value to the slow moving inventory on hand against which Wells Fargo has advanced millions of dollars and is the current cause of the Bank being overadvanced against this collateral by over $1 million.

9.      This slow moving inventory constitutes as much as 51.3% of the Debtor's inventory, and continues to decrease in value as market prices have, at best, remained flat.  While the Debtor would like this Court to believe that the Bank unilaterally reduced the Debtor's

"availability under the line of credit by more than $7 million" (Motion, ¶ 12), the actual loss of Debtor's availability is based solely on the declining value of its own inventory, a fact that Mr. Smokovich himself recently affirmed to the Bank when on May 2, 2016 he wrote down the reported cost value of his "bag house" inventory as of April 30, 2016 by over $1 million.

10.     Not only does Wells Fargo have reason to believe that the Debtor has diverted hundreds of thousands of dollars of the Bank's cash collateral prior to filing for Chapter 11, as referred to in ¶ 2 above, the Bank will demonstrate at the hearing that the Debtor failed to timely correct reported cost values of inventory in an apparent effort to obtain more advances from the Bank at unwarranted advance rates, which has seriously harmed the Bank's prospects for a full recovery.

11.     It is respectfully submitted that, based on the Debtor's failure to satisfy its statutory burden to demonstrate how the Bank is adequately protected for the proposed use of its cash collateral, together with testimony that the Bank will offer from the appraiser of the Debtor's collateral, Ridley Gunderson of Sector 3 Appraisals, Inc., and Jeremy Breazzano of Calibre Group, LLC, the former management consultant to the Debtor who was recently terminated, and John Erwin of Wells Fargo, who has managed to Debtor's loan account with Wells Fargo over the last ten years, the Debtor's Motion must be denied as matter of law.

12.     Wells Fargo remains willing, as it has over the last several months, to again attempt to engage the Debtor in productive negotiations to address the Debtor's worsening financial performance and serial violations of the lending arrangements. However, the Debtor has consistently refused any attempts by the Bank to consensually resolve this matter, and has instead resorted to this Court to seek the non-consensual use of the Bank's cash collateral

without addressing any of the underlying liquidity issues that caused the Debtor's financial problems in the first place.

13. So long as the Debtor is determined to ignore the economic realities confronting its business so it can attempt to conduct "business as usual" while burning through the Bank's cash collateral without identifying or implementing any feasible business plan to maximize the value of the estate's assets, this Court must not permit the obviously impaired business judgment of the Debtor to cause irrevocable harm to the interests of Wells Fargo and other estate creditors through the non-consensual use of cash collateral.

## Background

14. On June 22, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor remains in possession of its property and the management of its businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

15. Wells Fargo is the prepetition senior secured lender to the Debtors pursuant to a certain revolving credit facility in the maximum amount of $18,500,000 (the "Credit Facility") pursuant to the Amended and Restated Credit and Security Agreement, dated July 16, 2010, as amended prior to the date hereof (collectively, the "Credit Agreement"), and (b) the Forbearance Agreement dated as of January 19, 2016 by and among Company, Guarantors and Wells Fargo, as amended by the First Amendment to Forbearance Agreement dated as of May 9, 2016 by and among Company, Guarantors and Wells Fargo (collectively, the "Forbearance Agreement").

16. Wells Fargo holds a first priority perfected security interest in all of the Debtor's assets, including, but not limited to, accounts receivable and inventory. The amount of secured debt outstanding under the Credit Facility was at least $13,177,998.82, consisting of

$13,127,998.82 in principal alone of funded advances as of the Petition Date and a $50,000 standby letter of credit. Debtor also owes Wells Fargo interest, fees and expenses as provided in the Credit Facility.

