**Hearing Date: July 7, 2016 at 11:00 a.m.**

DICONZA TRAURIG KADISH LLP
630 Third Avenue
New York, New York 10017
Gerard DiConza
Lance A. Schildkraut
Tel:  (212) 682-4940
Email:  gdiconza@dtklawgroup.com
         las@dtklawgroup.com

*Proposed Counsel for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re                                                    :
                                                         :      Chapter 11
HI-TEMP SPECIALTY METALS, INC.,          :      Case No. 16-72767-las
                                                         :
                              Debtor.                    :
-----------------------------------------------------------------x

## REPLY OF HI-TEMP SPECIALTY METALS, INC. TO
## OBJECTION OF WELLS FARGO BANK, N.A. TO
## DEBTOR'S MOTION FOR AUTHORITY TO USE CASH COLLATERAL

TO THE HONORABLE LOUIS A. SCARCELLA,
UNITED STATES BANKRUPTCY JUDGE:

Hi-Temp Specialty Metals, Inc. ("Hi-Temp" or the "Debtor"), as a debtor and debtor in

possession in the above-captioned chapter 11 case, by its proposed attorneys, DiConza Traurig

Kadish LLP, submits this Reply to the Objection of Wells Fargo Bank, N.A. dated June 27, 2016

[Dkt. No. 20] to the Debtor's motion (the "Motion")[1] for orders (a) authorizing Hi-Temp to use

Cash Collateral pursuant to sections 361 and 363 of chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code"); (b) approving the form of adequate protection provided to Wells

Fargo, pursuant to Bankruptcy Code sections 361 and 363; (c) scheduling a final hearing ("Final

Hearing") on the Motion; and (d) granting related relief.

---

[1]         Capitalized terms not defined herein shall have the meaning given those terms in the Motion.

## **Reply**

1.        The Debtor requests use of Cash Collateral so that it may continue to operate its business while its seeks capital to refinance Wells Fargo, create value for the Debtor's other stakeholders and exit chapter 11 as a reorganized entity.  As set forth in the Declaration of Joseph Smokovich Pursuant to Local Bankruptcy Rule 1007-4 dated and filed as of the Petition Date [Dkt. No. 2], the Debtor retained CohnReznick Capital Markets Securities, LLC ("CRCMS") on June 15, 2016 as investment banker to find new capital, including new senior lenders and investors, to replace the Wells Fargo loan and provide the Debtor with additional liquidity.

2.        In the short period of time since its retention, CRCMS has contacted several potential new lenders, and it has already received a non-bidding indication of interest featuring a $20 million revolver with a three-year term loan.  CRCMS is already in discussion with several new investors who understand that time is of the essence.  At the currently scheduled July 7, 2016 hearing to consider use of Cash Collateral, the Debtor will introduce Jeffrey R. Manning, a Managing Director at CRCMS, who will provide testimony on the oversecured position of Wells Fargo, his firm's marketing efforts thus far and anticipated timing on a transaction that will provide new financing to the Debtor.

3.        In its Objection and at the preliminary hearing held on June 28, 2016 (the "June 28 Hearing"), Wells Fargo attacked the Debtor's principal, Joseph Smokovich, for pre-petition use of a non-Wells Fargo lockbox account and demanded that the Court appoint a Chief Restructuring Officer.

2

4.      At the June 28 Hearing, after extensive cross-examination by counsel for Wells Fargo, Mr. Smokovich testified that certain Debtor funds were directed to a non-Wells Fargo account during a short period prior to Petition Date, but were used for necessary expenses of the business.  When asked why the non-Wells Fargo account was used, Mr. Smokovich testified as follows:

> I was put in a very difficult position. I had a choice to make, and that is to have the company survive, where I have a fiduciary responsibility to take care of that company, all of its employees, its staff, and to demonstrate that the company would be viable. I needed to do that, or else the company would have gone out of business the way Wells was -- Wells Fargo was driving the task.

(Tr. 6/28/16 pp. 40-41; a copy of the June 28 Hearing Transcript is annexed hereto as Exhibit A.)

5.      Mr. Smokovich further testified that he used the non-Wells Fargo account:

> [T]o take care of my employees, as well as my vendors to keep the company alive, because it was clear -- after Wells Fargo unilaterally decided not to pay payroll and then held it back overnight, that next morning it became very clear to me that I was in a situation where the bank only had one thing in mind.  And that is to liquidate the company. I had to sit and talk to my employees and explain to them that I could not pay them.

(Tr. 6/28/16 p. 37)

6.      Mr. Smokovich's testimony referred to an email exchange between the Debtor and Wells Fargo dated as of May 31, 2016 in which Wells Fargo initially authorized the Debtor to make payroll, but revoked the funding later in the day.  (*See* Email exchange between Wells Fargo and Debtor dated May 31, 2016 annexed hereto as Exhibit B).

7.      Since the June 28 Hearing, the Debtor, with the assistance of CohnReznick, has provided Wells Fargo with a full accounting (including back-up documentation) of the funds

3

transferred into the non-Wells Fargo account and the use of such funds. Annexed hereto as

Exhibit C is a spreadsheet of the non-Wells Fargo account transactions.[2]

8.      At the June 28 Hearing, Wells Fargo requested the appointment of a CRO. (*See*

Tr. 6/28/16 Hr. pp. 16-18.) After the Hearing, the Debtor made a good faith effort to reach a

resolution with Wells Fargo on the consensual use of Cash Collateral and offered to appoint a

mutually acceptable CRO. Eventually, the Debtor advised Wells Fargo that it would agree to

appoint Toby Kriedler of the Calibre Group, LLC, the consulting group recommended by Wells

Fargo and one of the witnesses proposed by Wells Fargo at the July 28 Hearing. (*See* Objection ¶

11.) Instead of reaching agreement with the Debtor on the appointment of Mr. Kriedler, after

insisting on the appointment of a CRO, Wells Fargo then made additional demands on the

Debtor before it would consent to use Cash Collateral, including, that: (a) the Debtor agree to a

debtor-in-possession loan from Wells Fargo in the form proposed prior to the bankruptcy filing,[3]

---

[2]      In addition to the accounting, the Debtor and CohnReznick's consultants spent many hours providing Wells Fargo with supporting documents, including bank statements, wire transfer receipts, invoices and other information regarding the non-Wells Fargo account. As directed by Judge Trust at the June 28 Hearing, the Debtor provided Wells Fargo with access to its facility and books and records on July 1, 2016 so that Wells Fargo could conduct a requested field exam. The Debtor and CohnReznick's consultants expended several hours before the field exam in providing information requested by Wells Fargo about the Debtor's finances.

It has come to the Debtor's attention that Wells Fargo used certain of the information provided in violation of the automatic stay. *See* 11 U.S.C. § 362(a) (automatic stay prohibits creditors from, among other things, exercising control over property of the estate). Certain of the Debtor's customers have advised the Debtor that over the holiday weekend, Wells Fargo contacted the Debtor's customers to verify the Debtor's accounts receivable. Obviously, the Debtor and its customers are troubled by Wells Fargo's actions, which actions only serve to undermine the Debtor's reorganization efforts. The Debtor has demanded that Wells Fargo cease and desist from contacting its customers.

[3]      In fact, the alleged pre-petition forbearance agreement proposed by Wells Fargo was neither a forbearance agreement nor in the form of a DIP proposal. While the Wells Fargo DIP financing proposal is not clear, the Debtor, with the assistance of CRCMS, has identified several potential sources of DIP financing. The Debtor recently received a DIP financing proposal from a third party that it is under consideration.

and (b) a $600,000 capital contribution by Mr. Smokovich.  After agreeing to appoint a mutually acceptable CRO, these additional demands were rejected by the Debtor.

9.      Thus, Wells Fargo is willing to move forward with the Debtor and Mr. Smokovich, but only on its unrealistic terms, which include the Debtor agreeing to a DIP loan from Wells Fargo and Mr. Smokovich's capital contribution to the Debtor.  Unfortunately, it is clear that Wells Fargo has no interest consenting to the Debtor's use of Cash Collateral and its objective here is to hasten and control the liquidation of the Debtor, replace Mr. Smokovich, and satisfy solely its claim at the expense of other stakeholders in the case.

10.     The Debtor respectfully requests that the Court allow it to use Cash Collateral in accordance with the revised Budget annexed hereto as <u>Exhibit D</u>.  The Revised Budget was prepared with the assistance and input of Howard Konicov, a partner of CohnReznick LLP, the proposed financial advisors to the Debtor.[4]  At the July 7 Hearing, Mr. Konicov will provide testimony on, among other things, the Debtor's anticipated Cash Collateral needs and uses and adequate protection afforded to Wells Fargo.[5]

---

[4]      On July 1, 2016, the Debtor filed its Application to Retain CohnReznick LLP as Financial Advisors to the Debtor [Dkt. No. 26.]

[5]      As set forth in the Motion and at the June 28 Hearing, the Debtor is proposing adequate protection in the form of replacement liens.  In addition, Wells Fargo is adequately protected due to its substantial equity cushion. Courts in this District have held that the granting of replacement liens on post-petition collateral provides adequate protection to a secured lender.  *See In re Island Helicopter Corp*., 63 B.R. 515, 523 (Bankr. E.D.N.Y. 1986) (secured lender found to be adequately protected by maintenance and upgrade in value of collateral and replacement liens on post-petition assets).  Courts have held that a lender is adequately protected by an equity cushion over and above the value of such lender's claims.  *In re Podzemny*, 2011 Bankr. Lexis 567 * 29, Case No. 09-14226 (Bankr. D.N.M. Feb. 8, 2011) (30% equity cushion sufficient to provide adequate protection for use of cash collateral); *In re Hefty*, 2011 Bankr. Lexis 2387 **41-43, Case Nos. 11-60039-40 (Bankr. D. Mont. June 20, 2011) (holding that a 38% equity cushion in collateral provided adequate protection for a secured claim).

WHEREFORE the Debtor respectfully requests that the Court enter an order allowing it to use Cash Collateral in accordance with the Revised Budget annexed hereto.

Dated: New York, New York
July 5, 2016

Respectfully submitted,

DICONZA TRAURIG KADISH LLP
*Proposed Attorneys to Debtor and Debtor in Possession*

By: ___/s/ Gerard DiConza_____
Gerard DiConza
Lance A. Schildkraut
630 Third Avenue
New York, New York 10017
Telephone: (212) 682-4940

## Exhibit A

## June 28 Hearing Transcript

**In Re:**

*HI-TEMP SPECIALTY METALS, INC.*
*Case No. 8-16-72767-las*

---

*June 28, 2016*

---

*eScribers, LLC*
*(973) 406-2250*
*operations@escribers.net*
*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*

**Min-U-Script® with Word Index**

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF NEW YORK

Case No. 8-16-72767-las

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


HI-TEMP SPECIALTY METALS, INC.,


            Debtor.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            Alfonse M. D'Amato U.S. Courthouse

            290 Federal Plaza

            Central Islip, New York


            June 28, 2016

            11:02 AM


B E F O R E:

HON. ALAN S. TRUST

U.S. BANKRUPTCY JUDGE

1

2   Hearing Re:  Motion to Use Cash Collateral Filed by Gerard

3   DiConza on Behalf of Hi-Temp Specialty Metals, Inc., (DiConza,

4   Gerard) (Entered:  06/22/2016)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Aliza Chodoff

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2  A P P E A R A N C E S :

3  DICONZA TRAURIG KADISH LLP

4       Attorneys for Debtor

5       630 Third Avenue

6       New York, NY 10017

7

8  BY:   GERARD DICONZA, ESQ.

9

10

11  OTTERBOURG P.C.

12       Attorneys for Wells Fargo N.A.

13       230 Park Avenue

14       New York, NY 10169

15

16  BY:   JONATHAN N. HELFAT, ESQ.

17       DANIEL FIORILLO, ESQ.

18       ADAM SILVERSTEIN, ESQ.

19

20

21

22

23

24

25

1

2

3   UNITED STATES DEPARTMENT OF JUSTICE

4          Office of the United States Trustee

5          560 Federal Plaza

6          Central Islip, NY 11722

7

8   BY:    STAN YANG, ESQ.

9

10

11  ALSO PRESENT:

12          JEFFREY MANNING, Managing Director, CohnReznick Capital

13              Market Securities

14

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2            THE COURT:  All right.  All right.  We have on this

3    morning the emergency hearing in Hi-Temp Specialty Metals.

4            I'll take appearances, please.

5            MR. DICONZA:  Good morning, Your Honor.  Gerard

6    DiConza, DiConza Traurig Kadish on behalf of the debtor.

7    Seated next to me, Your Honor, is Jeffrey Manning from

8    CohnReznick, the investment broker -- proposed investment

9    broker for the debtor.  And seated behind me, Your Honor, is

10   Mr. Joe Smokovich, who is the debtor's principal.

11           MR. YANG:  Good morning, Your Honor.  Stan Yang for

12   the United States Trustee.

13           MR. SILVERSTEIN:  Good morning, Your Honor.  Adam

14   Silverstein of Otterbourg P.C. for Wells Fargo.  With me is my

15   partners John Helfat and Daniel Fiorillo.

16           THE COURT:  All right.  This morning, we have the

17   emergency hearing on the debtor's request for interim use of

18   cash collateral.  To make sure that you all understand what I

19   anticipate, you understood before 11 o'clock this morning, this

20   is Judge Scarcella's case.  This will be perhaps the only

21   case -- the only matter that I hear in this case, so I intend

22   to proceed on this as an emergency hearing only; meaning that,

23   unless you're about to tell me what agreement you've reached,

24   the only issue that I'm going to decide today is to what extent

25   the debtor will be able to use cash collateral to avoid

1    immediate and irreparable harm to the estate pending a further

2    hearing to be held before Judge Scarcella on July 7th.

3            MR. DICONZA:  Yes, Your Honor, I understand

4    completely.  Unfortunately, we have not been able to come to an

5    agreement, although I have requested input on our proposal.  So

6    we are prepared today to give the Court a brief background of

7    why we're here, where we're going with this case, and how much

8    cash we are going to need between the petition date and July

9    7th.  And then, we can duke it out before Judge Scarcella if we

10   don't have an agreement before then.

11           THE COURT:  All right.

12           MR. DICONZA:  So Your Honor, the cash collateral

13   motion was filed on June 22nd, the petition date.  In addition

14   to that motion, Your Honor, we also filed a declaration of Mr.

15   Smokovich.  And that declaration included financial statements

16   of the debtor.  By order dated June 23rd, Your Honor, this

17   hearing was scheduled.  My office provided service in

18   accordance with that order.

19           And before we get into the specifics of the cash

20   collateral motion, Your Honor, just a little background on the

21   debtor and -- which is included in the Smokovich declaration,

22   which can be -- which we asked the Court to take judicial

23   notice of.

24           THE COURT:  I've read it.

25           MR. DICONZA:  Your Honor, the debtor, Hi-Temp, is a

1  Delaware corporation, which was founded in 1982.  And it's a

2  niche metals recycling company located in Yaphank, Long Island,

3  several miles east of this courthouse.  It employs about

4  twenty-five people, Your Honor, here in Suffolk County.  Mr.

5  Smokovich and a group of investors bought -- acquired the

6  debtor back in 1999.  And as of the petition date, Mr.

7  Smokovich is the president, CEO, and majority shareholder of

8  the debtor.

9        As stated in the Smokovich declaration, Your Honor,

10  the debtor's financial difficulties started with the dramatic

11  decrease in the price of commodities over the last several

12  years, which caused a loss for the debtor, triggering a

13  technical default provision under the loan agreement between

14  the debtor and Wells.  That loan facility, Your Honor, is a

15  22.5 million-dollar facility dated as of 2010.  It is attached

16  as a copy to the cash collateral motion, Your Honor.

17        As of the petition date, Wells Fargo is the largest

18  creditor of the debtor holding a secured claim of approximately

19  thirteen million dollars, Your Honor.  Since early 2015, Your

20  Honor, the debtor and Wells Fargo have been in workout

21  discussions over forbearance and amendments to the loan

22  document.  Since that time, Your Honor, the availability under

23  the loan has dramatically decreased from the 22.5 million to

24  its current approximate of 13 million.

25        Since 2015, Your Honor, Wells Fargo has been paid

1   approximately five million dollars -- its obligations have been
2   paid down by approximately five million dollars.  And due to
3   the default, Your Honor, over the last year and a half, Wells
4   Fargo has been an active participant, to say the least, in the
5   debtor's business, Your Honor.  Wells Fargo has been provided
6   with daily financials, conducted field exams, audited --
7   audits.  Availability has reduced significantly.  Wells has
8   been involved in the debtor's ability to make payments,
9   supervising on who the debtor makes payments to, who it can't
10  make payments to.

11          The shrinking availability, Your Honor, and control
12  asserted by Wells has put a strain on the debtor.  Recent
13  negotiations, Your Honor, Wells had made demands for personal
14  financial accommodations from the debtor's principal.  These
15  requests and the inability to reach a workout agreement, Your
16  Honor, caused the debtor -- excuse me, Your Honor -- to retain
17  my firm recently in May of this year, as well as Mr. Jeff
18  Manning's firm several weeks ago, Your Honor.

19          But prior to the retention of my firm, Your Honor, and
20  during the workout discussions, Wells directed the debtor to
21  retain a financial advisor and recommended a couple financial
22  advisors.  And the debtor, several months ago, retained this
23  group called the Caliber Group.  Unfortunately, during the
24  involvement -- during Caliber's involvement with the debtor,
25  Caliber did not identify any investors or lenders who would be

1  willing to come in to refinance and take Wells out of the

2  picture.

3          So the debtor realized that it was continuing down

4  this suicide mission under the Wells agreement, Your Honor, and

5  the watchful eye of Wells Fargo.  In the end, the debtor's

6  relationship with Caliber soured, yet Wells Fargo continued to

7  insist that Caliber be retained going forward by the debtor.

8          In contrast to Caliber, Your Honor, in just the few

9  weeks that Mr. Manning's group has been on board with the

10  debtor, Mr. Manning -- and he will testify, Your Honor, today

11  that --

12          THE COURT:  Well, he may testify, but not today.

13          MR. DICONZA:  Okay, Your Honor.  Done.

14          He has established an online virtual data room

15  containing the debtor's financials, Your Honor.  He has already

16  identified several potential investors, some who have already

17  signed NDAs, Your Honor, and has fielded several calls from

18  interested strategic investors.  Your Honor, Mr. Manning is an

19  investment banker and firmly believes that the debtor will be

20  able to obtain financing or an investment in a short period of

21  time that will be able to pay off Wells Fargo in full in that

22  short period of time.  And the debtor will be able to

23  reorganize coming out of this case, maintaining employment of

24  twenty-five employees here in Suffolk County under a

25  reorganized entity.

1          The debtor had to file this Chapter 11, Your Honor, to

2     get some breathing space so that the continued Wells Fargo

3     control -- every day control so that the debtor's principal can

4     focus on the business during the next several months to deal

5     with potential investors who are interested in the company.

6          The debtor filed this company, Your Honor, because it

7     has fiduciary obligations not just to Wells Fargo, but to all

8     of its creditors.  Your Honor, if Mr. Manning were given the

9     opportunity to testify today, he would testify that Wells Fargo

10    is in fact oversecured.  There's enough value here, Your Honor,

11    not just for Wells Fargo but for creditors and other

12    stakeholders.  If Wells Fargo has its way, Your Honor, this

13    would be a liquidation, and Wells Fargo would be the only

14    entity that gets paid out during this case.

15         So Your Honor, that brings us to today's cash

16    collateral motion, and we understand today we're only dealing

17    with a short period of time from the petition date through July

18    7th, Your Honor.  As part of the motion, we filed a thirteen-

19    week budget.  So Your Honor, what the debtor needs during the

20    petition date through July 7th is approximately 1.5 million

21    dollars in cash to pay critical vendors, employees, utilities,

22    insurance.  And that's all set forth on the budget, Your Honor,

23    and Mr. Manning --

24         THE COURT:  Well, the critical -- well, critical

25    vendors is not --

1          MR. DICONZA:  Not --

2          THE COURT:  -- for today, and there's no employee

3    payroll line until the July 8 week.

4          MR. DICONZA:  Your Honor, I -- yeah, it's not critical

5    vendors in the sense of pre-petition critical vendors.  We have

6    not filed a motion for payment of pre-petition critical

7    vendors, so we're not considering those right now until --

8    unless and until we actually do file a motion.  Critical

9    vendors is who I -- what I mean by post-petition suppliers,

10   Your Honor, for today's purposes.

11         THE COURT:  All right.

12         MR. DICONZA:  Your Honor, so the amount that we

13   believe is necessary to get the debtor through the July 7th

14   hearing is approximately 1.5 million dollars.

15         As far as adequate protection for the bank, Your

16   Honor, the debtor has proposed to provide the debtor with

17   replacement liens on post-petition property acquired by the

18   debtor, post-petition inventory acquired by the debtor, which

19   the bank does not have liens on.  We also believe, Your Honor,

20   that there's a substantial equity cushion here.  Mr. Manning

21   would testify that he believes that there's value above and

22   beyond the thirteen million dollars due and owing to Wells

23   Fargo.

24         There's -- in just the inventory and accounts

25   receivable, Your Honor, there's approximately twenty million

1   dollars in value.  And that's excluding equipment, Your Honor,

2   which Wells Fargo also has a lien on and is valued somewhere --

3   on a liquidation value, Your Honor -- is between one million

4   and two million.  So there's approximately twenty-two million

5   dollars in value here.  And the Wells Fargo claim is only

6   thirteen million, Your Honor.

7           So we believe that the case law establishes that an

8   equity cushion of that size is sufficient adequate protection.

9   The replacement liens, Your Honor, that we're offering --

10          THE COURT:  All right.  Well, I'm going to give Wells

11  Fargo a chance to present their side of the story.  I've read

12  your objection -- I mean, I've read the motion, I've read the

13  Smokovich affidavit, I've read the Wells Fargo objection.  So

14  let me let you summarize.  And then, the Court's intention is

15  this:  is we've got the declaration of the principal of the

16  debtor.  The Court's intention would be to allow Wells Fargo to

17  cross-examine Mr. Smokovich on his declaration so that I can

18  get a feel for how much actually needs to be utilized in terms

19  of cash between now and July 8th, and then what protection to

20  Wells Fargo is or might be worth.

21          Presumably, the principal of the company has a handle

22  on what the stuff is worth, as well as the expert might.  And

23  then, to hear from a Wells Fargo witness on why they believe

24  that this case is going down the drain very rapidly.  And

25  presumably, they want to know -- at least their objection says

1    they want to know what happened to the cash pre-filing.

2            So let me give Mr. Silverstein a chance, and then

3    we'll come back to get in some evidence.

4            MR. DICONZA:  Thank you, Your Honor.

5            MR. SILVERSTEIN:  Good morning again, Your Honor.

6    Adam Silverstein for Wells Fargo.

7            There's a lot that Mr. DiConza said that I want to

8    address, but I want to focus the conversation now on the

9    emergency relief that they're seeking.  And under different

10   circumstances with a different debtor, we might not be here

11   today.  In fact, on the car ride out from Manhattan, when I was

12   with Mr. Forte, he was trying to remember the last time that he

13   came out and appeared for a cash collateral fight.

14           So the starting point is really the debtor and Mr.

15   Smokovich.  And I want to focus on that.  The -- according to

16   the debtor's financials, the debtor collects approximately two

17   to two and a half million dollars a month.  And in fact, when

18   the debtor filed its application for use of cash collateral, it

19   projected that for the week ending June 24th, which was two

20   days after the application was filed, there would be 800,000

21   dollars in collections.

22           As we stand here today, in Wells Fargo's sweep

23   account, there is 26,000 dollars.  In fact, for the three weeks

24   in June leading up to June 24th, there was total collections in

25   the control account of 52,000 dollars.  So the record is pretty

1    clear, Your Honor, that Mr. Smokovich has diverted proceeds

2    that he knew were in security for Wells Fargo that should have

3    gone into a control account.  And he's now put them somewhere

4    else.  We don't know where they are.  We don't what's been with

5    them, but it's clear that Mr. Smokovich is playing by his own

6    set of rules.

7            He's -- Mr. DiConza said that Wells Fargo's getting

8    daily reporting.  In fact, Your Honor, the debtor's supposed to

9    be providing monthly financials.  The April financial would be

10   due by the end of May.  And in fact, historically, the debtor

11   has provided financials by the end of the following month.  And

12   we do not have the April financials.  And those financials are

13   going to show, Your Honor, as has been the recent history of

14   the debtor's business, that there are ongoing losses at the

15   company.  There's not sufficient liquidity, and -- but that's

16   being withheld and concealed from us.

17           We asked for Mr. DiConza's -- I'm sorry, we asked for

18   Mr. Smokovich's deposition between the filing and today.  We

19   were told no.  The debtor has transferred monies to a nondebtor

20   affiliate in the hundreds of thousands of dollars within the

21   last year, including even after we entered into a forbearance

22   agreement that acknowledged the default for such conduct.  And

23   it still continued.

24           So in essence, Your Honor, the debtor and Mr.

25   Smokovich are thumbing their nose at their creditors.  And Mr.

1  Smokovich thinks that he can play by his own set of rules.  And

2  now, after playing fast and loose, he's asking the Court to

3  essentially give him unfettered use of Wells Fargo's cash.

4  There -- the application seeks no restrictions other than now

5  we're hearing an amount of 1.5 million dollars, but there's no

6  strings attached on what that money, as far as we know, can be

7  used for.

8          And in -- and what I just heard Mr. DiConza say is

9  that the debtor, who is sitting on, according to them -- I

10 think Mr. DiConza said twenty million dollars of inventory,

11 they want to use cash collateral to buy yet inventory.  The

12 fact of the matter is, Your Honor, that the inventory that the

13 debtor has is these specialty metals; we think up to fifty

14 percent of which are -- have been sitting in the warehouse for

15 a year or more.  The collateral hasn't been -- the inventory

16 hasn't been sold.  But if it is as valuable as Mr. DiConza

17 says, there's no need to buy any more of it.  He's got

18 sufficient inventory to sell off.  He doesn't need to use cash

19 to buy more inventory.

20         So -- and in addition, they want to use the

21 debtor's -- they want to use Wells Fargo's cash to pay

22 professional fees.  So even without addressing the merits of

23 the cash collateral application, there's not even a basis for

24 the unfettered use of the debtor's -- of Wells Fargo's cash for

25 even a week.

1          But in terms of the merits -- and there's --

2          THE COURT:  So you want -- the bank wants me to

3    convert the case today?

4          MR. SILVERSTEIN:  Pardon?

5          THE COURT:  The bank wants me to just convert the case

6    today?

7          MR. SILVERSTEIN:  I want to discuss it with my client,

8    if I could have a moment and -- a few moments, and we can let

9    you --

10          THE COURT:  I'm not saying I'm going to.  I'm just

11    trying to figure out --

12          MR. SILVERSTEIN:  Well, I think that --

13          THE COURT:  I -- you got to get from --

14          MR. SILVERSTEIN:  -- at a minimum, Your Honor, we

15    think there should --

16          THE COURT:  Well, but the bank -- well, hang on.  We

17    have to get from no to something.  So just saying stay in

18    Chapter 11 but don't operate or spend cash is not an option.

19    So --

20          MR. SILVERSTEIN:  Yeah, at a minimum, Your Honor, we

21    would want a CRO appointed.  I will talk to the client about

22    conversion, but I think having a CRO come in and take control

23    and work with Mr. Smokovich would be acceptable to the bank.

24          We disagree with virtually everything that Mr. DiConza

25    said about the presentation and the facts leading up to the

1    filing.  And I'm not going to address all of those things now.

2    What I will address, though, is that there's been absolutely no

3    showing whatsoever of adequate protection for the unfettered

4    use of Wells Fargo's cash.

5            There is no showing whatsoever as to when this

6    money -- when the one and a half million dollars is used to pay

7    whatever the debtor has in mind for what it's going to be used,

8    what is Wells Fargo left with?  We -- there's no -- there's

9    nothing in the record about what the current accounts

10   receivables are, what the current inventory is, what it's going

11   to look at in another week.

12           So we're happy to cross-examine Mr. Smokovich.  We're

13   happy to put on Mr. Irwin from Wells Fargo and to address these

14   issues.  But based on the conduct that is irrefutable -- Mr.

15   DiConza knew the allegations when he stood up here and he

16   didn't even address them.  We think, at a minimum, there should

17   be a CRO appointed, and we also want an accounting as to where

18   this money is and how it's been used, because, as -- our

19   understanding is today is a payroll day, Your Honor.  And

20   clearly, the debtor has been using cash even after -- or will

21   be using cash even after the bankruptcy filing without any

22   first day applications or orders.

23           So Your Honor, as I mentioned, we don't think that the

24   debtor should have any use of cash collateral even for a week,

25   certainly non -- on an unfettered basis.  And at a minimum,

1  there should be a CRO and an accounting.

2          THE COURT:  All right.

3          MR. SILVERSTEIN:  Thank you, Your Honor.

4          THE COURT:  All right.  Mr. Yang -- well, hang on.

5  Mr. Yang, from your office?

6          MR. YANG:  Not at this time, Your Honor.

7          THE COURT:  All right.

8          MR. DICONZA:  Your Honor, can I address some of those

9  points?  And then, if Your Honor would like to put Mr.

10  Smokovich on the stand or ask questions of him from there, we

11  can do that.

12          Your Honor, regarding the sweep account, I don't know

13  if Mr. Silverstein practices in bankruptcy, but the United

14  States Trustee has a requirement that the debtor shut down its

15  accounts as of the petition date and open up new accounts.  And

16  that's what the debtor has done.  The debtor has opened new

17  debtor-in-possession accounts at TD Bank, Your Honor.

18          As far as these various allegations that they're

19  making about Mr. Smokovich diverting funds, Your Honor, that's

20  negligent on the part of Wells Fargo, Your Honor.  This is a

21  company that we're trying to rehabilitate.  And by them coming

22  in here and making allegations that he's diverting funds, Your

23  Honor, is not only going to hurt the company but their own

24  collateral, Your Honor, at the end of the day.

25          Mr. Smokovich and the company was forced to open up

1    another account pre-petition, Your Honor, because of Wells

2    Fargo's control over the sweep accounts that were controlled by

3    Wells Fargo.  Wells Fargo directed who the debtor could make

4    payments to.  If Mr. Smokovich had not opened up the other

5    account, Your Honor, he would not have been able to retain

6    counsel of his own choice.  He would not have been able to

7    retain investment bankers of his own choice.  At one point,

8    Your Honor, the bank advised Mr. Smokovich that he could make

9    payroll one day.  The next day, they pulled that authority, and

10   he was unable to make payroll and had to go address all of his

11   employees and tell them that he wasn't able to pay them because

12   the bank revoked the authorization to make payroll.

13           Mr. Smokovich was forced to do this, Your Honor, in

14   order to keep the company alive as a fiduciary for all the

15   creditors of the company.

16           Regarding the bank's request for depositions, Your

17   Honor --

18           THE COURT:  What was the pre-petition bank?  You said

19   the debtor opened a DIP account --

20           MR. DICONZA:  Yes.

21           THE COURT:  -- at TD Bank post.  What was the nonWells

22   Fargo pre-petition bank?

23           MR. DICONZA:  I believe it was Citibank, Your Honor.

24   It was Citibank, Your Honor.

25           As far as the deposition, Your Honor, Your Honor, this

1   case was filed last, I believe, Wednesday, Your Honor.  I

2   advised Wells Fargo that I was out of the office on Friday.  I

3   could not make it, and there was no opportunity to provide any

4   depositions.  They requested within two hours of the filing --

5   they've alleged that they never knew about the filing except

6   through a random search.  Your Honor, within two hours after

7   the filing, I received a notice to depose four people from the

8   debtors.  So we weren't able to give them anyone before today.

9        But I told the bank that if they wanted to conduct

10  reasonable depositions -- and we don't need the depositions of

11  four people between now and the final hearing -- we're more

12  than willing.  4th of July is wide open.  I'm more than willing

13  to give them someone on the 4th of July if they want to depose

14  someone in our offices.

15       Your Honor, transferred to affiliates.  Again, Your

16  Honor, that was all done with Wells Fargo's knowledge.  Wells

17  Fargo knew about those transfers.  It wasn't -- it's not as if

18  this is an affiliate off site.  This is a company within the

19  business at the facility at Yaphank.

