**DICONZA TRAURIG KADISH LLP**
630 Third Avenue
New York, New York 10017
Gerard DiConza
Lance A. Schildkraut
Tel: (212) 682-4940
Email:   gdiconza@dtklawgroup.com
         las@dtklawgroup.com

*Proposed Counsel for Debtor and*
*Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                          :        Chapter 11
                                                :
HI-TEMP SPECIALTY METALS, INC.,                 :        Case No. 16-72767-las
                                                :
                                  Debtor.       :
-------------------------------------------------------------x

### APPLICATION FOR AN ORDER AUTHORIZING THE DEBTOR TO RETAIN TOBY J. KREIDLER AS CHIEF RESTRUCTURING OFFICER FOR HI-TEMP SPECIALTY METALS, INC. *NUNC PRO TUNC* TO JULY 11, 2016

TO THE HONORABLE LOUIS A. SCARCELLA,
UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtor and debtor-in-possession (the "Debtor") files this application

(the "Application") for entry of an order substantially in the form attached hereto as Exhibit A

(the "Order") authorizing the Debtor to retain and employ Toby J. Kreidler as Chief

Restructuring Officer ("CRO"), and in support, states as follows:

### JURISDICTION

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are §§ 105(a) and 363(b) of title

11 of the United States Code (the "Bankruptcy Code"), Rule 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(a) of the Local Bankruptcy

Rules for the Eastern District of New York (the "Local Bankruptcy Rules").

## BACKGROUND[1]

3.      On June 22, 2016 (the "Petition Date"), Debtor filed with this Court a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is operating its business

and managing its properties as debtor in possession pursuant to §§ 1107(a) and 1108 of the

Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this

chapter 11 case, and no committees have been appointed or designated.

4.      On July 13, 2016, the United States Trustee appointed a committee of unsecured

creditors in this case (the "Committee").

5.      The Debtor is a recycler and provider of specialty recycled metals for the super

alloy industry.  The Debtor recycles metals in a manner that eliminates the need to source

material from ore in mines, and then upgrades the material into pure forms.  The Debtor obtained

and maintains material approvals from many of the world's largest manufacturers of super alloys

where it is authorized and approved to provide scrap and recycled material instead of virgin

material.  In this industry, the Debtor is the largest manufacturer of such material in the world,

and is an essential part of the supply chain for many domestic U.S. manufacturers of precision

cast parts.

6.      The Debtor and its senior secured lender, Wells Fargo Bank, National Association

("Wells Fargo") are in discussions over proposed debtor-in-possession financing and the

Debtor's emergency and limited use of cash collateral.  In furtherance of its negotiations with

---

[1]      A detailed description of the Debtor's businesses and the reasons for the filing of this chapter 11 case and for the relief sought in this Application are set forth in the Declaration of Joseph Smokovich pursuant to Eastern District of New York Local Bankruptcy Rule 1007-4 filed on June 22, 2016 [Docket No. 2] ("First-Day Declaration").

Wells Fargo, the Debtor is required to seek approval for the employment of a qualified CRO. Wells Fargo has indicated that it approves the designation of Toby Kreidler to serve as the Debtor's CRO.  Mr. Kreidler's credentials and experience, as set forth below, qualify him to act as CRO.

## **RELIEF REQUESTED**

7.      The Debtor respectfully requests entry of an order, substantially in the form of the Order attached hereto as <u>Exhibit A</u>, authorizing and approving the employment of Toby Kreidler as CRO for the Debtor *nunc pro tunc* to July 11, 2016.

8.      In addition to the proposed engagement of Mr. Kreidler, the Debtor previously filed an application to retain CohnReznick Capital Market Securities, LLC ("<u>CRCMS</u>") to provide investment banking services to the Debtor.  In addition, on July 1, 2016, the Debtor filed an application (Dkt. No. 26) to retain CohnReznick LLP ("<u>CohnReznick</u>") to serve as the Debtor's financial advisor, *nunc pro tunc*, to the Petition Date (the "<u>CohnReznick Application</u>"). As Mr. Kreidler will provide substantially the same services as CohnReznick, the Debtor and CohnReznick have agreed that CohnReznick will no longer provide services after July 10, 2016 and CohnReznick will not seek compensation for services after July 10, 2016.  Accordingly, the Debtor will request that the order approving the CohnReznick Application be modified to limit the CohnReznick retention as financial advisor from the Petition Date through July 10, 2016. CRCMS will continue to serve as the Debtor's investment banker.

9.      With the proposed modification to the CohnReznick retention, the Debtor believes that the services to be provided by Mr. Kreidler will not duplicate the services that other professionals will be providing to the Debtor in this case.

A.    **Mr. Kreidler's Qualifications**

10.    Mr. Kreidler has extensive financial analysis and restructuring experience.  Mr. Kreidler's experience includes significant familiarity with the operations of the Debtor.  Prior to the Petition Date, the Debtor retained the services of Calibre as consultant and Mr. Kreidler served in a more limited capacity as a consultant to the Debtor.

11.    In addition to his prior role with the Debtor, Mr. Kreidler has extensive experience in the metals industry and is familiar with product sourcing, inventory management and market issues faced by metals companies.  More specifically, Mr. Kreidler previously served as a strategic advisor to a Pittsburgh scrap company and Colt Manufacturing Company, LLC and as the investment banker for debtors in *In re Ormet Corporation et. al.* and *In re WP Steel Venture LLC, et al.*, successfully leading those companies through the chapter 11 process.  Additionally, Mr. Kreidler and the Calibre team manage a proprietary investment Miami Valley Steel, a steel service center providing them additional insight into the industry and issues facing managers of metals companies.  As a result, the Debtor believes that Mr. Kreidler is duly qualified to serve as CRO in this case and that the services of Mr. Kreidler are necessary and essential to the Debtor's emergence from bankruptcy.