17. Wells Fargo has documented and addressed with the Debtor numerous events of defaults that have occurred under the Credit Agreement over the last seven years. Some of these defaults, which have continued through the Petition Date, include the following: (a) failing to deliver unqualified audited financial statements; (b) paying dividends or distributions to shareholders in excess of the amounts permitted pursuant to Section 8.2.6 of the Credit Agreement, (c) failing to maintain a Fixed Charge Coverage Ratio (which was amended several times over the last six years to accommodate the Debtor's financial performance) in accordance with the Credit Agreement for periods in 2008, 2009, 2013, 2014 and 2015; (d) incurring capital expenditures in excess of the amount permitted under the Credit Agreement; (e) incurring indebtedness of approximately $1,100,000 through loans and advances from an affiliate in violation of Section 5.4 of the Credit Agreement; (f) Debtor having made loans and advances to an affiliate, Aurora Metals, Inc., that is not a party to the Credit Agreement, in violation of Section 5.6 of the Credit Agreement.

18. In April, 2016, in response to the Bank's inquiries concerning the valuation of certain inventory collateral that formed the basis of loan availability under the Credit Facility, Mr. Smokovich acknowledged that such values were overstated by over $1 million, and he consequently submitted a revised borrowing base report on May 2, 2016 to reflect his reduced inventory values as of April 30, 2016. This, among other items contributing to the decline in the Debtor's "borrowing base" collateral, resulted in the Bank having an overadvance of

approximately $1 million, which remains outstanding and is most likely growing larger by the day.

19. On May 20, 2016, the Bank's agreement from exercising its default rights under the Forbearance Agreement expired. Prior to the expiration of the Forbearance Agreement, the Bank engaged in good faith negotiations with the Debtor in an attempt to, once again, restructure the financing arrangements to accommodate the financial difficulties the Debtor was experiencing. The Bank prepared and circulated several term sheets over the last month that set forth proposed terms and conditions on which the Bank would give the Debtor a <u>one year</u> extension of the forbearance agreement. These proposals made by the Bank were structured around *the Debtor's own financial projections* provided to the Bank. After numerous attempts to engage the Debtor in meaningful discussions to address and potentially finalize these restructuring proposals made by the Bank, the Debtor initially indicated it would agree to the Bank's revised restructuring terms circulated on June 6, 2016, but then the Debtor changed course and rejected the proposal and shut down all communication channels with the Bank, including initially refusing access to the Bank's field examiners, abruptly terminating Calibre Consulting's access to the Debtor's facility, and failing to respond to the Bank's revised restructuring proposals for over a week at a time, other than declaring that the proposals "didn't work" and that the Debtor could not live up to its own projections.

## Argument

### Cash Collateral Motion Should Be Denied

20. The Cash Collateral Motion should be denied or adjourned because Wells Fargo does not consent to the use of cash collateral and Wells Fargo's interest in its collateral cannot be adequately protected.

21. A debtor-in-possession may not use cash collateral unless the secured creditor consents to the use of such funds or the court authorizes the use of cash collateral in accordance with the other provisions of 11 U.S.C. § 363. *See id.* § 363(c)(2). In that regard, the court may authorize the use of cash collateral if such use is conditioned on the debtor providing adequate protection to the secured creditor's interest. *See id.* § 363(e).

22. Moreover, section 363 of the Bankruptcy Code requires the debtor-in-possession to segregate and account for any cash collateral in the debtor's possession, custody or control. *See id.* § 363(c)(4).

<u>*Wells Fargo is Not Adequately Protected*</u>

23. A secured creditor is deprived of its security interest in a debtor-in-possession's collateral when the debtor seeks to use the collateral to maintain an on-going business. Accordingly, the bankruptcy court must afford the secured creditor adequate protection that is "completely compensatory" and that is a "substitute of the most indubitable equivalence." *In re Waste Conversion Techs.*, 205 B.R. 1004, 1007 (D. Conn. 1997) (citing *In re Murel Holding Corporation*, 75 F.2d 941, 942 (2d Cir. 1935)).