20       Not knowing what the 1.5 million dollars is going to

21  be used for, Your Honor.  Again, there was a budget attached to

22  our cash collateral motion.  We filed this case last Wednesday.

23  Wells Fargo or its counsel could have called me and asked what

24  do you need the monies for, what are going to do.  No, they

25  refused to make that call, Your Honor.  They want to get rid of

1    Mr. Smokovich, and they're going to allege diversions here

2    before Your Honor because they want to put someone else in

3    control of the company and control this case for their own

4    purposes, Your Honor.

5        Regarding the inventory, Your Honor, Mr. Silverstein

6    misquoted me.  I did not say that there's twenty million

7    dollars' worth of inventory, Your Honor.  Based on the debtor's

8    books and records as of the petition date, there's about

9    fourteen million dollars in inventory, about five million in

10   receivables, Your Honor.

11       And as far as professional fees, Mr. Silverstein

12   should know that the debtor is not authorized to make any

13   payments to professionals during the post-petition period

14   unless the Court authorizes those payments.  There have been no

15   authorizations to make professional fees.  The debtor has not

16   made any professional payments to professionals post-petition,

17   nor has the debtor used cash post-petition to make any payments

18   to any creditors, Your Honor.

19       THE COURT:  There's no payroll on the June 24 line, so

20   was the payroll paid pre-filing?

21       MR. DICONZA:  There was payroll paid pre-filing, Your

22   Honor.

23       THE COURT:  All right.

24       All right, I have an 11:30 matter.  I don't know if

25   the parties are here yet for the 11:30 matter.

1          All right, I'm going to do this.  I'm going to recess

2     you all on Hi-Temp to have the conversation that I guess you

3     all have not yet had about which items within the June 24 and

4     July 1 lines actually need to be expended between now and July

5     7th on which any form of consensus can be reached.  If you all

6     can reach that agreement, great.  If not, then we'll proceed

7     when I call you back in with cross-examination of Mr. Smokovich

8     on his declaration, and we'll get down to the nitty-gritty of

9     what you all are telling me here and what the papers are saying

10    to what is actually happening on the ground.

11         And again, inform that conversation with the

12    following.  This will probably be my last hearing in this case,

13    and the institutional knowledge that you're willing to impart

14    to me will be somewhat lost when Judge Scarcella takes the case

15    back over.  And you will need to start all over again with him

16    on July 7th with the wonderful thought streams and aspirations

17    of where you each might want to see this case going.

18         All right?

19         MR. DICONZA:  Thank you, Your Honor.

20         THE COURT:  All right.

21         So we'll recall Hi-Temp at noon.  And there are two

22    conference rooms just outside my courtroom.  And I would prefer

23    you use one.  But feel free to -- feel free to use both, but

24    have the conversation about what, at a minimum, you all can

25    agree to, to get the company from here to after July 4th.  And

1  I will not impose depositions on the 4th of July for any number

2  of reasons, including the fact that I won't.

3          All right?

4          IN UNISON:  Thank you, Your Honor.

5          THE COURT:  All right.

6          MR. YANG:  Thank you, Your Honor.

7          THE COURT:  Mr. Yang, feel free to participate in

8  those conversations.

9          MR. YANG:  Sure, Your Honor.

10          THE COURT:  All right.

11          So let's go to our -- you all can leave your stuff set

12  up if you want to.  I don't think the 11:30 matter will take up

13  much space.

14          IN UNISON:  Thank you, Your Honor.

15          THE COURT:  All right.

16      (Recess from 11:33 a.m. until 12:15 p.m.)

17          THE COURT:  Thank you.  Please be seated.

18          We're back on the record on Hi-Temp Specialty.

19          Mr. DiConza.

20          MR. DICONZA:  Yes, Your Honor.  Thank you again.  Your

21  Honor -- and I appreciate the efforts of Mr. Yang, who was

22  trying to play mediator during our session there and narrow the

23  issues on the exact amount that's necessary between now and the

24  next hearing on July 7th.

25          Your Honor, when we left here, we had requested 1.5

1  million.  The debtor has come down to 1.25 million, Your Honor.

2  My understanding is that the bank -- about 990,000 of that, the

3  bank is not willing to agree to, Your Honor.  And that 990,000

4  is based -- is necessary to purchase new inventory that the

5  debtor needs for sales that it has that are upcoming, Your

6  Honor.  And we've been holding off on purchasing that inventory

7  for several weeks.  And the debtor believes that it's

8  absolutely critical that it has access to that money to

9  purchase that inventory.

10          And Mr. Smokovich is here, is willing to take the

11  stand to -- and tell the judge why it's necessary that he has

12  access to that to purchase that inventory.

13          THE COURT:  All right.  Let's hear from Mr. Smokovich.

14          Mr. Smokovich, if you'll take the witness stand on

15  your right.  When you get there, just remain standing so you

16  can be sworn by the court reporter.

17          THE CLERK:  Can you please raise your right hand?

18     (Witness sworn)

19          THE CLERK:  Can you please say and spell your name for

20  the record?

21          THE WITNESS:  May name is Joseph Smokovich, last name

22  spelled S-M-O-K-O-V-I-C-H.

23          THE CLERK:  Okay.  Please be seated.

24          THE WITNESS:  Thank you.

25          THE COURT:  All right.  The Court is creating the

1    declaration of Mr. Smokovich as docket item 2 as his direct

2    testimony.  if -- Mr. DiConza, if you want to now narrow the

3    proposed usages in accordance with the budget that was attached

4    to the motion so that we all know what specific uses of cash

5    collateral the debtor is seeking authority for today.  And

6    then, the bank can cross-examine.

7    CONTINUED DIRECT EXAMINATION

8    BY MR. DICONZA:

9    Q.    Mr. Smokovich, do you have a copy of your budget with you?

10   A.    No, it's on my --

11   Q.    Can you get it?

12   A.    Certainly.

13          THE COURT:  And so everyone is fairly informed, we're

14   going to be done at 1:30.  So use the time accordingly.  But I

15   am going to -- after Mr. Smokovich, I'll hear from the

16   representative from Wells Fargo.

17          MR. DICONZA:  Thank you, Your Honor.

18   Q.    Mr. Smokovich, do you understand that the purpose of your

19   testimony right now is to discuss the financing needs of the

20   debtor --

21   A.    Yes.

22   Q.    -- from the petition date through the --

23   A.    Yes.

24   Q.    -- July 7th hearing that is scheduled to be before Judge

25   Scarcella?

1   A.    I do.  I'm sorry, I left my forecast in -- I thought it

2   was in this folder, but it's not.

3   Q.    Okay.

4   A.    Would you give me another moment?  Thank you.

5         Thank you.

6   Q.    Mr. Smokovich, when we filed the Chapter 11 case, we

7   attached a thirteen-week budget to the motion for use of cash

8   collateral.  Do you have that budget?

9   A.    Yes, I do.

10  Q.    As part of the debtor's projections, Mr. Smokovich, going

11  forward to -- do you see week number 3 projected through

12  7/8/2016?

13  A.    Yes.

14  Q.    The debtor forecast approximately 1.5 million dollars at

15  the end of the -- of that three-week period of July 8th; is

16  that correct?

17  A.    Yes.  In total receipts?

18  Q.    Yes.

19  A.    Yes.

20  Q.    Do you have any reason to believe that that forecast is

21  not accurate?

22  A.    I have no reason to believe that.

23  Q.    How much cash does the debtor currently have on hand?

24  A.    Approximately 150,000 dollars, in addition, 30,000 in a

25  payroll account for today's payroll -- 35,000.

1    Q.    And between today and July 8th, how much is the debtor

2    expecting to receive?

3    A.    In total receipts, approximately, 1.5 million, give or

4    take.

5    Q.    And when you say "give or take", what do you mean?

6    A.    It's a timing question.  Many of our customers are

7    international, and we have not only a time difference,

8    sometimes a communication issue.  And you certainly can't

9    control when someone decides to send you a wire or a check.

10   The other additional complication is that now that we opened a

11   debtor-in-possession account with an operating account at TD

12   Bank, it will take some time for that to filter through because

13   there's a purchasing manager, and I'll hand it to the

14   accounting office.

15        So there may be -- I'm not saying there is -- there may be

16   some timing issue there.

17   Q.    And these receivables, Mr. Smokovich, what type of

18   companies owe receivables to your company?

19   A.    In this case, two of them are for -- just this period of

20   time?

21   Q.    Yes.

22   A.    Two of them are publically traded companies.  Another is

23   part of a large conglomerate, and one is a Japanese firm that

24   we've been doing business with for many years.  But the vast

25   majority are with publically traded companies.

1  Q.    Do you have any reason to believe that the accounts

2  receivable that the company has on its books and records would

3  not be collectible?

4  A.    I have no reason to believe that there's any or slight

5  dilution in that.

6  Q.    What is the company's history as far as collecting

7  accounts receivable?

8  A.    Very strong in my time.  I've been running the company for

9  more than fifteen years.  One or two incidences of write-off

10  for receivable.

11  Q.    Going to the necessary expenditures over the next week or

12  so -- and July 7th is already next week.  And you do recall the

13  discussions we had in the status conference just prior to you

14  being put on the stand about the company's requirements.  And

15  one of those requirements is the purchase of new inventory that

16  will cost approximately 990,000.  What is that inventory

17  necessary for?

18  A.    To fill existing orders that are due in the month of July.

19  Q.    And if the company is not able to purchase that inventory,

20  what will happen?

21  A.    There's a high degree of risk in that because, as I just

22  stated previously, many of our customers are publically traded

23  companies.  We have long-term contractual agreement with them,

24  and the risk is a significant one.  So let's say we don't

25  deliver on a particular order.  The contract will call for a

1  cancellation clause, and then the -- our customer, our
2  counterpart has the right to try to fill that order and seek
3  material at the best possible price.  And we'd be probably
4  responsible to pay the difference in his cost versus ours if
5  the price to fill that order was higher.

6       And there's also the risk of canceling the contract
7  thereafter.

8  Q.   The financials that the company has and the discussions
9  that's been before the Court today is that the company already
10 has approximately fourteen million dollars of inventory.  Why
11 does the company need new and additional inventory?

12 A.   That's a good question, of course.  Simply stated, not
13 every -- it's -- this is not a homogeneous inventory.  It's
14 first off three different types of material.  And within those
15 types of material, there are different forms.  Some require
16 difference processes.  Customers have different specifications.
17 Not all of that material can fill every order.  Some can, and
18 some cannot.  The material that I'm seeking to purchase is not
19 currently in inventory.  There would be no reason to purchase
20 if that was the case.

21 Q.   And the vendors and suppliers that will provide you with
22 this inventory, will they be willing -- would they be willing
23 to do it on credit?

24 A.   Some, I'm hoping, still will, because I've -- I'm past due
25 of approximately four and a half million dollars.  Some of our

1    trade creditors are not exactly enthused to offer us more

2    credit.  So I expect that most likely half will allow us some

3    level of credit, and half will not, which will require perhaps

4    some cash to pay for material to get it here.

5        Keeping in mind that not all of our suppliers are domestic

6    U.S. companies.  There are foreign companies, Asian, and they

7    may not understand this process very well.  But they do

8    understand getting paid.

9    Q.   Other than the purchase of inventory, what other cash

10   needs does the company have between the petition date and the

11   July 7th hearing?

12   A.   The ancillary costs of that material, freight and duties,

13   that is to deliver the material or take it in, certain

14   commissions to certain sales people, professional fees for

15   persons like yourself and Mr. Manning, certainly insurance

16   payments, workman's comp, things of that nature, rent -- oh,

17   between now and the 8th, rent and things like that, equipment

18   leases.

19   Q.   But that's -- that was our budget going into the Chapter

20   11.  As far as just emergency purchases between now and the

21   7th, in addition to inventory and the 1.25 million dollars that

22   we arrived at, what is included within that 1.25 million?

23   A.   I'm sorry, the question again?

24   Q.   What expenditures are nec -- are included within --

25   A.   Oh, yes.

1  Q.    -- the 1.25 --

2  A.    Okay.

3  Q.    -- million?

4  A.    Well, according to the budget, which I still believe is

5  the case, I have certain conversion costs related to material

6  that is being converted for sale, for which I have sales.

7  Q.    What are conversion costs?

8  A.    I'm sorry?

9  Q.    What are conversion costs?

10 A.    Okay, we have some material that needs to be upgraded.  Of

11 course, Wells Fargo is well aware of that and -- so is our

12 prior consultant, where we take material, we upgrade it.  We

13 have to ship it to a foreign country.  They convert the

14 material to another form, and it is sold.  That material is

15 sold, so this is the cost of selling that -- cost of getting

16 that material in place to sell.

17 Q.    And those costs are critical between now and July 7th?

18 A.    If I don't pay it, I won't get the material, and it is

19 sold.

20 Q.    And it was what?

21 A.    It is sold.

22 Q.    Are there insurance costs included within the 1.25

23 million?

24 A.    Yes, there is.  One of the issues that I just learned

25 yesterday is that we have a workman's comp issue.  Apparently,

1   they lost a check at the insurance company, and they're seeking

2   to cancel us by July 5th if I don't make payment, approximately

3   23,000 dollars or something like that.

4   Q.    And additional costs would be employees with -- is that

5   correct?

6   A.    Excuse me?

7   Q.    Employee, as part of the 1.25 million?

8   A.    Yes, employees -- yes, of course, employees' commissions,

9   interest -- I'm sorry, trustee fees.

10  Q.    Well, as part of the 1.25 --

11  A.    Oh.

12  Q.    -- million, the U.S. Trustee --

13  A.    Okay.

14  Q.    -- and professional fees are not included with that; is

15  that correct?

16  A.    Yes.  Yes.

17  Q.    Can you think of any other costs that are necessary

18  between now and July 7th that the company needs to pay in order

19  to remain operating?

20  A.    I think that this is an accurate portrayal of what we

21  need.

22          MR. DICONZA:  Your Honor, I have no further questions

23  for Mr. Smokovich.

24          THE COURT:  All right.  Thank you.

25          Mr. Silverstein.

1          MR. SILVERSTEIN:  Thank you, Your Honor.

2    CROSS-EXAMINATION

3    BY MR. SILVERSTEIN:

4    Q.   All right, good afternoon, Mr. Smokovich.  Adam

5    Silverstein for Wells Fargo.  I have some questions for you.

6          You recognize we're here on an emergency basis, right?

7    A.   I suppose so, yes.

8    Q.   All right, that you're asking for use of Wells Fargo's

9    money to get you through to July 7th, right?

10   A.   Yes, I guess that is the case.

11   Q.   And the only money you're asking for at this point is

12   money that you're saying is essential for your business to get

13   from today until July 7th, right?

14   A.   That's correct.

15   Q.   Okay.  And we're going to dive into that, but let me ask

16   you about the Citibank account.  When did you open that?

17   A.   Excuse me?

18          MR. DICONZA:  Your Honor --

19   Q.   When did you open the Citibank account?

20          MR. DICONZA:  Your Honor, the Citibank account is a

21   pre-petition account.  It has no relevancy to the debtor's cash

22   needs between today and July 7th.

23          THE COURT:  Well, it might.  There's only one way to

24   find out is to find out.  So --

25   A.   The Citibank account was opened in late March of this

1   year.

2   Q.    What monies went into the Citibank account?

3   A.    Could you be more specific?

4   Q.    The Citibank account held what money?  What went into it?

5   A.    Payments from vendors, primarily.

6   Q.    Payments from vendors?

7   A.    I'm sorry, customers.  Customers, sorry.  Pardon me.

8   Q.    So you were collecting on sales, and the money was going

9   into the Citibank account?

10  A.    Only recently.

11  Q.    Well, from late March until the bankruptcy filing?

12  A.    There was one transaction in late March.  Actually, money

13  came in from an Indian supplier, went right back out, and that

14  was the only transaction.

15  Q.    So how much money came in from the Indian supplier?

16  A.    About 120,000 dollars.

17  Q.    That was in late March?

18  A.    Late March, early April.

19  Q.    And you said it went right out?

20  A.    Right back to them, yes.

21  Q.    So the suppl -- the customer paid 110,000 dollars (sic) to

22  Hi-Temp, and then you sent the money right back to them?

23  A.    That's correct.

24  Q.    Okay.  And was this part of a -- some sort of swap program

25  or something?

1  A.    That's correct, part of it.

2  Q.    And the only monies -- so right now, the Citibank account

3  has no money in it?

4  A.    No money, the account is closed, yes.

5  Q.    And when did you close the account?

6  A.    Approximately three or four days ago.

7  Q.    Okay.  At any point in time, between late March and the

8  bankruptcy filing, did any other monies besides approximately

9  110,000 dollars in late March go into it?

10  A.    Yes.

11  Q.    Okay.  What other monies?

12  A.    In the past two weeks or so, prior to closing the account,

13  payments from customers, which I needed to pay payroll, make

14  payroll, pay the rent, make sure that Citi -- make sure that my

15  company stayed afloat because it was clear that Wells Fargo had

16  no interest in supporting the ongoing business opportunities

17  for the company.

18  Q.    Let me just ask you -- I'm going to come back to this, but

19  I just want to ask you a question about Wells Fargo's support.

20        The loan has been in default previous to the bankruptcy

21  filing, correct?

22  A.    There was a technical default, and then some --

23  Q.    Did --

24  A.    -- other defaults after that.

25  Q.    You -- Hi-Temp was consistently in default of the fixed

1    charge coverage ratio, correct, under the loan documents?

2    A.    And that was waived, correct.

3    Q.    Right.  Wells Fargo didn't use that default to try to shut

4    down your business and liquidate your collateral, did it?

5    A.    Yes.

6    Q.    It did?

7    A.    Yes.

8    Q.    It used the fixed coverage ratios to do that?

9    A.    They -- it initiated an entire program.

10   Q.    In 2012, they excused your default, correct?

11   A.    Yes.

12   Q.    In 2013, they excused your default, correct?

13   A.    I don't recall 2013.

14   Q.    All right.  2014, they excused your default, correct?

15   A.    I don't recall 2014.

16   Q.    There were multiple times where Wells Fargo excused

17   defaults by Hi-Temp; isn't that true?

18   A.    More than one time it was waived.

19   Q.    Now, coming back to the Citibank account, how much money

20   in total went into that account beyond the 110,000 dollars?

21   A.    Approximately 900,000 dollars.

22   Q.    When was that?

23   A.    Within the last two weeks prior to closing the account.

24   Q.    Now, that was money from customers of Hi-Temp?

25   A.    That's correct.

1  Q.   And those customers, prior to the last two weeks, had been

2  sending payments for goods to a Wells Fargo account; isn't that

3  true?

4  A.   I believe so, yes.

5  Q.   So you called up your customers and told them to send the

6  money elsewhere; isn't that right?

7  A.   I was advised by counsel that I have a fiduciary

8  responsibility for my company --

9  Q.   And who --

10  A.   -- and to take --

11  Q.   Sorry.

12  A.   -- to take care of my employees, as well as my vendors to

13  keep the company alive, because it was clear -- after Wells

14  Fargo unilaterally decided not to pay payroll and then held it

15  back overnight, that next morning it became very clear to me

16  that I was in a situation where the bank only had one thing in

17  mind.  And that is to liquidate the company.  I had to sit and

18  talk to my employees and explain to them that I could not pay

19  them.

20       So I spoke with and engaged Mr. DiConza, and he said that

21  I must protect the company.

22  Q.   So it was on advice of counsel that you diverted --

23            MR. DICONZA:  Your Honor --

24  Q.   -- funds?

25            MR. DICONZA:  -- Your Honor --

 1         THE COURT:  Hang on.

 2         MR. DICONZA:  -- Mr. Smokovich, any conversations that

 3   we've had should not divulge --

 4         THE COURT:  So stay away from the specifics, but I

 5   think the general tenor has already been set.

 6         MR. SILVERSTEIN:  Understood.

 7   Q.   Mr. Smokovich, when you closed the account, how much money

 8   was in it?

 9   A.   Approximately 55- or 60,000 dollars.

10   Q.   What did you spend the 845,000 dollars on that was

11   previously in the account?

12   A.   Payroll.

13   Q.   Okay.  How much was that?

14   A.   I don't have an exact accounting, but let's say two weeks

15   or so.

16   Q.   What's the week of payroll?

17   A.   35- to 37,000 per week.

18   Q.   Okay, so that's about 70,000.  Where --

19   A.   Yes.

20   Q.   -- where did the rest of the 800,000 go?

21   A.   Went to pay the rent.

22   Q.   Okay.  Then, that's rent to --

23   A.   Some utilities.

24   Q.   -- to your wife's company?

25   A.   That is correct.

1   Q.   Okay.  Your wife's company is the landlord for the space

2   that you lease?

3   A.   Yes.

4   Q.   And is that -- and do you consider paying your wife's

5   company, is that a critical expense?

6   A.   If you don't pay the --

7        MR. DICONZA:  Your Honor, that's a legal question

8   whether or not the debtor is obligated to pay its rent.  It's

9   not whether or not it's a critical expense.

10       THE COURT:  Well, I don't think he was asking him if

11  it was a legal obligation.  I think he was asking him if that

12  really needs to be paid right now.

13       MR. DICONZA:  Well, it -- Your Honor, the landlord,

14  which is a company owned by his wife, also has a mortgage on

15  the premises.  So if the rent is not paid, then the mortgage is

16  not paid.

17       MR. SILVERSTEIN:  Is Mr. DiConza going to take the

18  stand next?  It sounds like --

19       THE COURT:  Before you all get too much more excited

20  about that, I'm not going to authorize payments to any insiders

21  or affiliates over the next nine days.  So this started with

22  how much went to the landlord.  It migrated to how much the

23  debtor wants to pay in the emergency setting, but I don't think

24  he answered the question, how much went to his wife's company

25  in the couple weeks before the filing.

1  Q.   How much did you pay in rent?

2  A.   The lease calls for payments of -- monthly of 45,000, but

3  we've been paying a lot less than that.  So 33- or 35,000 per

4  month.

5  Q.   Where did the rest of the money go?

6  A.   To pay our suppliers so that they would continue to fund

7  us.

8  Q.   To fund you, did you say?

9  A.   Yes, ship us and fund us with trade credit.

10  Q.   So while your company was in distress and you were on the

11  verge of filing for bankruptcy, you were -- you bought about

12  700,000 dollars of new materials?

13  A.   And not all new material; it was to encourage certain

14  vendors to ship more as well.

15  Q.   And you have records somewhere that shows all the money

16  that came in and that went out?

17  A.   Of course.

18  Q.   And you haven't given that to Wells Fargo, correct?

19  A.   Not so far.

20  Q.   Right, you haven't -- you didn't tell Wells Fargo that you

21  had opened up an account at Citibank, did you?

22  A.   No, I did not.

23  Q.   You knew that the monies that went into the Citibank

24  account were supposed to go to Wells Fargo --

25  A.   I was put in a very difficult position.  I had a choice to

1    make, and that is to have the company survive, where I have a

2    fiduciary responsibility to take care of that company, all of

3    its employees, its staff, and to demonstrate that the company

4    would be viable.  I needed to do that, or else the company

5    would have gone out of business the way Wells was -- Wells

6    Fargo was driving the task.

7    Q.    Do you have April financials?

8    A.    I am in the process of finishing them, yes.

9    Q.    You still have not finished your April financials?

10   A.    They will be finished inside of twenty-four hours.  I've

11   been quite busy.

12   Q.    Within twenty-four hours, you'll have them done?

13   A.    I believe so, yes.

14   Q.    Do you have May financials?

15   A.    Not yet, no.  May financials are due -- although I'm not

16   sure we still have a relationship with Wells Fargo, according

17   to our old documents, they're due ninety days after the period

18   end.

19   Q.    Now, let's talk about the financials that you attached to

20   your declaration.

21        You attached to your declaration financials for the period

22   ending on March 31st, 2016; is that right?

23   A.    If you don't mind, I will have to look at that.

24        I have attached -- yes, I have attached that to the

25   declaration.

1  Q.    By the way, what do you have up there with you next to

2  you, or what's in your file?

3  A.    This?

4  Q.    What do you have next to you there?

5  A.    This?

6  Q.    Yes, what is it?  What is that?

7  A.    Notes.

8  Q.    Notes of what?

9  A.    How much money was needed for the next week.

10         MR. SILVERSTEIN:  Your Honor, may we see the notes?

11         THE COURT:  Have you referred to them in your

12  testimony?

13  Q.    Did you refer --

14         THE COURT:  Actually --

15  Q.    -- to your notes?

16  A.    Excuse me?

17  Q.    Did you refer to your notes --

18         MR. DICONZA:  Your Honor --

19  A.    -- in the --

20         MR. DICONZA:  -- I believe that Mr. Manning was

21  jotting down numbers while we were speaking with Stan Yang.

22  And that's how we came up with the 1.25 million dollars that's

23  needed.  So that's what he's referring to.

24         THE COURT:  Well, it doesn't matter who wrote them.

25  It matters if he looked at them while he was testifying.  If he

 1  did, they can go up and look at them.  It doesn't sound like

 2  it's the key to the nuclear codes, so if you want to go over

 3  and take a look at them, that's fine.

 4          MR. SILVERSTEIN:  If I may, Your Honor?  May I

 5  approach the witness?

 6          THE COURT:  Sure, absolutely.

 7          MR. SILVERSTEIN:  It has -- it appears to have a

 8  breakdown in the expenses, so we'll -- is it okay if I bring

 9  this back and ask Mr. Smokovich about it?

10          THE COURT:  Why don't you just question him from there

11  so that you all can share the page?

12          MR. SILVERSTEIN:  I'll come back.  I want to just ask

13  him a couple more things before --

14          THE WITNESS:  Okay.

15          MR. SILVERSTEIN:  -- I get to the details of the next

16  week.

17          THE COURT:  All right.

18  Q.   Mr. Smokovich --

19  A.   Yes.

20  Q.   -- you attached the financials for the period ending March

21  31st, 2016 to your declaration?

22  A.   I did.

23  Q.   And did it show that your -- I'm sorry, when I say "your",

24  I mean Hi-Temp's -- the revenues for the ten months ending

25  with -- let me step back.  I'm sorry.

1    Your fiscal year is -- ends on May 31st, correct?

2    A.    That is correct.

3    Q.    All right.  So where -- in the income statement, for

4    example, where it says "Year to Date", that's ten months of

5    financial activity, correct?

6    A.    What page are you referring to?

7    Q.    I'm referring to the income statement in your financials.

8    A.    I believe I have them.  There are a few pages of income

9    statements.

10   Q.    There's a page entitled "Hi-Temp Specialty Metals, Inc.

11   Income Statement for the Month Ended March".  It has for year-

12   to-date actual revenues of $40,474,763 -- I'm sorry -- 783.35.

13   Do you see that?

14   A.    I do.

15   Q.    Okay.  So for the first ten months of this most recent

16   fiscal year, the company had 40 million dollars of --

17   approximately 40.5 million dollars of revenues, correct?

18   A.    That is correct.

19   Q.    And for the year ending, you, the company, made about

20   forty-eight million dollars; is that correct?

21   A.    I'm sorry, could you repeat the question?

22   Q.    For 2016, the company made approximately forty-eight

23   million dollars in revenues, right?

24   A.    I don't have -- know that number offhand; I'm sorry.

25   Q.    Okay.  But for the first ten months, it was approximately

1  40.5 million dollars.  And the cost of goods sold for those

2  40.5 million dollars of revenues was in excess of 35 million

3  dollars, correct?

4  A.   That's correct.

5  Q.   So your gross margin was about twelve percent for the

6  first ten months of the fiscal year, correct?

7  A.   Yes.  Please note that these numbers are unaudited

8  numbers; they're internal.

9  Q.   Okay.  So --

10  A.   Thank you.

11  Q.   -- of the approximately eighty-eight percent of the

12  company's expenses for the first ten months of last year went

13  to buying goods, correct?

14  A.   I believe so, yes.

15  Q.   Okay.  So let's talk about the remaining expenses that are

16  not for purchasing goods.

17       You have operating expenses you've itemized, correct?

18  A.   Yes.

19  Q.   And for the first ten months of 2016, you had -- you, the

20  company, had operating expenses, excluding depreciation, of

21  approximately 4.5 million dollars; is that right?

22  A.   Yes.

23  Q.   Okay.  So the -- for the first ten months of 2016, the

24  company was operating on a basis of approximately 450,000

25  dollars per month, correct?

1    A.    I don't understand the question; I'm sorry.

2    Q.    For the first ten months of 2016, the company spent about

3    4.5 million dollars in total on operating expenses, correct?

4    A.    Correct.

5    Q.    So 4.5 million dollars divided by 10 months averages

6    approximately 450,000 dollars per month, correct?

7    A.    Excluding depreciation, yes.

8    Q.    Okay.  And that's approximately 110,000 dollars per week

9    in out-of-pocket expenses, correct?

10   A.    A little bit less, but yes.

11   Q.    Okay.  And that's the basis on which the company operated

12   for the first ten months of 2016, correct?  I'm sorry, 2015.

13   A.    I'm sorry, was --

14   Q.    Is that --

15   A.    -- that a question?

16        MR. SILVERSTEIN:  I'll withdraw it.

17   Q.    And let's talk about now the next period of time through

18   July 8th, okay?

19        So you're not asking for approximately 110,000 dollars to

20   operate your business between now and July 8th, right?

21   A.    Could you repeat the question?

22   Q.    You want 1- -- you want to use 1.25 million dollars

23   between now and July 8th; is that right?

24   A.    That's correct.

25   Q.    Okay.  And there's 990,000 dollars that you're saying the

1    company needs for -- to buy new materials?

2    A.    Yes.

3    Q.    And that's for sales that you've already received?

4    A.    Correct.

5    Q.    Okay.  And --

6    A.    I'm -- excuse me, not sales that I've received.  I have

7    sales orders.

8    Q.    You have sales orders?  And what are the sales orders for?

9    A.    To purchase material for Hi-Temp.

10   Q.    What goods?

11   A.    Across the board?

12   Q.    Okay.  Tell --

13   A.    Tantalum --

14   Q.    -- tell the Court what the board is?

15   A.    The board is tantalum, tungsten, molybdenum, and oxides.

16   Q.    And, in fact, of the fourteen million dollars or so of

17   inventory the company claims it has, the company has tantalum,

18   tungsten, molybdenum, correct?  Right?

19   A.    Yes, the company does possess those elements in inventory.

20   Q.    Okay.  Now, is it your testimony that of the approximately

21   fourteen million dollars of inventory that the company has,

22   including tantalum, tungsten, molybdenum, none of that can be

23   used to fill these orders?

24   A.    That is not my testimony.

25   Q.    Okay.  How much of it can be used to fill these orders?

1   A.   For what material?

2   Q.   For the sales that you're claiming you need to buy 990,000

3   dollars' worth of materials?

4   A.   In general, or in specific for each item?

5   Q.   To fill these orders -- how much are the sales orders?

6   A.   We have going forward approximately twenty million dollars

7   in sales orders.

8   Q.   There are sales orders that you're saying you need to buy

9   materials in order to fill, right?

10   A.   That's correct.

11   Q.   Okay.

12   A.   As an ongoing business, you'll always buy material.

13   Q.   But we're only focusing now on between now and July 8th.

14   What's critical for the company to spend, right?

15   A.   Yes.

16   Q.   So there are orders that are critical, in your view, for

17   the company to fill?

18   A.   Correct.

19   Q.   And the orders need to be filled by when?

20   A.   July.

21   Q.   When?

22   A.   Throughout the month of July.

23   Q.   What --

24   A.   Some now.  Molybdenum, tantalum, very little tungsten.

25   Q.   So what's the total number of the sales orders that need

1   to be filled?

2   A.    For what period of time?

3   Q.    The period of time for which you need to buy, so you say,

4   990,000 dollars of materials?

5   A.    It's actually a fact, it's not what I say.  We have sales

6   orders in place.

7   Q.    What are the total --

8   A.    What happens --

9   Q.    -- of those sales orders?

10  A.    What happens -- what happens is some of the material takes

11  four to six weeks to deliver.  And if I don't order it now, I

12  will have to then ship it by air for a specific panel of ingot,

13  which we don't have much in inventory, for which I have

14  approximately 6,000 pounds of sales in the month of late June

15  and July.  I need money for that.