**B.**    <u>Services to Be Provided</u>

12.    Subject to the Court's approval, the Debtor and Calibre Group, LLC ("<u>Calibre Group</u>") entered into an engagement letter (the "<u>Engagement Letter</u>"), a copy of which is attached hereto as <u>Exhibit B</u>, pursuant to which Calibre Group will provide Mr. Kreidler to serve as the Debtor's CRO.  The terms of the Engagement Letter were approved by and executed by Mr. Joseph Smokovoich, the Debtor's Chief Executive Officer and sole member of the Debtor's board of directors.

13.    Subject to entry of the proposed Order and consistent with the terms of the Engagement Letter, Mr. Kreidler will serve as the CRO of the Debtor.  The duties of Mr. Kreidler will include, without limitation, the following:

(a)    Preparing, updating and monitoring the Debtor's 13 week cash flow model and budget;

(b)    With the assistance of the Debtor's CEO, developing and implementing the restructuring plan;

(c)    Leading all the Debtor's treasury management functions including control over disbursements of Debtor's monies, assets or other value;

(d)    Monitoring all aspects of the Debtor including commercial, procurement, production, logistics and inventory;

(e)    Assisting the Debtor in its chapter 11 case, including the preparation and oversight of its financial statements and schedules related to the bankruptcy process, including monthly operating reports;

(f)    Communicating with the Debtor's stakeholders, including but not limited to, vendors, customers, employees, lenders, creditor committees, Court officials, attorneys and other service providers, as required; and

(g)    Overseeing and working with the Debtor and its retained investment banking professionals in pursuing any refinancing or sale options.

**C.**    <u>Professional Compensation</u>

14.    The principal terms of Calibre Group's engagement are as follows:

(a)	Calibre Group shall be paid (i) $40,000 each week for the first four (4) weeks following entry of the attached Order; and (ii) $25,000 for each week thereafter; plus (iii) 1.5% of any Capital Raise (as defined in the Engagement Letter) or 2% of the value of a sale of the Debtor (with any such fee being paid only after application to the Court pursuant to section 330 of the Bankruptcy Code);

(b)	the Debtor shall reimburse Calibre Group for all reasonable out-of- pocket expenses incurred in connection with this assignment including without limitation legal fees and expenses incurred by Calibre Group; provided, however, that any expenses in excess of $5,000 must be approved in writing by the Debtor; and

(c)	The Debtor shall specifically include employees and agents of Calibre Group serving as directors or officers of the Debtor with direct coverage under the Debtor's liability insurance covering officers and directors; and (ii) maintain such insurance policies through the period in which claims can be made against any such employees or agents of Calibre Group.

15.	Calibre Group will file with the Court a monthly statement of compensation received from the Debtor in connection with the services to be provided under the Engagement Letter, but will not apply to the Court for approval of amounts paid.  Calibre Group will be paid weekly by the Debtor for its services and expenses on the terms set forth in the Engagement Letter.  The Debtor will not seek authority to engage Mr. Kreidler or Calibre Group as a professional under section 327 of the Bankruptcy Code in its chapter 11 case.

16.	The Debtor believes that this compensation is fair and reasonable in light of the industry practice and market rates, Mr. Kreidler's experience in comparable cases, and the scope of work to be performed.

17.     Calibre Group and Mr. Kreidler have agreed to waive any unpaid and owed amount for services performed or expenses incurred prior to the commencement of the Debtor's chapter 11 case and, thus, neither Calibre Group nor Mr. Kreidler is a prepetition creditor of the Debtor.

**D.     <u>Indemnification</u>**

18.     In addition to any insurance policies carried by the Debtor that would cover Mr. Kreidler and other employees and agents of Calibre Group, the Engagement Letter further provides that the Debtor will indemnify and hold harmless Calibre Group and its employees and agents from and against any and all losses, claims, damages, liabilities, penalties, judgments, awards, costs, fees, expenses and disbursements, directly or indirectly caused by, relating to, based upon, arising out of or in connection with this engagement of Mr. Kreidler as CRO by the Debtor or the performance by Mr. Kreidler and Calibre Group of any services rendered pursuant to such engagement, unless there is a final non-appealable order of a Court of competent jurisdiction, at the trial level, finding Mr. Kreidler or Calibre Group directly liable for gross negligence or willful misconduct (the "<u>Indemnification Provisions</u>"), which provisions are defined in the Engagement Letter.

19.     The terms of the Indemnification Provisions were fully negotiated between the Debtor and Calibre Group at arm's length and the Debtor respectfully submit that the Indemnification Provisions are reasonable and appropriate.   Accordingly, as part of this Application, the Debtor requests that this Court approve the Indemnification Provisions.

**E.   <u>Calibre Group's and Mr. Kreidler's Disinterestedness</u>**

20.     To the best of the Debtor's knowledge, information, and belief, neither Mr. Kreidler nor Calibre Group has any connection with or any interest adverse to the Debtor,

Debtor's significant creditors, or any other significant party in interest known to Calibre Group,

Mr. Kreidler, or their respective attorneys and accountants.  The Debtor submits that Calibre

Group and Mr. Kreidler are otherwise a "disinterested person" as that term is defined by section

101(14) of the Bankruptcy Code.  As set forth on the Declaration of Toby Kreidler annexed

hereto as <u>Exhibit C</u>, Wells Fargo, the Debtor's largest creditor, is the secured lender to Miami

Valley Steel, a steel service center controlled by an investment vehicle managed by Calibre

Group.  One of Calibre's principals is a significant shareholder in Miami Valley and two of

Calibre's principals serve on the board of directors.  Miami Valley processes carbon steel and is

not a competitor or creditor of the Debtor.

## **<u>BASIS FOR RELIEF</u>**

21.     The Debtor seeks approval of the employment of Mr. Kreidler pursuant to section

363 of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides in relevant part

that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary

court of business, property of the estate." 11 U.S.C. § 363(b)(1).  Further, pursuant to section

105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

22.     Under applicable case law, in this and other circuits, if a debtor's proposed use of

its assets pursuant to § 363(b) of the Bankruptcy Code represents a reasonable business judgment

on the part of the debtor, such use should be approved.  *See, e.g., Comm. of Equity Sec. Holders*

*v. Lionel Corp*. (*In re Lionel Corp*.), 722 F.2d 1063, 1070 (2d Cir. 1983) ("The rule we adopt

requires that a judge determining a § 363(b) application expressly find from the evidence

presented before him at the hearing a good business reason to grant such an application.");

*Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp*. (*In re JohnsManville Corp*.), 60

B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").