24. Further, adequate protection is designed to protect a secured creditor against "any decrease in the value of its collateral which may result from … the debtor's use of the collateral." *In re R & G Props.*, 2009 Bankr. LEXIS 2100, *12 (Bankr. D. Vt. July 6, 2009) (citing *Volvo Commercial Finance LLC the Americas v. Gasel Transp. Lines, Inc. (In re Gasel Transp. Lines, Inc.)*, 326 B.R. 683, 691-92 (6th Cir. BAP 2005)).

25. The focus of adequate protection is the protection of a secured creditor from diminution in the value of its collateral during the reorganization process. *In re Beker Industries Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

26.     If the Debtor's Motion was granted, Wells Fargo would face a significant risk of the diminution in the value of its collateral. Replacement liens alone do not adequately protect Wells Fargo from any decrease in the value of its collateral. The value of the collateral the Debtors intend to use exceeds the value of the replacement liens proposed by the Debtors as adequate protection. The result of this is that the Debtor's proposed replacement liens do not provide the required adequate protection for Wells Fargo from any decrease in the value of the collateral resulting from the Debtor's use of such collateral.

27.     Generally, courts have held that a 12% equity cushion in property falls short of establishing that the secured party is demonstrably oversecured. *In re Atrium Development Co.*, 159 B.R. 464, 471 (Bankr. E. D. Va. 1993). Case law has almost uniformly held that an equity cushion under 11% is insufficient to constitute adequate protection, and case law is at best divided on whether an equity cushion of 12% to 20% constitutes adequate protection. *See Kost v. First Interstate Bank of Greybull (In re Kost)*, 102 B.R. 829 (D.Wyo. 1989) (citations omitted); *see also Equitable Life Assurance Society of the United States v. James River Associates (In re James River Associates)*, 148 B.R. 790, 796 (E.D. Va. 1992) (citing *In re Kost*); 1 David G. Epstein, et. al., Bankruptcy § 3–27(c) (1992) (citing *In re Kost*). An equity cushion does not always respond to or answer fully the whole range of risks to the value of the creditor's encumbrance. *Atrium Development*, 159 B.R. at 471. Uncertainty can falsely inflate the equity cushion, and time will usually deflate it. *Id.*

28.     On information and belief, Wells Fargo's secured position is undersecured at present. It is without doubt that the requested use of cash collateral, if granted by this Court, will irrevocably harm the Bank's interest in the collateral, and will permanently reduce the secured portion of the Bank's claim against the Debtor.

*Wells Fargo Does Not Consent to Carve Out*

29. The Motion requests a carve-out for payment of the Debtor's professional fees and expenses. Wells Fargo does not consent to any carve-out for professional fees and expenses on an interim basis and does not consent to the use of its cash collateral to pay the Debtors' professional. *See e.g. In re Addison Properties Ltd. P'ship*, 185 B.R. 766 (Bankr. N.D. Ill. 1995) (Unless the secured parties consent, and the interest secured by the collateral is not adequately protected, then cash collateral may not properly be used to pay administrative expenses); *In re 680 Fifth Avenue Assocs.*, 154 B.R. 38, 41 (Bankr. S.D.N.Y. 1993) (denying use of rents to pay administrative expenses where debtors failed to prove that the secured creditor's interest would be adequately protected).

## CONCLUSION

**WHEREFORE,** Wells Fargo Bank, National Association respectfully requests that this Court enter an Order (A) denying, or at least adjourning, the Motion and (i) prohibiting the Debtor from using cash collateral, (ii) requiring the Debtor to segregate and account for all cash collateral, if any, pending further order of this Court, and (iii) requiring the Debtor to provide an accounting of all cash collateral, if any, from the Petition Date through the date of entry of an Order denying (or adjourning) the Motion; and (B) granting such other and further relief as is just and proper in this case.

Dated: New York, New York
June 27, 2016

**OTTERBOURG P.C.**

By: /s/ *Jonathan N. Helfat*
Jonathan N. Helfat
Daniel F. Fiorillo
Members of the Firm
230 Park Avenue
New York, New York 10169
Tel: (212) 661-9100
Fax: (212) 682-6104
*Counsel to Wells Fargo Bank, National Association*