16  Q.    So you placed the orders already?

17  A.    The orders were placed before this occurrence.

18  Q.    Okay.  So this is just a matter of when these vendors need

19  to be paid, is that what you're saying?

20  A.    No, it's a matter of filling sales orders.  I don't have

21  the material, so I have to pay to get the material.

22  Q.    Okay.  So --

23  A.    It's not a question of when I pay the vendors.

24  Q.    All right.  So in order for it -- there's 990,000 dollars

25  of material that is  -- that need to be paid for in order to

1  fill orders, is that right?

2  A.    Certain orders, yes.

3  Q.    Okay.  What is the total amount of the certain orders that

4  need to be sourced?

5  A.    Approximately three million dollars.

6  Q.    Well, you have 3 million dollars of orders and you need

7  900,000 dollars of material to fill them; is that what you're

8  saying?

9  A.    No, I'm sorry.  Some of the inventory is on hand, I

10  misspoke.  Thank you.

11  Q.    Well --

12  A.    Some of the inventory is on hand to fill the orders.

13  Q.    For the order -- I'm just trying to figure out, Mr.

14  Smokovich, for the orders that you say you need 900,000 dollars

15  of materials, what is the total amount of those orders for

16  which you need -- for which you don't currently have sourcing?

17  A.    Approximately two million.  Thank you.

18  Q.    All right.  So -- and of the two million dollars of sales

19  orders, that's -- that -- those sale orders are at

20  approximately twelve percent gross margin?

21  A.    Some of them are higher, thank you.

22  Q.    But there's a --

23  A.    What's going on in the marketplace is that -- and the

24  corollary you try to draw that ten-months history is going to

25  predict the future isn't the case today, because there's been

1  some expansion in the margin over the past few months.  So the

2  margins are improving and they will be improving, other than

3  having to liquidate inventory as Wells Fargo insisted I do.

4  Q.    And that's speculation, right?

5  A.    No.

6  Q.    You're speculating on what's going to happen in the

7  market?

8  A.    No, I'm speaking about existing sales orders, and my

9  ability to purchase today.

10  Q.    Okay.  So of the fourteen million dollars that you have --

11  the company has in inventory, the company does not have enough

12  material of tantalum, tungsten, and molybdenum to fill these

13  sales orders; is that right?

14  A.    Could you be a bit more specific, that's a little unclear?

15  Q.    Of the sales orders that you need money now to fill -- the

16  fourteen million dollars of inventory that you claim you have

17  isn't enough to fill those orders now, right?

18  A.    Not entirely because, as I said before, we don't have

19  certain material on hand.

20  Q.    Okay.  And do you have orders for these fourteen million

21  dollars of inventory?

22  A.    Not all of it, but some of it, yes.

23  Q.    Some of it, how much -- how many orders do you have for

24  which you currently have inventory that you can fill?

25  A.    I would say approximately half.

1  Q.    So you have orders right now of --

2  A.    Going forward, yes.

3  Q.    -- for seven million dollars of inventory?

4  A.    Approximately.

5  Q.    And this is inventory that's been sitting in your

6  warehouse for some time, correct?

7  A.    Not necessarily, no.

8  Q.    So you can move half of your inventory within some

9  relatively near period of time; is that right?

10  A.    Could you repeat that?

11  Q.    You can ship inventory -- you can sell inventory, half

12  your inventory, within a relatively near period of time?

13  A.    I didn't say that, no.

14  Q.    Well, when are the orders going to be filled?

15  A.    They take place over time.  I have more than twenty

16  million dollars in sales orders over the next year-and-a-half

17  to two.

18  Q.    A commitment to make sales orders, or you actually have

19  the orders in hand?

20  A.    Orders in hand.

21  Q.    Okay.  But you don't have -- so you have more sales orders

22  than you have materials to sell?

23  A.    That's correct.

24  Q.    Okay.

25        MR. SILVERSTEIN:  So now, Your Honor, if I may just go

1  over and look at the pad?

2          THE COURT:  All right.

3          MR. SILVERSTEIN:  Thank you.

4          THE WITNESS:  For your information, I didn't even look

5  at that yet, but if you want to make -- if you're going to ask

6  me questions about it, I haven't seen it.

7  Q.   Well, so you didn't refer to this at all?

8  A.   No.

9          MR. SILVERSTEIN:  Your Honor, I'm not sure what Your

10  Honor's views are on whether it's appropriate for me to

11  question.

12          THE COURT:  The evidentiary rule is if you use it to

13  refresh his recollection, then you can look at it.  If you

14  didn't use it, then you don't get to look at it.  So it doesn't

15  sound particularly germane.

16          MR. SILVERSTEIN:  I'm sorry; I didn't hear that, Your

17  Honor.  It does sound?

18          THE COURT:  It doesn't sound germane.

19          MR. SILVERSTEIN:  All right.

20  Q.   Mr. Smokovich, I think you said that you had very strong

21  collections activity?  I wrote that down, those were words that

22  you used.

23  A.   Could you repeat the words that I used?

24  Q.   I wrote down you used the words that your collections are

25  very strong?

1  A.   That was in reference to having survived any losses from

2  nonpayments from customers I think.

3  Q.   Well, I think you were -- the context that I recall it in

4  was that you were being asked about how likely it is that this

5  money is going to come in in the next period of time --

6  A.   Yes.

7  Q.   -- the 1.5 million dollars?

8  A.   Yes.  So in the context of that period of time, the answer

9  is yes.  But I don't want to speculate about the future.

10  Q.   Okay.  And when you prepared your projections that you

11  submitted in support of your cash collateral application --

12  A.   Yes.

13  Q.   -- you assumed strong collections?

14  A.   I assumed collections based on a reasonableness.

15  Q.   And who prepared the projections?

16  A.   Which projections are you referring to?

17  Q.   The thirteen-week projections that you submitted in part

18  of --

19  A.   Oh, okay.

20  Q.   -- as part of your cash collateral application.

21  A.   I prepared them with the assistance of Mr. Jeffrey

22  Manning, internal staff.  And original support from Caliber.

23  Q.   All right.

24  A.   Caliber was a consultant working with us.

25  Q.   And you're confident in these projections?

1  A.    As confident as one can be in projections, yes.

2  Q.    I just want to ask you about the collections that you're

3  projecting.  Do you have the collections -- do you have the

4  projections in front of you?

5  A.    Cash collection, projected 6/24/2016, week one --

6  Q.    Yes.

7  A.    -- it starts with?  Yes.

8  Q.    So you've projected through week one about 511,000 dollars

9  and change?  311,000, I'm sorry, my eyes --

10  A.    I'm sorry, repeat that?

11  Q.    You projected approximately 311,000 dollars and change?

12  A.    Correct.

13  Q.    And week two is approximately 520,000 dollars and change;

14  is it 420?

15  A.    I'm sorry, you lost me.

16  Q.    The second week, could you -- what are you projecting?

17  A.    Are you talking --

18        THE COURT:  Are you looking at -- hang on.

19  A.    What number are you on?

20  Q.    I'm sorry, domestic accounts receivable.

21        THE COURT:  Mr. Silverstein, hang on.  Are you looking

22  at the cash collateral thirteen-week projection?

23        MR. SILVERSTEIN:  Yes.

24        THE COURT:  Starting with June 24, 2016?

25        MR. SILVERSTEIN:  Yes.

1          THE COURT:  You asked him about the collective receipt

2     line?

3          MR. SILVERSTEIN:  Yes.  The domestic collection

4     receipt line.

5          THE COURT:  Just domestic?

6          MR. SILVERSTEIN:  Pardon?

7          THE COURT:  The budget the Court has for week one

8     shows 311,000 domestic, 531,000 foreign, for total projected

9     week one receipts of 843,000.  I just want to make sure we're

10    all looking at the same sheet of paper.

11         MR. SILVERSTEIN:  Yes.

12    Q.   Is that what you have, Mr. Smokovich?

13    A.   Yes, I believe so now.  Thank you.

14    Q.   All right.  So, Mr. Smokovich, I've added up the totality

15    of the domestic receivables that you projected.  And by my math

16    it comes out to approximately 1.3 million dollars in the next

17    ninety-one days?

18    A.   In the next how many?

19    Q.   Ninety-one days.  Looking at these numbers, and adding

20    them up, you projected collections of 1.3 million dollars of

21    receivables in the next ninety-one days, right?

22         MR. DICONZA:  Do you need a calculator?

23    A.   I'm doing the math, so give me a moment.

24         I quickly add 1.1 million.

25    Q.   Okay.  Now, as of the one week before the very first

1    projection, the company had approximately three million dollars

2    of domestic accounts receivable, correct?

3    A.    I can't say.

4              MR. SILVERSTEIN:  Your Honor, if I may, I'd like to

5    just show the witness the last borrowing day certificate that

6    was provided to Wells Fargo, which itemizes the various

7    collateral categories.

8              THE COURT:  All right, what's the date?

9              MR. SILVERSTEIN:  June 17th.  I have copies for the

10   Court and for counsel.  May I approach, Your Honor?

11             THE COURT:  Yes.

12             THE WITNESS:  Thank you.

13   Q.    I'm looking at the first page of what I just handed to

14   you, the daily collateral report, Mr. Smokovich?

15   A.    Yes.

16   Q.    Do you see that?

17   A.    This page?

18   Q.    Yes.

19   A.    Yes.

20   Q.    And this is a document that the company prepared and

21   provided to Wells Fargo, correct?

22   A.    Yes.

23   Q.    And as of June 17th, the company had domestic accounts

24   receivable that reported over three million dollars?

25   A.    I see.

1  Q.   Is that right?

2  A.   Yes.

3  Q.   And you projected that of that 3 million dollars in

4  receivables, within the next ninety-one days 1.1 million

5  dollars would be collected?

6  A.   That's what it says, yes.

7  Q.   So that is -- is that a strong collection activity that

8  you're referring to?

9  A.   I can't say, because I didn't prepare this daily

10  collateral report.

11  Q.   Well --

12  A.   So our customers pay according to term, and I'm presuming

13  this was done according to term.

14  Q.   All right.  Well, so you have terms where customers pay

15  well in excess of ninety day?

16  A.   Ninety days.

17  Q.   But this thirteen-week budget is ninety-one days?

18  A.   Okay.

19  Q.   Of the 3 million dollars in domestic accounts receivable,

20  your projection is that you'll collect 1.1 million dollars of

21  domestic receivables, right?

22  A.   That's correct.

23  Q.   Okay.  Now let's look at foreign.  Again, I've done the

24  math with a calculator, but if you add up your existing foreign

25  receivables, which is the third row, I came to 810,000 dollars.

1    Do you have any reason to disagree with that?

2    A.    Could you repeat the number that you came up with?

3    Q.    I had -- I came up with 810,215 dollars.

4    A.    Okay.

5    Q.    And that's the collection foreign cash receivable that you

6    were projecting to be collected in the next ninety-one days,

7    correct?

8    A.    Correct.

9    Q.    And as of one week before your first projection, the

10   company had foreign accounts receivables of approximately 1.9

11   million dollars?

12   A.    I see that.

13   Q.    So the math comes out roughly the same for both domestic

14   and the foreign; in the next ninety days, you were projecting

15   collections of approximately forty-two or forty-three percent

16   of the receivables?

17   A.    Yes.  Being conservative, I presume, my staff did.

18   Q.    But you have a great confidence that the 1.5 million

19   dollars will come in?

20   A.    Excuse me?

21   Q.    You have great confidence that the 1.5 million dollars

22   will come in?

23   A.    What 1.5 million are you referring to?

24   Q.    The 1.5 million dollars that you were so -- reflects the

25   very strong collections activity that you're confident will

1  come in the next three weeks?

2  A.    Are you referring to projected cash flow 6/24, 7/1 and

3  7/8?

4  Q.    I'm referring to what you --

5  A.    If you're referring to those, yes, I'm comfortable that

6  that will happen.

7  Q.    Okay.  Now, Mr. Smokovich, while you were putting money

8  within the Citibank accounts, within the two weeks prior to --

9  I'm sorry.  While you were direct -- asking that money be

10  placed into the Citibank account, within the two weeks prior to

11  the bankruptcy filing, isn't it true that you were in

12  negotiations with Wells Fargo over the terms of further

13  forbearance?

14        MR. DICONZA:  Your Honor, if he wants the witness to

15  testify about settlement discussions, then I'd ask the witness

16  to be careful, because those are privileged.

17        THE COURT:  Is it relevant?

18        MR. SILVERSTEIN:  The relevance, Your Honor, is the

19  activity of Mr. Smokovich while he's having good faith

20  negotiations with his lender, and yet diverting the money into

21  the account.

22        MR. DICONZA:  Objection, Your Honor, with the phrase

23  "diversion".

24        THE COURT:  Well, whatever you all were talking about

25  or not talking about on the record, there was about a million

1  dollars of collections that went through Citibank in the three

2  months prior to the filing.  I'm not sure beyond that how much

3  of it is relevant today.

4  Q.    Of that --

5  A.    I'm sorry, I didn't hear --

6  Q.    -- amount that went in within two weeks --

7  A.    -- I didn't -- I'm sorry, I didn't hear the judge's

8  response.

9         THE COURT:  In the three months prior to the filing,

10 the company ran about a million dollars through the Citibank

11 account?

12        THE WITNESS:  Yes.

13 Q.    And of that million dollars, most of that came -- 900,000

14 of that came within two weeks before the bankruptcy filing,

15 correct?

16 A.    That's correct.  After I was given very strong indications

17 that Wells Fargo was no longer going to fund the operations of

18 Hi-Temp Specialty Metals.

19 Q.    Now between now and July 8th, there's 990,000 dollars that

20 you -- that the company wants to use to buy inventory -- or

21 goods, correct?

22 A.    For orders which we have pending, yes.

23 Q.    Okay.  And that was another approximately 230,000 dollars

24 the company needs above that?

25 A.    I don't understand the question.

1  Q.    You're asking for -- you're -- the company believes it

2  needs 1.25 million dollars between now and July 8th; am I

3  correct?

4  A.    That's correct.

5  Q.    These are expenses that are essential?

6  A.    That's correct.

7  Q.    990,000 dollars is essential to buy new goods?

8  A.    Give or take, yes.

9  Q.    So there's another 235,000 dollars that the company

10  essentially needs between now and July 8th, right?

11  A.    I think -- I'm not sure what that means, I'm sorry.

12  Q.    What's the difference between the 1.25 million dollars

13  that you're asking for and the cost of the inventory?

14  A.    Oh, no, I know the difference, but I don't know what

15  you're referring to at 235,000.

16  Q.    Well, I'm asking you to tell me what you're referring to,

17  what is the money going for?

18  A.    I think all the other essential items that we listed on --

19  Q.    Tell me what they are, and what amount?

20  A.    Okay.  Freight and duties, commissions.

21  Q.    So let's stop.

22  A.    Yes.

23  Q.    How -- what -- freight and duties, how much money?

24  A.    In this case we had projected for the first week freight

25  and duties, 45,000 dollars for two weeks.

1  Q.   So -- well, one week has gone -- which -- what week are

2  you looking at, Mr. Smokovich?

3  A.   I was looking at 6/24, 7/1 and 7/8.  So we can say 7/1 and

4  7/8 weeks, 37,000 dollars.

5  Q.   37,000 dollars in freight and duty?

6  A.   Yes.

7  Q.   Okay.  What else?

8  A.   100,000 dollars for -- oh, I'm sorry, 73,000 dollars for

9  vendors and other critical vendors.

10  Q.   And what are the critical vendors?

11       MR. DICONZA:  Your Honor, the 73 for the critical

12  vendors is not part of the 1.25 million dollars, Your Honor.

13  This happened quickly as we were rushing into the court, Your

14  Honor, the 1.25 million dollars.  Perhaps if we have a minute

15  with Mr. Smokovich, to go over --

16       THE COURT:  To run back -- you ran through it with him

17  before the cross started, so --

18       MR. DICONZA:  Right, Your Honor, and it consisted of

19  the 35,000 in payroll, 25,000 in insurance, 117,000 in

20  conversions costs --

21       UNIDENTIFIED SPEAKER:  60,000 in shipping.

22       MR. DICONZA:  And 60,000 in shipping and freight

23  duties.  That's what we had agreed to with the U.S. Trustee in

24  the conference room beforehand, Your Honor.

25  Q.   And, Mr. Smokovich, is that your understanding, what your

1  counsel just said, what the money is needed for?

2  A.   I'm sorry, I couldn't hear it all, so -- I was trying to.

3       THE COURT:  Do you have the list in front of you?

4       THE WITNESS:  Yes.

5       THE COURT:  You want to tick down through it --

6  through the list by item line?

7  Q.   Mr. Smokovich, you need 35,000 for payroll?

8  A.   That's correct, 36,000.

9  Q.   And 37,000 dollars for insurance?

10  A.   Yes, and a little bit more because -- yes, let's say

11  35,000.

12  Q.   Okay.  And 117,000 dollars for conversion costs?

13  A.   That's correct.

14  Q.   And conversion costs are what?

15  A.   As I spoke earlier, we have certain material that need to

16  be upgraded and converted into a form that can be purchased by

17  our customers, and we have sold that material.  This is

18  something that we worked on with Caliber for a period of time,

19  that Wells Fargo had seen our presentation and support it.

20       THE COURT:  Is that a third-party outsource?

21       THE WITNESS:  Excuse me?

22       THE COURT:  Is that a third-party outsource?

23       THE WITNESS:  Yes.

24  Q.   So you have sales for this material that you now need to

25  convert?

1   A.    Yes.  At Wells Fargo's urging, we did this.

2   Q.    And 60,000 dollars in shipping and freight duties?

3   A.    Approximately, yes.

4   Q.    Okay.  And these --

5   A.    But for the --

6   Q.    Do you have a breakdown, Mr. Smokovich, of when these

7   goods need to be delivered?

8   A.    Of course I do.  Not in my hands, but of course we do.

9   Q.    So you have somewhere, you can identify when the goods

10  needs to be delivered to the customers?

11  A.    Yes.  But freight and duty is not necessarily just

12  outgoing, it could be incoming as well.

13  Q.    Okay.

14          MR. SILVERSTEIN:  Your Honor, may I just have a few

15  moments?

16          THE COURT:  Yes.

17      (Pause)

18  Q.   Mr. Smokovich, I'm sorry, take your time and get some

19  water.  Between now and July 7th, what orders do you need to

20  fill?

21  A.    I have -- I would have to speak offhand, because I don't

22  have every one of them in my head.  But we have approximately

23  one container load of molybdenum to fill.  Approximately 6,000

24  pounds of tantalum ingot to fill.  Approximately 4,500 pounds

25  of high grade oxide to fill.  And somewhat less in the form of

1  high quality, let's call orgrade (ph.) material.

2  Q.    So because you said your vendors have four to six-week

3  delivery time, right, to --

4  A.    Yes.

5  Q.    Right.  What -- in order to fill these orders between now

6  and July 7th --

7  A.    Yes.

8  Q.    -- how much goods do you have to pay for for only those

9  orders?

10  A.    Oh, that's a good question, because I have to air those in

11  now.  I appreciate that.  To fill these orders between now and

12  July 8th, I have to air freight this material from Asia.  And

13  that's the intention.

14  Q.    How much of the 990,000 dollars of goods that you need to

15  fill orders needs to be filled for a customer between now and

16  July 8th?

17  A.    All of it.

18  Q.    So to -- I thought you said that the orders were at

19  different times in July?

20  A.    Yes.

21  Q.    So I'm only asking for the orders that need to be filled

22  before July 8th?

23  A.    Yes, I --

24  Q.    How much of that 990,000 dollars of goods is needed to

25  fill the orders between now and July 8th, nothing after that?

1  A.   Oh --

2  Q.   So before when you said that the orders were at all times

3  in July, was really all times between now and July 8th?

4  A.   No, because if I don't place those orders and pay for

5  goods, I won't have material for the future.

6  Q.   So it's -- you're stockpiling inventory for the future?

7  A.   Not stockpiling, no, I didn't say that.  I will not get --

8  Q.   Did you buy inventory for the future?

9  A.   No, I did not say that.  I -- what I'm trying to say is

10  that if I don't purchase this material, I will have orders --

11  purchase orders canceled by my suppliers.  And then that stuff,

12  it takes four to six weeks as a material that I will be

13  purchasing in the future according to my forecasts.

14          MR. SILVERSTEIN:  Your Honor, I think at this point, I

15  don't know what -- we could put the Wells Fargo witness on, or

16  what Your Honor's intentions are?

17          THE COURT:  I'm going to give the U.S. Trustee, and

18  then the debtor opportunity if they want to ask this witness

19  any other questions.

20          MR. YANG:  Your Honor, I don't have any questions for

21  this witness.

22          THE COURT:  Mr. DiConza, any cleanup?

23          MR. DICONZA:  Just one question, Your Honor.

24  REDIRECT EXAMINATION

25  BY MR. DICONZA:

1  Q.    Mr. Smokovich, counsel for Wells Fargo referred to a daily

2  collateral report, do you still have a copy of that?

3  A.    I'm sorry?

4  Q.    The daily collateral report?

5  A.    This report here?

6  Q.    Yeah.

7  A.    Yes.

8  Q.    And based on that report as of June 17th, the company had

9  approximately five million in receivables and sixteen million

10 in inventory?

11 A.    Yes.

12 Q.    As of the petition date, what do you believe the numbers

13 would be?

14 A.    Today, probably fifteen to sixteen million dollars in

15 inventory, and approximately four million dollars in accounts

16 receivable.

17 Q.    And how much equipment does the company have, and what is

18 the value of that equipment by the premises?

19 A.    I'm glad you asked that question, because you have to look

20 at the value of equipment in a number of ways.  I know we

21 purchased equipment, actually financed it.  And when we had

22 paid off all of those, the cost of the equipment was seven

23 million dollars.  And depending on the scenario that you apply,

24 you can determine the value of the material.  Now, in place,

25 one can argue as an ongoing business the material is worth, but

1  I should say the equipment is worth four or five million

2  dollars.  On a liquidation basis, perhaps two million dollars.

3  Q.    The budget that was prepared and attached to the cash

4  collateral motion, who supplied the initial draft of that

5  budget?

6  A.    For the --

7  Q.    The cash collateral budget, the thirteen --

8  A.    Oh, yes, that was originally, as I said earlier, by

9  Caliber.

10  Q.    Okay.  And did you subsequently review that with

11  CohnReznick and Mr. Manning?

12  A.    Yes.

13  Q.    And there was a question posed to you about the actual

14  collections that you anticipate receiving over the next ninety

15  million dollars based on the --

16            UNIDENTIFIED SPEAKER:  Days.

17  Q.    Excuse me, over the next ninety days, based on the

18  approximately five million in receivables, and that you only

19  expect to receive a little less than fifty percent of that.

20  The projections in the budget, are they conservative?

21  A.    Yes.

22  Q.    And when you and Mr. Manning went over these budgets, was

23  there a concern about a potential bankruptcy impact upon the

24  filing, and that may hurt the collection --

25  A.    Yes.

1  Q.    And that's why you estimated the receipts over the next

2  ninety days at the amount that they are?

3  A.    That is correct, thank you.

4  Q.    Thank you.

5         THE COURT:  You can step down.  Mr. Smokovich, you can

6  leave the witness stand, take your papers with you.

7         All right, given the time, I'm prepared to give you

8  all the ruling on the emergency application for use of cash

9  collateral.  Unfortunately, we don't have time to start into

10  and get the testimony of the Wells Fargo representative.  So

11  I'm going to give you a ruling on the emergency request as

12  follows:

13         The Court has some concerns about Mr. Smokovich's

14  handle on the witness stand on the particulars of the purchase

15  orders that are in hand, how much inventory the debtor has on

16  hand that can actually be used to fill the current orders, and

17  how much inventory is potentially being purchased to shelve, if

18  you will, for future purchases.  It appeared to the Court that

19  in order to avoid immediate and irreparable harm to the debtor

20  pending the hearing on July 7th, the Court would authorize use

21  of cash collateral as follows:

22         The Court will authorize the debtor to use 500,000

23  dollars of collections between now and the July 7th hearing.

24  None of that 500,000 dollars is to be paid to insiders, or

25  affiliates, in any capacity.  Whether they're employees,

1    commissioned sales agents, landlord, et cetera.  No money to

2    insiders or affiliates pending the July 7th hearing.

3          The debtor's only authorized to buy material for the

4    current purchase orders that it does not have on hand.  No

5    restocking the shelves, Mr. Smokovich.  You can purchase

6    material that you don't have to fill orders that you do have,

7    because that would be what would be necessary to avoid

8    irreparable harm to the estate.

9          The debtor's going to be required -- the debtor is

10   required to provide to Wells Fargo all of the purchase orders

11   that it currently has for which it has made a request for use

12   of cash collateral.

13         The debtor and the bank can certainly agree to exceed

14   the 500,000-dollar cap if it appears to the lender that there's

15   a benefit to filling orders that would require more than

16   500,000 dollars to be used, both in the lender and the debtor's

17   best interest to do so.  So it's a hard cap in terms of the

18   debtor's unilateral right to use, but it's a soft cap in terms

19   of the lender agreeing to exceed the cap to fill other orders

20   that are on hand.

21         No critical vendors as listed on the debtor's budget,

22   can be paid.  No professional fees can be paid out of the

23   500,000 dollars.  The debtor obviously needs to make some

24   budgeting decisions within that money, so on the record, the

25   debtor had outlined within the line items of the budget,

1    conversion costs related to, and then the document cuts off.

2    But the witness testified as to what that meant, which the

3    Court understood to be third-party outsourcing of certain

4    changes or upgrades, or processing to be done of material that

5    is to be sold, freight and duties, payroll taxes, and

6    associated benefits, commissions and insurance payment.

7             So in addition to purchases of material that is not

8    currently on hand, the debtor may make expenditures within

9    those specific categories.  And, again, it's going to need to

10   make some decisions on how to allocate the 500,000 dollars

11   among the purchases and those categories.  That's all pending

12   the July 7th hearing.  The Court is not disallowing the use of

13   any requests that are in the budget, those are simply being

14   carried over to the July 7 hearing, except for the items that I

15   outlined today the money could not be used for.

16            The debtor's also required to provide a full

17   accounting to Wells Fargo of all funds that were collected

18   through, and spent out of the Citibank account pre-petition, as

19   well as providing an accounting of all post-petition activity

20   to date.  There are no secrets in bankruptcy, the debtor needs

21   to be transparent with the use of funds coming in, the use of

22   funds going out, and the expenditures out of the pre-petition

23   Citibank account need to be provided to the bank.  Where it

24   goes, if anywhere, will be for a later day, but the bank

25   certainly needs to know what happened to the million dollars,

1  and the debtor shouldn't have any reservations about providing

2  that information.  If it does, they're overruled anyway.

3          In terms of adequate protection, the Court will grant

4  to Wells Fargo a replacement lien on all unencumbered property

5  of the bankruptcy estate, excluding avoidance actions.  Wells

6  Fargo will also have the 507(a) fail for protection lien,

7  should this adequate protection fail it will have the rights

8  under 507(a).

9          I'm going to ask Mr. DiConza and Mr. Silverstein, that

10  you all prepare a form of order consistent with this ruling.

11  Keep it short.  If you all can't agree on something short, I've

12  got a three-pager sitting in the hopper that I'm more than

13  happy to put in place.

14          I am going to so-order the calendar that this is the

15  relief, because there's a fairly high probability that I won't

16  be able to sign an order before the debtor starts spending this

17  cash.  So I so-order the calendar with this relief.

18          All right, anything else for today on Hi-Temp?

19          MR. SILVERSTEIN:  The only other matter, Your Honor,

20  I'm not sure we need a court order, is just that we do want, if

21  we're not able to resolve things further than July 8th --

22  before July 8th, we do want Mr. Smokovich and some other

23  people's depositions between now and then, so that the

24  proceeding on July 8th will be more efficient for Judge

25  Scarcella.

1          THE COURT:  All right.  Well, you're in a contested

2     matter now, so the issue isn't whether you can; the issue is

3     when will you.  So I'll leave the parties to work out a

4     specific date, place and time, other than the intervening

5     Saturday, Sunday and Monday, between now and then.

6          MR. SILVERSTEIN:  There's one other matter, Your

7     Honor.  Wells Fargo is entitled to and would like to have a

8     field examiner go and inspect the collateral, and we think

9     that's appropriate between now and July 8th as well.

10          THE COURT:  All right.  Any issue with that, Mr.

11    DiConza?

12          MR. DICONZA:  Your Honor, they were there last week.

13    If they want to show up again --

14          THE COURT:  All right.  I can understand the reasons

15    why they want to do it, and I can't imagine it's a very

16    exciting tour, but they certainly should have the ability to

17    send someone in and look around, and see what's there.  And

18    this doesn't sound to be the kind of business that would be

19    disrupted by having a reasonable inspection during regular

20    business hours by a representative of Wells Fargo.

21          MR. DICONZA:  Can we limit it to an hour or so?

22          THE COURT:  I don't know how much time it takes to

23    actually inspect a facility of this kind.  And I can't imagine

24    it's the most exciting project to be undertaken either.  So

25    whatever --

1          MR. SILVERSTEIN:  Without commenting on how exciting

2     the field exams are or not, but I'm told, Your Honor, that the

3     field examiner was sent away last week when he went to the

4     debtor's premises.  So --

5          THE COURT:  Back when you all were holding hands and

6     singing Kumbaya, how long did the field inspection take?  Three

7     hours, four hours, a day?

8          MR. SILVERSTEIN:  May I have Mr. Forte (ph.) of Wells

9     Fargo address that, Your Honor?

10          THE COURT:  Sure.

11          MR. FORTE:  Well, it depends.  I mean, the field

12     examiner is going to want to look at inventory, look at

13     receive -- look at the cash receipts, cash disbursement

14     activities.  So I would frankly say if there was one examiner

15     the examiner could spend two or three days here.  I mean,

16     there's a lot going on.

17          MR. SILVERSTEIN:  Is that customary?

18          MR. FORTE:  That's less than customary.

19          THE COURT:  All right.  Seven person hours.  So if you

20     send one, it's seven; if you send two, it's three-and-a-half.

21     You all can do the math.  So seven person hours on site.  And

22     this is pending -- this is between now and July 7th.

23          All right.  If the debtor is going to provide an

24     updated budget, and if you're working with the budget that

25     there is, that's fine.  But in fairness to the parties, the

1   Court and Judge Scarcella, if there's to be any updated budget,

2   that should be docketed with the Court by 4 o'clock on July

3   5th, as well as any supplemental pleadings.  I'm not saying

4   he -- Judge Scarcella needs anymore paper, but if you're all

5   going to file more paper by July 5th at 4 p.m.

6            Mr. Yang, when is the 341 meeting?

7            MR. YANG:  It's sometime in August I believe.

8            UNIDENTIFIED SPEAKER:  Unfortunately, I don't think

9   it's -- either in July -- I think maybe July 20.

10            THE COURT:  The IDI.

11            UNIDENTIFIED SPEAKER:  IDI would be much sooner.

12            THE COURT:  All right.

13            UNIDENTIFIED SPEAKER:  But we don't usually get much

14   information.  The schedule hasn't been filed either.

15            THE COURT:  All right.  So I'll look for the order --

16            UNIDENTIFIED SPEAKER:  It's on the 22nd of July, the

17   341 --

18            THE COURT:  That's on at 11, right?

19            THE CLERK:  Yes.

20            THE COURT:  All right.  So we'll look for the order to

21   be submitted.  And please include in that a continued interim

22   hearing.  This is not a final hearing, the continued interim

23   hearing will be July 11th -- July 7th at 11 a.m.  That's not a

24   final, that's a further interim.  All right.

25            MR. DICONZA:  Thank you for your time, Your Honor.

1            THE COURT:  All right.  Very well, thank you all.

2            IN UNISON:  Thank you, Your Honor.

3            THE COURT:  The Court will then be in recess on Hi-

4    Temp, and we'll be adjourned.

5        IN UNISON:  Thank you.

6        (Whereupon these proceedings were concluded at 1:35 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                        I N D E X

 3

 4    WITNESS                EXAMINATION BY      PAGE

 5    Joseph Smokovich      Mr. DiConza          25

 6    Joseph Smokovich      Mr. Silverstein      33

 7    Mr. Smokovich         Mr. DiConza          68

 8

 9                          RULINGS

10                                        PAGE    LINE

11    Cash collateral authorized as follows:    70      22
      Debtor to use 500,000 dollars of
12    collections between now and the July 7th
      hearing.  None to be used to pay
13    insiders or affiliates.