23.     The retention of Mr. Kreidler is a sound exercise of the Debtor's business judgment.  Mr. Kreidler has extensive experience analyzing and serving as an advisor for many troubled companies, and has significant, unique experience with the Debtor.  The Debtor believes that Mr. Kreidler will provide services that benefit the Debtor's estate and creditors.

24.     Based upon the foregoing, the Debtor submits that the relief requested herein is essential, appropriate, and in the best interest of the Debtor's estate and creditors and, therefore, should be granted.

### THE COURT SHOULD WAIVE BANKRUPTCY RULES 6004(a) AND (h)

25.     To avoid irreparable harm, the Debtor seeks immediate implementation of the relief requested in the Application.  As such, the Debtor seeks a waiver of the notice requirements set forth in Bankruptcy Rule 6004(a).  Additionally, and to the extent applicable, the Debtor seeks a waiver of the fourteen-day stay of any order authorizing the use, sale, or lease of property set forth in Bankruptcy Rule 6004(h).

### RESERVATION OF RIGHTS

26.     Nothing contained is intended to or shall be construed as (1) an admission as to the validity of any claim against the Debtor, (2) a waiver of the Debtor's or any appropriate party in interest's rights to dispute any claim, or (3) an approval or assumption of any agreement, contract, program, policy, or lease under § 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and shall not be construed as an admission to the validity of any claim or a waiver of the

9

Debtor's rights to dispute such claim subsequently.

## NO PREVIOUS REQUEST

28.     No prior motion for the relief requested herein has been made by the Debtor to this or any other court.

## NOTICE

29.     Notice of this Application has been given to:  (i) the Office of the United States Trustee; (ii) counsel for Wells Fargo, the Debtor's pre-petition secured lender; (iii) the Debtor's 20 largest unsecured creditors; (iv) those parties having filed a notice of appearance in the Debtor's case; (v) the Debtor's taxing authorities; and (vi) all parties known to assert liens in any of the Debtor's assets.  In light of the nature of the relief requested, the Debtor submits that no further notice need be given.

**WHEREFORE**, the Debtor respectfully request entry of the Order, substantially in the form attached hereto as Exhibit A, (i) approving the Application in its entirety; (ii) authorizing the Debtor to retain Toby Kreidler as CRO for the Debtor *nunc pro tunc* to July 11, 2016; and (iii) granting such further relief as is necessary or appropriate.

Dated:  July 18, 2016
          Yaphank, New York

                                    Respectfully submitted,

                                    HI-TEMP SPECIALTY METALS, INC.

                                    By: _____
                                         Joseph Smokovich
                                    Its   President & CEO

                                    DICONZA TRAURIG KADISH LLP
                                    Proposed Counsel for the Debtor

                                    By: _____
                                         Gerard DiConza

630 Third Avenue
New York, New York 10017
Email:  gdiconza@dtklawgroup.com

**<u>Exhibit A</u>**
**(Proposed Order)**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                              :          Chapter 11
                                                    :
HI-TEMP SPECIALTY METALS, INC.,                     :          Case No. 16-72767-las
                                                    :
                                      Debtor.       :
------------------------------------------------------------x

## ORDER AUTHORIZING THE DEBTOR TO RETAIN TOBY J. KREIDLER AS CHIEF RESTRUCTURING OFFICER *NUNC PRO TUNC* TO JULY 11, 2016

Upon the application (the "Application")[1] of Hi-Temp Specialty Metals, Inc., the debtor

and debtor-in-possession (the "Debtor"), pursuant to §§ 105(a) and 363, of title 11 of the United

States Code (the "Bankruptcy Code"), Rule 6004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rule 9013-1(a) of the Local Bankruptcy Rules for the Eastern

District of New York (the "Local Bankruptcy Rules") for entry of an order authorizing and

approving the employment of Toby J. Kreidler as Chief Restructuring Officer ("CRO") for the

Debtor *nunc pro tunc* to July 11, 2016; and the Court having jurisdiction to consider the

Application and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and

consideration of the Application and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; and the Court having found that the Debtor provided appropriate notice of the

Application and the opportunity for a hearing on the Application under the circumstances; and

upon the Declaration of Joseph Smokovich pursuant to Eastern District of New York Local

Bankruptcy Rule 1007-4 filed on June 22, 2016 [Docket No. 2] (**"First-Day Declaration"**); and

the record of the Hearing and all of the proceedings had before the Court; and the Court having

---

[1]    Capitalized terms used herein but not otherwise defined shall have the meanings given to them in the
Application.

found and determined that the relief sought in the Application in the best interests of the Debtor, its estate, creditors, and all parties in interest; and that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

**ORDERED** that the Application is approved in its entirety, as provided herein; and it is further

**ORDERED** that, pursuant to §§ 105(a) and 363 of the Bankruptcy Code, the Debtor is authorized to engage Mr. Kreidler as CRO on the terms described in the Application and Engagement Letter with Calibre Group, LLC *nunc pro tunc* to July 11, 2016, subject to the following terms, which apply notwithstanding anything in the Application or any exhibits related thereto to the contrary:

(a)  Mr. Kreidler shall not act in any other capacity other than as the Debtor's CRO in connection with the Debtor's chapter 11 case;

(b)  in the event the Debtor seeks to have Mr. Kreidler assume executive officer positions that are different from the positions disclosed in the Application, or to materially change the terms of the engagement by either modifying the functions of his engagement or altering or expanding the scope of the engagement, an application to modify the engagement shall be filed;

(c)  Mr. Kreidler shall file with the Court, and provide notice to the United States Trustee and all official committees, reports of compensation earned and expenses incurred on a monthly basis.  Such reports shall contain summary charts which describe the services provided, identify the compensation earned, and itemize the expenses incurred;