14    Debtor's authorized to buy material for    71       3
      the current purchase orders that it does
15    not have on hand, no restocking the shelves.

16    Debtor to provide to Wells Fargo all       71       9
      purchase orders that it currently has for
17    which it has made a request for use of cash
      collateral.
18
      Debtor and lender can agree to            71      13
19    exceed 500,000 if in best interest of both.

20    No critical vendors or professional fees   71      21
      can be paid out of 500,000
21
      Debtor required to provide a full         72      16
22    accounting to Wells Fargo of all funds
      that were collected through, and spent
23    out of the Citibank account pre-petition

24    Wells Fargo granted replacement lien      73       3
      on all unencumbered property of the
25    bankruptcy estate, excluding avoidance actions.
```

1

2                    C E R T I F I C A T I O N

3

4    I, Aliza Chodoff, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   ALIZA CHODOFF

12   AAERT Certified Electronic Transcriber CET**D-634

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  June 29, 2016

19

20

21

22

23

24

25

**HI-TEMP SPECIALTY METALS, INC.**
Case No. 8-16-72767-las

June 28, 2016

---

**$**

---

**$40,474,763 (1)**
44:12

---

**A**

---

**ability (3)**
8:8;51:9;74:16
**able (12)**
5:25;6:4;9:20,21,
22;19:5,6,11;20:8;
28:19;73:16,21
**above (2)**
11:21;61:24
**absolutely (3)**
17:2;24:8;43:6
**acceptable (1)**
16:23
**access (2)**
24:8,12
**accommodations (1)**
8:14
**accordance (2)**
6:18;25:3
**according (7)**
13:15;15:9;31:4;
41:16;58:12,13;
67:13
**accordingly (1)**
25:14
**account (35)**
13:23,25;14:3;
18:12;19:1,5,19;
26:25;27:11,11;
33:16,19,20,21,25;
34:2,4,9;35:2,4,5,12;
36:19,20,23;37:2;
38:7,11;40:21,24;
60:10,21;61:11;
72:18,23
**accounting (6)**
17:17;18:1;27:14;
38:14;72:17,19
**accounts (15)**
11:24;17:9;18:15,
15,17;19:2;28:1,7;
55:20;57:2,23;
58:19;59:10;60:8;
68:15
**accurate (2)**
26:21;32:20
**acknowledged (1)**
14:22
**acquired (3)**
7:5;11:17,18
**Across (1)**
47:11
**actions (1)**
73:5
**active (1)**
8:4

**activities (1)**
75:14
**activity (6)**
44:5;53:21;58:7;
59:25;60:19;72:19
**actual (2)**
44:12;69:13
**actually (11)**
11:8;12:18;22:4,
10;34:12;42:14;
49:5;52:18;68:21;
70:16;74:23
**Adam (3)**
5:13;13:6;33:4
**add (2)**
56:24;58:24
**added (1)**
56:14
**adding (1)**
56:19
**addition (5)**
6:13;15:20;26:24;
30:21;72:7
**additional (3)**
27:10;29:11;32:4
**address (8)**
13:8;17:1,2,13,16;
18:8;19:10;75:9
**addressing (1)**
15:22
**adequate (5)**
11:15;12:8;17:3;
73:3,7
**adjourned (1)**
77:4
**advice (1)**
37:22
**advised (3)**
19:8;20:2;37:7
**advisor (1)**
8:21
**advisors (1)**
8:22
**affidavit (1)**
12:13
**affiliate (2)**
14:20;20:18
**affiliates (4)**
20:15;39:21;
70:25;71:2
**afloat (1)**
35:15
**afternoon (1)**
33:4
**again (10)**
13:5;20:15,21;
22:11,15;23:20;
30:23;58:23;72:9;
74:13
**agents (1)**
71:1
**ago (3)**
8:18,22;35:6

**agree (4)**
22:25;24:3;71:13;
73:11
**agreed (1)**
63:23
**agreeing (1)**
71:19
**agreement (9)**
5:23;6:5,10;7:13;
8:15;9:4;14:22;22:6;
28:23
**air (3)**
49:12;66:10,12
**alive (1)**
19:14;37:13
**allegations (3)**
17:15;18:18,22
**allege (1)**
21:1
**alleged (1)**
20:5
**allocate (1)**
72:10
**allow (2)**
12:16;30:2
**although (2)**
6:5;41:15
**always (1)**
48:12
**amendments (1)**
7:21
**among (1)**
72:11
**amount (8)**
11:12;15:5;23:23;
50:3,15;61:6;62:19;
70:2
**ancillary (1)**
30:12
**answered (1)**
39:24
**anticipate (2)**
5:19;69:14
**anymore (1)**
76:4
**Apparently (1)**
31:25
**appearances (1)**
5:4
**appeared (2)**
13:13;70:18
**appears (2)**
43:7;71:14
**application (7)**
13:18,20;15:4,23;
54:11,20;70:8
**applications (1)**
17:22
**apply (1)**
68:23
**appointed (2)**
16:21;17:17
**appreciate (2)**

**23:21;66:11**
**approach (2)**
43:5;57:10
**appropriate (2)**
53:10;74:9
**approximate (1)**
7:24
**approximately (50)**
7:18;8:1,2;10:20;
11:14,25;12:4;
13:16;26:14,24;
27:3;28:16;29:10,
25;32:2;35:6,8;
36:21;38:9;44:17,22,
25;45:11,21,24;46:6,
8,19;47:20;48:6;
49:14;50:5,17,20;
51:25;52:4;55:11,
13;56:16;57:1;
59:10,15;61:23;65:3,
22,23,24;68:9,15;
69:18
**April (5)**
14:9,12;34:18;
41:7,9
**argue (1)**
68:25
**around (1)**
74:17
**arrived (1)**
30:22
**Asia (1)**
66:12
**Asian (1)**
30:6
**aspirations (1)**
22:16
**asserted (1)**
8:12
**assistance (1)**
54:21
**associated (1)**
72:6
**assumed (2)**
54:13,14
**attached (11)**
7:15;15:6;20:21;
25:3;26:7;41:19,21,
24,24;43:20;69:3
**audited (1)**
8:6
**audits (1)**
8:7
**August (1)**
76:7
**authority (1)**
19:9;25:5
**authorization (1)**
19:12
**authorizations (1)**
21:15
**authorize (3)**
39:20;70:20,22

**authorized (2)**
21:12;71:3
**authorizes (1)**
21:14
**availability (3)**
7:22;8:7,11
**averages (1)**
46:5
**avoid (3)**
5:25;70:19;71:7
**avoidance (1)**
73:5
**aware (1)**
31:11
**away (2)**
38:4;75:3

---

**B**

---

**back (16)**
7:6;13:3;22:7,15;
23:18;34:13,20,22;
35:18;36:19;37:15;
43:9,12,25;63:16;
75:5
**background (2)**
6:6,20
**bank (21)**
11:15,19;16:2,5,
16,23;18:17;19:8,12,
18,21,22;20:9;24:2,
3;25:6;27:12;37:16;
71:13;72:23,24
**banker (1)**
9:19
**bankers (1)**
19:7
**bankruptcy (11)**
17:21;18:13;
34:11;35:8,20;
40:11;60:11;61:14;
69:23;72:20;73:5
**bank's (1)**
19:16
**based (7)**
17:14;21:7;24:4;
54:14;68:8;69:15,17
**basis (6)**
15:23;17:25;33:6;
45:24;46:11;69:2
**became (1)**
37:15
**beforehand (1)**
63:24
**behalf (1)**
5:6
**behind (1)**
5:9
**believes (4)**
9:19;11:21;24:7;
62:1
**benefit (1)**
71:15

**benefits (1)**
72:6
**besides (1)**
35:8
**best (2)**
29:3;71:17
**beyond (3)**
11:22;36:20;61:2
**bit (3)**
46:10;51:14;64:10
**board (4)**
9:9;47:11,14,15
**books (2)**
21:8;28:2
**borrowing (1)**
57:5
**both (3)**
22:23;59:13;71:16
**bought (2)**
7:5;40:11
**breakdown (2)**
43:8;65:6
**breathing (1)**
10:2
**brief (1)**
6:6
**bring (1)**
43:8
**brings (1)**
10:15
**broker (2)**
5:8,9
**budget (21)**
10:19,22;20:21;
25:3,9;26:7,8;30:19;
31:4;56:7;58:17;
69:3,5,7,20;71:21,
25;72:13;75:24,24;
76:1
**budgeting (1)**
71:24
**budgets (1)**
69:22
**business (14)**
8:5;10:4;14:14;
20:19;27:24;33:12;
35:16;36:4;41:5;
46:20;48:12;68:25;
74:18,20
**busy (1)**
41:11
**buy (12)**
15:11,17,19;47:1;
48:2,8,12;49:3;
61:20;62:7;67:8;
71:3
**buying (1)**
45:13

**C**

**calculator (2)**
56:22;58:24

**calendar (2)**
73:14,17
**Caliber (9)**
8:23,25;9:6,7,8;
54:22,24;64:18;69:9
**Caliber's (1)**
8:24
**call (4)**
20:25;22:7;28:25;
66:1
**called (3)**
8:23;20:23;37:5
**calls (2)**
9:17;40:2
**came (10)**
13:13;34:13,15;
40:16;42:22;58:25;
59:2,3;61:13,14
**can (47)**
6:9,22;10:3;12:17;
15:1,6;16:8;18:8,11;
22:5,6,24;23:11;
24:16,17,19;25:6,11;
29:17,17;32:17;43:1,
11;47:22,25;51:24;
52:8,11,11;53:13;
55:1;63:3;64:16;
65:9;68:24,25;70:5,
5,16;71:5,13,22,22;
74:2,14,21;75:21
**cancel (1)**
32:2
**canceled (1)**
67:11
**canceling (1)**
29:6
**cancellation (1)**
29:1
**cap (4)**
71:14,17,18,19
**capacity (1)**
70:25
**Capital (1)**
4:12
**car (1)**
13:11
**care (2)**
37:12;41:2
**careful (1)**
60:16
**carried (1)**
72:14
**case (23)**
5:20,21,21;6:7;
9:23;10:14;12:7,24;
16:3,5;20:1,22;21:3;
22:12,14,17;26:6;
27:19;29:20;31:5;
33:10;50:25;62:24
**cash (45)**
5:18,25;6:8,12,19;
7:16;10:15,21;
12:19;13:1,13,18;

15:3,11,18,21,23,24;
16:18;17:4,20,21,24;
20:22;21:17;25:4;
26:7,23;30:4,9;
33:21;54:11,20;55:5,
20;59:5;60:2;69:3,7;
70:8,21;71:12;
73:17;75:13,13
**categories (3)**
57:7;72:9,11
**caused (2)**
7:12;8:16
**Central (1)**
4:6
**CEO (1)**
7:7
**certain (9)**
30:13,14;31:5;
40:13;50:2,3;51:19;
64:15;72:3
**certainly (7)**
17:25;25:12;27:8;
30:15;71:13;72:25;
74:16
**certificate (1)**
57:5
**cetera (1)**
71:1
**chance (2)**
12:11;13:2
**change (3)**
55:9,11,13
**changes (1)**
72:4
**Chapter (4)**
10:1;16:18;26:6;
30:19
**charge (1)**
36:1
**check (2)**
27:9;32:1
**choice (3)**
19:6,7;40:25
**circumstances (1)**
13:10
**Citi (1)**
35:14
**Citibank (19)**
19:23,24;33:16,19,
20,25;34:2,4,9;35:2;
36:19;40:21,23;60:8,
10;61:1,10;72:18,23
**claim (3)**
7:18;12:5;51:16
**claiming (1)**
48:2
**claims (1)**
47:17
**clause (1)**
29:1
**cleanup (1)**
67:22
**clear (5)**

14:1,5;35:15;
37:13,15
**clearly (1)**
17:20
**CLERK (4)**
24:17,19,23;76:19
**client (2)**
16:7,21
**close (1)**
35:5
**closed (2)**
35:4;38:7
**closing (2)**
35:12;36:23
**codes (1)**
43:2
**CohnReznick (3)**
4:12;5:8;69:11
**collateral (31)**
5:18,25;6:12,20;
7:16;10:16;13:13,
18;15:11,15,23;
17:24;18:24;20:22;
25:5;26:8;36:4;
54:11,20;55:22;57:7,
14;58:10;68:2,4;
69:4,7;70:9,21;
71:12;74:8
**collect (1)**
58:20
**collected (3)**
58:5;59:6;72:17
**collectible (1)**
28:3
**collecting (2)**
28:6;34:8
**collection (5)**
55:5;56:3;58:7;
59:5;69:24
**collections (14)**
13:21,24;53:21,
24;54:13,14;55:2,3;
56:20;59:15,25;
61:1;69:14;70:23
**collective (1)**
56:1
**collects (1)**
13:16
**comfortable (1)**
60:5
**coming (4)**
9:23;18:21;36:19;
72:21
**commenting (1)**
75:1
**commissioned (1)**
71:1
**commissions (4)**
30:14;32:8;62:20;
72:6
**commitment (1)**
52:18
**commodities (1)**

7:11
**communication (1)**
27:8
**comp (2)**
30:16;31:25
**companies (6)**
27:18,22,25;
28:23;30:6,6
**company (66)**
7:2;10:5,6;12:21;
14:15;18:21,23,25;
19:14,15;20:18;
21:3;22:25;27:18;
28:2,8,19;29:8,9,11;
30:10;32:1,18;35:15,
17;37:8,13,17,21;
38:24;39:1,5,14,24;
40:10;41:1,2,3,4;
44:16,19,22;45:20,
24;46:2,11;47:1,17,
17,19,21;48:14,17;
51:11,11;57:1,20,23;
59:10;61:10,20,24;
62:1,9;68:8,17
**company's (3)**
28:6,14;45:12
**completely (1)**
6:4
**complication (1)**
27:10
**concealed (1)**
14:16
**concern (1)**
69:23
**concerns (1)**
70:13
**concluded (1)**
77:6
**conduct (3)**
14:22;17:14;20:9
**conducted (1)**
8:6
**conference (3)**
22:22;28:13;63:24
**confidence (2)**
59:18,21
**confident (3)**
54:25;55:1;59:25
**conglomerate (1)**
27:23
**consensus (1)**
22:5
**conservative (2)**
59:17;69:20
**consider (1)**
39:4
**considering (1)**
11:7
**consisted (1)**
63:18
**consistent (1)**
73:10
**consistently (1)**

35:25
**consultant (2)**
31:12;54:24
**container (1)**
65:23
**containing (1)**
9:15
**contested (1)**
74:1
**context (2)**
54:3,8
**continue (1)**
40:6
**continued (6)**
9:6;10:2;14:23;
25:7;76:21,22
**continuing (1)**
9:3
**contract (2)**
28:25;29:6
**contractual (1)**
28:23
**contrast (1)**
9:8
**control (10)**
8:11;10:3,3;13:25;
14:3;16:22;19:2;
21:3,3;27:9
**controlled (1)**
19:2
**conversation (4)**
13:8;22:2,11,24
**conversations (2)**
23:8;38:2
**conversion (7)**
16:22;31:5,7,9;
64:12,14;72:1
**conversions (1)**
63:20
**convert (4)**
16:3,5;31:13;
64:25
**converted (2)**
31:6;64:16
**copies (1)**
57:9
**copy (3)**
7:16;25:9;68:2
**corollary (1)**
50:24
**corporation (1)**
7:1
**cost (7)**
28:16;29:4;31:15,
15;45:1;62:13;68:22
**costs (12)**
30:12;31:5,7,9,17,
22;32:4,17;63:20;
64:12,14;72:1
**counsel (7)**
19:6;20:23;37:7,
22;57:10;64:1;68:1
**counterpart (1)**

29:2
**country (1)**
31:13
**County (2)**
7:4;9:24
**couple (3)**
8:21;39:25;43:13
**course (6)**
29:12;31:11;32:8;
40:17;65:8,8
**COURT (101)**
5:2,16;6:6,11,22,
24;9:12;10:24;11:2,
11;12:10;15:2;16:2,
5,10,13,16;18:2,4,7;
19:18,21;21:14,19,
23;22:20;23:5,7,10,
15,17;24:13,16,25,
25;25:13;29:9;
32:24;33:23;38:1,4;
39:10,19;42:11,14,
24;43:6,10,17;47:14;
53:2,12,18;55:18,21,
24;56:1,5,7,7;57:8,
10,11;60:17,24;61:9;
63:13,16;64:3,5,20,
22;65:16;67:17,22;
70:5,13,18,20,22;
72:3,12;73:3,20;
74:1,10,14,22;75:5,
10,19;76:1,2,10,12,
15,18,20;77:1,3,3
**courthouse (1)**
7:3
**courtroom (1)**
22:22
**Court's (2)**
12:14,16
**coverage (2)**
36:1,8
**creating (1)**
24:25
**credit (4)**
29:23;30:2,3;40:9
**creditor (1)**
7:18
**creditors (6)**
10:8,11;14:25;
19:15;21:18;30:1
**critical (17)**
10:21,24,24;11:4,
5,6,8;24:8;31:17;
39:5,9;48:14,16;
63:9,10,11;71:21
**CRO (4)**
16:21,22;17:17;
18:1
**cross (1)**
63:17
**cross-examination (2)**
22:7;33:2
**cross-examine (3)**
12:17;17:12;25:6

**current (5)**
7:24;17:9,10;
70:16;71:4
**currently (6)**
26:23;29:19;
50:16;51:24;71:11;
72:8
**cushion (2)**
11:20;12:8
**customary (2)**
75:17,18
**customer (3)**
29:1;34:21;66:15
**customers (14)**
27:6;28:22;29:16;
34:7,7;35:13;36:24;
37:1,5;54:2;58:12,
14;64:17;65:10
**cuts (1)**
72:1

**D**

**daily (6)**
8:6;14:8;57:14;
58:9;68:1,4
**Daniel (1)**
5:15
**data (1)**
9:14
**date (15)**
6:8,13;7:6,17;
10:17,20;18:15;
21:8;25:22;30:10;
44:4;57:8;68:12;
72:20;74:4
**dated (2)**
6:16;7:15
**day (10)**
10:3;17:19,22;
18:24;19:9,9;57:5;
58:15;72:24;75:7
**days (16)**
13:20;35:6;39:21;
41:17;56:17,19,21;
58:4,16,17;59:6,14;
69:16,17;70:2;75:15
**deal (1)**
10:4
**dealing (1)**
10:16
**debtor (75)**
5:6,9,25;6:16,21,
25;7:6,8,12,14,18,
20;8:9,12,16,20,22,
24;9:3,7,10,19,22;
10:1,6,19;11:13,16,
16,18,18;12:16;
13:10,14,16,18;
14:10,19,24;15:9,13;
17:7,20,24;18:14,16,
16;19:3,19;21:12,15,
17;24:1,5,7;25:5,20;

26:14,23;27:1;39:8,
23;67:18;70:15,19,
22;71:9,13,23,25;
72:8,20;73:1,16;
75:23
**debtor-in-possession (2)**
18:17;27:11
**debtors (1)**
20:8
**debtor's (24)**
5:10,17;7:10;8:5,
8,14;9:5,15;10:3;
13:16;14:8,14;15:21,
24;21:7;26:10;
33:21;71:3,9,16,18,
21;72:16;75:4
**decide (1)**
5:24
**decided (1)**
37:14
**decides (1)**
27:9
**decisions (2)**
71:24;72:10
**declaration (12)**
6:14,15,21;7:9;
12:15,17;22:8;25:1;
41:20,21,25;43:21
**decrease (1)**
7:11
**decreased (1)**
7:23
**default (10)**
7:13;8:3;14:22;
35:20,22,25;36:3,10,
12,14
**defaults (2)**
35:24;36:17
**degree (1)**
28:21
**Delaware (1)**
7:1
**deliver (3)**
28:25;30:13;49:11
**delivered (2)**
65:7,10
**delivery (1)**
66:3
**demands (1)**
8:13
**demonstrate (1)**
41:3
**DEPARTMENT (1)**
4:3
**depending (1)**
68:23
**depends (1)**
75:11
**depose (2)**
20:7,13
**deposition (2)**
14:18;19:25
**depositions (6)**

19:16;20:4,10,10;
23:1;73:23
**depreciation (2)**
45:20;46:7
**details (1)**
43:15
**determine (1)**
68:24
**DICONZA (54)**
5:5,6,6,6:3,12,25;
9:13;11:1,4,12;13:4,
7;14:7;15:8,10,16;
16:24;17:15;18:8;
19:20,23;21:21;
22:19;23:19,20;25:2,
8,17;32:22;33:18,20;
37:20,23,25;38:2;
39:7,13,17;42:18,20;
56:22;60:14,22;
63:11,18,22;67:22,
23,25;73:9;74:11,12,
21;76:25
**DiConza's (1)**
14:17
**difference (5)**
27:7;29:4,16;
62:12,14
**different (6)**
13:9,10;29:14,15,
16;66:19
**difficult (1)**
40:25
**difficulties (1)**
7:10
**dilution (1)**
28:5
**DIP (1)**
19:19
**direct (3)**
25:1,7;60:9
**directed (2)**
8:20;19:3
**Director (1)**
4:12
**disagree (2)**
16:24;59:1
**disallowing (1)**
72:12
**disbursement (1)**
75:13
**discuss (2)**
16:7;25:19
**discussions (5)**
7:21;8:20;28:13;
29:8;60:15
**disrupted (1)**
74:19
**distress (1)**
40:10
**dive (1)**
33:15
**diversion (1)**
60:23

**diversions (1)**
21:1
**diverted (2)**
14:1;37:22
**diverting (3)**
18:19,22;60:20
**divided (1)**
46:5
**divulge (1)**
38:3
**docket (1)**
25:1
**docketed (1)**
76:2
**document (3)**
7:22;57:20;72:1
**documents (2)**
36:1;41:17
**dollars (115)**
7:19;8:1,2;10:21;
11:14,22;12:1,5;
13:17,21,23,25;
14:20;15:5,10;17:6;
20:20;21:9;26:14,
24;29:10,25;30:21;
32:3;34:16,21;35:9;
36:20,21;38:9,10;
40:12;42:22;44:16,
17,20,23;45:1,2,3,21,
25;46:3,5,6,8,19,22,
25;47:16,21;48:6;
49:4,24;50:5,6,7,14,
18;51:10,16,21;52:3,
16;54:7;55:8,11,13;
56:16,20;57:1,24;
58:3,5,19,20,25;
59:3,11,19,21,24;
61:1,10,13,19,23;
62:2,7,9,12,25;63:4,
5,8,8,12,14;64:9,12;
65:2;66:14,24;68:14,
15,23;69:2,2,15;
70:23,24;71:16,23;
72:10,25
**dollars' (2)**
21:7;48:3
**domestic (11)**
30:5;55:20;56:3,5,
8,15;57:2,23;58:19,
21;59:13
**Done (8)**
9:13;18:16;20:16;
25:14;41:12;58:13,
23;72:4
**down (12)**
8:2;9:3;12:24;
18:14;22:8;24:1;
36:4;42:21;53:21,
24;64:5;70:5
**draft (1)**
69:4
**drain (1)**
12:24

**dramatic (1)**
7:10
**dramatically (1)**
7:23
**draw (1)**
50:24
**driving (1)**
41:6
**due (7)**
8:2;11:22;14:10;
28:18;29:24;41:15,
17
**duke (1)**
6:9
**during (9)**
8:20,23,24;10:4,
14,19;21:13;23:22;
74:19
**duties (7)**
30:12;62:20,23,
25;63:23;65:2;72:5
**duty (2)**
63:5;65:11

## E

**earlier (2)**
64:15;69:8
**early (2)**
7:19;34:18
**east (1)**
7:3
**efficient (1)**
73:24
**efforts (1)**
23:21
**eighty-eight (1)**
45:11
**either (3)**
74:24;76:9,14
**elements (1)**
47:19
**else (5)**
14:4;21:2;41:4;
63:7;73:18
**elsewhere (1)**
37:6
**emergency (9)**
5:3,17,22;13:9;
30:20;33:6;39:23;
70:8,11
**employee (2)**
11:2;32:7
**employees (9)**
9:24;10:21;19:11;
32:4,8;37:12,18;
41:3;70:25
**employees' (1)**
32:8
**employment (1)**
9:23
**employs (1)**
7:3

**encourage (1)**
40:13
**end (6)**
9:5;14:10,11;
18:24;26:15;41:18
**Ended (1)**
44:11
**ending (5)**
13:19;41:22;
43:20,24;44:19
**ends (1)**
44:1
**engaged (1)**
37:20
**enough (3)**
10:10;51:11,17
**entered (1)**
14:21
**enthused (1)**
30:1
**entire (1)**
36:9
**entirely (1)**
51:18
**entitled (2)**
44:10;74:7
**entity (2)**
9:25;10:14
**equipment (8)**
12:1;30:17;68:17,
18,20,21,22;69:1
**equity (2)**
11:20;12:8
**ESQ (1)**
4:8
**essence (1)**
14:24
**essential (4)**
33:12;62:5,7,18
**essentially (2)**
15:3;62:10
**established (1)**
9:14
**establishes (1)**
12:7
**estate (3)**
6:1;71:8;73:5
**estimated (1)**
70:1
**et (1)**
71:1
**even (9)**
14:21;15:22,23,
25;17:16,20,21,24;
53:4
**everyone (1)**
25:13
**evidence (1)**
13:3
**evidentiary (1)**
53:12
**exact (2)**
23:23;38:14

**exactly (1)**
30:1
**EXAMINATION (2)**
25:7;67:24
**examiner (5)**
74:8;75:3,12,14,15
**example (1)**
44:4
**exams (2)**
8:6;75:2
**exceed (2)**
71:13,19
**except (2)**
20:5;72:14
**excess (2)**
45:2;58:15
**excited (1)**
39:19
**exciting (3)**
74:16,24;75:1
**excluding (4)**
12:1;45:20;46:7;
73:5
**excuse (8)**
8:16;32:6;33:17;
42:16;47:6;59:20;
64:21;69:17
**excused (4)**
36:10,12,14,16
**existing (3)**
28:18;51:8;58:24
**expansion (1)**
51:1
**expect (2)**
30:2;69:19
**expecting (1)**
27:2
**expended (1)**
22:4
**expenditures (4)**
28:11;30:24;72:8,
22
**expense (2)**
39:5,9
**expenses (8)**
43:8;45:12,15,17,
20;46:3,9;62:5
**expert (1)**
12:22
**explain (1)**
37:18
**extent (1)**
5:24
**eye (1)**
9:5
**eyes (1)**
55:9

## F

**facility (4)**
7:14,15;20:19;
74:23

**fact (10)**
10:10;13:11,17,
23;14:8,10;15:12;
23:2;47:16;49:5
**facts (1)**
16:25
**fail (2)**
73:6,7
**fairly (2)**
25:13;73:15
**fairness (1)**
75:25
**faith (1)**
60:19
**far (8)**
11:15;15:6;18:18;
19:25;21:11;28:6;
30:20;40:19
**Fargo (63)**
5:14;7:17,20,25;
8:4,5;9:5,6,21;10:2,
7,9,11,12,13;11:23;
12:2,5,11,13,16,20,
23;13:6;14:2;17:8,
13;18:20;19:3,3,22;
20:2,17,23;25:16;
31:11;33:5;35:15;
36:3,16;37:2,14;
40:18,20,24;41:6,16;
51:3;57:6,21;60:12;
61:17;64:19;67:15;
68:1;70:10;71:10;
72:17;73:4,6;74:7,
20;75:9
**Fargo's (11)**
13:22;14:7;15:3,
21,24;17:4;19:2;
20:16;33:8;35:19;
65:1
**fast (1)**
15:2
**Federal (1)**
4:5
**feel (4)**
12:18;22:23,23;
23:7
**fees (7)**
15:22;21:11,15;
30:14;32:9,14;71:22
**few (5)**
9:8;16:8;44:8;
51:1;65:14
**fiduciary (4)**
10:7;19:14;37:7;
41:2
**field (6)**
8:6;74:8;75:2,3,6,
11
**fielded (1)**
9:17
**fifteen (2)**
28:9;68:14
**fifty (2)**

15:13;69:19

**fight (1)**
13:13

**figure (2)**
16:11;50:13

**file (4)**
10:1;11:8;42:2;
76:5

**filed (11)**
6:13,14;10:6,18;
11:6;13:18,20;20:1,
22;26:6;76:14

**filing (16)**
14:18;17:1,21;
20:4,5,7;34:11;35:8,
21;39:25;40:11;
60:11;61:2,9,14;
69:24

**fill (27)**
28:18;29:2,5,17;
47:23,25;48:5,9,17;
50:1,7,12;51:12,15,
17,24;65:20,23,24,
25;66:5,11,15,25;
70:16;71:6,19

**filled (5)**
48:19;49:1;52:14;
66:15,21

**filling (2)**
49:20;71:15

**filter (1)**
27:12

**final (3)**
20:11;76:22,24

**financed (1)**
68:21

**financial (7)**
6:15;7:10;8:14,21,
21;14:9;44:5

**financials (16)**
8:6;9:15;13:16;
14:9,11,12,12;29:8;
41:7,9,14,15,19,21;
43:20;44:7

**financing (2)**
9:20;25:19

**find (2)**
33:24,24

**fine (2)**
43:3;75:25

**finished (2)**
41:9,10

**finishing (1)**
41:8

**Fiorillo (1)**
5:15

**firm (4)**
8:17,18,19;27:23

**firmly (1)**
9:19

**first (14)**
17:22;29:14;
44:15,25;45:6,12,19,

23;46:2,12;56:25;
57:13;59:9;62:24

**fiscal (1)**
44:1,16;45:6

**five (6)**
8:1,2;21:9;68:9;
69:1,18

**fixed (1)**
35:25;36:8

**flow (1)**
60:2

**focus (3)**
10:4;13:8,15

**focusing (1)**
48:13

**folder (1)**
26:2

**following (2)**
14:11;22:12

**follows (2)**
70:12,21

**forbearance (3)**
7:21;14:21;60:13

**forced (2)**
18:25;19:13

**forecast (3)**
26:1,14,20

**forecasts (1)**
67:13

**foreign (8)**
30:6;31:13;56:8;
58:23,24;59:5,10,14

**form (5)**
22:5;31:14;64:16;
65:25;73:10

**forms (1)**
29:15

**Forte (4)**
13:12;75:8,11,18

**forth (1)**
10:22

**forty-eight (2)**
44:20,22

**forty-three (1)**
59:15

**forty-two (1)**
59:15

**forward (4)**
9:7;26:11;48:6;
52:2

**founded (1)**
7:1

**four (10)**
20:7,11;29:25;
35:6;49:11;66:2;
67:12;68:15;69:1;
75:7

**fourteen (7)**
21:9;29:10;47:16,
21;51:10,16,20

**frankly (1)**
75:14

**free (3)**

22:23,23;23:7

**freight (10)**
30:12;62:20,23,
24;63:5,22;65:2,11;
66:12;72:5

**Friday (1)**
20:2

**front (2)**
55:4;64:3

**full (2)**
9:21;72:16

**fund (4)**
40:6,8,9;61:17

**funds (6)**
18:19,22;37:24;
72:17,21,22

**further (5)**
6:1;32:22;60:12;
73:21;76:24

**future (7)**
50:25;54:9;67:5,6,
8,13;70:18

### G

**general (2)**
38:5;48:4

**Gerard (1)**
5:5

**germane (2)**
53:15,18

**gets (1)**
10:14

**given (4)**
10:8;40:18;61:16;
70:7

**glad (1)**
68:19

**goes (1)**
72:24

**Good (8)**
5:5,11,13;13:5;
29:12;33:4;40:19;
66:10

**goods (13)**
37:2;45:1,13,16;
47:10;61:21;62:7;
65:7,9;66:8,14,24;
67:5

**grade (1)**
65:25

**grant (1)**
73:3

**great (3)**
22:6;59:18,21

**gross (2)**
45:5;50:20

**ground (1)**
22:10

**group (4)**
7:5;8:23,23;9:9

**guess (1)**
22:2;33:10

### H

**half (9)**
8:3;13:17;17:6;
29:25;30:2,3;51:25;
52:8,11

**hand (13)**
24:17;26:23;
27:13;50:9,12;
51:19;52:19,20;
70:15,16;71:4,20;
72:8

**handed (1)**
57:13

**handle (2)**
12:21;70:14

**hands (2)**
65:8;75:5

**hang (5)**
16:16;18:4;38:1;
55:18,21

**happen (3)**
28:20;51:6;60:6

**happened (3)**
13:1;63:13;72:25

**happening (1)**
22:10

**happens (3)**
49:8,10,10

**happy (3)**
17:12,13;73:13

**hard (1)**
71:17

**harm (3)**
6:1;70:19;71:8

**head (1)**
65:22

**hear (3)**
5:21;12:23;24:13;
25:15;53:16;61:5,7;
64:2

**heard (1)**
15:8

**hearing (20)**
5:3,17,22;6:2,17;
11:14;15:5;20:11;
22:12;23:24;25:24;
30:11;70:20,23;
71:2;72:12,14;76:22,
22,23

**held (3)**
6:2;34:4;37:14

**Helfat (1)**
5:15

**Hi- (1)**
77:3

**high (4)**
28:21;65:25;66:1;
73:15

**higher (2)**
29:5;50:21

**historically (1)**

14:10

**history (3)**
14:13;28:6;50:24

**Hi-Temp (13)**
5:3;6:25;22:2,21;
23:18;34:22;35:25;
36:17,24;44:10;
47:9;61:18;73:18

**Hi-Temp's (1)**
43:24

**holding (5)**
7:18;24:6;75:5

**homogeneous (1)**
29:13

**Honor (143)**
5:5,7,9,11,13;6:3,
12,14,16,20,25;7:4,9,
14,16,19,20,22,25;
8:3,5,11,13,16,16,18,
19:9;4,8,10,13,15,17,
18;10:1,6,8,10,12,15,
18,19,22;11:4,10,12,
16,19,25;12:1,3,6,9;
13:4,5;14:1,8,13,24;
15:12;16:14,20;
17:19,23;18:3,6,8,9,
12,17,19,20,23,24;
19:1,5,8,13,17,23,24,
25,25;20:1,6,15,16,
21,25;21:2,4,5,7,10,
18,22,22;19:23;4,6,
9,14,20,21,25;24:1,3,
6;25:17;32:22;33:1,
18,20;37:23,25;39:7,
13;42:10,18;43:4;
52:25;53:9,17;57:4,
10;60:14,18,22;
63:11,12,14,18,24;
65:14;67:14,20,23;
73:19;74:7,12;75:2,
9;76:25;77:2

**Honor's (2)**
53:10;67:16

**hoping (1)**
29:24

**hopper (1)**
73:12

**hour (1)**
74:21

**hours (9)**
20:4,6;41:10,12;
74:20;75:7,7,19,21

**hundreds (1)**
14:20

**hurt (2)**
18:23;69:24

### I

**identified (1)**
9:16

**identify (2)**
8:25;65:9

**IDI (2)**
76:10,11
**imagine (2)**
74:15,23
**immediate (2)**
6:1;70:19
**impact (1)**
69:23
**impart (1)**
22:13
**impose (1)**
23:1
**improving (2)**
51:2,2
**inability (1)**
8:15
**Inc (1)**
44:10
**incidences (1)**
28:9
**include (1)**
76:21
**included (6)**
6:15,21;30:22,24;
31:22;32:14
**including (3)**
14:21;23:2;47:22
**income (4)**
44:3,7,8,11
**incoming (1)**
65:12
**Indian (2)**
34:13,15
**indications (1)**
61:16
**inform (1)**
22:11
**information (3)**
53:4;73:2;76:14
**informed (1)**
25:13
**ingot (2)**
49:12;65:24
**initial (1)**
69:4
**initiated (1)**
36:9
**input (1)**
6:5
**inside (1)**
41:10
**insiders (3)**
39:20;70:24;71:2
**insist (1)**
9:7
**insisted (1)**
51:3
**inspect (2)**
74:8,23
**inspection (2)**
74:19;75:6
**institutional (1)**
22:13

**insurance (7)**
10:22;30:15;
31:22;32:1;63:19;
64:9;72:6