(d)      all compensation shall be subject to review by the Court in the event an objection is filed;

(e)      the Debtor is permitted to indemnify Calibre Group, LLC, its employees and agents in accordance with the terms of the Engagement Letter;

(f)      to the extent Calibre Group or Mr. Kreidler seek payment of a success or bonus fee as set forth in the Application, such fee shall be subject to Bankruptcy Court approval pursuant to an application under section 330 of the Bankruptcy Code; and

(g)      Mr. Kreidler and Calibre Group, LLC shall have a continuing obligation to disclose any and all facts that may have a bearing on whether they hold or represent any interest adverse to the Debtor, its creditors or other parties in interest; and it is further

**ORDERED** that notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party; and it is further

**ORDERED** that the requirements of Bankruptcy Rule 6004(a) are hereby waived; and it is further

**ORDERED** that notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and it is further

**ORDERED** that the Debtor is authorized to take all steps necessary to carry out this Final Order; and it is further

**ORDERED** that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**<u>Exhibit B</u>**
**(Engagement Letter)**

July *11*, 2016

**PERSONAL AND CONFIDENTIAL**

Joseph Smokovich
Hi-Temp Specialty Metals
355 Sills Road
Yaphank, NY 11980

Dear Mr. Smokovich:

This letter sets forth the agreement ("**Agreement**") between Calibre Group, LLC, a Delaware limited liability company ("**Calibre**"), and Hi-Temp Specialty Metals (hereinafter the "**Company**" or the "**Client**") for the engagement of Calibre to provide the Chief Restructuring Officer of the Company to assist it in its restructuring as described below. Calibre understands that the Company filed for protection under Chapter 11 of the United States Bankruptcy Code on June 22, 2016 and that is retention will be subject to the approval of the Bankruptcy Court.

1.      Retention.  Subject to Calibre's confirmation that the Company has a directors and officers liability insurance policy in accordance with the section titled "Insurance" set forth below regarding directors and officers liability insurance coverage, and a copy of the signed Board of Directors' resolution as official confirmation of the appointment, Calibre will provide Mr. Toby Kreidler to serve as the Company's Chief Restructuring Officer ("**CRO**"), reporting to the Board of Directors. Working collaboratively with the senior management team, the Board of Directors and other Company professionals, Mr. Kreidler will assist the Company in evaluating and implementing strategic and tactical options through the restructuring process.

Subject to the terms and conditions of this Agreement, and after conferring with the Company, Calibre will be responsible for

- Preparing, updating and monitoring the company's 13 week cash flow model and budget;
- With the assistance of the Company's CEO, developing and implementing the restructuring plan;

- Leading all Treasury management functions including control over disbursements of Company monies, assets or other value;

- Monitoring all aspects of the company including commercial, procurement, production, logistics and inventory

- Assisting the Company in its Chapter 11 proceedings, including the preparation and oversight of its financial statements and schedules related to the bankruptcy process;

- Communicating with the Company's stakeholders, including but not limited to, vendors, customers, employees, lenders, creditor committees, Court officials, attorneys and other service providers, as required; and

- Overseeing and working with the Company and its retained investment banking professionals in pursuing any refinancing or sale options.

In furtherance of the objectives of this engagement, it is agreed by the Company that Wells Fargo Bank N.A. (the "Bank") in their role as lender to the Company per the Existing Credit Agreement, shall have reasonable access to Company records and documents that, within the discretion of Calibre, in consultation with the Company, are appropriate for disclosure to the Bank, including reports generated by the CRO. In this regard, the Bank shall be able to communicate with Mr. Kreidler in his role as CRO for the Company, and other Calibre employees.

2.    Information.   In connection with Calibre's activities hereunder, the Company will directly furnish Calibre with, to the extent practicable, all material and information regarding the business and financial condition of the Company (the "Information"). In addition, the Company shall provide Calibre with access to the Company's officers and employees. The Company represents and warrants to Calibre that all Information made available to Calibre hereunder will, when delivered, to the best of its knowledge, be complete and correct in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are or will be made.    The Company further represents and warrants that any projections and other forward-looking information provided by it to Calibre will have been prepared in good faith and will be based upon assumptions which, in light of the circumstances under which they are made, are reasonable. The Company recognizes and confirms that Calibre: (i) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same; (ii) does not assume responsibility for the accuracy or completeness of the Information and such other information; (iii) will not make an appraisal of any assets of the Company and (iv) retains the right to continue to perform due diligence during the course of the engagement. Any advice rendered by Calibre pursuant to this Agreement may not be disclosed publicly without Calibre's prior written consent. Calibre will treat confidentially any material non-public Information relating to the Company provided by the Company to Calibre during this engagement, except (a) as required in order to perform our services

under this engagement, including disclosing such information to its officers, employees, agents and other constituents subject to a non-disclosure agreement as necessary to provide the services contemplated hereunder, (b) as such information becomes publicly available other than by disclosure by Calibre in violation of the terms hereof or by a party known by Calibre to be subject to a confidentiality agreement with the Company and in violation of the terms thereof, (c) to assert any defenses available under the various state and federal securities laws, including, without limitation, "due diligence" defenses or (d) otherwise required by law or judicial or regulatory process, provided, that, Calibre shall promptly notify the Company in writing of such requirement so that the Company may seek, at its own expense, an appropriate protective order.

3.    Compensation.  As consideration for Calibre's services pursuant to this Agreement, the Company agrees that Calibre shall be entitled to the following compensation, which shall be paid in cash:

    (a) *Weekly Fee*.  On each of the first four weekly anniversaries of this agreement, the Company shall pay to Calibre a cash fee of forty thousand dollars ($40,000.00) per week.  On each weekly anniversary thereafter, the Company shall pay to Calibre a cash fee of twenty-five thousand dollars ($25,000) per week; and

    (b) *Success Fee*.  In the event the Company successfully raises any form of Capital or is sold, on the closing date of any Capital Raise or sale during the Term the Company shall pay Calibre a cash fee equal to 1.5% of any capital raised or 2% of value of the sale of the company.  For the avoidance of doubt, the success fee shall not be netted against weekly fees.