**intend (1)**
5:21
**intention (3)**
12:14,16;66:13
**intentions (1)**
67:16
**interest (3)**
32:9;35:16;71:17
**interested (2)**
9:18;10:5
**interim (4)**
5:17;76:21,22,24
**internal (2)**
45:8;54:22
**international (1)**
27:7
**intervening (1)**
74:4
**into (16)**
6:19;14:3,21;
30:19;33:15;34:2,4,
9;35:9;36:20;40:23;
60:10,20;63:13;
64:16;70:9
**inventory (52)**
11:18,24;15:10,11,
12,15,18,19;17:10;
21:5,7,9;24:4,6,9,12;
28:15,16,19;29:10,
11,13,19,22;30:9,21;
47:17,19,21;49:13;
50:9,12;51:3,11,16,
21,24;52:3,5,8,11,11,
12;61:20;62:13;
67:6,8;68:10,15;
70:15,17;75:12
**investment (5)**
5:8,8,9;19,20;19:7
**investors (5)**
7:5;8:25;9:16,18;
10:5
**involved (1)**
8:8
**involvement (2)**
8:24,24
**irrefutable (1)**
17:14
**irreparable (3)**
6:1;70:19;71:8
**Irwin (1)**
17:13
**Island (1)**
7:2
**Islip (1)**
4:6
**issue (7)**
5:24;27:8,16;
31:25;74:2,2,10
**issues (3)**

17:14;23:23;31:24
**item (3)**
25:1;48:4;64:6
**itemized (1)**
45:17
**itemizes (1)**
57:6
**items (4)**
22:3;62:18;71:25;
72:14

**J**

**Japanese (1)**
27:23
**Jeff (1)**
8:17
**JEFFREY (3)**
4:12;5:7;54:21
**Joe (1)**
5:10
**John (1)**
5:15
**Joseph (1)**
24:21
**jotting (1)**
42:21
**Judge (9)**
5:20;6:2,9;22:14;
24:11;25:24;73:24;
76:1,4
**judge's (1)**
61:7
**judicial (1)**
6:22
**July (63)**
6:2,8;10:17,20;
11:3,13;12:19;20:12,
13;22:4,4,16,25;
23:1,24;25:24;
26:15;27:1;28:12,
18;30:11;31:17;
32:2,18;33:9,13,22;
46:18,20,23;48:13,
20,22;49:15;61:19;
62:2,10;65:19;66:6,
12,16,19,22,25;67:3,
3;70:20,23;71:2;
72:12,14;73:21,22,
24;74:9;75:22;76:2,
5,9,9,16,23,23
**June (12)**
6:13,16;13:19,24,
24;21:19;22:3;
49:14;55:24;57:9,
23;68:8
**JUSTICE (1)**
4:3

**K**

**Kadish (1)**
5:6

**keep (3)**
19:14;37:13;73:11
**Keeping (1)**
30:5
**key (2)**
43:2
**kind (2)**
74:18,23
**knew (5)**
14:2;17:15;20:5,
17;40:23
**knowing (1)**
20:20
**knowledge (2)**
20:16;22:13
**Kumbaya (1)**
75:6

**L**

**landlord (4)**
39:1,13,22;71:1
**large (1)**
27:23
**largest (1)**
7:17
**last (14)**
7:11;8:3;13:12;
14:21;20:1,22;
22:12;24:21;36:23;
37:1;45:12;57:5;
74:12;75:3
**late (8)**
33:25;34:11,12,17,
18;35:7,9;49:14
**later (1)**
72:24
**law (1)**
12:7
**leading (2)**
13:24;16:25
**learned (1)**
31:24
**lease (2)**
39:2;40:2
**leases (1)**
30:18
**least (2)**
8:4;12:25
**leave (3)**
23:11;70:6;74:3
**left (3)**
17:8;23:25;26:1
**legal (2)**
39:7,11
**lender (4)**
60:20;71:14,16,19
**lenders (1)**
8:25
**less (5)**
40:3;46:10;65:25;
69:19;75:18
**level (1)**

30:3
**lien (2)**
12:2;73:4,6
**liens (3)**
11:17,19;12:9
**likely (2)**
30:2;54:4
**limit (1)**
74:21
**line (6)**
11:3;21:19;56:2,4;
64:6;71:25
**lines (1)**
22:4
**liquidate (3)**
36:4;37:17;51:3
**liquidation (3)**
10:13;12:3;69:2
**liquidity (1)**
14:15
**list (2)**
64:3,6
**listed (2)**
62:18;71:21
**little (6)**
6:20;46:10;48:24;
51:14;64:10;69:19
**load (1)**
65:23
**loan (5)**
7:13,14,21,23;
35:20;36:1
**located (1)**
7:2
**Long (2)**
7:2;75:6
**longer (1)**
61:17
**long-term (1)**
28:23
**look (16)**
17:11;41:23;43:1,
3;53:1,4,13,14;
58:23;68:19;74:17;
75:12,12,13;76:15,
20
**looked (1)**
42:25
**looking (7)**
55:18,21;56:10,
19;57:13;63:2,3
**loose (1)**
15:2
**loss (1)**
7:12
**losses (2)**
14:14;54:1
**lost (3)**
22:14;32:1;55:15
**lot (3)**
13:7;40:3;75:16

## M

**maintaining (1)**
9:23
**majority (1)**
7:7;27:25
**makes (1)**
8:9
**making (2)**
18:19,22
**manager (1)**
27:13
**Managing (1)**
4:12
**Manhattan (1)**
13:11
**MANNING (12)**
4:12;5:7;9:10,18;
10:8,23;11:20;
30:15;42:20;54:22;
69:11,22
**Manning's (2)**
8:18;9:9
**Many (5)**
27:6,24;28:22;
51:23;56:18
**March (10)**
33:25;34:11,12,17,
18;35:7,9;41:22;
43:20;44:11
**margin (3)**
45:5;50:20;51:1
**margins (1)**
51:2
**Market (2)**
4:13;51:7
**marketplace (1)**
50:23
**material (40)**
29:3,14,15,17,18;
30:4,12,13;31:5,10,
12,14,14,16,18;
40:13;47:9;48:1,12;
49:10,21,21,25;50:7;
51:12,19;64:15,17,
24;66:1,12;67:5,10,
12;68:24,25;71:3,6;
72:4,7
**materials (7)**
40:12;47:1;48:3,9;
49:4;50:15;52:22
**math (5)**
56:15,23;58:24;
59:13;75:21
**matter (11)**
5:21;15:12;21:24,
25;23:12;42:24;
49:18,20;73:19;74:2,
6
**matters (1)**
42:25
**May (20)**

8:17;9:12;14:10;
24:21;27:15,15;
30:7;41:14,15;
42:10;43:4,4;44:1;
52:25;57:4,10;
65:14;69:24;72:8;
75:8
**maybe (1)**
76:9
**mean (6)**
11:9;12:12;27:5;
43:24;75:11,15
**meaning (1)**
5:22
**means (1)**
62:11
**meant (1)**
72:2
**mediator (1)**
23:22
**meeting (1)**
76:6
**mentioned (1)**
17:23
**merits (2)**
15:22;16:1
**Metals (5)**
5:3;7:2;15:13;
44:10;61:18
**might (5)**
12:20,22;13:10;
22:17;33:23
**migrated (1)**
39:22
**miles (1)**
7:3
**million (89)**
7:19,23,24;8:1,2;
10:20;11:14,22,25;
12:3,4,4,6;13:17;
15:5,10;17:6;20:20;
21:6,9,9;24:1,1;
26:14;27:3;29:10,
25;30:21,22;31:3,23;
32:7,12;42:22;44:16,
17,20,23;45:1,2,2,
21;46:3,5,22;47:16,
21;48:6;50:5,6,17,
18;51:10,16,20;52:3,
16;54:7;56:16,20,24;
57:1,24;58:3,4,19,
20;59:11,18,21,23,
24;60:25;61:10,13;
62:2,12;63:12,14;
68:9,9,14,15,23;
69:1,2,15,18;72:25
**million-dollar (1)**
7:15
**mind (4)**
17:7;30:5;37:17;
41:23
**minimum (5)**
16:14,20;17:16,

25;22:24
**minute (1)**
63:14
**misquoted (1)**
21:6
**mission (1)**
9:4
**misspoke (1)**
50:10
**molybdenum (6)**
47:15,18,22;
48:24;51:12;65:23
**moment (3)**
16:8;26:4;56:23
**moments (2)**
16:8;65:15
**Monday (1)**
74:5
**money (33)**
15:6;17:6,18;24:8;
33:9,11,12;34:4,8,
12,15,22;35:3,4;
36:19,24;37:6;38:7;
40:5,15;42:9;49:15;
51:15;54:5;60:7,9,
20;62:17,23;64:1;
71:1,24;72:15
**monies (7)**
14:19;20:24;34:2;
35:2,8,11;40:23
**month (9)**
13:17;14:11;
28:18;40:4;44:11;
45:25;46:6;48:22;
49:14
**monthly (2)**
14:9;40:2
**months (16)**
8:22;10:4;43:24;
44:4,15,25;45:6,12,
19,23;46:2,5,12;
51:1;61:2,9
**more (20)**
15:15,17,19;20:11,
12;28:9;30:1;34:3;
36:18;39:19;40:14;
43:13;51:14;52:15,
21;64:10;71:15;
73:12,24;76:5
**morning (8)**
5:3,5,11,13,16,19;
13:5;37:15
**mortgage (2)**
39:14,15
**most (4)**
30:2;44:15;61:13;
74:24
**motion (13)**
6:13,14,20;7:16;
10:16,18;11:6,8;
12:12;20:22;25:4;
26:7;69:4
**move (1)**

52:8
**much (30)**
6:7;12:18;23:13;
26:23;27:1;34:15;
36:19;38:7,13;39:19,
22,22,24;40:1;42:9;
47:25;48:5;49:13;
51:23;61:2;62:23;
66:8,14,24;68:17;
70:15,17;74:22;
76:11,13
**multiple (1)**
36:16
**must (1)**
37:21

## N

**name (3)**
24:19,21,21
**narrow (2)**
23:22;25:2
**nature (1)**
30:16
**NDAs (1)**
9:17
**near (2)**
52:9,12
**nec (1)**
30:24
**necessarily (2)**
52:7;65:11
**necessary (8)**
11:13;23:23;24:4,
11;28:11,17;32:17;
71:7
**need (33)**
6:8;15:17,18;
20:10,24;22:4,15;
29:11;32:21;48:2,8,
19,25;49:3,15,18,25;
50:4,6,14,16;51:15;
56:22;64:7,15,24;
65:7,19;66:14,21;
72:9,23;73:20
**needed (6)**
35:13;41:4;42:9,
23;64:1;66:24
**needs (19)**
10:19;12:18;24:5;
25:19;30:10;31:10;
32:18;33:22;39:12;
47:1;61:24;62:2,10;
65:10;66:15;71:23;
72:20,25;76:4
**negligent (1)**
18:20
**negotiations (3)**
8:13;60:12,20
**new (9)**
18:15,16;24:4;
28:15;29:11;40:12,
13;47:1;62:7

**next (26)**
5:7;10:4;19:9;
23:24;28:11,12;
37:15;39:18,21;42:1,
4,9;43:15;46:17;
52:16;54:5;56:16,18,
21;58:4;59:6,14;
60:1;69:14,17;70:1
**niche (1)**
7:2
**nine (1)**
39:21
**ninety (7)**
41:17;58:15,16;
59:14;69:14,17;70:2
**ninety-one (6)**
56:17,19,21;58:4,
17;59:6
**nitty-gritty (1)**
22:8
**non (1)**
17:25
**nondebtor (1)**
14:19
**none (1)**
47:22;70:24
**nonpayments (1)**
54:2
**nonWells (1)**
19:21
**noon (1)**
22:21
**nor (1)**
21:17
**nose (1)**
14:25
**note (1)**
45:7
**Notes (5)**
42:7,8,10,15,17
**notice (2)**
6:23;20:7
**nuclear (1)**
43:2
**number (7)**
23:1;26:11;44:24;
48:25;55:19;59:2;
68:20
**numbers (5)**
42:21;45:7,8;
56:19;68:12
**NY (1)**
4:6

## O

**objection (4)**
12:12,13,25;60:22
**obligated (1)**
39:8
**obligation (1)**
39:11
**obligations (2)**

8:1;10:7
**obtain (1)**
    9:20
**obviously (1)**
    71:23
**occurrence (1)**
    49:17
**o'clock (2)**
    5:19;76:2
**off (7)**
    9:21;15:18;20:18;
    24:6;29:14;68:22;
    72:1
**offer (1)**
    30:1
**offering (1)**
    12:9
**offhand (2)**
    44:24;65:21
**Office (5)**
    4:4;6:17;18:5;
    20:2;27:14
**offices (1)**
    20:14
**old (1)**
    41:17
**one (29)**
    12:3;17:6;19:7,9;
    22:23;27:23;28:9,15,
    24;31:24;33:23;
    34:12;36:18;37:16;
    55:1,5,8;56:7,9,25;
    59:9;63:1;65:22,23;
    67:23;68:25;74:6;
    75:14,20
**ongoing (4)**
    14:14;35:16;
    48:12;68:25
**online (1)**
    9:14
**only (21)**
    5:20,21,22,24;
    10:13,16;12:5;
    18:23;27:7;33:11,
    23;34:10,14;35:2;
    37:16;48:13;66:8,
    21;69:18;71:3;73:19
**open (5)**
    18:15,25;20:12;
    33:16,19
**opened (6)**
    18:16;19:4,19;
    27:10;33:25;40:21
**operate (2)**
    16:18;46:20
**operated (1)**
    46:11
**operating (6)**
    27:11;32:19;
    45:17,20,24;46:3
**operations (1)**
    61:17
**opportunities (1)**

35:16
**opportunity (3)**
    10:9;20:3;67:18
**option (1)**
    16:18
**order (20)**
    6:16,18;19:14;
    28:25;29:2,5,17;
    32:18;48:9;49:11,24,
    25;50:13;66:5;
    70:19;73:10,16,20;
    76:15,20
**orders (61)**
    17:22;28:18;47:7,
    8,8,23,25;48:5,5,7,8,
    16,19,25;49:6,9,16,
    17,20;50:1,2,3,6,12,
    14,15,19,19;51:8,13,
    15,17,20,23;52:1,14,
    16,18,19,20,21;
    61:22;65:19;66:5,9,
    11,15,18,21,25;67:2,
    4,10,11;70:15,16;
    71:4,6,10,15,19
**orgrade (1)**
    66:1
**original (1)**
    54:22
**originally (1)**
    69:8
**Otterbourg (1)**
    5:14
**ours (1)**
    29:4
**out (22)**
    6:9;9:1,23;10:14;
    13:11,13;16:11;
    20:2;33:24,24;34:13,
    19;40:16;41:5;
    50:13;56:16;59:13;
    71:22;72:18,22,22;
    74:3
**outgoing (1)**
    65:12
**outlined (2)**
    71:25;72:15
**out-of-pocket (1)**
    46:9
**outside (1)**
    22:22
**outsource (2)**
    64:20,22
**outsourcing (1)**
    72:3
**over (21)**
    7:11,21;8:3;19:2;
    22:15,15;28:11;
    39:21;43:2;51:1;
    52:15,16;53:1;
    57:24;60:12;63:15;
    69:14,17,22;70:1;
    72:14
**overnight (1)**

37:15
**overruled (1)**
    73:2
**oversecured (1)**
    10:10
**owe (1)**
    27:18
**owing (1)**
    11:22
**own (6)**
    14:5;15:1;18:23;
    19:6,7;21:3
**owned (1)**
    39:14
**oxide (1)**
    65:25
**oxides (1)**
    47:15

**P**

**pad (1)**
    53:1
**page (5)**
    43:11;44:6,10;
    57:13,17
**pages (1)**
    44:8
**paid (16)**
    7:25;8:2;10:14;
    21:20,21;30:8;
    34:21;39:12,15,16;
    49:19,25;68:22;
    70:24;71:22,22
**panel (1)**
    49:12
**paper (3)**
    56:10;76:4,5
**papers (2)**
    22:9;70:6
**Pardon (3)**
    16:4;34:7;56:6
**part (11)**
    10:18;18:20;
    26:10;27:23;32:7,
    10;34:24;35:1;
    54:17,20;63:12
**participant (1)**
    8:4
**participate (1)**
    23:7
**particular (1)**
    28:25
**particularly (1)**
    53:15
**particulars (1)**
    70:14
**parties (3)**
    21:25;74:3;75:25
**partners (1)**
    5:15
**past (3)**
    29:24;35:12;51:1

**Pause (1)**
    65:17
**pay (25)**
    9:21;10:21;15:21;
    17:6;19:11;29:4;
    30:4;31:18;32:18;
    35:13,14;37:14,18;
    38:21;39:6,8,23;
    40:1,6;49:21,23;
    58:12,14;66:8;67:4
**paying (2)**
    39:4;40:3
**payment (3)**
    11:6;32:2;72:6
**payments (15)**
    8:8,9,10;19:4;
    21:13,14,16,17;
    30:16;34:5,6;35:13;
    37:2;39:20;40:2
**payroll (18)**
    11:3;17:19;19:9,
    10,12;21:19,20,21;
    26:25,25;35:13,14;
    37:14;38:12,16;
    63:19;64:7;72:5
**PC (1)**
    5:14
**pending (6)**
    6:1;61:22;70:20;
    71:2;72:11;75:22
**people (4)**
    7:4;20:7,11;30:14
**people's (1)**
    73:23
**per (5)**
    38:17;40:3;45:25;
    46:6,8
**percent (6)**
    15:14;45:5,11;
    50:20;59:15;69:19
**perhaps (4)**
    5:20;30:3;63:14;
    69:2
**period (17)**
    9:20,22;10:17;
    21:13;26:15;27:19;
    41:17,21;43:20;
    46:17;49:2,3;52:9,
    12;54:5,8;64:18
**person (2)**
    75:19,21
**personal (1)**
    8:13
**persons (1)**
    30:15
**petition (11)**
    6:8,13;7:6,17;
    10:17,20;18:15;
    21:8;25:22;30:10;
    68:12
**ph (2)**
    66:1;75:8
**phrase (1)**

60:22
**picture (1)**
    9:2
**place (7)**
    31:16;49:6;52:15;
    67:4;68:24;73:13;
    74:4
**placed (2)**
    49:16,17;60:10
**play (2)**
    15:1;23:22
**playing (2)**
    14:5;15:2
**Plaza (1)**
    4:5
**pleadings (1)**
    76:3
**please (7)**
    5:4;23:17;24:17,
    19,23;45:7;76:21
**pm (2)**
    23:16;76:5;77:6
**point (5)**
    13:14;19:7;33:11;
    35:7;67:14
**points (1)**
    18:9
**portrayal (1)**
    32:20
**posed (1)**
    69:13
**position (1)**
    40:25
**possess (1)**
    47:19
**possible (1)**
    29:3
**post (1)**
    19:21
**post-petition (7)**
    11:9,17,18;21:13,
    16,17;72:19
**potential (3)**
    9:16;10:5;69:23
**potentially (1)**
    70:17
**pounds (3)**
    49:14;65:24,24
**practices (1)**
    18:13
**predict (1)**
    50:25
**prefer (1)**
    22:22
**pre-filing (3)**
    13:1;21:20,21
**premises (3)**
    39:15;68:18;75:4
**prepare (2)**
    58:9;73:10
**prepared (7)**
    6:6;54:10,15,21;
    57:20;69:3;70:7

pre-petition (8)
11:5,6;19:1,18,22;
33:21;72:18,22
**PRESENT (2)**
4:11;12:11
presentation (2)
16:25;64:19
president (1)
7:7
Presumably (2)
12:21,25
presume (1)
59:17
presuming (1)
58:12
pretty (1)
13:25
previous (1)
35:20
previously (2)
28:22;38:11
price (3)
7:11;29:3,5
primarily (1)
34:5
principal (5)
5:10;8:14;10:3;
12:15,21
prior (10)
8:19;28:13;31:12;
35:12;36:23;37:1;
60:8,10;61:2,9
privileged (1)
60:16
probability (1)
73:15
probably (3)
22:12;29:3;68:14
proceed (2)
5:22;22:6
proceeding (1)
73:24
proceedings (1)
77:6
proceeds (1)
14:1
process (2)
30:7;41:8
processes (1)
29:16
processing (1)
72:4
professional (7)
15:22;21:11,15,
16;30:14;32:14;
71:22
professionals (2)
21:13,16
program (2)
34:24;36:9
project (1)
74:24
projected (11)

13:19;26:11;55:5,
8,11;56:8,15,20;
58:3;60:2;62:24
projecting (4)
55:3,16;59:6,14
projection (4)
55:22;57:1;58:20;
59:9
projections (9)
26:10;54:10,15,16,
17,25;55:1,4;69:20
property (2)
11:17;73:4
proposal (1)
6:5
proposed (3)
5:8;11:16;25:3
protect (1)
37:21
protection (7)
11:15;12:8,19;
17:3;73:3,6,7
provide (6)
11:16;20:3;29:21;
71:10;72:16;75:23
provided (6)
6:17;8:5;14:11;
57:6,21;72:23
providing (3)
14:9;72:19;73:1
provision (1)
7:13
publically (1)
27:22,25;28:22
pulled (1)
19:9
purchase (16)
24:4,9,12;28:15,
19;29:18,19;30:9;
47:9;51:9;67:10,11;
70:14;71:4,5,10
purchased (3)
64:16;68:21;70:17
purchases (4)
30:20;70:18;72:7,
11
purchasing (4)
24:6;27:13;45:16;
67:13
purpose (1)
25:18
purposes (2)
11:10;21:4
put (9)
8:12;14:3;17:13;
18:9;21:2;28:14;
40:25;67:15;73:13
putting (1)
60:7

## Q

quality (1)

66:1
quickly (2)
56:24;63:13
quite (1)
41:11

## R

raise (1)
24:17
ran (2)
61:10;63:16
random (1)
20:6
rapidly (1)
12:24
ratio (1)
36:1
ratios (1)
36:8
reach (2)
8:15;22:6
reached (2)
5:23;22:5
read (5)
6:24;12:11,12,12,
13
realized (1)
9:3
really (3)
13:14;39:12;67:3
reason (6)
26:20,22;28:1,4;
29:19;59:1
reasonable (2)
20:10;74:19
reasonableness (1)
54:14
reasons (2)
23:2;74:14
recall (5)
22:21;28:12;
36:13,15;54:3
receipt (2)
56:1,4
receipts (5)
26:17;27:3;56:9;
70:1;75:13
receivable (10)
11:25;28:2,7,10;
55:20;57:2,24;
58:19;59:5;68:16
receivables (13)
17:10;21:10;
27:17,18;56:15,21;
58:4,21,25;59:10,16;
68:9;69:18
receive (3)
27:2;69:19;75:13
received (3)
20:7;47:3,6
receiving (1)
69:14

Recent (3)
8:12;14:13;44:15
recently (2)
8:17;34:10
recess (3)
22:1;23:16;77:3
recognize (1)
33:6
recollection (1)
53:13
recommended (1)
8:21
record (6)
13:25;17:9;23:18;
24:20;60:25;71:24
records (3)
21:8;28:2;40:15
recycling (1)
7:2
REDIRECT (1)
67:24
reduced (1)
8:7
refer (3)
42:13,17;53:7
reference (1)
54:1
referred (2)
42:11;68:1
referring (11)
42:23;44:6,7;
54:16;58:8;59:23;
60:2,4,5;62:15,16
refinance (1)
9:1
reflects (1)
59:24
refresh (1)
53:13
refused (1)
20:25
regarding (3)
18:12;19:16;21:5
regular (1)
74:19
rehabilitate (1)
18:21
related (2)
31:5;72:1
relationship (2)
9:6;41:16
relatively (1)
52:9,12
relevance (1)
60:18
relevancy (1)
33:21
relevant (2)
60:17;61:3
relief (3)
13:9;73:15,17
remain (2)
24:15;32:19

remaining (1)
45:15
remember (1)
13:12
rent (8)
30:16,17;35:14;
38:21,22;39:8,15;
40:1
reorganize (1)
9:23
reorganized (1)
9:25
repeat (6)
44:21;46:21;
52:10;53:23;55:10;
59:2
replacement (3)
11:17;12:9;73:4
report (6)
57:14;58:10;68:2,
4,5,8
reported (1)
57:24
reporter (1)
24:16
reporting (1)
14:8
representative (3)
25:16;70:10;74:20
request (4)
5:17;19:16;70:11;
71:11
requested (3)
6:5;20:4;23:25
requests (2)
8:15;72:13
require (3)
29:15;30:3;71:15
required (3)
71:9,10;72:16
requirement (1)
18:14
requirements (2)
28:14,15
reservations (1)
73:1
resolve (1)
73:21
response (1)
61:8
responsibility (2)
37:8;41:2
responsible (1)
29:4
rest (2)
38:20;40:5
restocking (1)
71:5
restrictions (1)
15:4
retain (4)
8:16,21;19:5,7
retained (2)

8:22;9:7
**retention (1)**
8:19
**revenues (5)**
43:24;44:12,17,
23;45:2
**review (1)**
69:10
**revoked (1)**
19:12
**rid (1)**
20:25
**ride (1)**
13:11
**right (86)**
5:2,2,16;6:11;
11:7,11;12:10;18:2,
4,7;21:23,24;22:1,
18,20;23:3,5,10,15;
24:13,15,17,25;
25:19;29:2;32:24;
33:4,6,8,9,13;34:13,
19,20,22;35:2;36:3,
14;37:6;39:12;
40:20;41:22;43:17;
44:3,23;45:21;46:20,
23;47:18;48:9,14;
49:24;50:1,18;51:4,
13,17;52:1,9;53:2,
19;54:23;56:14,21;
57:8;58:1,14,21;
62:10;63:18;66:3,5;
70:7;71:18;73:18;
74:1,10,14;75:19,23;
76:12,15,18,20,24;
77:1
**rights (1)**
73:7
**risk (3)**
28:21,24;29:6
**room (2)**
9:14;63:24
**rooms (1)**
22:22
**roughly (1)**
59:13
**row (1)**
58:25
**rule (1)**
53:12
**rules (2)**
14:6;15:1
**ruling (3)**
70:8,11;73:10
**run (1)**
63:16
**running (1)**
28:8
**rushing (1)**
63:13

**S**

**sale (2)**
31:6;50:19
**sales (27)**
24:5;30:14;31:6;
34:8;47:3,6,7,8,8;
48:2,5,7,8,25;49:5,9,
14,20;50:18;51:8,13,
15;52:16,18,21;
64:24;71:1
**same (2)**
56:10;59:13
**Saturday (1)**
74:5
**saying (10)**
16:10,17;22:9;
27:15;33:12;46:25;
48:8;49:19;50:8;
76:3
**Scarcella (7)**
6:2,9;22:14;25:25;
73:25;76:1,4
**Scarcella's (1)**
5:20
**scenario (1)**
68:23
**schedule (1)**
76:14
**scheduled (2)**
6:17;25:24
**search (1)**
20:6
**Seated (4)**
5:7,9;23:17;24:23
**second (1)**
55:16
**secrets (1)**
72:20
**secured (1)**
7:18
**Securities (1)**
4:13
**security (1)**
14:2
**seek (1)**
29:2
**seeking (4)**
13:9;25:5;29:18;
32:1
**seeks (1)**
15:4
**sell (4)**
15:18;31:16;
52:11,22
**selling (1)**
31:15
**send (5)**
27:9;37:5;74:17;
75:20,20
**sending (1)**
37:2
**sense (1)**
11:5
**sent (2)**

34:22;75:3
**service (1)**
6:17
**session (1)**
23:22
**set (5)**
10:22;14:6;15:1;
23:11;38:5
**setting (1)**
39:23
**settlement (1)**
60:15
**seven (5)**
52:3;68:22;75:19,
20,21
**several (8)**
7:3,11;8:18,22;
9:16,17;10:4;24:7
**share (1)**
43:11
**shareholder (1)**
7:7
**sheet (1)**
56:10
**shelve (1)**
70:17
**shelves (1)**
71:5
**ship (5)**
31:13;40:9,14;
49:12;52:11
**shipping (3)**
63:21,22;65:2
**short (5)**
9:20,22;10:17;
73:11,11
**show (4)**
14:13;43:23;57:5;
74:13
**showing (2)**
17:3,5
**shows (2)**
40:15;56:8
**shrinking (1)**
8:11
**shut (2)**
18:14;36:3
**sic (1)**
34:21
**side (1)**
12:11
**sign (1)**
73:16
**signed (1)**
9:17
**significant (1)**
28:24
**significantly (1)**
8:7
**SILVERSTEIN (48)**
5:13,14;13:2,5,6;
16:4,7,12,14,20;
18:3,13;21:5,11;

32:25;33:1,3,5;38:6;
39:17;42:10;43:4,7,
12,15;46:16;52:25;
53:3,9,16,19;55:21,
23,25;56:3,6,11;
57:4,9;60:18;65:14;
67:14;73:9,19;74:6;
75:1,8,17
**Simply (2)**
29:12;72:13
**singing (1)**
75:6
**sit (1)**
37:17
**site (2)**
20:18;75:21
**sitting (4)**
15:9,14;52:5;
73:12
**situation (1)**
37:16
**six (2)**
49:11;67:12
**sixteen (2)**
68:9,14
**six-week (1)**
66:2
**size (1)**
12:8
**slight (1)**
28:4
**Smokovich (57)**
5:10;6:15,21;7:5,
7,9;12:13,17;13:15;
14:1,5,25;15:1;
16:23;17:12;18:10,
19,25;19:4,8,13;
21:1;22:7;24:10,13,
14,21;25:1,9,15,18;
26:6,10;27:17;
32:23;33:4;38:2,7;
43:9,18;50:14;
53:20;56:12,14;
57:14;60:7,19;63:2,
15,25;64:7;65:6,18;
68:1;70:5;71:5;
73:22
**S-M-O-K-O-V-I-C-H (1)**
24:22
**Smokovich's (2)**
14:18;70:13
**soft (1)**
71:18
**sold (8)**
15:16;31:14,15,19,
21;45:1;64:17;72:5
**someone (5)**
20:13,14;21:2;
27:9;74:17
**sometime (1)**
76:7
**sometimes (1)**
27:8

**somewhat (2)**
22:14;65:25
**somewhere (4)**
12:2;14:3;40:15;
65:9
**sooner (1)**
76:11
**so-order (2)**
73:14,17
**sorry (30)**
14:17;26:1;30:23;
31:8;32:9;34:7,7;
37:11;43:23,25;
44:12,21,24;46:1,12,
13;50:9;53:16;55:9,
10,15,20;60:9;61:5,
7;62:11;63:8;64:2;
65:18;68:3
**sort (1)**
34:24
**sound (5)**
43:1;53:15,17,18;
74:18
**sounds (1)**
39:18
**sourced (1)**
50:4
**sourcing (1)**
50:16
**soured (1)**
9:6
**space (3)**
10:2;23:13;39:1
**speak (1)**
65:21
**SPEAKER (6)**
63:21;69:16;76:8,
11,13,16
**speaking (2)**
42:21;51:8
**Specialty (5)**
5:3;15:13;23:18;
44:10;61:18
**specific (7)**
25:4;34:3;48:4;
49:12;51:14;72:9;
74:4
**specifications (1)**
29:16
**specifics (2)**
6:19;38:4
**speculate (1)**
54:9
**speculating (1)**
51:6
**speculation (1)**
51:4
**spell (1)**
24:19
**spelled (1)**
24:22
**spend (4)**
16:18;38:10;

48:14;75:15
**spending (1)**
    73:16
**spent (2)**
    46:2;72:18
**spoke (2)**
    37:20;64:15
**staff (3)**
    41:3;54:22;59:17
**stakeholders (1)**
    10:12
**STAN (3)**
    4:8;5:11;42:21
**stand (8)**
    13:22;18:10;
    24:11,14;28:14;
    39:18;70:6,14
**standing (1)**
    24:15
**start (2)**
    22:15;70:9
**started (3)**
    7:10;39:21;63:17
**starting (2)**
    13:14;55:24
**starts (2)**
    55:7;73:16
**stated (3)**
    7:9;28:22;29:12
**statement (3)**
    44:3,7,11
**statements (2)**
    6:15;44:9
**STATES (4)**
    4:3,4;5:12;18:14
**status (1)**
    28:13
**stay (2)**
    16:17;38:4
**stayed (1)**
    35:15
**step (2)**
    43:25;70:5
**still (6)**
    14:23;29:24;31:4;
    41:9,16;68:2
**stockpiling (2)**
    67:6,7
**stood (1)**
    17:15
**stop (1)**
    62:21
**story (1)**
    12:11
**strain (1)**
    8:12
**strategic (1)**
    9:18
**streams (1)**
    22:16
**strings (1)**
    15:6
**strong (7)**

28:8;53:20,25;
    54:13;58:7;59:25;
    61:16
**stuff (3)**
    12:22;23:11;67:11
**submitted (3)**
    54:11,17;76:21
**subsequently (1)**
    69:10
**substantial (1)**
    11:20
**sufficient (3)**
    12:8;14:15;15:18
**Suffolk (2)**
    7:4;9:24
**suicide (1)**
    9:4
**summarize (1)**
    12:14
**Sunday (1)**
    74:5
**supervising (1)**
    8:9
**suppl (1)**
    34:21
**supplemental (1)**
    76:3
**supplied (1)**
    69:4
**supplier (2)**
    34:13,15
**suppliers (5)**
    11:9;29:21;30:5;
    40:6;67:11
**support (4)**
    35:19;54:11,22;
    64:19
**supporting (1)**
    35:16
**suppose (1)**
    33:7
**supposed (2)**
    14:8;40:24
**sure (12)**
    5:18;23:9;35:14,
    14;41:16;43:6;53:9;
    56:9;61:2;62:11;
    73:20;75:10
**survive (1)**
    41:1
**survived (1)**
    54:1
**swap (1)**
    34:24
**sweep (3)**
    13:22;18:12;19:2
**sworn (2)**
    24:16,18

## T

**talk (5)**
    16:21;37:18;

41:19;45:15;46:17
**talking (3)**
    55:17;60:24,25
**Tantalum (7)**
    47:13,15,17,22;
    48:24;51:12;65:24
**task (1)**
    41:6
**taxes (1)**
    72:5
**TD (3)**
    18:17;19:21;27:11
**technical (1)**
    7:13;35:22
**telling (1)**
    22:9
**Temp (1)**
    77:4
**ten (10)**
    43:24;44:4,15,25;
    45:6,12,19,23;46:2,
    12
**ten-months (1)**
    50:24
**tenor (1)**
    38:5
**term (2)**
    58:12,13
**terms (7)**
    12:18;16:1;58:14;
    60:12;71:17,18;73:3
**testified (1)**
    72:2
**testify (6)**
    9:10,12;10:9,9;
    11:21;60:15
**testifying (1)**
    42:25
**testimony (6)**
    25:2,19;42:12;
    47:20,24;70:10
**thereafter (1)**
    29:7
**third (1)**
    58:25
**third-party (3)**
    64:20,22;72:3
**thirteen (4)**
    7:19;11:22;12:6;
    69:7
**thirteen- (1)**
    10:18
**thirteen-week (4)**
    26:7;54:17;55:22;
    58:17
**though (1)**
    17:2
**thought (3)**
    22:16;26:1;66:18
**thousands (1)**
    14:20
**three (11)**
    13:23;29:14;35:6;

50:5;57:1,24;60:1;
    61:1,9;75:6,15
**three-and-a-half (1)**
    75:20
**three-pager (1)**
    73:12
**three-week (1)**
    26:15
**Throughout (1)**
    48:22
**thumbing (1)**
    14:25
**tick (1)**
    64:5
**times (4)**
    36:16;66:19;67:2,
    3
**timing (2)**
    27:6,16
**to-date (1)**
    44:12
**today (25)**
    5:24;6:6;9:10,12;
    10:9,16;11:2;13:11,
    22;14:18;16:3,6;
    17:19;20:8;25:5;
    27:1;29:9;33:13,22;
    50:25;51:9;61:3;
    68:14;72:15;73:18
**today's (3)**
    10:15;11:10;26:25