4.    Expenses.  In addition to payment to Calibre of the compensation set forth in Section 3 hereof, the Company shall reimburse Calibre for all reasonable expenses, including, without limitation, legal fees and expenses and expenses of counsel to Calibre.  Any expense in excess of $5,000.00 must be approved in writing by the Company to be reimbursed (including, without limitation, fees and disbursements of counsel, all travel expenses, and all other out-of-pocket expenses) incurred by Calibre in connection with its engagement hereunder.    Following the request and written approval, Calibre will provide the Company an invoice and copies of receipts pursuant to its expenses.  Nothing herein shall be construed to limit the Company's obligations under the indemnification provisions attached hereto as Exhibit A.

5.    Insurance. The Company shall specifically include and cover employees and agents serving as directors or officers of the Company or affiliates from time to time with direct coverage under the Company's policy for liability insurance covering its directors, officers and any equivalently placed employees ("D&O insurance"). Prior to Calibre accepting any officer position, the Company

shall, at the request of Calibre, provide Calibre a copy of its current D&O policy, a certificate of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other documents as Calibre may reasonably request evidencing the appointment and coverage of the indemnities. The Company will maintain such D&O insurance coverage for the period through which claims can be made against such persons. The Company disclaims a right to distribution from the D&O insurance coverage with respect to such persons. In the event that the Company is unable to include Calibre employees and agents under the Company's policy or does not have first-dollar coverage reasonably acceptable to Calibre in effect (e.g., there are outstanding or threatened claims against officers and directors alleging prior acts that may give rise to a claim), Calibre may, at its option, attempt to purchase a separate D&O insurance policy acceptable to the Company that will cover Calibre employees acting as an officer of the Company, in which case the cost of the policy shall be invoiced to the Company as an out-of-pocket expense. If Calibre is unable or unwilling to purchase such D&O insurance, then Calibre reserves the right to terminate the Agreement.

The Company represents and warrants to Calibre that its by-laws or other corporate governance documents provide for indemnification by the Company of its officers in the manner provided therein. The Company agrees not to amend or modify such corporate governance documents insofar as they provide indemnification to the CRO and the Temporary Staff without the CRO's prior written consent.

Notwithstanding anything to the contrary, the Company's indemnification and advancement obligations shall be primary to (and without allocation against) any similar indemnification and advancement obligations of Calibre, its affiliates and insurers to the indemnities (which shall be secondary), and the Company's D&O insurance coverage for the indemnities shall be specifically primary to (and without allocation against) any other valid and collectible insurance coverage that may apply to the indemnities (whether provided by Calibre or otherwise).

If Calibre personnel are required by applicable law, legal process or government action to produce information or testimony as a witness with respect to this Agreement, the Company shall reimburse Calibre for any professional time and expenses (including reasonable external and internal legal costs) incurred to respond to the request.

6.    <u>Indemnification</u>.  The Company agrees to indemnify Calibre in accordance with the indemnification and other provisions attached to this Agreement as <u>Exhibit A</u> (the "**Indemnification Provisions**"), which provisions are incorporated herein by reference and shall survive the termination or expiration of this Agreement.

7.    <u>Other Activities</u>.  The Company acknowledges that Calibre may have been, and may in the future be, engaged to provide services as a placement agent, finder, advisor and investment banker

to other companies in the industry in which the Company is involved. The Company acknowledges and agrees that nothing contained in this Agreement shall limit or restrict the right of Calibre or of any member, manager, officer, employee, agent or representative of Calibre, to be a member, manager, partner, officer, director, employee, agent or representative of, investor in, or to engage in, any other business, whether or not of a similar nature to the Company's business, nor to limit or restrict the right of Calibre to render services of any kind to any other corporation, firm, individual or association. Calibre may, but shall not be required to, present opportunities to the Company.

8.    _Termination_. Calibre may terminate this Agreement at any time upon 10 days' prior written notice to the Company, and the Company may terminate this Agreement upon 10 days' prior written notice to Calibre at any time. The date upon which such termination occurs shall be referred to herein as the "**Termination Date**" and the period beginning on the date hereof and ending on the Termination Date shall be referred to herein as the "**Term**." Upon either such termination, the Company shall pay and deliver to Calibre all compensation earned and expenses incurred through the Termination Date pursuant to any provision of Sections 3 and 4 hereof.

9.    _Notices_. All notices provided hereunder shall be given in writing and either delivered personally or by overnight courier service or sent by certified mail, return receipt requested, or by facsimile transmission to Calibre Group, LLC 707 Grant Street, Suite 2320, Pittsburgh, Pennsylvania 15219, and if to the Company, to the address, set forth on the first page of this Agreement. Any notice delivered personally shall be deemed given upon receipt; any notice given by overnight courier shall be deemed given on the next business day after delivery to the overnight courier; and any notice given by certified mail shall be deemed given upon the second business day after certification thereof.

10.    _Governing Law; Jurisdiction; Waiver of Jury Trial_. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be fully performed therein, without regard to conflicts of law principles. The Company irrevocably submits to the exclusive jurisdiction of any court of the State of New York or the United States District Court for the District of New York for the purpose of any suit, action or other proceeding arising out of this Agreement, or any of the agreements or transactions contemplated hereby, which is brought by or against the Company, and agrees that service of process in connection with any such suit, action or proceeding may be made upon the Company in accordance with Section 9 hereof. THE PARTIES HEREBY EXPRESSLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING UNDER THIS AGREEMENT AND AGREE THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT.

11.    _Amendments_. This Agreement may not be modified or amended except in a writing duly executed by the parties hereto.