**told (4)**
    14:19;20:9;37:5;
    75:2
**total (10)**
    13:24;26:17;27:3;
    36:20;46:3;48:25;
    49:7;50:3,15;56:8
**totality (1)**
    56:14
**tour (1)**
    74:16
**trade (2)**
    30:1;40:9
**traded (3)**
    27:22,25;28:22
**transaction (2)**
    34:12,14
**transferred (2)**
    14:19;20:15
**transfers (1)**
    20:17
**transparent (1)**
    72:21
**Traurig (1)**
    5:6
**triggering (1)**
    7:12
**true (3)**
    36:17;37:3;60:11
**Trustee (7)**
    4:4;5:12;18:14;
    32:9,12;63:23;67:17

50:1,24;60:1;
    61:1,9;75:6,15

**try (3)**
    29:2;36:3;50:24
**trying (7)**
    13:12;16:11;
    18:21;23:22;50:13;
    64:2;67:9
**tungsten (5)**
    47:15,18,22;
    48:24;51:12
**twelve (2)**
    45:5;50:20
**twenty (5)**
    11:25;15:10;21:6;
    48:6;52:15
**twenty-five (2)**
    7:4;9:24
**twenty-four (2)**
    41:10,12
**twenty-two (1)**
    12:4
**two (26)**
    12:4;13:16,17,19;
    20:4,6;22:21;27:19,
    22;28:9;35:12;
    36:23;37:1;38:14;
    50:17,18;52:17;
    55:13;60:8,10;61:6,
    14;62:25;69:2;
    75:15,20
**type (1)**
    27:17
**types (2)**
    29:14,15

## U

**unable (1)**
    19:10
**unaudited (1)**
    45:7
**unclear (1)**
    51:14
**under (7)**
    7:13,22;9:4,24;
    13:9;36:1;73:8
**understood (3)**
    5:19;38:6;72:3
**undertaken (1)**
    74:24
**unencumbered (1)**
    73:4
**unfettered (4)**
    15:3,24;17:3,25
**Unfortunately (4)**
    6:4;8:23;70:9;76:8
**UNIDENTIFIED (6)**
    63:21;69:16;76:8,
    11,13,16
**unilateral (1)**
    71:18
**unilaterally (1)**
    37:14
**UNISON (4)**

23:4,14;77:2,5
**UNITED (4)**
    4:3,4;5:12;18:13
**unless (3)**
    5:23;11:8;21:14
**up (20)**
    13:24;15:13;
    16:25;17:15;18:15,
    25;19:4;23:12,12;
    37:5;40:21;42:1,22;
    43:1;56:14,20;
    58:24;59:2,3;74:13
**upcoming (1)**
    24:5
**updated (2)**
    75:24;76:1
**upgrade (1)**
    31:12
**upgraded (2)**
    31:10;64:16
**upgrades (1)**
    72:4
**upon (1)**
    69:23
**urging (1)**
    65:1
**usages (1)**
    25:3
**use (29)**
    5:17,25;13:18;
    15:3,11,18,20,21,24;
    17:4,24;22:23,23;
    25:14;26:7;33:8;
    36:3;46:22;53:12,
    14;61:20;70:8,20,22;
    71:11,18;72:12,21,
    21
**used (15)**
    15:7;17:6,7,18;
    20:21;21:17;36:8;
    47:23,25;53:22,23,
    24;70:16;71:16;
    72:15
**uses (1)**
    25:4
**using (2)**
    17:20,21
**usually (1)**
    76:13
**utilities (2)**
    10:21;38:23
**utilized (1)**
    12:18

**V**

**valuable (1)**
    15:16
**value (8)**
    10:10;11:21;12:1,
    3,5;68:18,20,24
**valued (1)**
    12:2

**various (2)**
    18:18;57:6
**vast (1)**
    27:24
**vendors (19)**
    10:21,25;11:5,5,7,
    9;29:21;34:5,6;
    37:12;40:14;49:18,
    23;63:9,9,10,12;
    66:2;71:21
**verge (1)**
    40:11
**versus (1)**
    29:4
**viable (1)**
    41:4
**view (1)**
    48:16
**views (1)**
    53:10
**virtual (1)**
    9:14
**virtually (1)**
    16:24

**W**

**waived (2)**
    36:2,18
**wants (5)**
    16:2,5;39:23;
    60:14;61:20
**warehouse (2)**
    15:14;52:6
**watchful (1)**
    9:5
**water (1)**
    65:19
**way (4)**
    10:12;33:23;41:5;
    42:1
**ways (1)**
    68:20
**Wednesday (2)**
    20:1,22
**week (27)**
    10:19;11:3;13:19;
    15:25;17:11,24;
    26:11;28:11,12;
    38:16,17;42:9;
    43:16;46:8;55:5,8,
    13,16;56:7,9,25;
    59:9;62:24;63:1,1;
    74:12;75:3
**weeks (18)**
    8:18;9:9;13:23;
    24:7;35:12;36:23;
    37:1;38:14;39:25;
    49:11;60:1,8,10;
    61:6,14;62:25;63:4;
    67:12
**Wells (81)**
    5:14;7:14,17,20,

25;8:3,5,7,12,13,20;
9:1,4,5,6,21;10:2,7,9,
11,12,13;11:22;12:2,
5,10,13,16,20,23;
13:6,22;14:2,7;15:3,
21,24;17:4,8,13;
18:20;19:1,3,3;20:2,
16,16,23;25:16;
31:11;33:5,8;35:15,
19;36:3,16;37:2,13;
40:18,20,24;41:5,5,
16;51:3;57:6,21;
60:12;61:17;64:19;
65:1;67:15;68:1;
70:10;71:10;72:17;
73:4,5;74:7,20;75:8
**weren't (1)**
    20:8
**what's (10)**
    14:4;38:16;42:2;
    48:14,25;50:23;
    51:6;57:8;62:12;
    74:17
**whatsoever (2)**
    17:3,5
**Whereupon (1)**
    77:6
**wide (1)**
    20:12
**wife (1)**
    39:14
**wife's (4)**
    38:24;39:1,4,24
**willing (8)**
    9:1;20:12,12;
    22:13;24:3,10;29:22,
    22
**wire (1)**
    27:9
**withdraw (1)**
    46:16
**withheld (1)**
    14:16
**within (22)**
    14:20;20:4,6,18;
    22:3;29:14;30:22,
    24;31:22;36:23;
    41:12;52:8,12;58:4;
    60:8,8,10;61:6,14;
    71:24,25;72:8
**without (3)**
    15:22;17:21;75:1
**witness (22)**
    12:23;24:14,18,21,
    24;43:5,14;53:4;
    57:5,12;60:14,15;
    61:12;64:4,21,23;
    67:15,18,21;70:6,14;
    72:2
**wonderful (1)**
    22:16
**words (3)**
    53:21,23,24

**work (2)**
    16:23;74:3
**worked (1)**
    64:18
**working (2)**
    54:24;75:24
**workman's (2)**
    30:16;31:25
**workout (2)**
    7:20;8:15,20
**worth (6)**
    12:20,22;21:7;
    48:3;68:25;69:1
**write-off (1)**
    28:9
**wrote (2)**
    42:24;53:21,24

**Y**

**YANG (14)**
    4:8;5:11,11;18:4,
    5,6;23:6,7,9,21;
    42:21;67:20;76:6,7
**Yaphank (2)**
    7:2;20:19
**year (11)**
    8:3,17;14:21;
    15:15;34:1;44:1,4,
    16,19;45:6,12
**year- (1)**
    44:11
**year-and-a-half (1)**
    52:16
**years (3)**
    7:12;27:24;28:9
**yesterday (1)**
    31:25

**1**

**1 (1)**
    22:4
**1- (1)**
    46:22
**1.1 (3)**
    56:24;58:4,20
**1.25 (13)**
    24:1;30:21,22;
    31:1,22;32:7,10;
    42:22;46:22;62:2,
    12;63:12,14
**1.3 (2)**
    56:16,20
**1.5 (12)**
    10:20;11:14;15:5;
    20:20;23:25;26:14;
    27:3;54:7;59:18,21,
    23,24
**1.9 (2)**
    59:10
**1:30 (1)**
    25:14

**1:35 (1)**
    77:6
**10 (1)**
    46:5
**100,000 (1)**
    63:8
**11 (7)**
    5:19;10:1;16:18;
    26:6;30:20;76:18,23
**11:30 (3)**
    21:24,25;23:12
**11:33 (1)**
    23:16
**110,000 (5)**
    34:21;35:9;36:20;
    46:8,19
**117,000 (2)**
    63:19;64:12
**11722 (1)**
    4:6
**11th (1)**
    76:23
**12:15 (1)**
    23:16
**120,000 (1)**
    34:16
**13 (1)**
    7:24
**150,000 (1)**
    26:24
**17th (3)**
    57:9,23;68:8
**1982 (1)**
    7:1
**1999 (1)**
    7:6

**2**

**2 (1)**
    25:1
**20 (1)**
    76:9
**2010 (1)**
    7:15
**2012 (1)**
    36:10
**2013 (2)**
    36:12,13
**2014 (2)**
    36:14,15
**2015 (3)**
    7:19,25;46:12
**2016 (8)**
    41:22;43:21;
    44:22;45:19,23;46:2,
    12;55:24
**22.5 (2)**
    7:15,23
**22nd (2)**
    6:13;76:16
**23,000 (1)**
    32:3

**230,000 (1)**
  61:23
**235,000 (2)**
  62:9,15
**23rd (1)**
  6:16
**24 (3)**
  21:19;22:3;55:24
**24th (2)**
  13:19,24
**25,000 (1)**
  63:19
**26,000 (1)**
  13:23

---

**3**

**3 (4)**
  26:11;50:6;58:3,
  19
**30,000 (1)**
  26:24
**311,000 (3)**
  55:9,11;56:8
**31st (3)**
  41:22;43:21;44:1
**33- (1)**
  40:3
**341 (2)**
  76:6,17
**35 (1)**
  45:2
**35- (1)**
  38:17
**35,000 (5)**
  26:25;40:3;63:19;
  64:7,11
**36,000 (1)**
  64:8
**37,000 (4)**
  38:17;63:4,5;64:9

---

**4**

**4 (2)**
  76:2,5
**4,500 (1)**
  65:24
**4.5 (3)**
  45:21;46:3,5
**40 (1)**
  44:16
**40.5 (3)**
  44:17;45:1,2
**420 (1)**
  55:14
**45,000 (2)**
  40:2;62:25
**450,000 (2)**
  45:24;46:6
**4th (4)**
  20:12,13;22:25;
  23:1

---

**5**

**500,000 (5)**
  70:22,24;71:16,
  23;72:10
**500,000-dollar (1)**
  71:14
**507a (2)**
  73:6,8
**511,000 (1)**
  55:8
**52,000 (1)**
  13:25
**520,000 (1)**
  55:13
**531,000 (1)**
  56:8
**55- (1)**
  38:9
**560 (1)**
  4:5
**5th (3)**
  32:2;76:3,5

---

**6**

**6,000 (2)**
  49:14;65:23
**6/24 (2)**
  60:2;63:3
**6/24/2016 (1)**
  55:5
**60,000 (4)**
  38:9;63:21,22;
  65:2

---

**7**

**7 (1)**
  72:14
**7/1 (3)**
  60:2;63:3,3
**7/8 (3)**
  60:3;63:3,4
**7/8/2016 (1)**
  26:12
**70,000 (1)**
  38:18
**700,000 (1)**
  40:12
**73 (1)**
  63:11
**73,000 (1)**
  63:8
**783.35 (1)**
  44:12
**7th (25)**
  6:2,9;10:18,20;
  11:13;22:5,16;
  23:24;25:24;28:12;
  30:11,21;31:17;
  32:18;33:9,13,22;

---

  65:19;66:6;70:20,
  23;71:2;72:12;
  75:22;76:23

---

**8**

**8 (1)**
  11:3
**800,000 (2)**
  13:20;38:20
**810,000 (1)**
  58:25
**810,215 (1)**
  59:3
**843,000 (1)**
  56:9
**845,000 (1)**
  38:10
**8th (20)**
  12:19;26:15;27:1;
  30:17;46:18,20,23;
  48:13;61:19;62:2,
  10;66:12,16,22,25;
  67:3;73:21,22,24;
  74:9

---

**9**

**900,000 (4)**
  36:21;50:7,14;
  61:13
**990,000 (11)**
  24:2,3;28:16;
  46:25;48:2;49:4,24;
  61:19;62:7;66:14,24

**Exhibit B**


**Wells Fargo Email Authorizing and Revoking Payroll**

## Gerard DiConza

**From:** Joseph Smokovich <joesmokov@aol.com>
**Sent:** Tuesday, May 31, 2016 7:16 PM
**To:** Gerard DiConza
**Subject:** Fwd: Advance Request $100,121.24

First message approving the advance

Sent from my iPhone

Begin forwarded message:

> **From:** <jim.kelly@wellsfargo.com>
> **Date:** May 31, 2016 at 12:40:28 PM EDT
> **To:** <kdluginski@hi-tempmetals.com>
> **Cc:** <joesmokov@aol.com>, <John.Erwin@wellsfargo.com>, <barbara.albano@wellsfargo.com>, <madge.lallo@wellsfargo.com>, <jbreazzano@calibregroupllc.com>
> **Subject: RE: Advance Request $100,121.24**
>
> Ok to process Kristin.
>
> **From:** Kristin Dluginski [mailto:kdluginski@hi-tempmetals.com]
> **Sent:** Tuesday, May 31, 2016 11:10 AM
> **To:** Kelly, James A
> **Cc:** joesmokov@aol com; Erwin, John; Albano, Barbara M.; Lallo, Madeline M.; Jeremy Breazzano
> **Subject:** Advance Request $100,121.24

*Kristin Dluginski, Controller*



Hi-Temp Specialty Metals, Inc.
355 Sills Road
Yaphank, NY 11980
631-775-8750
kdluginski@hi-tempmetals.com

## Gerard DiConza

| | |
|---|---|
| **From:** | Joseph Smokovich <joesmokov@aol.com> |
| **Sent:** | Tuesday, May 31, 2016 7:15 PM |
| **To:** | Gerard DiConza |
| **Subject:** | Fwd: Forbearance Agreement Extension |

Second message from bank cancelling the approval which misled us

Sent from my iPhone

Begin forwarded message:

> **From:** <jim.kelly@wellsfargo.com>
> **Date:** May 31, 2016 at 6:48:26 PM EDT
> **To:** <joesmokov@aol.com>
> **Cc:** <John.Erwin@wellsfargo.com>, <john.brady@wellsfargo.com>, <kdluginski@hi-tempmetals.com>
> **Subject: FW: Forbearance Agreement Extension**
>
> Joe,
>
> We have not received satisfactory responses from you to John Erwin's email to you below. Since we do not yet have an acceptable structure to extend the Bank's forbearance agreement against existing defaults beyond today, 5/31/16, your advance request of $100,121.24 for today was not processed.
>
> We remain interested in working with you to obtain a mutually acceptable resolution, and I'm sure we'll be speaking in the morning in an effort to resolve the company's funding issues.
>
> Thanks,
>
> Jim
>
>
> James A. Kelly
> Wells Fargo Capital Finance
> 1 South Broad Street, Y1375-031
> Philadelphia, PA 19107
> (267) 321-6685 (Phone)
> (856) 404-4993 (Cell)
> (267) 321-6741 (Fax)

> **From:** Erwin, John
> **Sent:** Friday, May 27, 2016 4:23 PM
> **To:** Joseph Smokovich
> **Cc:** Toby Kreidler; Kelly, James A; Brady, John P.
> **Subject:** Forbearance Agreement Extension
>
> Joe:

Following up to our conversation, you know by now that we approved Hi-Temp's funding request for today.  We approved today's advance request even though daily advance requests by Hi-Temp continue to be entirely discretionary since our Forbearance Agreement expired on May 20th.

Wells Fargo offered you a proposal for a possible extension of the Forbearance Agreement on May 25th ( subject to final credit approval and satisfactory documentation ), and in conjunction with that proposal, we requested your personal financial statement and the buy sell agreement for the Willingboro real estate, both of which documents would be required for a possible credit approval of our May 25th proposal.  Further, we gave you verbal notice on Monday May 23rd , and again on May 25th, that we request an answer from you by Tuesday,  May 31st as to whether you accept our proposal.

To date, we have received neither your personal financial statement, nor the buy sell agreement for Willingboro.  You have explained that you want more time to speak with advisors, and that you intend to reply to us by May 31st as to whether our proposal for an extension of your Forbearance Agreement is acceptable.

To reiterate, we request your response by May 31st as we are becoming increasingly uncomfortable funding with an expired Forbearance Agreement.  We need to know whether or not we have a workable agreement for an extension to your Forbearance Agreement by Tuesday, May 31st.

As I mentioned on our earlier call, I am available all weekend and over the Memorial Day holiday if anyone wants to speak further about any aspect of our proposal.  You can reach me by cell or email.  Thank you.

Regards,

John

**John D. Erwin**
**Senior Vice President - Portfolio Manager**
Wells Fargo Capital Finance  l One South Broad Street  l  PNB Building, 3rd Floor  l  Philadelphia, Pa. 19107
(p)  267-321-7729  l  (c)  215-764-7658

## Exhibit C

## Accounting Non-Wells Fargo Account

# Confidential Memorandum

To:     Wells Fargo Representatives

From:   Howard Konicov, CohnReznick Partner

Date:   July 5, 2016

Re:     Status of Citibank and TD North Bank Account (together "the Accounts") Investigation

## Introduction

CohnReznick representatives Howard Konicov and Ying Zheng visited the Company's offices on June 30th, July 1st and July 5th to perform certain procedures in connection with the Accounts.  Management provided us with a chronological record of each transaction, noting the transaction date, payee or source of the funds, the general ledger account associated with the transaction, and other explanatory notes to the extent available.  Management also provided bank statements for the relevant periods, and bank reconciliations prepared monthly.  Based on the information provided, CohnReznick compiled Exhibit A, which presents a detailed and summarized form of the sources of uses of the cash affecting the Accounts.

This memorandum presents a status report of CohnReznick's ongoing investigation of the Accounts as of July 5, 2016.

## Procedures Performed

1. The transactions were summarized and totaled on Exhibit A, based on their general ledger account coding.   The general ledger coding assigned by the Company was reviewed for consistency and appropriateness.

2. Timely prepared bank reconciliations and accompanying bank statements were examined, and determined to be competently prepared.  This information provided assurance that the transactions affecting the Accounts were recorded on the books.

3. On a test basis, the Accounts' transactions as recorded on Exhibit A were traced and agreed to the bank statements noting consistency between the records. In addition, and on a test basis, transactions recorded on the bank statements were traced and agreed to information on Exhibit A.

4. Cash disbursements to accounts payable vendors amount to $899,508[1].  In examination of these disbursements, CohnReznick performed the following procedures:

    a. CohnReznick obtained the underlying vendor invoices, shipping and receiving documentation, and noted that the paid vendors are recorded on the accounts payable subsidiary ledgers and legitimate inventory suppliers.

    b. CohnReznick interviewed Joseph Smokovich and Kristin Dluginski to determine the nature of these payments. Specifically, CohnReznick noted whether the payments were

---

[1] Disbursed from the Citibank operating bank account.

exchanged contemporaneously for materials, used to pay existing recorded obligations, or deposits/advance payment on future receipts of inventory.

Findings and Observations

1. The Accounts' cash disbursements were for the benefit of the Company's operations and business, and CohnReznick noted no transactions that indicated otherwise.

2. Insider and related party disbursement payments were noted:

    a. Happy Precious Metal Co. Ltd. ("Happy") is purportedly a 100% owned by Joseph Smokovich.  Based on responses to CohnReznick's inquiries, Happy is based in Hong Kong and was formed to allow for the purchase and sales of scrap material in the Asian market to remain competitive.  Happy's profit on its sales is sufficient to satisfy certain local expenses.  Accordingly, the Company's cost of the materials acquired from Happy is no greater than Happy's acquisition cost.   Happy takes delivery of materials, inspects and samples, and then ships thus avoiding the lead time that would be required if shipment was made to the United States.  Happy also has the ability to procure customer relationships which the Company benefits from.

    b. From the Accounts, the Company paid Happy approximately $325,000, of which $95,000 was an advance deposit towards a future purchase.  CohnReznick was informed that Happy grants the Company credit terms, in those circumstances whereby Happy is provided credit from its suppliers.

    c. $35,000 was paid to Valerie Realty, the owner of the real estate in which the Company operates.

3. The Company's restructuring professionals CohnReznick Capital Markets Securities, LLC.  and Diconza Trauig Kadish LLP was paid $50,000 and $39,217, respectively.

EXHIBIT A

**Hi-Temp Specialty Metals, Inc.**
**Review of Non-Wells Fargo Bank Account Activities**

| Date | Name | Memo | 1101 · Accounts Receivable-Trade | 1102 · Accounts Receivable - Misc | 2320 · Unearned Revenue | Citibank Total Sources | 1005 · Cash-TD Bank Payroll | 1012 · TD BANK OPERATING DIP | 2000 · Accounts Payable | 2320 · Unearned Revenue | 4030 · Freight Out | 5407 · Professional Fees | 5409 · Bank Charges | 5501 · Rent | Citibank Total Usese | Citibank Total Net Transactions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/01/2016 | HI-TEMP SPECIALTY | PPE 02 27 2016 | | | | | | | | | | | | | | |
| 03/01/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 03/02/2016 | TD Bank Payroll | PPE 02 27 2015 | | | | | | | | | | | | | | |
| 03/02/2016 | TD Bank Payroll | PPE 02 27 2016 | | | | | | | | | | | | | | |
| 03/03/2016 | TD Bank Payroll | 401k match catch-up 1/1/2016 to 1/30/2016 | | | | | | | | | | | | | | |
| 03/08/2016 | HI-TEMP SPECIALTY | PPE 03 05 2016 | | | | | | | | | | | | | | |
| 03/08/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 03/09/2016 | TD Bank Payroll | PPE 03 05 2016 | | | | | | | | | | | | | | |
| 03/09/2016 | TD Bank Payroll | PPE 03 5 2016 | | | | | | | | | | | | | | |
| 03/11/2016 | PAYCHEX | 14337118 | | | | | | | | | | | | | | |
| 03/14/2016 | HI-TEMP SPECIALTY | PPE 03 12 2016 | | | | | | | | | | | | | | |
| 03/14/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 03/15/2016 | TD Bank Payroll | PPE 03 12 2016 | | | | | | | | | | | | | | |
| 03/21/2016 | HI-TEMP SPECIALTY | PPE 03 19 2016 | | | | | | | | | | | | | | |
| 03/21/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 03/22/2016 | TD Bank Payroll | PPE 03 19 2016 | | | | | | | | | | | | | | |
| 03/28/2016 | HI-TEMP SPECIALTY | PPE 03 26 2016 | | | | | | | | | | | | | | |
| 03/28/2016 | Metallurgical Products | Wire from Metallurgical Products | | | 113,966 | 113,966 | | | | | | | | | | 113,966 |
| 03/28/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 03/29/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (14) | | (14) | (14) |
| 03/29/2016 | TD Bank Payroll | PPE 03 26 2016 | | | | | | | | | | | | | | |
| 03/30/2016 | Citi Bank | Deposit in Citibank | | 32,039 | | 32,039 | | | | | | | | | | 32,039 |
| 03/31/2016 | TD Bank | PaperSTMT3/31/16 | | | | | | | | | | | | | | |
| 03/31/2016 | TD Bank Payroll | MAR 2016 O/S P/R CKS | | | | | | | | | | | | | | |
| 04/01/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (27) | | (27) | (27) |
| 04/01/2016 | Metallurgical Products | Wire to Metallurgical Products | | | | | | | (113,966) | | | | | | (113,966) | (113,966) |
| 04/04/2016 | HI-TEMP SPECIALTY | PPE 04 02 2016 | | | | | | | | | | | | | | |
| 04/04/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 04/05/2016 | TD Bank Payroll | PPE 04 02 2016 | | | | | | | | | | | | | | |
| 04/12/2016 | HI-TEMP SPECIALTY | PPE 04 09 2016 | | | | | | | | | | | | | | |
| 04/12/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 04/13/2016 | TD Bank Payroll | PPE 04 09 2016 | | | | | | | | | | | | | | |
| 04/15/2016 | PAYCHEX | 14484088 | | | | | | | | | | | | | | |
| 04/19/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (27) | | (27) | (27) |
| 04/19/2016 | HI-TEMP SPECIALTY | PPE 04 16 2016 | | | | | | | | | | | | | | |
| 04/19/2016 | Metallurgical Products | Freight - Metallurgical Products | | | | | | | | | (1,221) | | | | (1,221) | (1,221) |
| 04/19/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 04/20/2016 | TD Bank Payroll | PPE 04 16 2016 | | | | | | | | | | | | | | |
| 04/25/2016 | HI-TEMP SPECIALTY | PPE 04 23 2016 | | | | | | | | | | | | | | |
| 04/25/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 04/26/2016 | TD Bank Payroll | PPE 04 23 2016 | | | | | | | | | | | | | | |
| 04/29/2016 | TD Bank | 4/29/15-Statement Fee | | | | | | | | | | | | | | |
| 04/30/2016 | TD Bank Payroll | APR 2016 O/S P/R CKS | | | | | | | | | | | | | | |
| 05/03/2016 | HI-TEMP SPECIALTY | PPE 04 30 2016 | | | | | | | | | | | | | | |
| 05/03/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 05/06/2016 | TD Bank Payroll | PPE 04 30 2016 | | | | | | | | | | | | | | |
| 05/09/2016 | HI-TEMP SPECIALTY | PPE 05 07 2016 | | | | | | | | | | | | | | |
| 05/09/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 05/11/2016 | TD Bank Payroll | PPE 05 07 2016 | | | | | | | | | | | | | | |
| 05/13/2016 | PAYCHEX | 14621021 | | | | | | | | | | | | | | |
| 05/16/2016 | HI-TEMP SPECIALTY | PPE 05 14 2016 | | | | | | | | | | | | | | |
| 05/16/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 05/17/2016 | TD Bank Payroll | PPE 05 14 2016 | | | | | | | | | | | | | | |

**Hi-Temp Specialty Metals, Inc.**
**Review of Non-Wells Fargo Bank Account Activities**

| Date | Name | Memo | 1101 · Accounts Receivable-Trade | 1102 · Accounts Receivable - Misc | 2320 · Unearned Revenue | Citibank Total Sources | 1005 · Cash-TD Bank Payroll | 1012 · TD BANK OPERATING DIP | 2000 · Accounts Payable | 2320 · Unearned Revenue | 4030 · Freight Out | 5407 · Professional Fees | 5409 · Bank Charges | 5501 · Rent | Citibank Total Usese | Citibank Total Net Transactions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/23/2016 | HI-TEMP SPECIALTY | PPE 05212016 | | | | | | | | | | | | | | |
| 05/23/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 05/24/2016 | SG Recycling Inc. | INV17736 | 1,400 | | | 1,400 | | | | | | | | | | 1,400 |
| 05/25/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (17) | | (17) | (17) |
| 05/25/2016 | Diconza Traurig Kaish LLP | Diconza Traurig Kaish LLP | | | | | | | | | | (20,000) | | | (20,000) | (20,000) |
| 05/25/2016 | TD Bank Payroll | PPE 05 21 2016 | | | | | | | | | | | | | | |
| 05/31/2016 | AMERICAN EXPRESS | Prepayment of Amex | | | | | | | | | | | | | | |
| 05/31/2016 | HI-TEMP SPECIALTY | PPE 05 28 2016 | | | | | | | | | | | | | | |
| 05/31/2016 | TD Bank | Bank Fee 5/31/16 | | | | | | | | | | | | | | |
| 05/31/2016 | TD Bank Payroll | MAY 2016 O/S P/R CKS | | | | | | | | | | | | | | |
| 05/31/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 06/01/2016 | TD Bank Payroll | PPE 05 28 2016 | | | | | | | | | | | | | | |
| 06/03/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (17) | | (17) | (17) |
| 06/03/2016 | Diconza Traurig Kaish LLP | Diconza Traurig Kaish LLP | | | | | | | | | | (10,000) | | | (10,000) | (10,000) |
| 06/03/2016 | Yano Metals Co., Ltd. | INV17692 & 17709 | 344,450 | | | 344,450 | | | | | | | | | | 344,450 |
| 06/06/2016 | Citi Bank | Funds Transfer | | | | | | | | | | | | | | |
| 06/06/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (75) | | (75) | (75) |
| 06/06/2016 | Happy Precious Metal Co LTD | PO3648 INHP16-06001 | | | | | | (230,000) | | | | | | | (230,000) | (230,000) |
| 06/06/2016 | HI-TEMP SPECIALTY | PPE  06 06 16 | | | | | | | | | | | | | | |
| 06/06/2016 | Payroll | Wire to Payroll account | | | | | (35,000) | | | | | | | | (35,000) | (35,000) |
| 06/06/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 06/06/2016 | Valerie Realty | Wire to Valerie Realty | | | | | | | | | | | | (35,000) | (35,000) | (35,000) |