12.    <u>Independent Contractor; Nondisclosure of Confidential Information</u>.  Calibre has been retained under this agreement as an independent contractor with duties owed solely to the Company and nothing in this Agreement or the nature of the Calibre's services shall be deemed to create a fiduciary or agency relationship between the Company and Calibre.  The advice, written or oral, rendered by Calibre pursuant to this Agreement is intended solely for the benefit and use of the Company in considering the matters to which this agreement relates, and the Company agrees that such advice may not be relied upon by any other person, used for any other purpose, reproduced, disseminated, or referred to at any time, in any manner or for any purpose, nor shall any public references to Calibre be made by the Company, without the prior written consent of Calibre, which consent shall not be unreasonably withheld.

13.    <u>Press Announcements</u>. The Company agrees that Calibre shall, upon a successful transaction, have the right to place advertisements in financial and other newspapers and journals and websites, with prior written consent at its own expense describing its services to the Company hereunder.  The foregoing shall also include placement of a tombstone on the Calibre corporate website and marketing materials.  Conversely, the Company agrees that it shall not use Calibre's name, nor the name of any of its employees, representatives or Affiliates in any public manner without prior written consent from Calibre.

14.    <u>Headings</u>.  The section headings in this Agreement have been inserted as a matter of reference and are not part of this Agreement.

15.    <u>Successors and Assigns</u>.  The benefits of this Agreement shall inure to the parties hereto, their respective successors and assigns and to the indemnified parties hereunder and their respective successors and assigns, and the obligations and liabilities assumed in this Agreement shall be binding upon the parties hereto and their respective successors and assigns.  Notwithstanding anything contained herein to the contrary, neither Calibre nor the Company shall assign any of its obligations hereunder without the prior written consent of the other party.  Any securities transactions will be conducted through Calibre Group's subsidiary, Calibre Group Securities.   All rights and obligations will be shared by Calibre Group Securities.

16.    <u>Waiver</u>.  Any waiver or any breach of any of the terms or conditions of this Agreement shall not operate as a waiver of any other breach of such terms or conditions or of any other term or condition, nor shall any failure to insist upon strict performance or to enforce any provision hereof on any one occasion operate as a waiver of such provision or of any other provision hereof or a waiver of the right to insist upon strict performance or to enforce such provision or any other provision on any subsequent occasion.  Any waiver must be in writing.

17.    <u>No Third Party Beneficiaries</u>.   This Agreement does not create, and shall not be construed as creating, any rights enforceable by any person or entity not a party to this Agreement, except those entitled to the benefits of the Indemnification Provisions.  Without limiting the foregoing, the Company acknowledges and agrees that Calibre has been retained under this Agreement as an independent contractor, and is not being engaged as and shall not be deemed to be a fiduciary to any party.

18.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all of which taken together shall constitute one and the same agreement.   Electronically transmitted signatures shall be deemed to be original signatures for all purposes.

19.    <u>Severability</u>.   The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

20.    <u>No Presumption Against Drafter</u>.  The Parties acknowledge and agree that the terms and provisions of this Agreement have been negotiated and discussed between them, and that this Agreement reflects their mutual agreement regarding the subject matter of this Agreement. Because of the nature of such negotiations and discussions, neither party shall be deemed to be the drafter of this Agreement, and therefore no presumption for or against the drafter shall be applicable in interpreting or enforcing this Agreement.

[Remainder of Page Intentionally Blank]

If the foregoing correctly sets forth our agreement, please sign the enclosed copy of this Agreement in the space provided below and return it to us.

Very truly yours,

CALIBRE GROUP, LLC

By: ______________________

Name: Toby Kreidler

Title: Principal

Agreed to and accepted this 11th day of [July, 2016]

Hi-Temp Specialty Metals, Inc

By: ______________________

Name: Joseph Smokovich

Title: President

EXHIBIT A

INDEMNIFICATION PROVISIONS

Capitalized terms used in this Exhibit shall have the meanings ascribed to such terms in the Agreement to which this Exhibit is attached.

The Company agrees to indemnify and hold harmless Calibre and each of the other Indemnified Parties (as hereinafter defined) from and against any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements whatsoever, and any and all actions, suits, proceedings and investigations in respect thereof (including, without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing, pursing or defending any such action, suit or proceeding (to which Indemnified Party (as defined below) is a party thereto)) (collectively, "Losses"), directly, caused by, based upon, arising out of, or in connection with (i) any act or omission by Calibre in connection with its acceptance of or the performance  or non-performance of its obligations under the Agreement, (ii) any breach by the Company of any representation, warranty, covenant or agreement contained in the Agreement (or in any instrument, document or agreement relating thereto), (iii) any untrue statement or alleged untrue statement of any material fact contained in an offering memorandum or other offering documentation, any Form D delivered to an investor or prospective investor or filed with any government body, agency or authority, any blue sky law application, any information, statement or material delivered or distributed to, or filed with, any investor or prospective investor or government body, agency or authority with respect to any financing or any amendment or supplement thereto (collectively, "Offering Material"), or (iv) the omission or alleged omission to state in any Offering Material a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, however, that the Company shall not be liable in any case to the extent that any such Losses are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence or willful misconduct of the Indemnified Party seeking indemnification hereunder; provided further, however, that the Company shall not be liable in any case under items (iii) and (iv) to the extent that any such Losses arise out of or are based upon an untrue statement or alleged untrue statement or omission or alleged omission made in the Offering Material in reliance upon and in conformity with written information furnished to the Company by Calibre specifically for use in the preparation of the Offering Material.  The Company will reimburse each Indemnified Party for all expenses (including reasonable counsel fees and expenses) as they are incurred in connection with the investigation of, preparation for, or defense of any pending or threatened claim, action or proceeding, and in pursuing any claim for indemnification or reimbursement under the Agreement.  The Company also agrees that

no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the engagement of Calibre by the Company or for any other reason, except to the extent that any such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct.

The term "lndemnified Parties" shall mean Calibre and its affiliates and their respective managers, members, partners, directors, officers, stockholders, employees, legal counsel, agents and controlling persons (within the meaning of the Securities Act and the Securities Exchange Act of 1934, as amended).  These indemnification provisions shall be in addition to any liability, which the Company may otherwise have to any Indemnified Party.