| 06/07/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (27) | | (27) | (27) |
| 06/07/2016 | Globe Metal | PO3653 & 3634-2 | | | | | | (168,876) | | | | | | | (168,876) | (168,876) |
| 06/07/2016 | Western Australia Specialty Alloys | INV17621, 17657, 17677, 17679 | 357,599 | | | 357,599 | | | | | | | | | | 357,599 |
| 06/08/2016 | Certified Alloy Products | INV17626 | 16,900 | | | 16,900 | | | | | | | | | | 16,900 |
| 06/08/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (14) | | (14) | (14) |
| 06/08/2016 | Pacific Particulate Ltd. | INV17689 | 17,190 | | | 17,190 | | | | | | | | | | 17,190 |
| 06/08/2016 | TD Bank Payroll | PPE 06 04 2016 | | | | | | | | | | | | | | |
| 06/09/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (28) | | (28) | (28) |
| 06/09/2016 | Hickman Williams & Company | INV17668 | 58,802 | | | 58,802 | | | | | | | | | | 58,802 |
| 06/09/2016 | Yano Metals Co., Ltd. | INV17692 & 17709 | 117,790 | | | 117,790 | | | | | | | | | | 117,790 |
| 06/10/2016 | AURORA - GLENCORE | Deposit | | | 15,204 | 15,204 | | | | | | | | | | 15,204 |
| 06/10/2016 | Citi Bank | Glencore wired Hi-Temp in error | | | | | | | | | | | (14) | | (14) | (14) |
| 06/10/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (14) | | (14) | (14) |
| 06/13/2016 | AURORA - GLENCORE | RETURN OF FUNDS TO AURORA - GLENCORE WIRED HITEMP IN ERROR | | | | | | | (15,204) | | | | | | (15,204) | (15,204) |
| 06/13/2016 | Certified Alloy Products | INV17633 | 73,500 | | | 73,500 | | | | | | | | | | 73,500 |
| 06/13/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (58) | | (58) | (58) |
| 06/13/2016 | HI-TEMP SPECIALTY | PPE 06 11 16 | | | | | | | | | | | | | | |
| 06/13/2016 | LKAB Minerals | PO3616-2 INV80118 R-12225 | | | | | | (355,420) | | | | | | | (355,420) | (355,420) |
| 06/13/2016 | PAYCHEX | 14762894 | | | | | | | | | | | | | | |
| 06/13/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 06/14/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (31) | | (31) | (31) |
| 06/14/2016 | TD Bank Payroll | PPE 6/11/16 | | | | | | | | | | | | | | |
| 06/14/2016 | TD Bank Payroll | PPE 6/11/16 | | | | | | | | | | | | | | |
| 06/14/2016 | Tosoh SMD Inc. | PO3614 INVCD184348 R-12133 | | | | | | (50,000) | | | | | | | (50,000) | (50,000) |
| 06/15/2016 | Ross & Catherall | INV17639 | 136,557 | | | 136,557 | | | | | | | | | | 136,557 |
| 06/17/2016 | Citi Bank | Funds Transfer | | | | | | | | | | | | | | |
| 06/17/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (95) | | (95) | (95) |
| 06/17/2016 | COHN REZNICK | COHN REZNICK | | | | | | | | | | (25,000) | | | (25,000) | (25,000) |
| 06/17/2016 | DICONZA TRAURIG KADISH LLP | DICONZA TRAURIG KADISH LLP | | | | | | | | | | (7,500) | | | (7,500) | (7,500) |
| 06/17/2016 | Happy Precious Metal Co LTD | PO3645-1 INVTBD PPD | | | | | | | (95,212) | | | | | | (95,212) | (95,212) |
| 06/17/2016 | Payroll | Wire to Payroll account | | | | | (37,500) | | | | | | | | (37,500) | (37,500) |

**Hi-Temp Specialty Metals, Inc.**
**Review of Non-Wells Fargo Bank Account Activities**

| Date | Name | Memo | 1101 · Accounts Receivable-Trade | 1102 · Accounts Receivable - Misc | 2320 · Unearned Revenue | Citibank Total Sources | 1005 · Cash-TD Bank Payroll | 1012 · TD BANK OPERATING DIP | 2000 · Accounts Payable | 2320 · Unearned Revenue | 4030 · Freight Out | 5407 · Professional Fees | 5409 · Bank Charges | 5501 · Rent | Citibank Total Usese | Citibank Total Net Transactions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **1009 · Citibank** | | | | | | | | | | | | | |
| | | | Sources | | | | Uses | | | | | | | | | |
| 06/17/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | | | | | |
| 06/21/2016 | TD Bank Payroll | PPE 6/18/2016 | | | | | | | | | | | | | | |
| 06/22/2016 | Citi Bank | Wire Fee | | | | | | | | | | | (17) | | (17) | (17) |
| 06/22/2016 | COHN REZNICK | COHN REZNICK | | | | | | | | | | (25,000) | | | (25,000) | (25,000) |
| 06/22/2016 | DICONZA TRAURIG KADISH LLP | DICONZA TRAURIG KADISH LLP | | | | | | | | | | (1,717) | | | (1,717) | (1,717) |
| 06/23/2016 | Employee Loan | Deposit | | | | | | | | | | | | | | |
| 06/24/2016 | Cronimet Specialty Metals USA | CG1620113 | | | | | | | | | | | | | | |
| 06/24/2016 | TD Bank Payroll | Funds Transfer | | | | | | | | | | | | | | |
| 06/24/2016 | Transfer | Closing of Citibank; Deposit into TD DIP | | | | | | (58,306) | | | | | | | (58,306) | (58,306) |
| 06/24/2016 | Transfer | Funds Transfer | | | | | | | | | | | | | | |
| 06/27/2016 | TD Bank Payroll | Funds Transfer | | | | | | | | | | | | | | |
| 06/27/2016 | TD Bank Payroll | O/S P/R CKS AT CLOSING OF ACCT | | | | | | | | | | | | | | |
| 06/29/2016 | TD Bank Payroll DIP | PPE 06 25 2016 | | | | | | | | | | | | | | |
| 06/30/2016 | Precision Castparts Corp | INV17486 & 17711 | | | | | | | | | | | | | | |
| 07/01/2016 | Carpenter Technology Corp. | INV | | | | | | | | | | | | | | |
| 07/01/2016 | Certified Alloy Products | INV | | | | | | | | | | | | | | |
| 07/01/2016 | GENERAL WELDING | 00650532-00 | | | | | | | | | | | | | | |
| 07/01/2016 | Pacific Particulate Ltd. | INV | | | | | | | | | | | | | | |
| 07/02/2016 | Special Metals Corp. | INV | | | | | | | | | | | | | | |
| 07/05/2016 | Western Australia Specialty Alloys | INV | | | | | | | | | | | | | | |
| **Grand Total** | | | 1,124,188 | 32,039 | 129,170 | 1,285,397 | (72,500) | (58,306) | (899,508) | (129,170) | (1,221) | (89,217) | (475) | (35,000) | (1,285,397) | (0) |

EXHIBIT A

| | | | 1012 · TD BANK OPERATING DIP | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Sources | | | | Uses | | |
| Date | Name | Memo | 1009 · Citibank | 1101 · Accounts Receivable-Trade | 1401 · Employee Loan | TD Bank Operating DIP Total Sources | 2000 · Accounts Payable | TD Bank Operating DIP Total Uses | TD Bank Operating DIP Total Net Transactions |
| | Hi-Temp Specialty Metals, Inc. | | | | | | | | |
| | Review of Non-Wells Fargo Bank Account Activities | | | | | | | | |
| 03/01/2016 | HI-TEMP SPECIALTY | PPE 02 27 2016 | | | | | | | |
| 03/01/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 03/02/2016 | TD Bank Payroll | PPE 02 27 2015 | | | | | | | |
| 03/02/2016 | TD Bank Payroll | PPE 02 27 2016 | | | | | | | |
| 03/03/2016 | TD Bank Payroll | 401k match catch-up 1/1/2016 to 1/30/2016 | | | | | | | |
| 03/08/2016 | HI-TEMP SPECIALTY | PPE 03 05 2016 | | | | | | | |
| 03/08/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 03/09/2016 | TD Bank Payroll | PPE 03 05 2016 | | | | | | | |
| 03/09/2016 | TD Bank Payroll | PPE 03 5 2016 | | | | | | | |
| 03/11/2016 | PAYCHEX | 14337118 | | | | | | | |
| 03/14/2016 | HI-TEMP SPECIALTY | PPE 03 12 2016 | | | | | | | |
| 03/14/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 03/15/2016 | TD Bank Payroll | PPE 03 12 2016 | | | | | | | |
| 03/21/2016 | HI-TEMP SPECIALTY | PPE 03 19 2016 | | | | | | | |
| 03/21/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 03/22/2016 | TD Bank Payroll | PPE 03 19 2016 | | | | | | | |
| 03/28/2016 | HI-TEMP SPECIALTY | PPE 03 26 2016 | | | | | | | |
| 03/28/2016 | Metallurgical Products | Wire from Metallurgical Products | | | | | | | |
| 03/28/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 03/29/2016 | Citi Bank | Wire Fee | | | | | | | |
| 03/29/2016 | TD Bank Payroll | PPE 03 26 2016 | | | | | | | |
| 03/30/2016 | Citi Bank | Deposit in Citibank | | | | | | | |
| 03/31/2016 | TD Bank | PaperSTMT3/31/16 | | | | | | | |
| 03/31/2016 | TD Bank Payroll | MAR 2016 O/S P/R CKS | | | | | | | |
| 04/01/2016 | Citi Bank | Wire Fee | | | | | | | |
| 04/01/2016 | Metallurgical Products | Wire to Metallurgical Products | | | | | | | |
| 04/04/2016 | HI-TEMP SPECIALTY | PPE 04 02 2016 | | | | | | | |
| 04/04/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 04/05/2016 | TD Bank Payroll | PPE 04 02 2016 | | | | | | | |
| 04/12/2016 | HI-TEMP SPECIALTY | PPE 04 09 2016 | | | | | | | |
| 04/12/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 04/13/2016 | TD Bank Payroll | PPE 04 09 2016 | | | | | | | |
| 04/15/2016 | PAYCHEX | 14484088 | | | | | | | |
| 04/19/2016 | Citi Bank | Wire Fee | | | | | | | |
| 04/19/2016 | HI-TEMP SPECIALTY | PPE 04 16 2016 | | | | | | | |
| 04/19/2016 | Metallurgical Products | Freight - Metallurgical Products | | | | | | | |
| 04/19/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 04/20/2016 | TD Bank Payroll | PPE 04 16 2016 | | | | | | | |
| 04/25/2016 | HI-TEMP SPECIALTY | PPE 04 23 2016 | | | | | | | |
| 04/25/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 04/26/2016 | TD Bank Payroll | PPE 04 23 2016 | | | | | | | |
| 04/29/2016 | TD Bank | 4/29/15-Statement Fee | | | | | | | |
| 04/30/2016 | TD Bank Payroll | APR 2016 O/S P/R CKS | | | | | | | |
| 05/03/2016 | HI-TEMP SPECIALTY | PPE 04 30 2016 | | | | | | | |
| 05/03/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 05/06/2016 | TD Bank Payroll | PPE 04 30 2016 | | | | | | | |
| 05/09/2016 | HI-TEMP SPECIALTY | PPE 05 07 2016 | | | | | | | |
| 05/09/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 05/11/2016 | TD Bank Payroll | PPE 05 07 2016 | | | | | | | |
| 05/13/2016 | PAYCHEX | 14621021 | | | | | | | |
| 05/16/2016 | HI-TEMP SPECIALTY | PPE 05 14 2016 | | | | | | | |
| 05/16/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 05/17/2016 | TD Bank Payroll | PPE 05 14 2016 | | | | | | | |

| | | | | 1012 - TD BANK OPERATING DIP | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Sources | | | | | Uses | | |
| Date | Name | Memo | 1009 - Citibank | 1101 - Accounts Receivable-Trade | 1401 - Employee Loan | TD Bank Operating DIP Total Sources | 2000 - Accounts Payable | TD Bank Operating DIP Total Uses | TD Bank Operating DIP Total Net Transactions |
| 05/23/2016 | HI-TEMP SPECIALTY | PPE 05212016 | | | | | | | |
| 05/23/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 05/24/2016 | SG Recycling Inc. | INV17736 | | | | | | | |
| 05/25/2016 | Citi Bank | Wire Fee | | | | | | | |
| 05/25/2016 | Diconza Traurig Kaish LLP | Diconza Traurig Kaish LLP | | | | | | | |
| 05/25/2016 | TD Bank Payroll | PPE 05 21 2016 | | | | | | | |
| 05/31/2016 | AMERICAN EXPRESS | Prepayment of Amex | | | | | | | |
| 05/31/2016 | HI-TEMP SPECIALTY | PPE 05 28 2016 | | | | | | | |
| 05/31/2016 | TD Bank | Bank Fee 5/31/16 | | | | | | | |
| 05/31/2016 | TD Bank Payroll | MAY 2016 O/S P/R CKS | | | | | | | |
| 05/31/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 06/01/2016 | TD Bank Payroll | PPE 05 28 2016 | | | | | | | |
| 06/03/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/03/2016 | Diconza Traurig Kaish LLP | Diconza Traurig Kaish LLP | | | | | | | |
| 06/03/2016 | Yano Metals Co., Ltd. | INV17692 & 17709 | | | | | | | |
| 06/06/2016 | Citi Bank | Funds Transfer | | | | | | | |
| 06/06/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/06/2016 | Happy Precious Metal Co LTD | PO3648 INHP16-06001 | | | | | | | |
| 06/06/2016 | HI-TEMP SPECIALTY | PPE  06 06 16 | | | | | | | |
| 06/06/2016 | Payroll | Wire to Payroll account | | | | | | | |
| 06/06/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 06/06/2016 | Valerie Realty | Wire to Valerie Realty | | | | | | | |
| 06/07/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/07/2016 | Globe Metal | PO3653 & 3634-2 | | | | | | | |
| 06/07/2016 | Western Australia Specialty Alloys | INV17621, 17657, 17677, 17679 | | | | | | | |
| 06/08/2016 | Certified Alloy Products | INV17626 | | | | | | | |
| 06/08/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/08/2016 | Pacific Particulate Ltd. | INV17689 | | | | | | | |
| 06/08/2016 | TD Bank Payroll | PPE 06 04 2016 | | | | | | | |
| 06/09/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/09/2016 | Hickman Williams & Company | INV17668 | | | | | | | |
| 06/09/2016 | Yano Metals Co., Ltd. | INV17692 & 17709 | | | | | | | |
| 06/10/2016 | AURORA - GLENCORE | Deposit | | | | | | | |
| 06/10/2016 | Citi Bank | Glencore wired Hi-Temp in error | | | | | | | |
| 06/10/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/13/2016 | AURORA - GLENCORE | RETURN OF FUNDS TO AURORA - GLENCORE WIRED HITEMP IN ERROR | | | | | | | |
| 06/13/2016 | Certified Alloy Products | INV17633 | | | | | | | |
| 06/13/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/13/2016 | HI-TEMP SPECIALTY | PPE 06 11 16 | | | | | | | |
| 06/13/2016 | LKAB Minerals | PO3616-2 INV80118 R-12225 | | | | | | | |
| 06/13/2016 | PAYCHEX | 14762894 | | | | | | | |
| 06/13/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 06/14/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/14/2016 | TD Bank Payroll | PPE 6/11/16 | | | | | | | |
| 06/14/2016 | TD Bank Payroll | PPE 6/11/2016 | | | | | | | |
| 06/14/2016 | Tosoh SMD Inc. | PO3614 INVCD184348 R-12133 | | | | | | | |
| 06/15/2016 | Ross & Catherall | INV17639 | | | | | | | |
| 06/17/2016 | Citi Bank | Funds Transfer | | | | | | | |
| 06/17/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/17/2016 | COHN REZNICK | COHN REZNICK | | | | | | | |
| 06/17/2016 | DICONZA TRAURIG KADISH LLP | DICONZA TRAURIG KADISH LLP | | | | | | | |
| 06/17/2016 | Happy Precious Metal Co LTD | PO3645-1 INVTBD PPD | | | | | | | |
| 06/17/2016 | Payroll | Wire to Payroll account | | | | | | | |

**Hi-Temp Specialty Metals, Inc.**
**Review of Non-Wells Fargo Bank Account Activities**

**Hi-Temp Specialty Metals, Inc.**
**Review of Non-Wells Fargo Bank Account Activities**

| | | | 1012 · TD BANK OPERATING DIP | | | | | |
| | | | Sources | | | | Uses | |
| Date | Name | Memo | 1009 · Citibank | 1101 · Accounts Receivable-Trade | 1401 · Employee Loan | TD Bank Operating DIP Total Sources | 2000 · Accounts Payable | TD Bank Operating DIP Total Uses | TD Bank Operating DIP Total Net Transactions |
|---|---|---|---|---|---|---|---|---|---|
| 06/17/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 06/21/2016 | TD Bank Payroll | PPE 6/18/2016 | | | | | | | |
| 06/22/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/22/2016 | COHN REZNICK | COHN REZNICK | | | | | | | |
| 06/22/2016 | DICONZA TRAURIG KADISH LLP | DICONZA TRAURIG KADISH LLP | | | | | | | |
| 06/23/2016 | Employee Loan | Deposit | | | 100 | 100 | | | 100 |
| 06/24/2016 | Cronimet Specialty Metals USA | CG1620113 | | 100,000 | | 100,000 | | | 100,000 |
| 06/24/2016 | TD Bank Payroll | Funds Transfer | | | | | | | |
| 06/24/2016 | Transfer | Closing of Citibank; Deposit into TD DIP | | | | | | | |
| 06/24/2016 | Transfer | Funds Transfer | 58,306 | | | 58,306 | | | 58,306 |
| 06/27/2016 | TD Bank Payroll | Funds Transfer | | | | | | | |
| 06/27/2016 | TD Bank Payroll | O/S P/R CKS AT CLOSING OF ACCT | | | | | | | |
| 06/29/2016 | TD Bank Payroll DIP | PPE 06 25 2016 | | | | | | | |
| 06/30/2016 | Precision Castparts Corp | INV17486 & 17711 | | 283,284 | | 283,284 | | | 283,284 |
| 07/01/2016 | Carpenter Technology Corp. | INV | | 304,964 | | 304,964 | | | 304,964 |
| 07/01/2016 | Certified Alloy Products | INV | | 73,500 | | 73,500 | | | 73,500 |
| 07/01/2016 | GENERAL WELDING | 00650532-00 | | | | | (547) | (547) | (547) |
| 07/01/2016 | Pacific Particulate Ltd. | INV | | 85,944 | | 85,944 | | | 85,944 |
| 07/02/2016 | Special Metals Corp. | INV | | 140,000 | | 140,000 | | | 140,000 |
| 07/05/2016 | Western Australia Specialty Alloys | INV | | 335,335 | | 335,335 | | | 335,335 |
| Grand Total | | | 58,306 | 1,323,027 | 100 | 1,381,432 | (547) | (547) | 1,380,886 |

**Hi-Temp Specialty Metals, Inc.**
**Review of Non-Wells Fargo Bank Account Activities**

| Date | Name | Memo | 1005 · Cash-TD Bank Payroll (Sources) | 1009 · Citibank | 2000 · Accounts Payable | TD Bank Payroll Total Sources | 1005 · Cash-TD Bank Payroll (Uses) | 1013 · TD BANK PAYROLL DIP | 2000 · Accounts Payable | 2201 · Wages and p/r taxes Payable | 5101 · Plant Wages | 5409 · Bank Charges | 5524 · Pension | TD Bank Payroll Total Uses | TD Bank Payroll Total Net Transactions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/01/2016 | HI-TEMP SPECIALTY | PPE 02 27 2016 | | | 38,500 | 38,500 | | | | | | | | | 38,500 |
| 03/01/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 03/02/2016 | TD Bank Payroll | PPE 02 27 2015 | | | | | | | | (38,572) | | | | (38,572) | (38,572) |
| 03/02/2016 | TD Bank Payroll | PPE 02 27 2016 | | | | | | | | | (118) | | | (118) | (118) |
| 03/03/2016 | TD Bank Payroll | 401k match catch-up 1/1/2016 to 1/30/2016 | | | | | | | | | | | - | - | - |
| 03/08/2016 | HI-TEMP SPECIALTY | PPE 03 05 2016 | | | 36,500 | 36,500 | | | | | | | | | 36,500 |
| 03/08/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 03/09/2016 | TD Bank Payroll | PPE 03 05 2016 | | | | | | | | (33,985) | | | | (33,985) | (33,985) |
| 03/09/2016 | TD Bank Payroll | PPE 03 5 2016 | | | | | | | | | (94) | | | (94) | (94) |
| 03/11/2016 | PAYCHEX | 14337118 | | | | | | | (40) | | | | | (40) | (40) |
| 03/14/2016 | HI-TEMP SPECIALTY | PPE 03 12 2016 | | | 34,200 | 34,200 | | | | | | | | | 34,200 |
| 03/14/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 03/15/2016 | TD Bank Payroll | PPE 03 12 2016 | | | | | | | | (35,251) | (93) | | | (35,344) | (35,344) |
| 03/21/2016 | HI-TEMP SPECIALTY | PPE 03 19 2016 | | | 37,600 | 37,600 | | | | | | | | | 37,600 |
| 03/21/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 03/22/2016 | TD Bank Payroll | PPE 03 19 2016 | | | | | | | | (37,474) | (95) | | | (37,569) | (37,569) |
| 03/28/2016 | HI-TEMP SPECIALTY | PPE 03 26 2016 | | | 33,200 | 33,200 | | | | | | | | | 33,200 |
| 03/28/2016 | Metallurgical Products | Wire from Metallurgical Products | | | | | | | | | | | | | |
| 03/28/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 03/29/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 03/29/2016 | TD Bank Payroll | PPE 03 26 2016 | | | | | | | | (33,199) | (96) | | | (33,295) | (33,295) |
| 03/30/2016 | Citi Bank | Deposit in Citibank | | | | | | | | | | | | | |
| 03/31/2016 | TD Bank | PaperSTMT3/31/16 | | | | | | | (2) | | | | | (2) | (2) |
| 03/31/2016 | TD Bank Payroll | MAR 2016 O/S P/R CKS | 3,841 | | | 3,841 | (3,841) | | | | | | | (3,841) | - |
| 04/01/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 04/01/2016 | Metallurgical Products | Wire to Metallurgical Products | | | | | | | | | | | | | |
| 04/04/2016 | HI-TEMP SPECIALTY | PPE 04 02 2016 | | | 33,000 | 33,000 | | | | | | | | | 33,000 |
| 04/04/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 04/05/2016 | TD Bank Payroll | PPE 04 02 2016 | | | | | | | | (32,979) | (120) | | | (33,099) | (33,099) |
| 04/12/2016 | HI-TEMP SPECIALTY | PPE 04 09 2016 | | | 32,900 | 32,900 | | | | | | | | | 32,900 |
| 04/12/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 04/13/2016 | TD Bank Payroll | PPE 04 09 2016 | | | | | | | | (34,808) | (96) | | | (34,904) | (34,904) |
| 04/15/2016 | PAYCHEX | 14484088 | | | | | | | (40) | | | | | (40) | (40) |
| 04/19/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 04/19/2016 | HI-TEMP SPECIALTY | PPE 04 16 2016 | | | 35,500 | 35,500 | | | | | | | | | 35,500 |
| 04/19/2016 | Metallurgical Products | Freight - Metallurgical Products | | | | | | | | | | | | | |
| 04/19/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 04/20/2016 | TD Bank Payroll | PPE 04 16 2016 | | | | | | | | (36,602) | (112) | | | (36,714) | (36,714) |
| 04/25/2016 | HI-TEMP SPECIALTY | PPE 04 23 2016 | | | 36,800 | 36,800 | | | | | | | | | 36,800 |
| 04/25/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 04/26/2016 | TD Bank Payroll | PPE 04 23 2016 | | | | | | | | (36,174) | (96) | | | (36,270) | (36,270) |
| 04/29/2016 | TD Bank | 4/29/15-Statement Fee | | | | | | | (2) | | | | | (2) | (2) |
| 04/30/2016 | TD Bank Payroll | APR 2016 O/S P/R CKS | 1,820 | | | 1,820 | (1,820) | | | | | | | (1,820) | - |
| 05/03/2016 | HI-TEMP SPECIALTY | PPE 04 30 2016 | | | 34,300 | 34,300 | | | | | | | | | 34,300 |
| 05/03/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 05/06/2016 | TD Bank Payroll | PPE 04 30 2016 | | | | | | | | (34,131) | (120) | | | (34,251) | (34,251) |
| 05/09/2016 | HI-TEMP SPECIALTY | PPE 05 07 2016 | | | 32,800 | 32,800 | | | | | | | | | 32,800 |
| 05/09/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 05/11/2016 | TD Bank Payroll | PPE 05 07 2016 | | | | | | | | (32,787) | (96) | | | (32,883) | (32,883) |
| 05/13/2016 | PAYCHEX | 14621021 | | | | | | | (40) | | | | | (40) | (40) |
| 05/16/2016 | HI-TEMP SPECIALTY | PPE 05 14 2016 | | | 36,500 | 36,500 | | | | | | | | | 36,500 |
| 05/16/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 05/17/2016 | TD Bank Payroll | PPE 05 14 2016 | | | | | | | | (36,119) | (96) | | | (36,215) | (36,215) |

Hi-Temp Specialty Metals, Inc.
Review of Non-Wells Fargo Bank Account Activities

| Date | Name | Memo | 1005 · Cash-TD Bank Payroll | 1009 · Citibank | 2000 · Accounts Payable | TD Bank Payroll Total Sources | 1005 · Cash-TD Bank Payroll | 1013 · TD BANK PAYROLL DIP | 2000 · Accounts Payable | 2201 · Wages and p/r taxes Payable | 5101 · Plant Wages | 5409 · Bank Charges | 5524 · Pension | TD Bank Payroll Total Uses | TD Bank Payroll Total Net Transactions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Sources | | | | Uses | | | | | | | | |
| 05/23/2016 | HI-TEMP SPECIALTY | PPE 05212016 | | | 32,300 | 32,300 | | | | | | | | | 32,300 |
| 05/23/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 05/24/2016 | SG Recycling Inc. | INV17736 | | | | | | | | | | | | | |
| 05/25/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 05/25/2016 | Diconza Traurig Kaish LLP | Diconza Traurig Kaish LLP | | | | | | | | | | | | | |
| 05/25/2016 | TD Bank Payroll | PPE 05 21 2016 | | | | | | | | (32,820) | (96) | | | (32,916) | (32,916) |
| 05/31/2016 | AMERICAN EXPRESS | Prepayment of Amex | | | | | | | (5,643) | | | | | (5,643) | (5,643) |
| 05/31/2016 | HI-TEMP SPECIALTY | PPE 05 28 2016 | | | 30,100 | 30,100 | | | | | | | | | 30,100 |
| 05/31/2016 | TD Bank | Bank Fee 5/31/16 | | | | | | | | (2) | | | | (2) | (2) |
| 05/31/2016 | TD Bank Payroll | MAY 2016 O/S P/R CKS | 1,461 | | | 1,461 | (1,461) | | | | | | | (1,461) | - |
| 05/31/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 06/01/2016 | TD Bank Payroll | PPE 05 28 2016 | | | | | | | | (24,992) | (118) | | | (25,111) | (25,111) |
| 06/03/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 06/03/2016 | Diconza Traurig Kaish LLP | Diconza Traurig Kaish LLP | | | | | | | | | | | | | |
| 06/03/2016 | Yano Metals Co., Ltd. | INV17692 & 17709 | | | | | | | | | | | | | |
| 06/06/2016 | Citi Bank | Funds Transfer | | 35,000 | | 35,000 | | | | | | | | | 35,000 |
| 06/06/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 06/06/2016 | Happy Precious Metal Co LTD | PO3648 INHP16-06001 | | | | | | | | | | | | | |
| 06/06/2016 | HI-TEMP SPECIALTY | PPE 06 06 16 | | | 31,000 | 31,000 | | | | | | | | | 31,000 |
| 06/06/2016 | Payroll | Wire to Payroll account | | | | | | | | | | | | | |
| 06/06/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (30) | | (30) | (30) |
| 06/06/2016 | Valerie Realty | Wire to Valerie Realty | | | | | | | | | | | | | |
| 06/07/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 06/07/2016 | Globe Metal | PO3653 & 3634-2 | | | | | | | | | | | | | |
| 06/07/2016 | Western Australia Specialty Alloys | INV17621, 17657, 17677, 17679 | | | | | | | | | | | | | |
| 06/08/2016 | Certified Alloy Products | INV17626 | | | | | | | | | | | | | |
| 06/08/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 06/08/2016 | Pacific Particulate Ltd. | INV17689 | | | | | | | | | | | | | |
| 06/08/2016 | TD Bank Payroll | PPE 06 04 2016 | | | | | | | | (29,990) | (95) | | | (30,085) | (30,085) |
| 06/09/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 06/09/2016 | Hickman Williams & Company | INV17668 | | | | | | | | | | | | | |
| 06/09/2016 | Yano Metals Co., Ltd. | INV17692 & 17709 | | | | | | | | | | | | | |
| 06/10/2016 | AURORA - GLENCORE | Deposit | | | | | | | | | | | | | |