If any action, suit, proceeding or investigation (a "Claim") is commenced as to which an Indemnified Party proposes to demand indemnification, it shall promptly notify the Company in writing; provided, however, that any failure by an Indemnified Party to notify promptly the Company (i) shall not relieve the Company from any liability which it may have to any Indemnified Party unless, and only to the extent that, the Company did not otherwise learn of such Claim and the Company shall have been prejudiced materially by such failure and (ii) will not, in any event, relieve the Company from any obligations to any Indemnified Party other than the particular item for which indemnification is being sought.  In case any such Claim shall be brought against such Indemnified Party and it shall notify the Company of the commencement thereof, the Company shall be entitled to participate in, and, to the extent that it shall wish, to assume the defense thereof, with counsel selected by the Company but satisfactory to the Indemnified Party.  After the Indemnified Party shall have received written notice from the agreed upon counsel that the defense of the Claim has been assumed, the Company shall not be responsible for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof, other than reasonable costs of investigation or those incurred by the Indemnified Party at and after such time, if ever, when the Company shall have ceased to diligently prosecute the indemnified matter to conclusion.  Notwithstanding the two immediately preceding sentences, the Indemnified Party shall have the right to employ separate counsel (including local counsel) with respect to the defense of a Claim, and the Company shall bear the reasonable fees, costs and expenses of such separate counsel if (a) the use of counsel chosen by the Company to represent the Indemnified Party would present such counsel with a conflict of interest, (b) the actual or potential defendants in, or targets of, any such Claim include both the Indemnified Party and the Company and the Indemnified Party shall have reasonably concluded that there may be legal defenses available to it and/or other Indemnified Parties which are different from or additional to those available to the Company, (iii) the Company shall not have employed counsel satisfactory to the Indemnified Party to represent the Indemnified Party within a reasonable time after notice of the institution of such Claim or (iv) the Company shall authorize the Indemnified Party to employ separate counsel at the expense of

the Company.  The Company shall be liable for any settlement of any Claim against any Indemnified Party, which settlement is made with the Company's written consent.  The Company shall not, without the prior written consent of Calibre, settle or compromise any Claim, or permit a default or consent to the entry of any judgment in respect thereof, unless such settlement, compromise or consent (i) includes, as an unconditional term thereof, the giving by the claimant to all of the Indemnified Parties of an unconditional release from all liability in respect of such Claim, and (ii) does not contain any admission of a violation of any foreign, federal or state law by or with respect to any Indemnified Party.

In order to provide for just and equitable contribution, if a claim for indemnification pursuant to these indemnification provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification in such case, then the Company shall contribute to the Losses to which any Indemnified Party may be subject (i) in accordance with the relative benefits received by the Company on the one hand, and the Indemnified Party, on the other hand, and (ii) if (and only if) the allocation provided in clause (i) of this sentence is not permitted by applicable law, in such proportion as to reflect not only the relative benefits, but also the relative fault of the Company, on the one hand, and the Indemnified Party, on the other hand, in connection with the statements, acts or omissions which resulted in such Losses as well as any relevant equitable considerations.  The benefits received (or anticipated to be received) by the Company shall be deemed to be equal to the aggregate consideration paid or payable to the Company and the aggregate proceeds received or receivable by the Company in connection with the transaction or transactions to which the Agreement relates and the benefits received by the Indemnified Party shall be deemed to be equal to the amount of fees actually received by Calibre in connection with such transaction or transactions. Notwithstanding the foregoing, in no event shall the amount contributed by all Indemnified Parties exceed the amount of fees previously received by Calibre pursuant to the Agreement.  No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any person who is not found liable for fraudulent misrepresentation.  Each affiliate of Calibre and each manager, director, officer, employee, member, shareholder, partner, agent and controlling person of Calibre or any affiliate of Calibre shall be entitled to contribution to the same extent as Calibre is so entitled.

Neither termination nor completion of the Agreement shall affect these Indemnification Provisions which shall remain operative and in full force and effect.  The Indemnification Provisions shall be binding upon the Company and its successors and assigns and shall inure to the benefit of the Indemnified Parties and their respective successors, assigns, heirs and personal representatives.

11

**<u>Exhibit C</u>**

**<u>Kreidler Declaration</u>**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
In re                                              :
                                                   :        Chapter 11
HI-TEMP SPECIALTY METALS, INC.,                    :        Case No. 16-72767-las
                                                   :
                                                   :
                              Debtor.              :
--------------------------------------------------------------x

## DECLARATION OF TOBY J. KREIDLER PURSUANT TO 28 U.S.C. § 1746(2) IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER DESIGNATING TOBY J. KREIDLER AS CHIEF RESTRUCTURING OFFICER, *NUNC PRO TUNC* TO JULY 11, 2016

I, TOBY J. KREIDLER, declare as follows:

1.      I am a Principal of Calibre Group, LLC and I submit this Declaration (the "**Declaration**") in support of the application (the "**Application**") of Hi-Temp Specialty Metals, Inc., Debtor and Debtor-in-Possession (the "**Debtor**"), for an order authorizing the Debtor to retain and employ Toby J. Kreidler as Chief Restructuring Officer ("CRO"), *nunc pro tunc* to July 11, 2016.

2.      Except as otherwise noted, I have personal knowledge of the matters set forth herein.

### Background

3.      I am a Principal and Member of Calibre Group, LLC ("Calibre Group").  Calibre Group and the Debtor have entered into an engagement letter (the "Engagement Letter"), a copy of which is attached as Exhibit B to the Application.  Pursuant to the Engagement Letter, I will serve as the Debtor's CRO.  The terms of the Engagement Letter were approved by and executed by Mr. Joseph Smokovich, the Debtor's Chief Executive Officer and sole member of the Debtor's board of directors.

## Qualifications

4.      I have extensive financial analysis and restructuring experience.  In addition, I have significant familiarity with the operations of the Debtor.  Prior to the Petition Date, the Debtor retained the services of Calibre Group as consultant and I served in a more limited capacity as a consultant to the Debtor.