| 06/10/2016 | Citi Bank | Glencore wired Hi-Temp in error | | | | | | | | | | | | | |
| 06/10/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 06/13/2016 | AURORA - GLENCORE | RETURN OF FUNDS TO AURORA - GLENCORE WIRED HITEMP IN ERROR | | | | | | | | | | | | | |
| 06/13/2016 | Certified Alloy Products | INV17633 | | | | | | | | | | | | | |
| 06/13/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 06/13/2016 | HI-TEMP SPECIALTY | PPE 06 11 16 | | | 33,400 | 33,400 | | | | | | | | | 33,400 |
| 06/13/2016 | LKAB Minerals | PO3616-2 INV80118 R-12225 | | | | | | | | | | | | | |
| 06/13/2016 | PAYCHEX | 14762894 | | | | | | | | (40) | | | | (40) | (40) |
| 06/13/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 06/14/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 06/14/2016 | TD Bank Payroll | PPE 6/11/16 | | | | | | | | | (96) | | | (96) | (96) |
| 06/14/2016 | TD Bank Payroll | PPE 6/11/16 | | | | | | | | (33,433) | | | | (33,433) | (33,433) |
| 06/14/2016 | Tosoh SMD Inc. | PO3614 INVCD184348 R-12133 | | | | | | | | | | | | | |
| 06/15/2016 | Ross & Catherall | INV17639 | | | | | | | | | | | | | |
| 06/17/2016 | Citi Bank | Funds Transfer | | 37,500 | | 37,500 | | | | | | | | | 37,500 |
| 06/17/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 06/17/2016 | COHN REZNICK | COHN REZNICK | | | | | | | | | | | | | |
| 06/17/2016 | DICONZA TRAURIG KADISH LLP | DICONZA TRAURIG KADISH LLP | | | | | | | | | | | | | |
| 06/17/2016 | Happy Precious Metal Co LTD | PO3645-1 INVTBD PPD | | | | | | | | | | | | | |
| 06/17/2016 | Payroll | Wire to Payroll account | | | | | | | | | | | | | |

EXHIBIT A

**Hi-Temp Specialty Metals, Inc.**
**Review of Non-Wells Fargo Bank Account Activities**

| Date | Name | Memo | Sources 1005 · Cash-TD Bank Payroll | 1009 · Citibank | 2000 · Accounts Payable | TD Bank Payroll Total Sources | Uses 1005 · Cash-TD Bank Payroll | 1013 · TD BANK PAYROLL DIP | 2000 · Accounts Payable | 2201 · Wages and p/r taxes Payable | 5101 · Plant Wages | 5409 · Bank Charges | 5524 · Pension | TD Bank Payroll Total Uses | TD Bank Payroll Total Net Transactions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/17/2016 | TD Bank Payroll | Wire Fee | | | | | | | | | | (15) | | (15) | (15) |
| 06/21/2016 | TD Bank Payroll | PPE 6/18/2016 | | | | | | | | (33,285) | (96) | | | (33,381) | (33,381) |
| 06/22/2016 | Citi Bank | Wire Fee | | | | | | | | | | | | | |
| 06/22/2016 | COHN REZNICK | COHN REZNICK | | | | | | | | | | | | | |
| 06/22/2016 | DICONZA TRAURIG KADISH LLP | DICONZA TRAURIG KADISH LLP | | | | | | | | | | | | | |
| 06/23/2016 | Employee Loan | Deposit | | | | | | | | | | | | | |
| 06/24/2016 | Cronimet Specialty Metals USA | CG1620113 | | | | | | | | | | | | | |
| 06/24/2016 | TD Bank Payroll | Funds Transfer | | | | | | (41,380) | | | | | | (41,380) | (41,380) |
| 06/24/2016 | Transfer | Closing of Citibank; Deposit into TD DIP | | | | | | | | | | | | | |
| 06/24/2016 | Transfer | Funds Transfer | | | | | | | | | | | | | |
| 06/27/2016 | TD Bank Payroll | Funds Transfer | | | | | | (486) | | | | | | (486) | (486) |
| 06/27/2016 | TD Bank Payroll | O/S P/R CKS AT CLOSING OF ACCT | 498 | | | 498 | (498) | | | | | | | (498) | - |
| 06/29/2016 | TD Bank Payroll DIP | PPE 06 25 2016 | | | | | | | | | | | | | |
| 06/30/2016 | Precision Castparts Corp | INV17486 & 17711 | | | | | | | | | | | | | |
| 07/01/2016 | Carpenter Technology Corp. | INV | | | | | | | | | | | | | |
| 07/01/2016 | Certified Alloy Products | INV | | | | | | | | | | | | | |
| 07/01/2016 | GENERAL WELDING | 00650532-00 | | | | | | | | | | | | | |
| 07/01/2016 | Pacific Particulate Ltd. | INV | | | | | | | | | | | | | |
| 07/02/2016 | Special Metals Corp. | INV | | | | | | | | | | | | | |
| 07/05/2016 | Western Australia Specialty Alloys | INV | | | | | | | | | | | | | |
| Grand Total | | | 7,620 | 72,500 | 548,600 | 628,720 | (7,620) | (41,866) | (5,809) | (576,603) | (1,734) | (270) | - | (633,901) | (5,181) |

**Hi-Temp Specialty Metals, Inc.**
**Review of Non-Wells Fargo Bank Account Activities**

| Date | Name | Memo | Sources 1005 · Cash-TD Bank Payroll | 1401 - Employee Loan | TD Bank Payroll DIP Total Sources | Uses 2201 - Wages and p/r taxes Payable | 5101 - Plant Wages | TD Bank Payroll DIP Total Uses | TD Bank Payroll DIP Total Net Transactions |
|---|---|---|---|---|---|---|---|---|---|
| 03/01/2016 | HI-TEMP SPECIALTY | PPE 02 27 2016 | | | | | | | |
| 03/01/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 03/02/2016 | TD Bank Payroll | PPE 02 27 2015 | | | | | | | |
| 03/02/2016 | TD Bank Payroll | PPE 02 27 2016 | | | | | | | |
| 03/03/2016 | TD Bank Payroll | 401k match catch-up 1/1/2016 to 1/30/2016 | | | | | | | |
| 03/08/2016 | HI-TEMP SPECIALTY | PPE 03 05 2016 | | | | | | | |
| 03/08/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 03/09/2016 | TD Bank Payroll | PPE 03 05 2016 | | | | | | | |
| 03/09/2016 | TD Bank Payroll | PPE 03 5 2016 | | | | | | | |
| 03/11/2016 | PAYCHEX | 14337118 | | | | | | | |
| 03/14/2016 | HI-TEMP SPECIALTY | PPE 03 12 2016 | | | | | | | |
| 03/14/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 03/15/2016 | TD Bank Payroll | PPE 03 12 2016 | | | | | | | |
| 03/21/2016 | HI-TEMP SPECIALTY | PPE 03 19 2016 | | | | | | | |
| 03/21/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 03/22/2016 | TD Bank Payroll | PPE 03 19 2016 | | | | | | | |
| 03/28/2016 | HI-TEMP SPECIALTY | PPE 03 26 2016 | | | | | | | |
| 03/28/2016 | Metallurgical Products | Wire from Metallurgical Products | | | | | | | |
| 03/28/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 03/29/2016 | Citi Bank | Wire Fee | | | | | | | |
| 03/29/2016 | TD Bank Payroll | PPE 03 26 2016 | | | | | | | |
| 03/30/2016 | Citi Bank | Deposit in Citibank | | | | | | | |
| 03/31/2016 | TD Bank | PaperSTMT3/31/16 | | | | | | | |
| 03/31/2016 | TD Bank Payroll | MAR 2016 O/S P/R CKS | | | | | | | |
| 04/01/2016 | Citi Bank | Wire Fee | | | | | | | |
| 04/01/2016 | Metallurgical Products | Wire to Metallurgical Products | | | | | | | |
| 04/04/2016 | HI-TEMP SPECIALTY | PPE 04 02 2016 | | | | | | | |
| 04/04/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 04/05/2016 | TD Bank Payroll | PPE 04 02 2016 | | | | | | | |
| 04/12/2016 | HI-TEMP SPECIALTY | PPE 04 09 2016 | | | | | | | |
| 04/12/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 04/13/2016 | TD Bank Payroll | PPE 04 09 2016 | | | | | | | |
| 04/15/2016 | PAYCHEX | 14484088 | | | | | | | |
| 04/19/2016 | Citi Bank | Wire Fee | | | | | | | |
| 04/19/2016 | HI-TEMP SPECIALTY | PPE 04 16 2016 | | | | | | | |
| 04/19/2016 | Metallurgical Products | Freight - Metallurgical Products | | | | | | | |
| 04/19/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 04/20/2016 | TD Bank Payroll | PPE 04 16 2016 | | | | | | | |
| 04/25/2016 | HI-TEMP SPECIALTY | PPE 04 23 2016 | | | | | | | |
| 04/25/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 04/26/2016 | TD Bank Payroll | PPE 04 23 2016 | | | | | | | |
| 04/29/2016 | TD Bank | 4/29/15-Statement Fee | | | | | | | |
| 04/30/2016 | TD Bank Payroll | APR 2016 O/S P/R CKS | | | | | | | |
| 05/03/2016 | HI-TEMP SPECIALTY | PPE 04 30 2016 | | | | | | | |
| 05/03/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 05/06/2016 | TD Bank Payroll | PPE 04 30 2016 | | | | | | | |
| 05/09/2016 | HI-TEMP SPECIALTY | PPE 05 07 2016 | | | | | | | |
| 05/09/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 05/11/2016 | TD Bank Payroll | PPE 05 07 2016 | | | | | | | |
| 05/13/2016 | PAYCHEX | 14621021 | | | | | | | |
| 05/16/2016 | HI-TEMP SPECIALTY | PPE 05 14 2016 | | | | | | | |
| 05/16/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 05/17/2016 | TD Bank Payroll | PPE 05 14 2016 | | | | | | | |

| | | | 1013 - TD BANK PAYROLL DIP Total | | | | | | |
| | | | Sources | | | Uses | | | |
| Date | Name | Memo | 1005 - Cash-TD Bank Payroll | 1401 - Employee Loan | TD Bank Payroll DIP Total Sources | 2201 - Wages and p/r taxes Payable | 5101 - Plant Wages | TD Bank Payroll DIP Total Uses | TD Bank Payroll DIP Total Net Transactions |
|---|---|---|---|---|---|---|---|---|---|
| 05/23/2016 | HI-TEMP SPECIALTY | PPE 05212016 | | | | | | | |
| 05/23/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 05/24/2016 | SG Recycling Inc. | INV17736 | | | | | | | |
| 05/25/2016 | Citi Bank | Wire Fee | | | | | | | |
| 05/25/2016 | Diconza Traurig Kaish LLP | Diconza Traurig Kaish LLP | | | | | | | |
| 05/25/2016 | TD Bank Payroll | PPE 05 21 2016 | | | | | | | |
| 05/31/2016 | AMERICAN EXPRESS | Prepayment of Amex | | | | | | | |
| 05/31/2016 | HI-TEMP SPECIALTY | PPE 05 28 2016 | | | | | | | |
| 05/31/2016 | TD Bank | Bank Fee 5/31/16 | | | | | | | |
| 05/31/2016 | TD Bank Payroll | MAY 2016 O/S P/R CKS | | | | | | | |
| 05/31/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 06/01/2016 | TD Bank Payroll | PPE 05 28 2016 | | | | | | | |
| 06/03/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/03/2016 | Diconza Traurig Kaish LLP | Diconza Traurig Kaish LLP | | | | | | | |
| 06/03/2016 | Yano Metals Co., Ltd. | INV17692 & 17709 | | | | | | | |
| 06/06/2016 | Citi Bank | Funds Transfer | | | | | | | |
| 06/06/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/06/2016 | Happy Precious Metal Co LTD | PO3648 INHP16-06001 | | | | | | | |
| 06/06/2016 | HI-TEMP SPECIALTY | PPE  06 06 16 | | | | | | | |
| 06/06/2016 | Payroll | Wire to Payroll account | | | | | | | |
| 06/06/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 06/06/2016 | Valerie Realty | Wire to Valerie Realty | | | | | | | |
| 06/07/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/07/2016 | Globe Metal | PO3653 & 3634-2 | | | | | | | |
| 06/07/2016 | Western Australia Specialty Alloys | INV17621, 17657, 17677, 17679 | | | | | | | |
| 06/08/2016 | Certified Alloy Products | INV17626 | | | | | | | |
| 06/08/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/08/2016 | Pacific Particulate Ltd. | INV17689 | | | | | | | |
| 06/08/2016 | TD Bank Payroll | PPE 06 04 2016 | | | | | | | |
| 06/09/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/09/2016 | Hickman Williams & Company | INV17668 | | | | | | | |
| 06/09/2016 | Yano Metals Co., Ltd. | INV17692 & 17709 | | | | | | | |
| 06/10/2016 | AURORA - GLENCORE | Deposit | | | | | | | |
| 06/10/2016 | Citi Bank | Glencore wired Hi-Temp in error | | | | | | | |
| 06/10/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/13/2016 | AURORA - GLENCORE | RETURN OF FUNDS TO AURORA - GLENCORE WIRED HITEMP IN ERROR | | | | | | | |
| 06/13/2016 | Certified Alloy Products | INV17633 | | | | | | | |
| 06/13/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/13/2016 | HI-TEMP SPECIALTY | PPE 06 11 16 | | | | | | | |
| 06/13/2016 | LKAB Minerals | PO3616-2 INV80118 R-12225 | | | | | | | |
| 06/13/2016 | PAYCHEX | 14762894 | | | | | | | |
| 06/13/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 06/14/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/14/2016 | TD Bank Payroll | PPE 6/11/16 | | | | | | | |
| 06/14/2016 | TD Bank Payroll | PPE 6/11/2016 | | | | | | | |
| 06/14/2016 | Tosoh SMD Inc. | PO3614 INVCD184348 R-12133 | | | | | | | |
| 06/15/2016 | Ross & Catherall | INV17639 | | | | | | | |
| 06/17/2016 | Citi Bank | Funds Transfer | | | | | | | |
| 06/17/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/17/2016 | COHN REZNICK | COHN REZNICK | | | | | | | |
| 06/17/2016 | DICONZA TRAURIG KADISH LLP | DICONZA TRAURIG KADISH LLP | | | | | | | |
| 06/17/2016 | Happy Precious Metal Co LTD | PO3645-1 INVTBD PPD | | | | | | | |
| 06/17/2016 | Payroll | Wire to Payroll account | | | | | | | |

EXHIBIT A

| | | | 1013 - TD BANK PAYROLL DIP Total | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Hi-Temp Specialty Metals, Inc.** | | | | | | | | | |
| **Review of Non-Wells Fargo Bank Account Activities** | | | | | | | | | |
| | | | Sources | | | Uses | | | |
| Date | Name | Memo | 1005 · Cash-TD Bank Payroll | 1401 · Employee Loan | TD Bank Payroll DIP Total Sources | 2201 · Wages and p/r taxes Payable | 5101 · Plant Wages | TD Bank Payroll DIP Total Uses | TD Bank Payroll DIP Total Net Transactions |
| 06/17/2016 | TD Bank Payroll | Wire Fee | | | | | | | |
| 06/21/2016 | TD Bank Payroll | PPE 6/18/2016 | | | | | | | |
| 06/22/2016 | Citi Bank | Wire Fee | | | | | | | |
| 06/22/2016 | COHN REZNICK | COHN REZNICK | | | | | | | |
| 06/22/2016 | DICONZA TRAURIG KADISH LLP | DICONZA TRAURIG KADISH LLP | | | | | | | |
| 06/23/2016 | Employee Loan | Deposit | | 100 | 100 | | | | 100 |
| 06/24/2016 | Cronimet Specialty Metals USA | CG1620113 | | | | | | | |
| 06/24/2016 | TD Bank Payroll | Funds Transfer | 41,380 | | 41,380 | | | | 41,380 |
| 06/24/2016 | Transfer | Closing of Citibank; Deposit into TD DIP | | | | | | | |
| 06/24/2016 | Transfer | Funds Transfer | | | | | | | |
| 06/27/2016 | TD Bank Payroll | Funds Transfer | 486 | | 486 | | | | 486 |
| 06/27/2016 | TD Bank Payroll | O/S P/R CKS AT CLOSING OF ACCT | | | | | | | |
| 06/29/2016 | TD Bank Payroll DIP | PPE 06 25 2016 | | | | (32,730) | (96) | (32,827) | (32,827) |
| 06/30/2016 | Precision Castparts Corp | INV17486 & 17711 | | | | | | | |
| 07/01/2016 | Carpenter Technology Corp. | INV | | | | | | | |
| 07/01/2016 | Certified Alloy Products | INV | | | | | | | |
| 07/01/2016 | GENERAL WELDING | 00650532-00 | | | | | | | |
| 07/01/2016 | Pacific Particulate Ltd. | INV | | | | | | | |
| 07/02/2016 | Special Metals Corp. | INV | | | | | | | |
| 07/05/2016 | Western Australia Specialty Alloys | INV | | | | | | | |
| **Grand Total** | | | 41,866 | 100 | 41,966 | (32,730) | (96) | (32,827) | 9,139 |

**Exhibit D**

**Revised Budget**

**Hi-Temp Specialty Metals**
**13-Week Cash Flow Forecast**
**USD**

| Account Type | Account Category | Account | Actual A 6/24/2016 | Actual B 7/1/2016 | Projected 1 7/8/2016 | Projected 2 7/15/2016 | Projected 3 7/22/2016 | Projected 4 7/29/2016 | Projected 5 8/5/2016 | Projected 6 8/12/2016 | Projected 7 8/19/2016 | Projected 8 8/26/2016 | Projected 9 9/2/2016 | Projected 10 9/9/2016 | Projected 11 9/16/2016 | Projected 12 9/23/2016 | Projected 13 9/30/2016 | Projected 14 10/7/2016 | Projected 15 10/14/2016 | Total 15 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RECEIPT** | | | | | | | | | | | | | | | | | | | |
| | Cash Collections: | | | | | | | | | | | | | | | | | | | |
| | | **TOTAL RECEIPTS:** | $141,400 | $747,702 | $789,959 | $477,756 | $667,342 | $267,925 | $351,147 | $916,968 | $1,106,789 | $789,959 | $577,756 | $767,342 | $367,925 | $451,147 | $1,059,254 | $787,474 | $343,833 | $9,722,576 |
| **DISBURSEMENT** | | | | | | | | | | | | | | | | | | | |
| | Cash Payments: | Trade Accounts Payable Vendors | | $547 | $347,582 | $254,213 | $337,631 | $161,887 | $215,994 | $935,569 | $694,071 | $405,499 | $517,989 | $484,237 | $383,828 | $695,506 | $536,096 | $381,366 | $375,999 | $6,727,466 |
| | | Conversion Costs Related To Baghouse Swap **(A)** | | | $127,000 | $100,000 | $0 | $117,600 | $100,000 | $0 | $150,000 | $0 | $100,000 | $0 | $0 | $0 | $0 | $0 | $0 | $694,600 |
| | | Non-Inventory Expenses, Other Than Below | $17 | | $79,318 | $15,075 | $19,075 | $16,005 | $75,093 | $18,080 | $17,575 | $17,505 | $45,093 | $49,300 | $17,575 | $16,575 | $18,505 | $75,598 | $17,575 | $497,948 |
| | | Freight & Duties | | | $16,495 | $19,283 | $16,711 | $17,580 | $20,564 | $12,112 | $14,056 | $15,577 | $18,639 | $14,913 | $16,692 | $17,677 | $17,577 | $17,577 | $21,496 | $256,949 |
| | | Payroll, Taxes & Benefits | $33,381 | $32,827 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $36,215 | $543,231 |
| | | Commissions | | | $2,358 | $2,358 | $2,395 | $2,454 | $1,953 | $1,953 | $1,978 | $1,991 | $1,953 | $2,338 | $2,363 | $2,338 | $2,338 | $661 | $661 | $30,092 |
| | | Interest & Bank Charges | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | Bankruptcy Professional Fees | $26,717 | | | | | | | | | | | | | | | | | $0 |
| | | US Trustee Fees | | | | | | | | | | | | $5,000 | | | | | | $5,000 |
| | | Insurance Payments | | | $23,161 | $21,054 | $0 | $246 | $19,733 | $21,054 | $0 | $133,896 | $9,750 | $19,733 | $21,054 | $10,007 | $246 | $19,733 | $0 | $299,666 |
| | | Utilities | | | $4,525 | $6,905 | $2,525 | $37,025 | $4,525 | $7,655 | $2,525 | $2,525 | $39,025 | $6,905 | $2,525 | $2,525 | $37,025 | $4,525 | $6,905 | $167,645 |
| | | Rent, Auto & Equipment Leases | | | $41,804 | $2,168 | $2,461 | $1,829 | $43,519 | $0 | $2,868 | $3,061 | $41,713 | $2,335 | $2,168 | $3,761 | $529 | $43,519 | $2,168 | $193,903 |
| | | Timing Contingency | | | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $375,000 |
| | | **TOTAL DISBURSEMENTS** | $60,115 | $33,374 | $703,459 | $482,272 | $442,013 | $415,841 | $542,597 | $1,057,639 | $794,289 | $791,269 | $735,378 | $740,976 | $512,420 | $809,604 | $673,531 | $604,195 | $486,019 | $9,791,499 |
| **NET CASH FLOW** | | | $ 81,285 | $ 714,328 | $ 86,500 | $ (4,516) | $ 225,330 | $ (147,916) | $ (191,450) | $ (140,671) | $ 312,501 | $ (1,310) | $ (157,622) | $ 26,367 | $ (144,495) | $ (358,457) | $ 385,723 | $ 183,280 | $ (142,187) | $ (68,923) |

Rolling Cash Flow:

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash, Beginning of Week | | | 21,000 | $ 102,285 | $ 816,613 | $ 903,113 | $ 898,597 | $ 1,123,927 | $ 976,011 | $ 784,561 | $ 643,890 | $ 956,391 | $ 955,081 | $ 797,459 | $ 823,826 | $ 679,331 | $ 320,873 | $ 706,596 | $ 889,876 | $ 816,613 |
| Cash, End of Week | | | 102,285 | $ 816,613 | $ 903,113 | $ 898,597 | $ 1,123,927 | $ 976,011 | $ 784,561 | $ 643,890 | $ 956,391 | $ 955,081 | $ 797,459 | $ 823,826 | $ 679,331 | $ 320,873 | $ 706,596 | $ 889,876 | $ 747,689 | $ 747,689 |

(A) Conversion costs related to the Baghouse swap consists of processings costs. In connection with these transactions, local Indian rules require the exchange of payment equal to the agreed-upon value of the materials processed. The Debtor's counterparty does not take title to the materials, thus thier payment to the Debtor for the materials is simultaneously refunded by the Debtor back to the processor. The cash receipts and cash disbursements associated with these transactions have not been included in the Budget.

Draft and Preliminary

**Hi-Temp Specialty Metals**
**13-Week Cash Flow Forecast**
**USD**

| Account | A | B | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total 15 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Scenario: | Actual | Actual | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | |
| Week Ending (Friday): | 6/24/2016 | 7/1/2016 | 7/8/2016 | 7/15/2016 | 7/22/2016 | 7/29/2016 | 8/5/2016 | 8/12/2016 | 8/19/2016 | 8/26/2016 | 9/2/2016 | 9/9/2016 | 9/16/2016 | 9/23/2016 | 9/30/2016 | 10/7/2016 | 10/14/2016 | |
| Period #: | A | B | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
| **Accounts Receivable Rollforward:** | | | | | | | | | | | | | | | | | | |
| Accounts Receivable, Beginning of Week | | | 4,577,886 | 4,577,886 | 4,677,886 | 4,777,886 | 4,877,886 | 4,977,886 | 5,120,172 | 4,800,857 | 4,354,731 | 4,186,881 | 4,152,152 | 4,205,416 | 4,275,711 | 3,647,382 | 3,382,816 | 4,577,886 |
| Accrual Basis Sales | | | 789,959 | 577,756 | 767,342 | 367,925 | 451,147 | 1,059,254 | 787,474 | 343,833 | 409,906 | 732,613 | 421,189 | 521,442 | 430,925 | 522,909 | 444,637 | 8,628,310 |
| Collections | | | (789,959) | (477,756) | (667,342) | (267,925) | (351,147) | (916,968) | (1,106,789) | (789,959) | (577,756) | (767,342) | (367,925) | (451,147) | (1,059,254) | (787,474) | (343,833) | (9,722,576) |
| Accounts Receivable, End of Week | | | 4,577,886 | 4,677,886 | 4,777,886 | 4,877,886 | 4,977,886 | 5,120,172 | 4,800,857 | 4,354,731 | 4,186,881 | 4,152,152 | 4,205,416 | 4,275,711 | 3,647,382 | 3,382,816 | 3,483,620 | 3,483,620 |
| | | | | | | | | | | | | | | | | | | |
| Days Sales in Accounts Receivable Assumption | | | | | | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | |
| | | | | | | | | | | | | | | | | | | |
| **Inventory Rollforward:** | | | | | | | | | | | | | | | | | | |
| Inventory, Beginning of Week | | | 15,059,000 | 15,186,000 | 15,286,000 | 15,286,000 | 15,403,600 | 15,503,600 | 15,503,600 | 15,503,600 | 15,653,600 | 15,653,600 | 15,753,600 | 15,753,600 | 15,753,600 | 15,753,600 | 15,753,600 | 15,059,000 |
| Purchases | | | 695,164 | 508,425 | 675,261 | 323,774 | 397,009 | 932,143 | 692,977 | 302,573 | 360,717 | 644,700 | 370,646 | 458,869 | 379,214 | 460,160 | 391,280 | 7,592,913 |
| Baghouse Conversion Costs (Cash Basis) | | | 127,000 | 100,000 | - | 117,600 | 100,000 | - | - | 150,000 | - | 100,000 | - | - | - | - | - | 694,600 |
| Cost of Sales (88%) | | | (695,164) | (508,425) | (675,261) | (323,774) | (397,009) | (932,143) | (692,977) | (302,573) | (360,717) | (644,700) | (370,646) | (458,869) | (379,214) | (460,160) | (391,280) | (7,592,913) |
| Inventory, End of Week | | | 15,186,000 | 15,286,000 | 15,286,000 | 15,403,600 | 15,503,600 | 15,503,600 | 15,503,600 | 15,653,600 | 15,653,600 | 15,753,600 | 15,753,600 | 15,753,600 | 15,753,600 | 15,753,600 | 15,753,600 | 15,753,600 |
| | | | | | | | | | | | | | | | | | | |
| **Post Petition Accounts Payable:** | | | | | | | | | | | | | | | | | | |
| Post Petition Accounts Payable, Beginning of Week | | | 200,000 | 547,582 | 801,795 | 1,139,425 | 1,301,312 | 1,482,327 | 1,478,901 | 1,477,808 | 1,374,882 | 1,217,610 | 1,378,073 | 1,364,891 | 1,128,254 | 971,372 | 1,050,166 | 200,000 |
| Purchases | | | 695,164 | 508,425 | 675,261 | 323,774 | 397,009 | 932,143 | 692,977 | 302,573 | 360,717 | 644,700 | 370,646 | 458,869 | 379,214 | 460,160 | 391,280 | 7,592,913 |
| Disbursements | | | (347,582) | (254,213) | (337,631) | (161,887) | (215,994) | (935,569) | (694,071) | (405,499) | (517,989) | (484,237) | (383,828) | (695,506) | (536,096) | (381,366) | (375,999) | (6,727,466) |
| Post Petition Accounts Payable, End of Week | | | 547,582 | 801,795 | 1,139,425 | 1,301,312 | 1,482,327 | 1,478,901 | 1,477,808 | 1,374,882 | 1,217,610 | 1,378,073 | 1,364,891 | 1,128,254 | 971,372 | 1,050,166 | 1,065,447 | 1,065,447 |
| | | | | | | | | | | | | | | | | | | |
| **Calculation or Accounts Payable Disbursements:** | | | | | | | | | | | | | | | | | | |
| Total Purchases | | | 695,164 | 508,425 | 675,261 | 323,774 | 397,009 | 932,143 | 692,977 | 302,573 | 360,717 | 644,700 | 370,646 | 458,869 | 379,214 | 460,160 | 391,280 | 7,592,913 |
| 50% Assumed Paid in Cash | | | (347,582) | (254,213) | (337,631) | (161,887) | (198,505) | (466,072) | (346,489) | (151,286) | (180,359) | (322,350) | (185,323) | (229,435) | (189,607) | (230,080) | (195,640) | (3,796,456) |
| Balance to Carry 30 Day Terms | | | 347,582 | 254,213 | 337,631 | 161,887 | 198,505 | 466,072 | 346,489 | 151,286 | 180,359 | 322,350 | 185,323 | 229,435 | 189,607 | 230,080 | 195,640 | 3,796,456 |
| Payment of Purchases Subject to Credit Terms | | | | | | | 17,490 | 469,498 | 347,582 | 254,213 | 337,631 | 161,887 | 198,505 | 466,072 | 346,489 | 151,286 | 180,359 | 2,931,009 |
| Total Accounts Payable Disbursements | | | 347,582 | 254,213 | 337,631 | 161,887 | 215,994 | 935,569 | 694,071 | 405,499 | 517,989 | 484,237 | 383,828 | 695,506 | 536,096 | 381,366 | 375,999 | 6,727,466 |
| | | | | | | | | | | | | | | | | | | |
| **Accrued Restructuring Fees:** | | | | | | | | | | | | | | | | | | |
| Accrued Restructuring Fees, Beginning of Week | | | 42,500 | 78,500 | 101,500 | 126,500 | 156,500 | 182,500 | 195,000 | 224,000 | 239,000 | 269,000 | 295,000 | 310,000 | 339,000 | 424,340 | 450,340 | 42,500 |
| Fees Accrued | | | 36,000 | 23,000 | 25,000 | 30,000 | 26,000 | 12,500 | 29,000 | 15,000 | 30,000 | 26,000 | 15,000 | 29,000 | 85,340 | 26,000 | 12,500 | 420,340 |
| Fees Paid | | | | | | | | | | | | | | | | | | - |
| Accrued Restructuring Fees, End of Week | | | 78,500 | 101,500 | 126,500 | 156,500 | 182,500 | 195,000 | 224,000 | 239,000 | 269,000 | 295,000 | 310,000 | 339,000 | 424,340 | 450,340 | 462,840 | 462,840 |