5.      In addition to my prior role with the Debtor, I have extensive experience in the metals industry and is familiar with product sourcing, inventory management and market issues faced by metals companies.  More specifically, I previously served as a strategic advisor to a Pittsburgh scrap company and Colt Manufacturing Company, LLC and as the investment banker for debtors in *In re Ormet Corporation et. al.* and *In re WP Steel Venture LLC, et al.*, successfully leading those companies through the chapter 11 process.

6.      Additionally, I and other members of the Calibre Group team manage a proprietary investment called Miami Valley Steel, a steel service center providing them additional insight into the industry and issues facing managers of metals companies.

7.      I am duly qualified to serve as CRO in the Debtor's case.

## Disinterestedness and Eligibility

8.      Based on information supplied by the Debtor, Calibre Group has searched its client database to identify any current connection or relationship with (a) the Debtor, (b) the Debtor's directors and officers, (c) the Debtor's other professionals, (d) shareholders, and (e) the Debtor's significant creditors (the "**Interested Parties**").  Based on the results of its review, Calibre Group does not have any interest adverse to the Debtor.  My fiduciary obligations are to the Debtor and its estate and not to any other Interested Party.

9.      Calibre Group may in the future provide services for certain of the Debtor's creditors and other parties-in-interest and their respective attorneys and accountants in matters unrelated to such parties' claims against or interests in the Debtor or interest in this case. Calibre Group may currently perform, has previously performed or may have performed services for the Interested Parties, however, except as disclosed herein, such services are unrelated to the Debtor or this case.

10.     Calibre Group has not provided, and will not provide, any professional services to any of the Interested Parties, other parties-in-interest, or their respective attorneys and accountants with regard to any matter related to the Debtor or the case.

11.     To the best of my knowledge, except as may be otherwise disclosed, Calibre Group neither holds nor represents an interest adverse to the Debtor or its estate and is a "disinterested person" as that term is defined in section 101(14) of title 11 of the United States Code (the "Bankruptcy Code"), as modified by section 1107(b) of the Bankruptcy Code.

12.     Further, none of the Calibre Group's professionals who have provided or will provide services to the Debtor is a creditor or equity security holder of the Debtor, or otherwise holds an interest adverse to the Debtor, except as disclosed herein. None of the Calibre Group's team members is related to a judge of the United States Bankruptcy Court for the Eastern District of New York, or the U.S. Trustee or any person employed by the Office of the U.S. Trustee in this District.

13.     As noted above, I and other members of the Calibre Group team manage a proprietary investment called Miami Valley Steel, a steel service center controlled by an investment vehicle managed by Calibre Group. Wells Fargo, the Debtor's senior secured lenders, is also the secured lender to Miami Valley Steel. One of Calibre's principals is a

significant shareholder in Miami Valley and two of Calibre's principals serve on the board of directors. Miami Valley processes carbon steel and is not a competitor or creditor of the Debtor.

## Services to be Provided

14.    I will serve as the CRO of the Debtor and my duties will include, without limitation, the following:

(a)    Preparing, updating and monitoring the Debtor's 13 week cash flow model and budget;

(b)    With the assistance of the Debtor's CEO, developing and implementing the restructuring plan;

(c)    Leading all the Debtor's treasury management functions including control over disbursements of Debtor's monies, assets or other value;

(d)    Monitoring all aspects of the Debtor including commercial, procurement, production, logistics and inventory;

(e)    Assisting the Debtor in its chapter 11 case, including the preparation and oversight of its financial statements and schedules related to the bankruptcy process, including monthly operating reports;

(f)    Communicating with the Debtor's stakeholders, including but not limited to, vendors, customers, employees, lenders, creditor committees, Court officials, attorneys and other service providers, as required; and

(g)    Overseeing and working with the Debtor and its retained investment banking professionals in pursuing any refinancing or sale options.

## Professional Compensation

15.    The principal terms of Calibre Group's compensation for my services to the Debtor are as follows:

(a) Weekly Fee.    On each of the first four weekly anniversaries of the firm's retention, the Debtor shall pay to Calibre a cash fee of forty thousand dollars ($40,000.00) per week.   On each weekly anniversary thereafter, the Debtor shall pay to Calibre a cash fee of twenty-five thousand dollars ($25,000) per week.

(b) Success Fee.    In addition to its weekly fee, Calibre Group will be entitled to a

success fee. In the event the Debtor successfully raises any form of capital or is sold, on the closing date of any capital raise or sale during the term of its engagement, the Debtor shall pay Calibre a cash fee equal to 1.5% of any capital raised or 2% of value of the sale of the Debtor. For the avoidance of doubt, the success fee shall not be netted against weekly fees. Calibre Group agrees that any such success fee will be subject to Bankruptcy Court approval upon application to the Court pursuant to section 330 of the Bankruptcy Code.

(c) Expenses. The Debtor will reimburse Calibre for all reasonable expenses, including, without limitation, legal fees and expenses and expenses of counsel to Calibre. Any expense in excess of $5,000 must be approved in writing by the Debtor to be reimbursed (including, without limitation, fees and disbursements of counsel, all travel expenses, and all other out-of-pocket expenses) incurred by Calibre in connection with its engagement.

16.    The Debtor shall specifically include employees and agents of Calibre Group serving as directors or officers of the Debtor with direct coverage under the Debtor's liability insurance covering officers and directors; and (ii) maintain such insurance policies through the period in which claims can be made against any such employees or agents of Calibre Group.

17.    Calibre Group has agreed to file with the Court a monthly statement of compensation received from the Debtor in connection with the services to be provided under its engagement, but will not apply to the Court for approval of amounts paid. Calibre Group will be paid weekly by the Debtor for its services and expenses.

18.    Calibre Group waives any unpaid and owed amount for services performed or expenses incurred prior to the commencement of the Debtor's chapter 11 case.

19.    Calibre Group agree that it will not make any investment into the Debtor or purchase any of the Debtor's securities.

20.    I declare under penalty of perjury that the foregoing is true and correct.

5

Executed on:   July 13, 2016

TOBY J. KREIDLER