**Preliminary Hearing Date and Time:**
**July 20, 2016 at 10:00 a.m.**

DICONZA TRAURIG KADISH LLP
630 Third Avenue
New York, New York 10017
Gerard DiConza
Lance A. Schildkraut
Tel: (212) 682-4940
Email:   gdiconza@dtklawgroup.com
         las@dtklawgroup.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
In re                                          :
                                               :      Chapter 11
HI-TEMP SPECIALTY METALS, INC.,                :      Case No. 16-72767-las
                                               :
                           Debtor.             :
----------------------------------------------------------------x

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING DEBTOR AND DEBTOR-IN-POSSESSION TO**
**OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPER-**
**PRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO**
**PREPETITION SECURED LENDER, (IV) MODIFYING THE AUTOMATIC STA,**
**(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor-in-possession (the "**Debtor**") files this motion

(the "**Motion**") for entry of (a) an interim order, substantially in the form of order attached

hereto as **Exhibit A** (the "**Interim DIP Order**") (i) authorizing the Debtor, on an interim basis,

to obtain post-petition financing on a senior secured, superpriority basis, (ii) granting adequate

protection to Wells Fargo Bank, National Association ("**Wells Fargo**") in respect of its existing

liens and the Debtor's use of the Cash Collateral, (iii) scheduling a hearing to consider entry of a

final order (the "**Final DIP Order**" and together with the Interim DIP Order, the "**DIP**

**Orders**"), and (iv) granting related relief; and (b) the Final DIP Order, authorizing the relief

granted in the Interim DIP Order on a permanent basis as described in this Motion, and in support, state as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-5 and 9013-1(a) of the Local Bankruptcy Rules for the Eastern District of New York (the "**Local Bankruptcy Rules**").

## Procedural Background[1]

3.      On June 22, 2016 (the "**Petition Date**"), Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is operating its business and managing its properties as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this chapter 11 case.   On July 13, 2016, the United States Trustee appointed a committee of unsecured creditors in this case (the "Committee").

## Relief Requested

4.      By this Motion, the Debtor requests entry of the DIP Orders, which, collectively, will provide the Debtor with critical and necessary access to a senior secured superpriority debtor-in-possession revolving credit and letter of credit facility of up to $14,700,000 inclusive

---

[1]      A detailed description of the Debtor's business and the reasons for the filing of the chapter 11 case and for the relief sought in this Motion are set forth in the Declaration of Joseph Smokovich Pursuant to Local bankruptcy Rule 1007-4, which was filed on the Petition Date [Dkt. No. 2.]

of revolving loans in excess of pre-petition lending formula limits of up to $1,100,000 (the "**DIP Facility**"):

- **The Interim DIP Order provides:**

  - <u>DIP Facility</u>.  Authority to obtain a revolving credit and letter of credit facility of up to $14,700,000, inclusive of revolving loans in excess of pre-petition lending formula limits of up to $4,100,000, on an interim basis and other financial accommodations, pursuant to the terms and conditions of that certain Ratification and Amendment to the Amended and Restated Credit and Security Agreement dated July 19, 2016 (the "**Ratification Agreement**") by and among Debtor and Wells Fargo, substantially in the form attached as **<u>Exhibit 1</u>** to the Interim DIP Order, which ratifies and amends that certain Amended and Restated Credit and Security Agreement, dated as of July 10, 2010, by and among Debtor and Wells Fargo (as the same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, the "**Pre-Petition Loan Agreement**", and as ratified and amended by the Ratification Agreement, the "**DIP Credit Agreement**").  (<u>See</u> Interim DIP Order at § 1.2.)

  - <u>DIP Loan Documents</u>.  Authority to execute and deliver the DIP Credit Agreement and all agreements, documents and instruments contemplated by each (collectively, the "**DIP Loan Documents**"), and to take all actions necessary, appropriate or required to comply with the Debtor's obligations under the DIP Loan Documents and under the DIP Orders.  (<u>See</u> Interim DIP Order at § 1.3.)

  - <u>DIP Liens and Claims</u>.  Authority to grant Wells Fargo senior, first-priority liens on the Collateral (as defined in the DIP Credit Agreement) securing the DIP Facility, and superpriority claims in respect of the obligations under the DIP Facility.  (<u>See</u> Interim DIP Order at § 2.1.)

  - <u>Adequate Protection</u>.  Approval of the Adequate Protection Liens and other Adequate Protection Obligations (in each case, as defined herein) to be provided to Wells Fargo to protect Wells Fargo's interest in the Cash Collateral, as well as to compensate for any decline in, or diminution of, the value of Wells Fargo's liens or security interests under the Pre-Petition Credit Facility (as defined herein).  (<u>See</u> Interim DIP Order at § 2.6.)

  - <u>Final Hearing</u>.  A date for a hearing on the Motion to consider entry of the Final DIP Order, to be held no sooner than 15 days after the date of this Motion, and no later than 30 days after entry of the Interim DIP Order.  (<u>See</u> Interim DIP Order at § 6.)

- **The Final DIP Order provides:**

  - <u>Final Relief</u>.  Authorizing the relief granted in the Interim DIP Order on a permanent basis.

### Concise Statement Pursuant to Local Bankruptcy Rule 4001-5[2]

| Material Terms of the DIP Facility | |
|---|---|
| **Borrower** <br> Bankruptcy Rule 4001(c)(1)(B) | Hi-Temp Specialty Metals, Inc.  (See DIP Credit Agreement, Preamble; Interim DIP Order at pp. 1-2, § 1.2.) |
| **Guarantors** <br> Bankruptcy Rule 4001(c)(1)(B) | Continuing guaranties from non-debtors (i) Hi-Temp Acquisition Corporation ("Parent") as evidenced by the Amended and Restated Continuing Guaranty, dated March 30, 2012 by Parent in favor of Wells Fargo  and (ii) HT Realty, Inc. ("HT Realty") as evidenced by the Amended and Restated Continuing Guaranty dated March 30, 2012 by HT Realty in favor of Wells Fargo. |
| **DIP Lender** <br> Bankruptcy Rule 4001(c)(1)(B) | Wells Fargo Bank, National Association (See DIP Credit Agreement, Preamble; Interim DIP Order at pp. 1-2, § 1.2.) |
| **DIP Facility** <br> Bankruptcy Rule 4001(c)(1)(B); <br> Local Rule 4001-2(a)(1) | Revolving line of credit and letter of credit facility of up to $14,700,000 inclusive of revolving loans in excess of pre-petition lending formula limits of up to $4,100,000.  (See DIP Credit Agreement at § 1.1; Interim DIP Order at pp. 1-2, § 1.2.) |
| **Budget** <br> Bankruptcy Rule 4001(c)(1)(B); | Use of proceeds of DIP Facility are subject to a Budget that will consist of weekly statements of receipts and disbursements of the Debtor for the 13 weeks commencing with July 15, 2016.  (See Ratification Agreement at § 5.3; Interim DIP Order at p. 9, §§ 1.2, 2.6(a)) <br><br> The Debtor believes that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing or the Budget. |
| **Use of DIP Proceeds/Roll-Up Provisions** <br> Bankruptcy Rule 4001(c)(1)(B); | For working capital and general corporate purposes, including payment of Pre-Petition Obligations (as defined in the DIP Credit Agreement), in accordance with the Budget.  (See Ratification Agreement at § 5.2; Interim DIP Order at § 1.2.) <br><br> Wells Fargo may, in its discretion, apply any payments or proceeds first to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full. <br><br> (See Ratification Agreement at § 6.6; Interim DIP Order at § 1.2) |
| **Interest Rates** <br> Bankruptcy Rule 4001(c)(1)(B) | LIBOR plus 3.50% on advances, LIBOR plus 4.5% on Temporary Overadvance Amount (See Ratification Agreement at § 6.3; Interim DIP Order at § 1.2; DIP Credit Agreement at § 1.7) |

---

[2]      To the extent the summary of terms and conditions set forth in this Motion are inconsistent with or in conflict with the terms and conditions of the DIP Facility, the terms and conditions of the DIP Facility shall control and govern.

| Material Terms of the DIP Facility | |
|---|---|
| **Expenses and Fees** | A DIP facility fee of $100,000, which shall be fully earned as of the entry date of the Interim Financing Order and payable as follows: (a) $50,000 payable to Wells Fargo forty-five (45) days after the Interim Financing Order and (b) $50,000 payable 90 days after entry of the Final Financing Order.<br><br>(See Ratification Agreement at § 5.6; Interim DIP Order at § 1.2) |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B); | The "**Maturity Date**" is the date that is the earlier of earliest of: (i) May 31, 2017, (ii) the date Hi-Temp terminates the Line of Credit, or (iii) the date Wells Fargo terminates the Line of Credit following an Event of Default. (See Ratification Agreement at § 6.1; Interim DIP Order at § 3.4.) |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(ii); | The Indebtedness (as defined in the DIP Credit Agreement) under the DIP Facility shall be senior secured obligations.  The DIP Facility shall be afforded liens and claims, including superpriority claims, on substantially all of the property of the estate.  (See Interim DIP Order at §§ 2.1(a), 2.1(c), 2.2(a)) |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B); | Customary borrowing conditions, including, among other things, execution of the DIP Loan Documents, entry of the Interim DIP Order approving the DIP Facility and Cash Collateral usage and granting a lien upon and security interest in the DIP collateral, payment of fees and expenses and delivery of the Budget.  (See Ratification Agreement at Art. 9; Interim DIP Order at §§ 1.2, 1.3.) |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B); | Usual and customary for financings of this type, including, among other things:<br><br>Affirmative Covenants:  Include delivery of financial and other information, maintenance of existing businesses, payment of taxes and claims, maintenance of properties and insurance, inspections, compliance with laws and achievement of the Sale Milestones (defined below).<br><br>Negative Covenants:  Include limitations of indebtedness, liens, guarantees, negative pledges, restricted payments, investments, fundamental changes, disposition of assets, acquisitions, transactions with affiliates and conduct of business.<br><br>Financial Covenants:  Include delivery of the Budget and compliance with Budget. It shall constitute a Material Budget Deviation and an additional Event of Default under the Credit Agreement if (i) commencing with the week ending July 29, 2016, and each week thereafter, the actual aggregate cash receipts for the trailing three (3) week period are less than eighty-five percent (85%) of the projected aggregate cash receipts set forth in the Budget for such trailing three (3) week period; and (ii) actual aggregate cash disbursements for the trailing three (3) week period are more than one hundred and twenty percent (120%) of the projected aggregate cash disbursements set forth in the Budget for such trailing three (3) week period.<br><br>(See Ratification Agreement, Art. 5, Interim DIP Order at §§ 1.2, 1.3, 4.) |

| Material Terms of the DIP Facility | |
|---|---|
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B); | Usual and customary for financings of this type, including non-payment of obligations, defaults under covenants, breaches of representations and warranties, judgment defaults, failure to comply with ERISA rules and regulations, appointment of bankruptcy trustee or examiner, modification to DIP Orders, dismissal or conversion of the bankruptcy case, lifting of stay as to material assets of the Debtor, invalidity of DIP Loan Documents and confirmation of a bankruptcy plan that does not require indefeasible payment in full of the DIP Facility and the Pre-Petition Credit Facility (defined below.  (See Ratification Agreement, § 6.15; Interim DIP Order at § 3.1.) |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi); | A sale process in connection with sale of all or substantially all of Debtor's assets and properties in accordance with the following time-frame:<br><br>Not later thirty (30) days after the entry of the Interim Financing Order, Debtor shall obtain the entry of an order of the Bankruptcy Court, in form and substance satisfactory to Wells Fargo, (i) approving the bidding procedures for the sale of all or substantially all of the Debtor's assets in accordance with Section 363 of the Bankruptcy Code (the "Sale"), including, without limitation, a form of asset purchase agreement reasonably acceptable to Wells Fargo, and (ii) providing that all cash proceeds generated by such Sale(s), less reasonable out of pocket fees, costs and expenses directly arising from the closing of such Sale(s), subject to approval by Wells Fargo (collectively, "Excluded Sale Proceeds") shall be remitted to Wells Fargo for application against, and in permanent reduction of, the Indebtedness (the "Bid Procedures Order");<br><br>(b) Not later than forty-five (45) days after the entry of the Interim Financing Order, the Debtor shall have entered into an agreement in form and substance acceptable to Wells Fargo with a "stalking horse" bidder, reasonably acceptable to Wells Fargo, committing to purchase all or substantially all of the Debtor's assets;<br><br>(c) Not later than seventy (70) days after the entry of the Interim Financing Order, Debtor shall conduct an auction (the "Auction"), in accordance with the Bid Procedures Order, if more than one bona fide offer is received meeting the conditions set forth in the Bid Procedures Order;<br><br>(d) Not later than two (2) Business Days after the Auction, an order, in form and substance satisfactory to Wells Fargo, shall have been entered by the Bankruptcy Court approving the Sale(s) (the "Sale Order"); and<br><br>(e) Not later than two (2) Business Days after the Sale Order is entered, the closing of the Bankruptcy Court-approved Sale(s) shall have occurred.<br><br>(See Ratification Agreement at § 5.7) |

| Material Terms of the DIP Facility | |
|---|---|
| **Carve-Outs**<br>Local Rule 4001-5(a) | There shall be a carve-out for the payment of (the "**Carve-Out Expenses**"):<br><br>    (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees due to the clerk of the Bankruptcy Court and<br><br>    (ii) amounts payable in respect of certain Allowed Professional Fees (defined below) (A) incurred at any time on or after the Trigger Date (defined below) up to the aggregate amount of $75,**000** (the "**Professional Fee Carve Out**").   An additional carve out of $5,000 for the Chapter 7 trustee in the event that the Debtor's bankruptcy case converts to Chapter 7 is also provided for under the DIP Orders.<br><br>"**Trigger Date**" shall mean the first business day after the occurrence and continuation of an Event of Default (as defined in the Interim DIP Order) and delivery of written notice thereof (the "**Carve Out Notice**") by Wells Fargo to the Court, U.S. Trustee, counsel for the Debtor, and counsel for the Committee(s).<br><br>"**Professionals**" shall mean, collectively, attorneys, accountants and other professionals retained by the Debtor or any Committee(s) under § 327 or § 1103(a) of the Bankruptcy Code.<br><br>"**Allowed Professional Fees**" shall mean the unpaid and outstanding reasonable fees and expenses of Professionals (i) actually incurred on or after the Petition Date and (ii) allowed at any time by a final order of the Court pursuant to §§ 326, 328, 330 or 331 of the Bankruptcy Code.<br><br>(See Interim DIP Order at § 2.3(a)) |
| **Duration of DIP Facility**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The earlier of (i) the Maturity Date, (ii) the confirmation of a plan of reorganization for the Debtor, (iii) the consummation of the sale or sales of all or substantially all of the Debtor's assets and properties or of all equity interests in Debtor, and (iv) the occurrence of an Event of Default (as defined in the DIP Credit Agreement) (the earlier to occur of clauses (i), (ii), (iii), (iv) and (v) referred to herein as the "Termination Date"). |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(iv) and (c)(1)(B)(ii) | As adequate protection for the diminution in value of their interests in the Pre-Petition Collateral, including prior use of Cash Collateral, on account of the Debtor's use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out-Expenses, Wells Fargo will be granted pursuant to §§ 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "**Replacement Lien**"). The Replacement Lien shall be junior and subordinate only to (A) the Carve-Out Expenses to the extent set forth in the Interim DIP Order, (B) the Permitted Liens and Permitted Indebtedness (each as defined in the DIP Credit Agreement), and (C) Wells Fargo's liens on the Collateral to secure the Indebtedness (as defined in the DIP Credit Agreement), and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.  (See Interim DIP Order at § 2.6(b)) |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi); | Wells Fargo will not receive a lien on causes of action under Chapter 5 of the Bankruptcy Code under the Interim DIP Order; however, upon entry of the Final DIP Order granting such relief, they may receive a lien on such actions.  (See Interim DIP Order at § 2.1(a)) |

| Material Terms of the DIP Facility | |
|---|---|
| **Determination Regarding Pre-Petition Claim** Bankruptcy Rule 4001(c)(1)(B)(iii), (iv) | The Interim DIP Order contains stipulated findings of fact, including those related to the validity and enforceability of the Pre-Petition Credit Facility and the liens securing the Pre-Petition Credit Facility, subject to the challenge rights of any official committee appointed in this Case or other party in interest with the requisite standing.  (See Interim DIP Order at pp. 5-7, § E) |
| **Waiver or Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay is modified and vacated to the extent necessary to permit Wells Fargo to perform any act authorized or permitted under or by virtue of the Interim Order or the DIP Loan Documents, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by the Interim Order and pursuant to the terms of the DIP Loan Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Pre-Petition Obligations or the DIP Obligations, as applicable, including, without limitation, all interests, fees, costs and expenses permitted under the DIP Loan Documents and apply such payments to the Pre-Petition Obligation or DIP Obligations pursuant to the DIP Loan Documents and/or the Interim Order, as applicable, and (d) immediately upon the occurrence of an Event of Default, to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Loan Documents or applicable law other than those rights and remedies against the Collateral. Additionally, upon the occurrence of an Event of Default and after providing three (3) business days' (the "**Default Notice Period**") prior written notice (the "**Enforcement Notice**") to counsel for the Debtor, counsel for the Committee (if appointed), and the U.S. Trustee, Wells Fargo shall be entitled to exercise rights and remedies against the Collateral.  (See Interim DIP Order at § 3.5.) |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | All security interests and liens in Collateral granted by the DIP Loan Documents shall be valid and perfected upon entry of the Interim DIP Order. (See Interim DIP Order at § 2.1(c)) |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of a Final DIP Order granting such relief, no costs or expenses of administration which have or may be incurred in the Debtor's bankruptcy case shall be charged against Wells Fargo, its claims or the Collateral pursuant to § 506(c) of the Bankruptcy Code without the prior written consent of Wells Fargo, and no such consent shall be implied from any other action, inaction or acquiescence by Wells Fargo.  (See Interim DIP Order at § 4.3.) |
| **Release, Waivers or Limitations on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to the challenge period, Wells Fargo get a release of claims.  (See Interim DIP Order at § 4.5.) |

## Background

### I.    Pre-Petition Capital Structure

5.    As of the Petition Date, the Debtor's principal capital structure consists of a secured revolving line of credit facility and equity.

6.    On July 10, 2010, the Debtor entered into the Pre-Petition Loan Agreement with Wells Fargo, to obtain an $18,500,000 line of credit revolving facility with a $1,000,000 letter of credit sub-line facility (the "**Pre-Petition Credit Facility**").  The total borrowing capacity under the Pre-Petition Credit Facility is based on a borrowing base, which is defined under the Pre-Petition Loan Agreement as 85% of the Debtor's eligible accounts receivable arising from account debtors located in the United States or not covered by a credit insurance policy, plus 90% of eligible accounts receivable arising covered by a credit insurance policy, plus the lesser of (i) $15,525,000, or (ii) 85% of the net recovery percentage of eligible inventory, less reserves.

7.    Amounts loaned under the Pre-Petition Credit Facility bear interest, at LIBOR, plus an applicable margin of 3.50%.  The Debtor is also required to pay an annual non-use fee of 0.50% of the unused amounts under the Pre-Petition Credit Facility, as well as other customary fees as set forth in the Pre-Petition Loan Agreement.

8.    As of the Petition Date, the Debtor was indebted to Wells Fargo under the Pre-Petition Loan Agreement in respect of loans, advances, Letters of Credit, and all other Indebtedness (each as defined in the Pre-Petition Loan Agreement) in an aggregate outstanding principal amount of approximately $13.2 million, including interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "**Pre-Petition Obligations**"; for purposes hereof, the term Pre-Petition Obligations shall include,

without limitation, all "Pre-Petition Obligations", as such term is defined in the DIP Credit Agreement).

9.    The Debtor's obligations under the Pre-Petition Credit Facility are secured by first-priority, perfected security interests in substantially all of the Debtor's assets.

## II.   Proposed Post-Petition Financing

### A.   The Debtor's Marketing Efforts for Post-Petition Financing

10.    On or about June 13, 2016, the Debtor engaged CohnReznick Capital Market Securities, LLC ("**CRCMS**") to identify potential strategic and financial buyers, and, ultimately, run a marketing and sale process of the Debtor's assets.  Additionally, at the request of the Debtor, CRCMS identified and contacted several third parties as potential sources of debtor-in-possession financing.  The third parties solicited by CRCMS included sophisticated financial institutions, hedge funds, and lower-middle-market business lenders active in the debtor-in-possession financing market, which CRCMS had identified based on a number of factors, including their ability to quickly complete diligence and fund a transaction through debtor-in-possession financing.  At this time, CRCMS has received one written proposal to provide a $1.0 million DIP that would require a successful priming fight, and discussions continue with other parties.

11.    Through discussions with these potential third-party lenders, it became apparent that the Debtor's existing capital structure,  the expedited timeframe, and lack of unencumbered assets, foreclosed any opportunities for the Debtor to access unsecured or junior credit.  Further, in the absence of a successful priming fight, any debtor-in-possession loan provided by parties other than Wells Fargo would have required the consent of Wells Fargo, which had indicated they would not be willing to provide.  Based on numerous conversations with Wells Fargo as part of this process, it became readily apparent that a collateral priming fight with a third-party

lender would be extremely time intensive, expensive and not value accretive to the Debtor as compared to the DIP Financing negotiated with Wells Fargo.

**B.      The DIP Facility**

12.      After extended good faith, arm's-length negotiations, Wells Fargo agreed to provide the DIP Facility on the terms provided in the DIP Credit Agreement, summarized above. The proceeds of the DIP Facility, which the Debtor estimates will be sufficient to support them through the pendency of the chapter 11 case, will be used (a) for general working capital and other purposes permitted under the DIP Credit Agreement; (b) to fund the costs of administering the chapter 11 case; and (c) to pay all fees and expenses provided for under the DIP Credit Agreement and authorized by the Court.

13.      Terms similar to those included in the DIP Facility are standard for financing of this kind.   The Debtor also successfully negotiated for several key concessions from Wells Fargo, including more flexible covenant defaults, an increase in the amount of the loan facility, an increase in the letter of credit facility, more flexible operating tests, a more favorable DIP Facility fee, more favorable interest rates, and, during negotiations of the DIP Facility, authorization by Wells Fargo to borrow funds outside the borrowing base formulas provided for under the Pre-Petition Loan Agreement.   Further, the maximum loan limit provides up to $4,100,000 of loans outside the applicable formula. The terms of the DIP Facility, therefore, are an attractive option, especially in light of the inevitable priming fight that would occur to the extent the Debtor was to obtain financing from parties other than Wells Fargo.

**C.      Adequate Protection Obligations**

14.      The Debtor and Wells Fargo have agreed on consideration (the "**Adequate Protection Obligations**") as adequate protection for the diminution in value of Wells Fargo's interests in the Pre-Petition Collateral, including Cash Collateral, on account of the Debtor's use

of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out-Expenses.  Specifically, as detailed above, Wells Fargo will be granted pursuant to §§ 361 and 363 of the Bankruptcy Code, the Replacement Lien in all of the Collateral.  The Replacement Lien shall be junior and subordinate only to (A) the Carve-Out Expenses to the extent set forth in the Interim DIP Order, (B) the Permitted Liens and Permitted Indebtedness, and (C) Wells Fargo's liens on the Collateral to secure the DIP Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

**Basis for Relief**

**I.**    **The Debtor Should Be Authorized to Obtain Post-Petition Financing Through the DIP Loan Documents.**

      **A.**    **Entering into the DIP Loan Documents Is an Exercise of the Debtor's Sound Business Judgment.**

22.    For the reasons set forth in greater detail below, the Court should authorize the Debtor to enter into the DIP Loan Documents, and obtain access to the DIP Facility as an exercise of the Debtor's sound business judgment.  At their core, the statutory predicates for a debtor to enter into the DIP Loan Documents require the exercise of sound business judgment.

23.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with its sound business judgment in obtaining such credit.  See In re Barbara K. Enters., Inc., No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to

one party in interest."); <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)

("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy

Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be

exercised so long as the financing agreement does not contain terms that leverage the

bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to

benefit a party-in-interest."); <u>In re Farmland Indus., Inc.</u>, 294 B.R. 855, 881 (Bankr. W.D. Mo.

2003) ("[T]he applicable factors can be synthesized as follows: (1) That the proposed financing

is an exercise of sound and reasonable business judgment . . . .").

24.     Furthermore, in determining whether the Debtor has exercised sound business

judgment in deciding to enter into the DIP Loan Documents, the Court should consider the

economic terms of the DIP Facility in light of current market conditions.  <u>See, e.g.</u>, <u>Transcript of

Record at 734-35:24-1</u>, <u>In re Lyondell Chem. Co.</u>, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5,

2009) (recognizing that "the terms that are now available for DIP facilities in the current

economic environment aren't as desirable" as in the past).   Moreover, the Court may

appropriately take into consideration non-economic benefits to the Debtor offered by a proposed

post-petition facility.  For example, in <u>In re ION Media Networks, Inc.</u>, the Bankruptcy Court

for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee,
> are naturally motivated to obtain financing on the best possible
> terms, a business decision to obtain credit from a particular lender
> is almost never based purely on economic terms.   Relevant
> features of the financing must be evaluated, including non-
> economic elements such as the timing and certainty of closing,
> the impact on creditor constituencies and the likelihood of a
> successful reorganization.    This is particularly true in a
> bankruptcy setting where cooperation and establishing
> allegiances with creditor groups can be a vital part of building
> support for a restructuring that ultimately may lead to a
> confirmable reorganization plan.    That which helps foster

> consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

25.    The Debtor's execution of the DIP Loan Documents is an exercise of its sound business judgment that warrants approval by the Court.  The Debtor and its advisors undertook a detailed investigation as to the Debtor's projected financing needs during the pendency of a chapter 11 case, and determined that the Debtor would require post-petition financing to support its operational and restructuring activities.  Accordingly, the Debtor negotiated the DIP Loan Documents with Wells Fargo in good faith, at arm's-length, and with the assistance of outside advisors, in order to obtain the required post-petition financing on terms favorable to the Debtor. Based on the advice of counsel and other professionals, and the Debtor's own analysis, the Debtor has determined in its sound business judgment that the DIP Loan Documents provide financing on more favorable terms than any other reasonably available alternative.

26.    Specifically, as noted above, the DIP Loan Documents will provide the Debtor with access of up to $4.1 million in excess the pre-petition lending formulas, which the Debtor and its advisors have independently determined should be sufficient to support the Debtor's ongoing operations and reorganization activities through the pendency of this chapter 11 case. Accordingly, the Debtor submits that entering into the DIP Loan Documents constitutes an exercise of the Debtor's sound business judgment that should be approved by the Court.

**B.    The Debtor Should Be Authorized to Obtain Post-Petition Financing on a Senior Secured and Superpriority Basis.**

27.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, post-petition financing on a secured or superpriority basis, or both.  Specifically, § 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a

hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative

expense under § 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1)      with priority over any or all administrative expenses of the
> kind specified in § 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2)      secured by a lien on property of the estate that is not
> otherwise subject to a lien; or
>
> (3)      secured by a junior lien on property of the estate that is
> subject to a lien.

11 U.S.C. § 364(c).

28.    In order to satisfy the requirements of § 364(c) of the Bankruptcy Code, a debtor

need only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re

Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek

credit from every possible lender before concluding that such credit is unavailable."  Id.; see

also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001)

(superpriority administrative expenses authorized where debtor could not obtain credit as an

administrative expense).  When few lenders are likely to be able and willing to extend the

necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to

conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113

(Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R.

117, 120 n.4 (N.D. Ga. 1989).  See also Ames Dep't Stores, 115 B.R. at 40 (approving financing

facility and holding that the debtor made reasonable efforts to satisfy the standards of § 364(c)

where it approached four lending institutions, was rejected by two, and selected the most

favorable of the two offers it received).

29.     As described above, CRCMS identified and solicited offers from multiple potential post-petition lenders.  Notwithstanding these efforts, the Debtor was unable to obtain any post-petition financing in the form of unsecured credit or as an administrative expense.  The Debtor's significant secured debt (relative to their assets) precludes it from obtaining post-petition financing in the amount they require on terms other than on a secured and superpriority basis.  The Court should therefore (i) authorize the Debtor to provide Wells Fargo senior liens on the Debtor's unencumbered property as provided in § 364(c)(3) of the Bankruptcy Code, and junior liens on the Debtor's property that is subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by § 546(b) of the Bankruptcy Code, if any, as provided in § 364(c)(2) of the Bankruptcy Code; and (ii) grant the Debtor's repayment obligations under the DIP Loan Documents superpriority administrative expense status as provided for in § 364(c)(1) of the Bankruptcy Code.

II.     **The Provisions of the DIP Financing Agreements Are Appropriate.**

30.     As described above, the Debtor has agreed, subject to Court approval, to pay Wells Fargo, in exchange for their providing the DIP Facility, a fee of $100,000, payable in two installments of $50,000.   This fee, together with the other provisions of the DIP Loan Documents, represent the most favorable terms to the Debtor on which Wells Fargo would agree to make the DIP Facility available.   The Debtor considered the fee described above when determining in their sound business judgment that the DIP Loan Documents constituted the best terms on which the Debtor could obtain the post-petition financing necessary to continue its operations and prosecute its chapter 11 case, and paying the fee in order to obtain the DIP Facility is in the best interests of the Debtor's estate, creditors and other parties in interest.

31.     Courts routinely authorize debtors to pay fees similar to those the Debtor proposes to pay, where the associated financing is, in the debtors' business judgment, beneficial to the debtors' estates.  See, e.g., In re the Brown Publ'g Co., No. 10-73295 (DTE) (Bankr. E.D.N.Y. Jul. 2, 2010) (approving 4% closing fee); In re Insight Health Services Holdings Corp., No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.0% DIP closing fee); In re NR Liquidation III Co. (f/k/a Neff Corp.), No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit facility fee); In re The Reader's Digest Ass'n, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3% exit fee), In re Lear Corp., No. 14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0% up-front fee and a 1.0% exit/conversion fee); In re Gen. Growth Prop., Inc., No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75% exit fee); In re Aleris Int'l. Inc., No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (approving an up-front 3% facility fee); In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (approving exit fee of 3%); In re DJK Residential, No. 08-10375 (Bankr. S.D.N.Y. Feb. 29, 2008) (approving 3% fee in connection with post-petition financing).[3]  Accordingly, the Court should authorize the Debtor to pay the fee provided under the DIP Loan Documents in connection with entering into those agreements.

47.     The terms of the DIP Loan Documents, including the key provisions described above, constitute, on the whole, the most favorable terms on which the Debtor could obtain needed post-petition financing.

---

[3]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to the Motion. Copies of these orders are available upon request to the Debtor's proposed counsel.

### III.    The Scope of the Carve-Out Is Appropriate.

48.    The proposed DIP Facility subjects the security interests and administrative expense claims of Wells Fargo to the Carve-Out Expenses.  Such carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  See, e.g., Ames Dep't Stores, 115 B.R. at 40.  The DIP Facility does not directly or indirectly deprive the Debtor's estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in this case.  See id. at 38 (observing that courts insist on carve outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").  In addition, the carve-out ensures that proceeds of the DIP Facility may be used for the payment of U.S. Trustee fees and professional fees of the Debtor and any future Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

### IV.    Wells Fargo Should Be Deemed Good Faith Lenders Under § 364(e).

49.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, § 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

50.    As explained in detail herein, the DIP Loan Documents are the result of the Debtor's reasonable and informed determination that Wells Fargo offered the most favorable terms on which to obtain needed post-petition financing, and of extended arm's-length, good faith negotiations between the Debtor and Wells Fargo.  The terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that Wells Fargo is a "good faith" lender within the meaning of § 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## V.    **Modification of the Automatic Stay Is Warranted.**

51.    The DIP Loan Documents and the proposed Interim DIP Order contemplate that the automatic stay arising under § 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit Wells Fargo to exercise, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the DIP Credit Agreement), all rights and remedies provided for in the DIP Credit Agreement, and to take various other actions without further order of or application to the Court.  The DIP Loan Documents provide, however, that Wells Fargo must provide the Debtor, the United States Trustee for the Bankruptcy Court for the Eastern District of New York and counsel to any Committee with five (5) business days' prior written notice before exercising any enforcement rights or remedies against the Collateral, which will allow the Debtor and other interested parties to seek an expedited hearing before the Court for the purpose of determining whether, in fact, an Event of Default has occurred and is continuing.

*52.*    Stay modification provisions of this sort are ordinary features of debtor-in-possession financing facilities and, in the Debtor's business judgment, are reasonable under the circumstances.  See, e.g., In re Hawker Beechcraft, Inc., No. 12-11873 (SMB) (Bankr. S.D.N.Y. June 1, 2012); In re Velo Holdings Inc., No. 12-11384 (MG) (Bankr. S.D.N.Y. Apr. 23, 2012); In re United Retail Grp., Inc., No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 23, 2012); In re Hostess Brands, Inc., No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012); In re Insight Health Servs. Holdings Corp., No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011); In re NR Liquidation III Co. (f/k/a Neff Corp.), No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010); In re The Reader's Digest Ass'n, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009); In re Lear Corp., No. 14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009); In re Gen. Growth Prop. Inc., No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); In re Chemtura Corp., No. 09-11233 (Bankr. S.D.N.Y. Apr. 23, 2009); In re Wellman, Inc., No. 0810595 (Bankr. S.D.N.Y. Apr. 7, 2008); In re Musicland Holding Corp., No. 06-10064 (Bankr. S.D.N.Y. Feb. 21, 2006).

**VII.    The Debtor Requires Immediate Access to the DIP Facility.**

53.    The Court may grant interim relief in respect of a motion filed pursuant to § 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2) and (c)(2).  In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions.  See, e.g., Ames Dep't Stores, 115 B.R. at 36.

54.    As set forth at the interim hearing on the Motion and the record heretofore established before this Court, the Debtor and its estate will suffer immediate and irreparable

harm if it cannot access financing as requested herein promptly. Further, the Debtor recognizes that the chapter 11 case is significantly and immediately increasing the demands on its liquidity as a result of, among other things, the costs of administering the chapter 11 case, implementing critical restructuring initiatives, and addressing key constituents' concerns regarding the Debtor's financial health and ability to continue operations in light of the chapter 11 case. Accordingly, the Debtor has an immediate need for access to liquidity to, among other things, continue the operation of its business, maintain important relationships with customers and landlords, meet payroll, procure goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which are required to preserve and maintain the Debtor's going concern value for the benefit of all parties in interest.

55.     The importance of a debtor's ability to secure post-petition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in similar circumstances.  See, e.g., In re the Brown Publ'g Co., No. 10-73295 (DTE) (Bankr. E.D.N.Y. Jul. 2, 2010) (same); In re United Retail Grp., Inc., No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012) (same); In re Sbarro, Inc., No. 11-11527 (SCC) (Bankr. S.D.N.Y. Apr. 5, 2011) (same); In re MSR Resort Golf Course LLC, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Mar. 16, 2011) (same); In re Insight Health Servs. Holdings Corp., No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011); In re Great Atl. & Pac. Tea Co., No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) (same); In re The Reader's Digest Assoc., No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) (same); In re Tronox Inc., No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 13, 2009) (same); In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (same); In re Lenox Sales, Inc., No. 08-14679 (ALG) (S.D.N.Y. Nov. 25, 2008) (same); In re Wellman, Inc., No. 08-10595 (SMB) (S.D.N.Y. Feb. 27, 2008) (same).  Accordingly, for all of the reasons

set forth above, prompt entry of the Interim DIP Order is necessary to avert immediate and irreparable harm to the Debtor's estate and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

### Request for a Final Hearing

56.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date, which is no sooner than 15 days after the date of this Motion and no later than 30 days after the entry of the Interim DIP Order, to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion.  The Debtor also requests authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, to entry of the Final DIP Order, by email or first-class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

### Reservation of Rights

57.     Nothing contained in this Motion is intended or should be construed as an admission as to the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under § 365 of the Bankruptcy Code.  The Debtor expressly reserves its right to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtor's rights to subsequently dispute such claim.

## Notice

15.     The Debtor has provided email or overnight notice of this Motion to:  (a) the Office of the United States Trustee for the Eastern District of New York (United States Trustee's Office Region 2, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, New York 11722); (b) the Debtor's 20 largest unsecured creditors; (c) Wells Fargo, by its counsel, Otterbourg P.C., 230 Park Avenue, New York, New York 10169, Attn: Jon Helfat, Esq. and Daniel F. Fiorillo, Esq.; (d) the Debtor's taxing authorities; (e) all known secured creditors of the Debtor; and (f) all parties who have requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtor respectfully submits that no other or further notice is necessary.

## No Prior Request

16.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests entry of an interim order, substantially in the form attached hereto as **Exhibit A**, (i) granting the relief requested herein and (ii) granting such other relief as is just and proper.

Dated: Yaphank, New York
      July 19, 2016

                              Respectfully submitted,

                              HI-TEMP SPECIALTY METALS, INC.

                By: _____
                    Joseph Smokovich
                Its: *President*

Dated: New York, New York
      July 19, 2016

                              DICONZA TRAURIG KADISH LLP
                              Proposed Counsel for the Debtor

                By: */s/* Gerard DiConza
                    Gerard DiConza
                    630 Third Avenue
                    New York, New York 10017
                    Tel: (212) 682-4940
                    Email: gdiconza@dtklawgroup.com

## **EXHIBIT A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re                                                                    :

                                        :        Chapter 11

HI-TEMP SPECIALTY METALS, INC.,                :        Case No. 16-72767-las

                                          :

              Debtor.                             :

-------------------------------------------------------------x

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTOR AND DEBTOR IN POSSESSION TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[1] of the above-captioned debtor and debtor in possession (the "Debtor") pursuant to §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2) and 364(c)(3) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-5 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of New York (the "Local Rules"), *inter alia* seeking, among other things:

(1)        authorization for Debtor to obtain, post-petition financing in the form of a revolving credit facility in accordance with the terms and conditions set forth in the Existing Credit Agreement (as defined below), as ratified and amended by that certain Ratification and Amendment Agreement, dated as of even date herewith (the "Ratification Agreement"; a copy of which is attached to this Order (this "Interim Order") as **Exhibit 1** hereto) (as the same now

---

[1]        Capitalized terms used but not defined in this Order shall have the same meanings ascribed to such terms in the Motion, or if not so defined in the Motion then as defined in the Ratification Agreement.

exists or may hereafter be amended, supplemented or otherwise modified from time to time in accordance with this Interim Order, the "DIP Credit Agreement"), made by and among the Debtor and Wells Fargo ("Wells Fargo"), and the other Financing Agreements (as defined in the Ratification Agreement), and in accordance with this Interim Order, secured by perfected senior priority security interests in and liens on the Collateral (as defined below) pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code;

(2)     authorization for Debtor to repay and gradually "roll up" all Pre-Petition Obligations (as defined below) in accordance with the DIP Credit Agreement, the other Financing Agreements and this Interim Order;

(3)     authorization for the Debtor to grant superpriority administrative claim status, pursuant to § 364(c)(1) of the Bankruptcy Code, to Wells Fargo in respect of all Post-Petition Obligations;

(4)     as set forth below, approval of certain stipulations by the Debtor as set forth in this Interim Order with respect to the Pre-Petition Loan Documents (as defined below) and the liens and security interests arising therefrom, subject to the rights of any official committee appointed in this case or other party in interest with requisite standing in accordance with this Interim Order;

(5)     as set forth below, adequate protection to Wells Fargo;

(6)     subject only to and effective upon entry of a Final Financing Order (as defined below), the waiver of the Debtor's right to assert claims to surcharge against the Collateral (as defined below) pursuant to § 506(c) of the Bankruptcy Code, to the extent set below;

(7)      the vacation and modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order to the extent hereinafter set forth; and

(8)      the setting of a final hearing on the Motion ("Final Hearing") to consider entry of a final order (the "Final Financing Order") authorizing, among other things, the borrowing under the Financing Agreements on a final basis, as set forth in the Motion and the DIP Credit Agreement filed with the Court, including the granting to Wells Fargo the senior security interests and liens described above and super-priority administrative expense claims in respect of all Obligations (as defined in the DIP Credit Agreement).

The initial hearing on the Motion having been held by this Court on July 20, 2016 (the "Interim Hearing"), and upon the record made by the Debtor at the Interim Hearing, including the Motion, the Declaration of Joseph Smokovich in Support of Debtor's Chapter 11 Petition and First-Day Filings (the "First-Day Declaration"), the testimony and record set forth at the Interim Hearing in support of the Motion and the filings and pleadings in the above-captioned chapter 11 case (the "Case"), the Court having found that the relief requested in the Motion is in the best interests of Debtor, its estate, its creditors and other parties in interest; and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "Notice") was appropriate under the circumstances; and the Notice having been served by the Debtor in accordance with Rule 4001(c) on (i) counsel to Wells Fargo; (ii) the office of the United States Trustee (the "U.S. Trustee"), (iii) proposed counsel for the Committee; (iv) the Debtor's twenty (20) largest unsecured creditors (the "20 Largest Unsecured Creditors"), (v) the Debtor's taxing authorities, (vi) all parties having file a notice of appearance, and (vii) certain other parties identified in the certificate of service filed with the Court, including, without limitation, all creditors who have

filed or recorded pre-petition liens or security interests against any of the Debtor's assets (collectively, the "Noticed Parties") and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and after due deliberation sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    Petition.  On June 22, 2016 (the "Petition Date"), Debtor filed a voluntary petition (each, a "Petition") under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  On July 13, 2016, the United States Trustee appointed a committee of unsecured creditors in this case (the "Committee").

B.    Disposition.  The Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of the Interim Order that have not been withdrawn, waived or settled are hereby denied and overruled.

C.    Jurisdiction and Venue.  The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).  Venue of the Case and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    Notice.  The Notice was given in the manner described in the Motion.  Under the circumstances, the Notice given by the Debtor of the Motion, the Interim Hearing and the relief granted under this Interim Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and 4001(c).

E.      <u>Debtor's Acknowledgments and Agreements</u>.  Without prejudice to the rights of the Committee or other parties-in-interest as and to the extent set forth in Section 4.1.1 of this Interim Order, the Debtor admits, stipulates, acknowledges and agrees that:

(i)      <u>Pre-Petition Loan Documents</u>.  Prior to the commencement of the Case, Wells Fargo made loans, advances and provided other financial accommodations to Debtor pursuant to the terms and conditions set forth in: (1) the Existing Credit Agreement (as defined in the Ratification Agreement and referred to herein as the "<u>Existing Credit Agreement</u>"); and (2) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of Wells Fargo, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Existing Credit Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "<u>Pre-Petition Loan Documents</u>"). Copies of the operative Pre-Petition Loan Documents are on file with counsel to the Debtor and available upon reasonable request therefor.

(ii)      <u>Pre-Petition Loan Obligations</u>.  As of the Petition Date, the Debtor was indebted to Wells Fargo under the Pre-Petition Loan Documents in respect of loans, advances, Letters of Credit, and all other Indebtedness (each as defined in the Existing Credit Agreement) in an aggregate outstanding principal amount of approximately $13.2 million, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "<u>Pre-Petition Obligations</u>"; for purposes hereof, the term Pre-

Petition Obligations shall include, without limitation, all "Pre-Petition Obligations", as such term is defined in the Ratification Agreement).  The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtor, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtor does not possess, shall not assert, hereby forever releases, and is forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations.

(iii)    <u>Pre-Petition Loan Collateral</u>.  As of the Petition Date, the Pre-Petition Obligations were fully secured pursuant to the Pre-Petition Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens granted by Debtor to Wells Fargo under the Pre-Petition Loan Documents, upon all of the Pre-Petition Collateral (as defined in the Ratification Agreement and hereinafter referred to as the "<u>Pre-Petition Collateral</u>"), subject only to the liens specifically permitted under Section 5.3 of the Existing Credit Agreement to the extent that such security interests, liens or encumbrances are (1) valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date, and (2) senior to and have not been or are not subject to being subordinated to Wells Fargo's liens on and security interests in the Pre-Petition Collateral under the Pre-Petition Loan Documents or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding (hereinafter referred to as the "<u>Permitted Encumbrances</u>").  The Debtor does not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect

the validity, enforceability and non-avoidability of any of Wells Fargo's liens, claims or security interests in the Pre-Petition Collateral.

(iv)    <u>Proof of Claim</u>.    The acknowledgment by Debtor of the Pre-Petition Obligations and the liens, rights, priorities and protections granted to or in favor of Wells Fargo in respect of the Pre-Petition Collateral as set forth herein and in the Pre-Petition Loan Documents shall be deemed a timely filed proof of claim on behalf of Wells Fargo in this Case.

F.    <u>Findings Regarding the Post-Petition Financing</u>.

(i)    <u>Post-Petition Financing</u>.    The Debtor has requested from Wells Fargo, and Wells Fargo is willing to extend certain loans, advances and other financial accommodations on the terms and conditions set forth in this Interim Order, the DIP Credit Agreement and the other Financing Agreements (as defined in the Ratification Agreement), respectively.

(ii)    <u>Need for Post-Petition Financing</u>.    The Debtor does not have sufficient available sources of working capital, including cash collateral, to operate its business in the ordinary course of business without the financing requested in the Motion.  The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise fund its operations is essential to the Debtor's continued viability as the Debtor seeks to maximize the value of the assets of the Estate (as defined below) for the benefit of all creditors of the Debtor.  The ability of the Debtor to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with Wells Fargo as set forth in this Interim Order, the DIP Credit Agreement, and other Financing Agreements, as applicable, is vital to the preservation and maintenance of the going concern value of Debtor. Accordingly, the Debtor has an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of its business, minimize the

4496627.5

disruption of its business operations, and preserve and maximize the value of the assets of the Debtor's bankruptcy estate (as defined under § 541 of the Bankruptcy Code, the "Estate") in order to maximize the recovery to all creditors of the Estate.

    (iii) <u>No Credit Available on More Favorable Terms</u>.  The Debtor is unable at the present time to procure financing in the form of unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code, as an administrative expense under § 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to § 364(c)(1), 364(c)(2) or 364(c)(3) of the Bankruptcy Code, without granting liens on assets.  The Debtor has been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by Wells Fargo pursuant to the Financing Agreements.

    (iv) <u>Budget</u>.  The Debtor has prepared and delivered to Wells Fargo an initial 13-week budget (as defined in the Ratification Agreement, the "Budget").  Such Budget has been thoroughly reviewed by the CRO (as defined below), the Debtor, and its management and sets forth, among other things, the projected receipts and disbursements of the Debtor for the periods covered thereby.  The Debtor represents that the Budget is achievable in accordance with the terms of the Financing Agreements and this Interim Order and will allow the Debtor to operate at all times during this Case without the accrual of unpaid administrative expenses.  Wells Fargo is relying upon the Debtor's compliance with the Budget in accordance with Section 5.3 of the Ratification Agreement, the other Financing Agreements, and this Interim Order in determining to enter into the post-petition financing arrangements provided for herein.

    (v) <u>Chief Restructuring Officer</u>.  The Debtor has engaged Toby Kreidler as its Chief Restructuring Officer ("CRO"), who will have exclusive authority to make all disbursements of the Debtor, in accordance with the Budget, and to otherwise monitor and

4496627.5

control all other financial affairs of the Debtor in accordance with the terms of the Engagement Agreement between the CRO and Debtor. Wells Fargo is relying upon the CRO to manage the disbursements of the Debtor in accordance with the Budget and the terms of the Financing Agreements.

(vi)     <u>Business Judgment and Good Faith Pursuant to § 364(e)</u>.  The terms of the Financing Agreements and this Interim Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.   The terms and conditions of the Financing Agreements and this Interim Order have been negotiated in good faith and at arms' length by and between the Debtor and Wells Fargo, with all parties being represented by counsel.   Any credit extended under the terms of this Interim Order shall be deemed to have been extended in good faith by Wells Fargo, as that term is used in § 364(e) of the Bankruptcy Code.

(vii)    <u>Good Cause</u>.  The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtor, its creditors and its Estate, as its implementation will, among other things, provide the Debtor with the necessary liquidity to (1) minimize disruption to the Debtor's business and on-going operations, (2) preserve and maximize the value of the Debtor's Estate for the benefit of all the Debtor's creditors, and (3) avoid immediate and irreparable harm to the Debtor, its creditors, its business, its employees, and its assets.

(viii)   <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(c)(2).  No party appearing in the Case has

filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED THAT:

Section 1.    <u>Authorization and Conditions to Financing.</u>

1.1    <u>Motion Granted</u>.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order.  Except as otherwise expressly provided in this Interim Order, any objection to the entry of this Interim Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

1.2    <u>Authorization to Borrow and Use Loan Proceeds</u>.  Debtor is hereby authorized and empowered to immediately borrow and obtain Advances, Letters of Credit and to incur indebtedness and other Post-Petition Obligations (as defined in the Ratification Agreement) during the period commencing on the date of this Interim Order through and including the date of the Final Hearing as set forth in Section 6 of this Interim Order (the "<u>Interim Financing Period</u>") in the amounts set forth in the Budget covered by the Interim Financing Period.  Subject to the terms and conditions contained in this Interim Order and the Financing Agreements, Debtor shall use the proceeds of the Advances, Letters of Credit and other credit and financial accommodations provided by Wells Fargo under the Financing Agreements solely for payment of expenses set forth in the Budget and amounts owing to Wells Fargo in accordance with the terms and conditions of the Financing Agreements and this Interim Order.

1.3    <u>Financing Documents</u>

(a)    <u>Authorization</u>.  Debtor is hereby authorized and directed to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the

4496627.5

DIP Credit Agreement and the other Financing Agreements. Upon execution and delivery of the Financing Agreements, the Financing Agreements shall constitute valid and binding obligations of the Debtor, enforceable against Debtor in accordance with the terms of the Financing Agreements and this Interim Order. No obligation, payment, transfer or grant of security under the Financing Agreements or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under § 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment or counterclaim.

(b)     Approval; Evidence of Borrowing Arrangements.    All terms, conditions and covenants set forth in the Financing Agreements (including, without limitation, the DIP Credit Agreement) are approved to the extent necessary to implement the terms and provisions of this Interim Order. All such terms, conditions and covenants shall be sufficient and conclusive evidence of (a) the borrowing arrangements by and among Debtor and Wells Fargo, and (b) Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Credit Agreement and the other Financing Agreements for all purposes, including, without limitation, to the extent applicable, the payment of all Pre-Petition and Post-Petition Obligations in accordance with the terms thereof, including, without limitation, all principal, interest, fees and other expenses, including, without limitation, all of Wells Fargo's consultant fees, professional fees, attorney fees and legal expenses, as more fully set forth in the Financing Agreements.

(c)     Amendment.  Subject to the terms and conditions of the DIP Credit Agreement and the other Financing Agreements, Debtor and Wells Fargo may amend, modify, supplement or waive any provision of the Financing Agreements (a "DIP Loan Amendment")

11

without further approval or order of the Court so long as (a) such DIP Loan Amendment is not material (for purposes hereof, a "material" DIP Loan Amendment shall mean, any DIP Loan Amendment that operates to increase the interest rate other than as currently provided in the Financing Agreements, increase the Maximum Line Amount (as defined in the Ratification Agreement), add specific new events of default or enlarge the nature and extent of default remedies available Wells Fargo following an event of default, or otherwise modify any terms and conditions in any Financing Agreement in a manner materially less favorable to Debtor) and is undertaken in good faith by Wells Fargo and Debtor; (b) the Debtor provides prior written notice of the DIP Loan Amendment (the "DIP Loan Amendment Notice") to (i) the U.S. Trustee, and (ii) proposed counsel to the Committee; (c) the Debtor files the DIP Loan Amendment Notice with the Court; and (d) no objection to the DIP Loan Amendment is filed with the Court within two (2) business days from the later of the date the DIP Loan Amendment Notice is served or the date the DIP Loan Amendment Notice is filed with the Court in accordance with this Section. Any material DIP Loan Amendment to the Financing Agreements must be approved by the Court to be effective.

   1.4 <u>Payment of Pre-Petition Debt</u>.  The Debtor is authorized to repay all Pre-Petition Obligations in accordance with the Financing Agreements and Sections 1.5 and 1.6 of this Interim Order.

   1.5 <u>Payments and Application of Payments</u>.  The Debtor is authorized and directed to (i) remit to Wells Fargo for application against all Indebtedness (as defined in the DIP Credit Agreement) all cash collateral of Wells Fargo held by the Debtor or maintained at various bank accounts of the Debtor (other than accounts maintained with Wells Fargo), and (ii) make all payments and transfers of Estate property to Wells Fargo as provided for, permitted and/or

required under the DIP Credit Agreement and the other Financing Agreements, which payments and transfers shall not be avoidable or recoverable from Wells Fargo under §§ 547, 548, 550, 553 or any other section of the Bankruptcy Code, or any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise.  All proceeds of the Pre-Petition Collateral and Post-Petition Collateral received by Wells Fargo, and any other amounts or payments received by Wells Fargo in respect of the Post-Petition Obligations, may be applied or deemed to be applied by Wells Fargo, in its discretion, first to the repayment in full of the Pre-Petition Obligations, and then in repayment of the Post-Petition Obligations, all in accordance with the DIP Credit Agreement, the other Financing Agreements and this Interim Order.  Without limiting the generality of the foregoing, the Debtor is authorized and directed, without further order of this Court, to pay or reimburse Wells Fargo for all present and future costs and expenses, including, without limitation, all professional fees, consultant fees and reasonable legal fees and expenses paid or incurred by Wells Fargo in connection with the financing transactions as provided in this Interim Order and the Financing Agreements, all of which shall be and are included as part of the principal amount of the Post-Petition Obligations and secured by the Collateral.

   1.6 <u>Continuation of Pre-Petition Procedures</u>.  Except to the extent expressly set forth in the Financing Agreements and this Interim Order, all pre-petition practices and procedures for the payment and collection of proceeds of the Collateral, the turnover of cash, the delivery of property to Wells Fargo, including the Deposit Account Control Agreements (as such term is defined in the DIP Credit Agreement) and any other similar lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption after the commencement of the Case. For so long as the Indebtedness remains

outstanding, the Debtor shall only maintain bank accounts with Wells Fargo, and shall immediately discontinue use of bank accounts with any other bank or financial institution unless with the prior consent of Wells Fargo.

Section 2.        Post-Petition Lien; Superpriority Administrative Claim Status.

        2.1        Post-Petition Lien.

        (a)        Post-Petition Lien Granting.  To secure the prompt payment and performance of any and all Post-Petition Obligations of Debtor to Wells Fargo of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, Wells Fargo shall have and is hereby granted, effective as of the Petition Date, valid and perfected first-priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtor's Estate may have (but subject to the Permitted Liens and Claims (as defined below), as and to the extent expressly provided in Section 2.1.3, below), in and upon all of the Collateral (as defined in the DIP Credit Agreement and referred to herein as the "Collateral"), provided, however, that any lien on property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to the Avoidance Actions (as defined below) shall be subject to entry of the Final Financing Order.

        (b)        DIP Loan Lien Priority in Collateral. The liens and security interests of Wells Fargo granted under the Financing Agreements and this Interim Order in the Collateral securing all Indebtedness (as defined in the DIP Credit Agreement) shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with §§ 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided, however, that Wells Fargo's liens on and security interests in the Collateral shall be subject only to (i) Permitted Encumbrances, and

(ii) the Carve Out Expenses (as defined below) solely to the extent provided for in Sections 2.3, 2.4 and 2.6 of this Interim Order (the foregoing clauses (i) and (ii) are collectively referred to herein as the "Permitted Liens and Claims").

(c)    <u>Post-Petition Lien Perfection.</u>    This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any financial institution(s) party to a Deposit Account Control Agreement or holding a Blocked Account (as defined in the DIP Credit Agreement) or other depository account consisting of Collateral (a "<u>Perfection Act</u>").    Notwithstanding the foregoing, if Wells Fargo, shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, then Wells Fargo is authorized to perform such act, and the Debtor is authorized and directed to perform such act to the extent necessary or required by Wells Fargo, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. Wells Fargo may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law.  Should Wells Fargo so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such

attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

(d) <u>Nullifying Pre-Petition Restrictions to Post-Petition Financing</u>. Notwithstanding anything to the contrary contained in any pre-petition agreement, contract, lease, document, note or instrument to which Debtor is a party or under which Debtor is obligated, except as otherwise permitted under the Financing Agreements, any provision that restricts, limits or impairs in any way Debtor from granting Wells Fargo security interests in or liens upon any of the Debtor's assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which Debtor is a party) under the Financing Agreements or this Interim Order, as applicable, or otherwise entering into and complying with all of the terms, conditions and provisions hereof or of the Financing Agreements, shall not (a) be effective and/or enforceable against any such Debtor, or Wells Fargo, as applicable, or (b) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to Wells Fargo pursuant to this Interim Order or the Financing Agreements, to the maximum extent permitted under the Bankruptcy Code and other applicable law.

2.2 <u>Superpriority Administrative Expenses</u>.

(a) <u>DIP Loans</u>. For all Post-Petition Obligations now existing or hereafter arising pursuant to this Interim Order, the Financing Agreements or otherwise, Wells Fargo is granted an allowed superpriority administrative claim pursuant to § 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtor, whether now in existence or hereafter incurred by Debtor,

and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtor and all proceeds thereof (the "DIP Loan Superpriority Claim").

   2.3 Carve Out Expenses.

    (a) Carve Out Expenses.  Upon Wells Fargo providing written notice of the occurrence of an Event of Default (as defined in the DIP Credit Agreement) to (a) the Court, (b) counsel for the Debtor, (c) counsel for the Committee, and (d) the U.S. Trustee (a "Carve Out Trigger Notice"), Wells Fargo's liens, claims and security interests in the Collateral and its DIP Loan Superpriority Claims, shall each be subject only to the right of payment of the following expenses (the "Carve Out Expenses"):

     (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (c) below);

     (ii) all reasonable fees and expenses up to $5,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (c) below); and

     (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses

(the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtor or the Committee pursuant to Sections 327(a) or 1103 of the Bankruptcy Code (the "<u>Professionals</u>") at any time on or after the date of delivery by Wells Fargo of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; <u>provided</u>, <u>that</u> such Allowed Professional Fees shall not at any time exceed the aggregate amount of $75,000 (the "<u>Professional Fee Carve Out</u>").

For the avoidance of doubt, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described herein.

(b)     <u>Excluded Professional Fees</u>.     Notwithstanding anything to the contrary in this Interim Order, neither the Professional Fee Carve Out nor the proceeds of Collateral or any Advances, Letters of Credit or any other credit or financial accommodations provided under or in connection with the Financing Agreements shall be used to pay any Allowed Professional Fees (whether covered by the Professional Fee Carve Out or otherwise) or any other fees or expenses incurred by any Professional in connection with any of the following:

(i)     an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of (A) the Pre-Petition Obligations or Wells Fargo's liens on and security interests in the Pre-Petition Collateral, or (B) the Post-Petition Obligations or Wells Fargo's or liens on and security interests in the Collateral; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, (A) the Pre-Petition Obligations or Wells Fargo's liens on and security interests in the Pre-Petition Collateral, or (B) the Post-Petition Obligations or Wells Fargo's liens on and security

interests in the Collateral; or (iii) preventing, hindering or delaying Wells Fargo's assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of this Interim Order;

(ii)    a request to use the Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior written consent of Wells Fargo in accordance with the terms and conditions of this Interim Order;

(iii)    a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or § 364(d) of the Bankruptcy Code, other than as provided in this Interim Order, without the prior written consent of Wells Fargo;

(iv)    the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against Wells Fargo or any of its officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from Wells Fargo under chapter 5 of the Bankruptcy Code (the "Avoidance Actions");

(v)    the cost of investigation into any claims against Wells Fargo arising under or in connection with the Pre-Petition Loan Documents in excess of $10,000; or

(vi)    any act which has or could materially and adversely modify or compromise the rights and remedies of Wells Fargo, or which results in the occurrence of an Event of Default under any Financing Agreements, or this Interim Order.

(c)    Carve Out Reserve.    At Wells Fargo's discretion, Wells Fargo may, at any time and in any increment in accordance with the DIP Credit Agreement, establish a

Reserve (the "<u>Professional Fee Reserve</u>") against the amount of Line of Credit and Letters of Credit that would otherwise be available to Debtor in respect of the Professional Fee Carve Out and the other Carve Out Expenses.

(d)    <u>Trigger Date</u>.  The "<u>Trigger Date</u>" shall mean the first business day after the occurrence and continuation of an Event of Default (as defined below) and delivery by Wells Fargo of the Carve-Out Trigger Notice.

2.4    <u>Funding the Professional Fee Carve Out</u>.  Prior to the Trigger Date, Debtor shall be authorized to pay Allowed Professional Fees up to the amounts set forth in the Budget and in accordance with the DIP Credit Agreement and this Interim Order.  Promptly following the Trigger Date, Wells Fargo shall make an advance to the Debtor in an amount equal to $30,000 (the "<u>Carve Out Advance</u>"), and the Debtor shall use the proceeds of the Carve Out Advance to fund the Allowed Professional Fees covered by the Professional Fee Carve Out and the other Carve Out Expenses subject to and in accordance with the terms of this Interim Order. Immediately upon Wells Fargo making the Carve Out Advance, the Collateral shall not be subject to any further carve out for any cost or expenses of the Debtor's estate, and Wells Fargo's obligation to fund or otherwise ensure the payment of any Carve Out Expenses pursuant to this Interim Order shall be fully and finally satisfied and discharged, and Wells Fargo shall have no obligation or responsibility to fund or otherwise ensure the payment of any Carve Out Expenses or any other professional fees or expenses of the Debtor or the Committee..

2.5    <u>Payment of Carve Out Expenses</u>.  Payment of any Carve Out Expenses, whether by or on behalf of Wells Fargo, shall not and shall not be deemed to reduce the Post-Petition Obligations, and shall not and shall not be deemed to subordinate any of any of Wells Fargo's liens and security interests in the Pre-Petition Collateral, any other Collateral, the

Adequate Protection Superpriority Claim (as defined below), or the DIP Loan Superpriority Claim to any junior pre- or post-petition lien, interest or claim in favor of any other party. Except and to the extent set forth in Section 2.5 of this Interim Order, Wells Fargo shall not, under any circumstance, be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Case under any chapter of the Bankruptcy Code, and nothing in Section 2.3 or 2.3(c) of this Interim Order shall be construed to obligate Wells Fargo in any way, to pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtor has sufficient funds to pay such compensation or reimbursement.

    2.6  <u>Adequate Protection.</u>

    (a)  <u>Replacement Liens</u>.  As adequate protection for the diminution in value of its interests in the Pre-Petition Collateral on account of the Debtor's use of such Pre-Petition Collateral (including all prior use of Wells Fargo's cash collateral), the imposition of the automatic stay and the subordination to the Carve Out-Expenses, Wells Fargo is hereby granted pursuant to §§ 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "<u>Replacement Lien</u>").  The Replacement Lien shall be junior and subordinate only to (A) the Carve-Out Expenses to the extent set forth herein, (B) the Permitted Liens and Claims, and (C) Wells Fargo's liens on the Collateral to secure the Post-Petition Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

    (b)  <u>Section 507(b) Priority Claims</u>.  As adequate protection for the diminution in value of its interests in the Pre-Petition Collateral on account of the Debtor's use of such Pre-Petition Collateral (including all prior use of Wells Fargo's cash collateral), the

imposition of the automatic stay and the subordination to the Carve-Out-Expenses, Wells Fargo is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Case and any successor bankruptcy cases (the "Adequate Protection Superpriority Claim").  The Adequate Protection Superpriority Claim shall be junior only to (A) the Carve-Out Expenses, and (B) the DIP Loan Superpriority Claim, and shall otherwise have priority over all administrative expense claims and unsecured claims against Debtor and its Estate now existing or hereafter arising, of any kind or nature whatsoever.

Section 3.        Default; Rights and Remedies; Relief from Stay.

3.1      Events of Default.  The occurrence of any of the following events shall constitute an "Event of Default" under this Interim Order: (a) Debtor's failure to perform, in any respect, any of the terms, conditions or covenants or its obligations under this Interim Order; or (b) an "Event of Default" under the DIP Credit Agreement or any of the other Financing Agreements.

3.2      Rights and Remedies upon Event of Default.  Upon the occurrence of and during the continuance of an Event of Default, (a) the Debtor shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order, the DIP Credit Agreement and the other Financing Agreements, and (b) Wells Fargo shall be entitled to take any act or exercise any right or remedy (subject to Section 3.5 below) as provided in this Interim Order or any Financing Document, as applicable, including, without limitation, declaring all Post-Petition Obligations immediately due and payable, accelerating the Post-Petition Obligations, ceasing to extend loans or advances or provide or arrange for Letters of Credit on behalf of Debtor, setting off any Post-Petition Obligations with Collateral or proceeds in Wells Fargo's possession, and enforcing any and all rights with respect to the Collateral.  Wells Fargo shall have no obligation to lend or

advance any additional funds to or on behalf of Debtor, or provide any other financial accommodations to Debtor, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

3.3 <u>Expiration of Loan Commitment</u>. Upon the expiration of Debtor's authority to borrow and obtain other credit accommodations from Wells Fargo pursuant to the terms of this Interim Order and the Financing Agreements (except if such authority shall be extended with the prior written consent of Wells Fargo, which consent shall not be implied or construed from any action, inaction or acquiescence by Wells Fargo), unless an Event of Default set forth in Section 3.1 above occurs sooner and the automatic stay has been lifted or modified pursuant to Section 3.5 of this Interim Order, all of the Post-Petition Obligations shall immediately become due and payable and Wells Fargo shall be automatically and completely relieved from the effect of any stay under section 362 of the Bankruptcy Code, any other restriction on the enforcement of its liens upon and security interests in the Collateral or any other rights granted to Wells Fargo pursuant to the terms and conditions of the Financing Agreements or this Interim Order, and A Wells Fargo shall be and is hereby authorized, in its sole discretion, to take any and all actions and remedies provided to it in this Interim Order, the Financing Agreements or applicable law which Wells Fargo may deem appropriate and to proceed against and realize upon the Collateral or any other property of the Debtor's Estate.

3.4 <u>Maturity of DIP Loans</u>. Upon the Maturity Date (as defined in the Ratification Agreement) (except if the Maturity Date shall be extended with the prior written consent of Wells Fargo, which consent shall not be implied or construed from any action, inaction or acquiescence by Wells Fargo), unless an Event of Default set forth in Section 3.1

4496627.5

above occurs sooner and the automatic stay has been lifted or modified pursuant to Section 3.5 of this Interim Order, all of the Post-Petition Obligations shall immediately become due and payable and Wells Fargo shall be automatically and completely relieved from the effect of any stay under section 362 of the Bankruptcy Code, any other restriction on the enforcement of its liens upon and security interests in the Post-Petition Collateral (as defined in the Ratification Agreement) or any other rights granted to Wells Fargo pursuant to the terms and conditions of the Financing Agreements or this Interim Order, and Wells Fargo shall be and is hereby authorized, in its sole discretion, to take any and all actions and remedies provided to it in this Interim Order, the Financing Agreements or applicable law which Wells Fargo may deem appropriate and to proceed against and realize upon the Post-Petition Collateral or any other property of the Debtor's Estate.

        3.5    <u>Relief from Automatic Stay</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application or order of the Court to the extent necessary to permit Wells Fargo to perform any act authorized or permitted under or by virtue of this Interim Order or the Financing Agreements, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by this Interim Order and pursuant to the terms of the Financing Agreements, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Pre-Petition Obligations or the Post-Petition Obligations, as applicable, including, without limitation, all interests, fees, costs and expenses permitted under the Financing Agreements and apply such payments to the Pre-Petition Obligation or Post-Petition Obligations pursuant to the Financing

Agreements and/or this Interim Order, as applicable, and (d) immediately upon the occurrence of an Event of Default, to take any action and exercise all rights and remedies provided to it by this Interim Order, the Financing Agreements or applicable law other than those rights and remedies against the Collateral as provided in the following sentence.  In addition, and without limiting the foregoing, upon the occurrence of an Event of Default and after providing five (5) business days (the "Default Notice Period") prior written notice (the "Enforcement Notice") to counsel for the Debtor, counsel for the Committee, and the U.S. Trustee, Wells Fargo shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim Order, the Financing Agreements or applicable law Wells Fargo may deem appropriate in its sole discretion to proceed against and realize upon the Collateral or any other assets or properties of Debtor's Estate upon which Wells Fargo has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all Post-Petition Obligations. Notwithstanding anything to the contrary, any action taken by Wells Fargo to (i) terminate the commitments under the Financing Agreements, (ii) accelerate the Indebtedness, (iii) send blocking notices or activation notices pursuant to the terms of any Deposit Account Control Agreement, (iv) repay any amounts owing in respect of the Post-Petition Obligations (including, without limitation, fees, indemnities and expense reimbursements) and (v) cash collateralize Letters of Credit issued pursuant to the Financing Agreements, in each case, shall not require any advance notice to the Debtor.  In any hearing regarding any exercise of rights or remedies (which hearing must take place within the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtor shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict

the rights and remedies of Wells Fargo set forth in this Interim Order or the Financing Agreements.

Section 4.  <u>Representations; Covenants; and Waivers.</u>

4.1  <u>Objections to Pre-Petition Obligations</u>.

(a)  <u>Objections to Pre-Petition Obligations</u>. Notwithstanding anything to the contrary in the Interim Order, any action, claim, defense complaint, motion or other written opposition (hereinafter, an "<u>Objection</u>") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Pre-Petition Obligations, or (b) the extent, legality, validity, perfection or enforceability of Wells Fargo's pre-petition liens and security interests in the Pre-Petition Collateral shall be properly filed with the Court by the Committee, and no other party, within sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee. If any such Objection is timely and properly filed and successfully pursued, nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the Pre-Petition Obligations or Wells Fargo's pre-petition liens on the Pre-Petition Collateral. If no Objection is timely and properly filed, or if an Objection is timely and properly filed but denied, (i) the Pre-Petition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Wells Fargo's pre-petition liens on and security interest in the Pre-Petition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Permitted Liens and Claims, and (ii) Wells Fargo and each of its participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from any and all

claims and causes of action related to or arising out of the Pre-Petition Loan Documents and shall not be subject to any further objection or challenge by any party at any time.  Nothing contained in this Section 4.1(a) or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to Wells Fargo in connection with all post-petition advances and Letters of Credit, and any other post-petition financial and credit accommodations provided Wells Fargo to Debtor in reliance on section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Interim Order and the Financing Agreements.

   4.2 <u>Debtor's Waivers</u>.  At all times during the Case, and whether or not an Event of Default has occurred, the Debtor irrevocably waives any right that it may have to seek further authority (a) to use Cash Collateral of Wells Fargo under section 363 of the Bankruptcy Code, (b) to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than as provided in this Interim Order or as may be otherwise expressly permitted pursuant to the Financing Agreements, except to the extent that such other post-petition loans or financial accommodations will pay Wells Fargo indefeasibly and immediately, in full, on all Indebtedness, inclusive of both Pre-Petition Obligations and Post-Petition Obligations, (c) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral is less than the Pre-Petition Obligations, (d) to propose, support or have a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash in full and satisfaction of all Post-Petition Obligations on the effective date of such plan in accordance with the terms and conditions set forth in the DIP Credit Agreement, or (e) to seek relief under the Bankruptcy Code, including without limitation,

4496627.5

under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of Wells Fargo as provided in this Interim Order and the Financing Agreements or Wells Fargo's exercise of such rights or remedies; provided, however, that Wells Fargo may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by Wells Fargo, and the consent of Wells Fargo shall be required in order to relieve the Debtor of its obligations under this Section 4.2.

4.3     Section 506(c) Claims.    Subject to entry of a Final Financing Order granting such relief, no costs or expenses of administration which have or may be incurred in the Case shall be charged against Wells Fargo, its claims or the Collateral pursuant to § 506(c) of the Bankruptcy Code without the prior written consent of Wells Fargo, and no such consent shall be implied from any other action, inaction or acquiescence by Wells Fargo.

4.4     Collateral Rights.    Until all Indebtedness shall have been indefeasibly paid and satisfied in full:

(a)     no other party shall foreclose or otherwise seek to enforce any junior lien or claim in Collateral; and

(b)     upon and after the declaration of the occurrence of an Event of Default, and subject to Wells Fargo obtaining relief from the automatic stay as provided for herein, in connection with a liquidation of any of the Collateral, Wells Fargo (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the sole cost and expense of Debtor, to: (i) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by Debtor and (ii) use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of Debtor, which are owned by or subject to a

lien of any third party and which are used by Debtor in its business. Wells Fargo will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property for the period of time that Wells Fargo actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that Wells Fargo actually occupies or uses such assets or properties or for any fees, rentals or other amounts that may become due following the end of Wells Fargo's occupation or use).

4.5    Releases.

(a)    Upon the earlier of (a) the entry of a Final Financing Order approving the Motion or (b) the entry of an order extending the Interim Financing Period beyond thirty (30) calendar days after the date of this Interim Order, and in each instance, subject to Section 4.1 above, in consideration of Wells Fargo permitting Debtor to use the Pre-Petition Collateral (including Cash Collateral) and providing other credit and financial accommodations to the Debtor pursuant to the provisions of the Financing Agreements and this Interim Order, Debtor, on behalf of itself and its successors and assigns, (collectively, the "Releasors"), shall, forever release, discharge and acquit Wells Fargo and its respective successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (collectively, the "Pre-Petition Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against Pre-Petition Releasees as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to the Debtor, the

Indebtedness, Financing Agreements and any loans, advances, Letters of Credit, Bank Products or other financial accommodations made by Wells Fargo to Debtor pursuant to the Financing Agreements.  In addition, upon the repayment of all Indebtedness (as defined in the DIP Credit Agreement) owed to Wells Fargo by Debtor and termination of the rights and obligations arising under the Financing Agreements (which payment and termination shall be on terms and conditions acceptable to Wells Fargo), Wells Fargo shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the Financing Agreements, this Interim Order or the Final Financing Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve-Out Expenses and/or the Professional Fee Carve Out in accordance with Sections 2.4 or 2.5 of this Interim Order or otherwise), on terms and conditions acceptable to Wells Fargo.

Section 5.        <u>Other Rights and Post-Petition Obligations</u>.

       5.1    <u>No Modification or Stay of This Interim Order</u>.  Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim Order, the Financing Agreements or any term hereunder or thereunder, (b) the failure to obtain a Final Financing Order pursuant to Bankruptcy Rule 4001(c)(2), or (c) the dismissal or conversion of the Case (each, a "<u>Subject Event</u>"), (x) the acts taken by Wells Fargo in accordance with this Interim Order, and (y) the Post-Petition Obligations incurred or arising prior to Wells Fargo's actual receipt of written notice from Debtor expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Order, and the acts taken by Wells Fargo in accordance with this Interim Order, and the liens granted to Wells Fargo in the Collateral, and all other rights,

remedies, privileges, and benefits in favor of Wells Fargo pursuant to this Interim Order and the Financing Agreements shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.  For purposes of this Interim Order, the term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

5.2    <u>Power to Waive Rights; Duties to Third Parties</u>.  Wells Fargo shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order in respect of Wells Fargo (the "<u>DIP Loan Lender Rights</u>"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Loan Lender Right(s).  Any waiver by Wells Fargo of any DIP Loan Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any DIP Loan Lender Right shall neither constitute a waiver of such DIP Loan Lender Right, subject Wells Fargo to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtor to Wells Fargo.

5.3    <u>Disposition of Collateral</u>.  Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of Wells Fargo (and no such consent shall be implied, from any other action, inaction or acquiescence by Wells Fargo) and an order of this Court, except for sales of Debtor's Inventory in the ordinary course of its business or otherwise expressly permitted pursuant to the terms of the DIP Credit Agreement.

4496627.5

5.4 _Inventory_. Debtor shall not, without the consent of Wells Fargo, (a) enter into any agreement to return any inventory to any of its creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

5.5 _Reservation of Rights_. The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of Wells Fargo to pursue any and all rights and remedies under the Bankruptcy Code, the Financing Agreements or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estates.

5.6 _Binding Effect_.

(a) The provisions of this Interim Order and the Financing Agreements, the Post-Petition Obligations, the A/L Adequate Protection Superpriority Claim, the DIP Loan Superpriority Claim and any and all rights, remedies, privileges and benefits in favor Wells Fargo provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any order which may be entered confirming any

plan of reorganization, converting the Case to any other chapter under the Bankruptcy Code, or dismissing the Case.

(b)    Any order dismissing the Case under section 1112 or otherwise shall be deemed to provide (in accordance with §§ 105 and 349 of the Bankruptcy Code) that (a) the DIP Loan Superpriority Claim and Wells Fargo's liens on and security interests in the Collateral and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Interim Order shall continue in full force and effect notwithstanding such dismissal until the Indebtedness is indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing all such claims, liens, protections and rights.

(c)    In the event this Court modifies any of the provisions of this Interim Order or the Financing Agreements following a Final Hearing, such modifications shall not affect the rights or priorities of Wells Fargo pursuant to this Interim Order with respect to the Collateral or any portion of the Indebtedness which arises or is incurred or is advanced prior to such modifications, and this Interim Order shall otherwise remain in full force and effect.

(d)    This Interim Order shall be binding upon Debtor, all parties in interest in the Case and its respective successors and assigns, including any trustee or other fiduciary appointed in the Case or any subsequently converted bankruptcy case(s) of Debtor. This Interim Order shall also inure to the benefit of Wells Fargo, Debtor and its respective successors and assigns.

5.7    <u>Restrictions on Cash Collateral Use, Additional Financing, Plan Treatment</u>.

(a)    All post-petition advances and other financial accommodations under the DIP Credit Agreement and the other Financing Agreements are made in reliance on this Interim Order and there shall not at any time be entered in the Case, or in any subsequently converted case under chapter 7 of the Bankruptcy Code, any order (other than the Final Financing Order) which (a) authorizes any further use of cash collateral of Debtor in which Wells Fargo has an interest, or the sale, lease, or other disposition of property of Debtor's Estate in which Wells Fargo has a lien or security interest, except as expressly permitted hereunder or in the Financing Agreements, or (b) authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which Wells Fargo holds a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to Wells Fargo herein; unless, in each instance (x) Wells Fargo shall have given its express prior written consent with respect thereto, no such consent being implied from any other action, inaction or acquiescence by Wells Fargo, or (y) such other order requires that all Post-Petition Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of the DIP Credit Agreement and the other Financing Agreements, including, without limitation, all debts and obligations of Debtor to Wells Fargo which arise or result from the obligations, loans, security interests and liens authorized herein, on terms and conditions acceptable to Wells Fargo.  The security interests and liens granted to or for the benefit of Wells Fargo hereunder and the rights of Wells Fargo pursuant to this Interim Order and the Financing Agreements with respect to the Post-Petition Obligations and the Collateral

are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of Debtor and, if Wells Fargo shall expressly consent in writing that the Post-Petition Obligations shall not be repaid in full upon confirmation thereof, shall continue after confirmation and consummation of any such plan.

5.8     No Owner/Operator Liability.

(a)     Subject to the entry of the Final Financing Order granting such relief, Wells Fargo shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

5.9     Marshalling.  Subject to entry of the Final Financing Order granting such relief, in no event shall Wells Fargo be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.  Wells Fargo shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to Wells Fargo with respect to proceeds, products, offspring or profits of any of the Collateral, as applicable.

5.10     Right of Setoff.

(a)     To the extent any funds were on deposit with Wells Fargo as of the Petition Date, including, without limitation, all funds deposited in, or credited to, an account of Debtor Wells Fargo immediately prior to the filing of the Case (regardless of whether, as of the Petition Date, such funds had been collected or made available for withdrawal by Debtor), such funds (the "Deposited Funds") are subject to rights of setoff.  By virtue of such setoff rights, the

Deposited Funds are subject to a lien in favor of Wells Fargo pursuant to §§ 506(a) and 553 of the Bankruptcy Code.

        5.11   <u>Right to Credit Bid</u>.

        (a)    Wells Fargo shall have the right to "credit bid" the amount of its claims arising under the terms of the Financing Agreements, during any sale of all or substantially all of the Debtor's assets, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code.

        5.12   <u>Term; Termination</u>.

        (a)    Notwithstanding any provision of this Interim Order to the contrary, the term of the financing arrangements among Debtor and Wells Fargo authorized by this Interim Order may be terminated pursuant to the terms of the DIP Credit Agreement.

        5.13   <u>Limited Effect</u>.  In the event of a conflict between the terms and provisions of any of the Financing Agreements and this Interim Order, the terms and provisions of this Interim Order shall govern, interpreted as most consistent with the terms and provisions of the Financing Agreements.

        5.14   <u>Objections Overruled</u>.  All objections to the entry of this Interim Order are, to the extent not withdrawn, hereby overruled.

Section 6.     <u>Final Hearing and Response Dates.</u>

        The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for _____, 2016, at _____ before this Court.  The Debtor shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with this Court and to proposed counsel for the Committee.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which

objections shall be served upon (a) proposed counsel to the Debtor, DiConza Traurig Kadish LLP, 630 Park Avenue, New York, New York, 10017; Attn: Gerard DiConza, Esq., Fax: (212) 682-4942; (b) counsel for Wells Fargo, Otterbourg, P.C., 230 Park Avenue, New York, New York 10169-0075; Attn: Jonathan N. Helfat, Esq. and Daniel F. Fiorillo, Esq., Fax: (212) 682-6104; (c) counsel to the Committee; and (d) the U.S. Trustee; and shall be filed with the Clerk of the United States Bankruptcy Court for the Eastern District of New York, in each case, to allow actual receipt of the foregoing no later than _____, prevailing Eastern time on ___, 2016.

**EXHIBIT 1**

**DIP Credit Agreement**

[OTTERBOURG DRAFT 7/19/2016]

RATIFICATION AND AMENDMENT TO THE AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

This RATIFICATION AND AMENDMENT TO THE AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT (the "Ratification Agreement") dated as of July __, 2016, is by and between Wells Fargo Bank, National Association, ("Wells Fargo") and Hi-Temp Specialty Metals, Inc., a Delaware corporation ("Company").

W I T N E S S E T H:

WHEREAS, Company has commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of New York, and Company has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Case (as defined below), Wells Fargo made loans and advances and provided other financial or credit accommodations to Company secured by substantially all assets and properties of Company as set forth in the Existing Financing Agreements (as defined below);

WHEREAS, the Bankruptcy Court (as defined below) has entered a Financing Order (defined below) pursuant to which Wells Fargo may make post-petition loans and advances, and provide other financial accommodations, to Company secured by substantially all the assets and properties of Company as set forth in the Financing Order and the Financing Agreements (as defined below);

WHEREAS, the Financing Order provides that as a condition to the making of such post-petition loans, advances and other financial accommodations, Company shall execute and deliver this Ratification Agreement;

WHEREAS, Company desires to reaffirm its obligations to Wells Fargo pursuant to the Existing Financing Agreements and acknowledge its continuing liabilities to Wells Fargo thereunder in order to induce Wells Fargo to make such post-petition loans and advances, and provide such other financial accommodations, to Company; and

WHEREAS, Company has requested that Wells Fargo make post-petition loans and advances and provide other financial or credit accommodations to Company and make certain amendments to the Credit Agreement (as defined below), and Wells Fargo is willing to do so, subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Wells Fargo and Company mutually covenant, warrant and agree as follows:

1.    <u>DEFINITIONS</u>.

1.1    <u>Additional Definitions</u>.  As used herein, the following terms shall have the respective meanings given to them below and the Credit Agreement and the other Financing Agreements shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "Baghouse Inventory" means Inventory designated as baghouse inventory, with a category identification of J-3125 on the inventory valuation summary report provided by Company to Wells Fargo from time to time, which is comprised of material recaptured from Company's production process through its baghouse system.

(b)    "Baghouse Inventory Sublimit" means (i) from the Ratification Effective Date to and including September 30, 2016, $1,800,000; (ii) from October 1, 2016 to and including March 30, 2017, $1,000,000; (iii) from March 31, 2017 to and including June 29, 2017, $500,000; (iv) from June 30, 2017 and thereafter, $0.

(c)    "Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

(d)    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Eastern District of New York.

(e)    "Budget" shall mean the budget to be delivered to Wells Fargo in accordance with Section 5.3(a) hereof, in form and substance satisfactory to Wells Fargo together with any subsequent or amended budget(s) thereto delivered to Wells Fargo, in form and substance satisfactory to Wells Fargo, in accordance with the terms and conditions hereof.

(f)    "Chapter 11 Case" shall mean the Chapter 11 case of Company under the Bankruptcy Code and is pending in the Bankruptcy Court as Case No. 16-72767 (LAS).

(g)    "Debtor" shall mean Company, as Debtor and Debtor-in-Possession in the Chapter 11 Case.

(h)    "Existing Credit Agreement" shall mean the Amended and Restated Credit and Security Agreement dated July 16, 2010 by and between Wells Fargo and Company as amended prior to the date hereof, as in effect immediately prior to the Petition Date.

(i)    "Existing Financing Agreements" shall mean the Loan Documents (as defined in the Existing Credit Agreement), including, without limitation, the Existing Credit Agreement, in each case, as in effect immediately prior to the Petition Date.

(j)    "Financing Order" shall mean the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Wells Fargo to Company on an emergency, interim or permanent basis pursuant to

2

Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

(k)    "Interim Financing Order" shall have the meaning set forth in Section 9.7 hereof.

(l)    "Permanent Financing Order" shall have the meaning set forth in Section 9.8 hereof.

(m)    "Petition Date" shall mean the date of the commencement of the Chapter 11 Case.

(n)    "Post-Petition Collateral" shall mean, collectively, all now existing and hereafter acquired real and personal property of Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Wells Fargo, pursuant to the Financing Agreements, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation, all Collateral, as such term is defined in the Existing Credit Agreement, and:

i.    all of Debtor's Accounts;

ii.    all of Debtor's Books;

iii.    all of Debtor's Chattel Paper;

iv.    all of Debtor's Commercial Tort Claims, including, without limitation, those identified on Schedule 1.1 to this Agreement;

v.    all of Debtor's Deposit Accounts;

vi.    all of Debtor's Equipment;

vii.    all of Debtor's Farm Products;

viii.    all of Debtor's Fixtures;

ix.    all of Debtor's General Intangibles;

x.    all of Debtor's Inventory;

xi.    all of Debtor's Investment Property;

xii.    all of Debtor's Intellectual Property and Intellectual Property Licenses;

xiii.    all of Debtor's Negotiable Collateral;

xiv.    all of Debtor's Pledged Interests (including all of Debtor's Pledged Operating Agreements and Pledged Partnership Agreements);

xv.  all of Debtor's Securities Accounts;

xvi.  all of Debtor's Supporting Obligations;

xvii.  all of Debtor's money, Cash Equivalents, or other assets of Debtor that now or hereafter come into the possession, custody, or control of Wells Fargo (or its agent or designee);

xviii. all of the proceeds (as such term is defined in the UCC) and products, whether tangible or intangible, of any of the foregoing, including, without limitation, proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General Intangibles, Inventory, Investment Property, Intellectual Property, Negotiable Collateral, Securities Accounts, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect to the Intellectual Property included in the Collateral, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, and the right to sue for past, present, and future infringements of the Intellectual Property included in the Collateral, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "Proceeds").  Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to Debtor or Wells Fargo from time to time with respect to any of the Investment Property;

xix.  from and after the entry of the Permanent Financing Order, all claims, rights, interests, assets and properties recovered by or on behalf of Debtor or any trustee of Debtor (whether in the Chapter 11 Case or any subsequent case to which the Chapter 11 Case is converted) including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Section 544, 545,547, 548, 549,550, 551, and 553 of the Bankruptcy Code; and

xx.  to the extent not otherwise described above, all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

4

xxi. to the extent not otherwise described above, all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (1) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (2) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (3) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (4) deposits by and property of account debtors or other persons securing the obligations of account debtors;

xxii. to the extent not otherwise described above, all (1) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (2) monies, credit balances, deposits and other property of Company now or hereafter held or received by or in transit to Wells Fargo or its Affiliates or at any other depository or other institution from or for the account of Company, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

xxiii. to the extent not otherwise described above to the extent not otherwise described above, all Receivables;

xxiv. to the extent not otherwise described above all Records; and

xxv. to the extent not otherwise described above, all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

(o)     "Post-Petition Obligations" shall mean all Indebtedness (as defined in the Existing Credit Agreement) arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Case, and whether arising under or related to this Ratification Agreement, the Credit Agreement, the other Financing Agreements, a Financing Order, by operation of law or otherwise, and whether incurred by Company as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(p)     "Pre-Petition Collateral" shall mean, collectively, (i) all "Collateral" as such term is defined in the Existing Credit Agreement as in effect immediately prior to the Petition Date, and (ii) all other security and collateral for the Pre-Petition Obligations

as provided in the Existing Credit Agreement and the other Existing Financing Agreements immediately prior to the Petition Date.

(q)     "Pre-Petition Obligations" shall mean all Indebtedness (as such term is defined in the Existing Credit Agreement) arising at any time before the Petition Date, whether incurred by Company as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(r)     "Ratification Agreement" shall mean this Ratification and Amendment to the Amended and Restated Credit and Security Agreement by and among Company and Wells Fargo, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(s)     "Ratification Effective Date" means July __, 2016.

(t)     "Slow Moving Inventory" means the SKUs of Inventory for which the Company has more pounds of such SKU on hand as of the fifth day of each month than it had sold in the trailing twelve (12) month period, which such Inventory would otherwise be Eligible Inventory but for the fact it is "slow moving" as described above. In addition, without limiting the foregoing, the SKUs of Inventory identified on Exhibit 4, dated as of July 14, 2016, shall be deemed "Slow Moving Inventory."

(u)     "Slow Moving Inventory Advance Rate" means the greater of (i) 37.1%, less (a) 1% per week starting with the sixty (60) day anniversary of the Ratification Effective Date for 8 weeks; (b) 2% per week thereafter; or (ii) 0%.

(v)     "Slow Moving Inventory Sublimit" means (i) the Net Orderly Liquidation Value of the Slow Moving Inventory multiplied by (ii) the Slow Moving Inventory Advance Rate.

(w)     "Specified Defaults" means all Defaults and Events of Default that are listed in Exhibit 1 hereto together with any Defaults or Events of Default arising due specifically to the commencement of the Bankruptcy Case.  Wells Fargo has not waived, is not by this Ratification Agreement waiving, and has no intention of waiving any Events of Default which may have occurred on or prior to the date hereof, whether or not continuing on the date hereof, or which may occur after the date hereof.

1.2     Amendments to Definitions.

(a)     Collateral.  All references to the term "Collateral" in the Credit Agreement, this Ratification Agreement or the other Financing Agreements, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

6

(b)    <u>Credit Agreement</u>.  All references to the term "Credit Agreement" in the Existing Credit Agreement, this Ratification Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean the Existing Credit Agreement, as amended by this Ratification Agreement and as ratified, assumed and adopted by Company pursuant to the terms hereof and the Financing Order, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(c)    <u>Debtor</u>.  All references to Debtor, including, without limitation, to the terms "Borrower," "Hi-Temp"  and "Company" in the Credit Agreement, this Ratification Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean and include the Debtor as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(d)    <u>Financing Agreements</u>.  All references to the term "Loan Documents" in the Credit Agreement, this Ratification Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Existing Financing Agreements, as ratified, assumed and adopted by Company pursuant to the terms hereof, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(e)    <u>Material Adverse Effect</u>.  All references to the term "Material Adverse Effect", "material adverse effect" or "material adverse change" in the Credit Agreement, this Ratification Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to add at the end thereof:  "provided, that, the commencement of the Chapter 11 Case shall not constitute a Material Adverse Effect or material adverse change".

(f)    <u>Indebtedness</u>.  All references to the term "Indebtedness" in the Credit Agreement, this Ratification Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

(g)    <u>Maximum Line Amount</u>.  The term "Maximum Line Amount" is hereby amended and restated as follows: "Maximum Line Amount" means (i) from the Ratification Effective Date to and including December 31, 2016, $14,700,000; (ii) from January 1, 2017 to and including February 28, 2017, $12,000,000; (iii) March 1, 2017 and thereafter, $10,000,000"

(h)    <u>Temporary Overadvance Amount</u>.  The term "Temporary Overadvance Amount" is hereby amended and restated as follows: "Temporary Overadvance Amount" means (i) from the Ratification Effective Date to and including November 30, 2016, $4,100,000; (ii) from December 1, 2016 to and including January 31, 2017, $3,500,000; (iii) from February 1, 2017 to and including February 28, 2017, $3,000,000; (iv) from March 1, 2017

7

to and including April 15, 2017, $2,500,000; (v) from April 16, 2017 to and including May 30, 2017, $2,000,000; (vi) from May 31, 2017 and thereafter, $1,500,000."

(i)     <u>Inventory Sublimit</u>.  The term "Inventory Sublimit" is hereby amended and restated as follows: "Inventory Sublimit" means (i) from the Ratification Effective Date to and including December 31, 2016, $8,500,000; (ii) from January 1, 2017 to and including February 28, 2017, $7,000,000; (iii) from March 1, 2017 and thereafter, $6,000,000.

(j)     <u>Eligible In-Transit Inventory</u>. The term "Eligible In-Transit Inventory" is hereby amended and restated as follows: "Eligible In-Transit Inventory" means Inventory of Company that would constitute Eligible Inventory but for the fact that it is in-transit.  In general, Wells Fargo will deem in-transit Inventory to be Eligible In-Transit Inventory if:

(i)     it has been in-transit for less than forty-five (45) days after its first having been loaded on board the cargo vessel;

(ii)     Company has provided Wells Fargo with (1) proof, in form and substance acceptable to Wells Fargo, that the original bona fide bill of lading is in negotiable form and such bills of lading have been consigned to Wells Fargo or are in Wells Fargo's possession or control, (2) copies of invoices and packaging slips and (3) such other information as Wells Fargo may request from time to time; and

(iii)     Wells Fargo, the Company and the broker or other agent handling any such in-transit Inventory are parties to an agreement, in form and substance acceptable to Wells Fargo with respect to such in-transit Inventory and confirming, among other things, that Wells Fargo's security interest thereon is first in priority; provided, that, notwithstanding the foregoing, the amount of Eligible In-Transit Inventory shall not exceed $1,430,000 (the "<u>Eligible In-Transit Inventory Sublimit</u>") during the Interim Financing Period (as defined in the Interim Financing Order), and such sublimit shall be subject to further adjustment in accordance with the Budget.

1.3.     <u>Interpretation</u>.

(a)     For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Existing Credit Agreement.

(b)     All references to the term "Wells Fargo", "Company", "Debtor" or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its respective successors and assigns.

(c)     All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(d)    All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

2.    ACKNOWLEDGMENT.

2.1    Pre-Petition Obligations.  Company hereby acknowledges, confirms and agrees that, as of July __, 2016, Company is indebted to Wells Fargo in respect of (a) all Pre-Petition Obligations in the aggregate principal amount of not less than $_____, consisting of: (i) Revolving Loans in the aggregate principal amount of not less than $_____, and (ii) Indebtedness relating to Letters of Credit in the aggregate amount of not less than $[50,000], together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and expenses), and (b) other charges now or hereafter owed by Company to Wells Fargo, all of which are unconditionally owing by Company to Wells Fargo, without offset, defense or counterclaim of any kind, nature and description whatsoever.

2.2    Acknowledgment of Security Interests.  Company hereby acknowledges, confirms and agrees that Wells Fargo, has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Wells Fargo pursuant to the Existing Financing Agreements as in effect immediately prior to the Petition Date to secure all of the Indebtedness, as well as valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Wells Fargo, under the Financing Order or hereunder or under any of the other Financing Agreements or otherwise granted to or held by Wells Fargo, in each case, subject only to liens or encumbrances expressly permitted by the Credit Agreement and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Wells Fargo.

2.3    Binding Effect of Documents.  Company hereby acknowledges, confirms and agrees that: (a) each of the Existing Financing Agreements to which it is a party was duly executed and delivered to Wells Fargo by Company and each is in full force and effect as of the date hereof, (b) the agreements and obligations of Company contained in the Existing Financing Agreements constitute the legal, valid and binding obligations of Company enforceable against it in accordance with the terms thereof, and Company has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Wells Fargo is and shall be entitled to all of the rights, remedies and benefits provided for in the Financing Agreements and the Financing Order.

3.    ADOPTION AND RATIFICATION.

Company hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Existing Financing Agreements to which it is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Existing Financing Agreements, as amended by this Ratification Agreement, and in accordance with the Financing Order.  All of the Existing Financing Agreements are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Company, as Debtor and Debtor-in-Possession, and considered as agreements between Company, on the one hand, and Wells Fargo, on the other

9

hand.  Company hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Financing Agreements, as amended and supplemented pursuant hereto and the Financing Order, and Company agrees to be fully bound, as Debtor and Debtor-in-Possession, by the terms of the Financing Agreements to which Company is a party.

4.      GRANT OF SECURITY INTEREST.

As collateral security for the prompt performance, observance and payment in full of all of the Indebtedness (including the Pre-Petition Obligations and the Post-Petition Obligations), Company, as Debtor and Debtor-in-Possession, hereby grants, pledges and assigns to Wells Fargo, and also confirms, reaffirms and restates the prior grant to Wells Fargo of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

5.      ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS.

In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Company to Wells Fargo, whether pursuant to the Financing Agreements or otherwise, and not in limitation thereof, Company hereby represents, warrants and covenants to Wells Fargo the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of Loans by Wells Fargo or the issuance of Letters of Credit:

5.1.      Financing Order.  The Interim Financing Order (and, following the expiration of the Interim Financing Period defined therein, the Permanent Financing Order) has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Wells Fargo) and is not subject to any pending appeal, stay or motion for reconsideration as to which an effective stay exists.

5.2.      Use of Proceeds.  All Loans provided by Wells Fargo to Company or Letters of Credit issued pursuant to the Financing Orders, the Credit Agreement or otherwise, shall be used by Company (i) during the Interim Financing Period (as defined in the Interim Financing Order) at the exclusive direction of the CRO (as defined below), and (ii) following the expiration of the Interim Financing Period, only in accordance with the Budget as set forth in Section 5.3 and subject to the other terms and conditions contained in the Financing Agreements and the Financing Orders. Unless otherwise provided for in the Budget or authorized by the Bankruptcy Court and approved by Wells Fargo in writing, no portion of any administrative expense claim relating to the Chapter 11 Case or any other claim against the Company shall be paid with the proceeds of such Loans or Letters of Credit provided or issued by (or on behalf of) Wells Fargo to Company, other than those administrative claims and other claims relating to the Chapter 11 Case directly attributable to the operation of the business of Company in the ordinary course of such business in accordance with the Financing Agreements and the Budget.

5.3.      Budget.

(a)      Company has delivered to Wells Fargo, a post-petition Budget covering the period commencing with the week beginning on  July 15, 2016 and ending on

10

October 7, 2016; provided that the Budget may be amended (to the extent such amended Budget is approved by Wells Fargo in writing).  The Budget has been, and any amendment to the Budget shall be, thoroughly reviewed and approved by the CRO (as defined below), its management and its restructuring advisors. The Budget sets forth and any amendment to the Budget shall set forth, for the periods covered thereby, projected weekly operating cash disbursements and cash receipts for each week covered by the Budget, in form and substance acceptable to Wells Fargo.

   (b) Not later than 5:00 p.m. (Eastern time) on the Monday of each week commencing on July 22, 2016, Company shall furnish to Wells Fargo, in form and substance satisfactory to Wells Fargo, a report (the "Budget Compliance Report") that sets forth, on both a week by week basis and a cumulative, weekly roll-forward basis through the end of the immediately preceding week, a comparison of the actual cash disbursements to the projected cash disbursements and the actual cash receipts to the projected cash receipts, each as set forth in the Budget for such Measurement Period, together with a certification from the Company's Chief Restructuring Officer that no Material Budget Deviation (as defined below) has occurred.

   (c) It shall constitute a Material Budget Deviation and an additional Event of Default under the Credit Agreement if (i) commencing with the week ending August 5, 2016, and each week thereafter, the actual aggregate cash receipts for the trailing three (3) week period are less than eighty-five percent (85%) of the projected aggregate cash receipts set forth in the Budget for such trailing three (3) week period; and (ii) actual aggregate cash disbursements for the trailing three (3) week period are more than one hundred and twenty percent (120%) of the projected aggregate cash disbursements set forth in the Budget for such trailing three (3) week period.

   (d) Debtor hereby confirms, acknowledges and agrees that, unless waived in writing by Wells Fargo, (i) a failure to maintain the deviations in the Budget as set forth in Section 5.3(c) hereof shall constitute a material deviation from the Budget and an additional Event of Default (each, a "Material Budget Deviation") and (ii) the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Wells Fargo, as provided in Section 5.3(b) hereof shall constitute an Event of Default.  Notwithstanding any approval by Wells Fargo of the Budget or any subsequent or amended Budget(s) Wells Fargo will not, and shall not be required to provide any Loans or Letters of Credit Accommodations to Company pursuant to the Budget and shall provide only Loans in accordance with the terms and conditions set forth in the Credit Agreement as amended by this Ratification Agreement, the other Financing Agreements and the Financing Order unless and until the Credit Agreement, as amended by this Ratification Agreement and the other Financing Agreements and the Financing Order  has been amended and supplemented to provide for the funding of the amounts provided for in the Budget.  Wells Fargo is relying upon Company's delivery of, and compliance with, the Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

   (e) Notwithstanding any projected amounts set forth in the Budget relating to the costs and expenses of Wells Fargo that are reimbursable by Company or any other amounts owing by Company to Wells Fargo (including, without limitation reasonable attorneys and consulting fees and expenses) in accordance with the Credit Agreement and the other Financing Agreements, such projections shall not limit, impair, modify or waive the Company's

obligation to pay the actual amounts due to Wells Fargo in respect of such costs, expenses and other amounts owing to Wells Fargo in accordance with the Credit Agreement and the other Financing Agreements.

5.4     Ratification of Blocked Account Agreements. To the extent Wells Fargo deems it necessary in its discretion and upon Wells Fargo's reasonable request, Company shall promptly use their best efforts to provide Wells Fargo with evidence, in form and substance reasonably satisfactory to Wells Fargo, that all deposit account arrangements provided for under Sections 1.6 of the Existing Credit Agreement have been ratified and amended by the parties thereto, or their respective successors in interest, in form and substance satisfactory to Wells Fargo, to reflect the commencement of the Chapter 11 Case, that Company, as Debtor and Debtor in Possession is the successor in interest to Company, that the Indebtedness includes both the Pre-Petition Obligations and the Post-Petition Obligations, and that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for herein.

5.5     ERISA. Company hereby represents and warrants with, to and in favor of Wells Fargo that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of Company arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "PBGC") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of Company and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of Company.

5.6     DIP Facility Fee.  A Debtor in Possession facility fee of $100,000, on account of the financing provided by Wells Fargo in the Chapter 11 Case, which shall be fully earned upon the Ratification Effective Date, $50,000 of which shall be due and payable to Wells Fargo by Debtor forty-five (45) days after the Interim Financing Order, and the balance shall be due and payable to Wells Fargo by Debtor ninety (90) days after entry of the Permanent Financing Order.

5.7     Sale Process.

(a)     Not later thirty (30) days after the entry of the Interim Financing Order, Debtor shall obtain the entry of an order of the Bankruptcy Court, in form and substance satisfactory to Wells Fargo, (i) approving the bidding procedures for the sale of all or substantially all of the Debtor's assets in accordance with Section 363 of the Bankruptcy Code (the "Sale"), including, without limitation, a form of asset purchase agreement reasonably acceptable to Wells Fargo, and (ii) providing that all cash proceeds generated by such Sale(s), less reasonable out of pocket fees, costs and expenses directly arising from the closing of such Sale(s), subject to approval by Wells Fargo (collectively, "Excluded Sale Proceeds") shall be remitted to Wells Fargo for application against, and in permanent reduction of, the Indebtedness (the "Bid Procedures Order");

(b)     Not later than forty-five (45) days after the entry of the Interim Financing Order, the Debtor shall have entered into an agreement in form and substance acceptable to Wells Fargo with a "stalking horse" bidder, reasonably acceptable to Wells Fargo, committing to purchase all or substantially all of the Debtor's assets;

(c)     Not later than seventy (70) days after the entry of the Interim Financing Order, Debtor shall conduct an auction (the "Auction"), in accordance with the Bid Procedures Order, if more than one bona fide offer is received meeting the conditions set forth in the Bid Procedures Order;

(d)     Not later than two (2) Business Days after the Auction, an order, in form and substance satisfactory to Wells Fargo, shall have been entered by the Bankruptcy Court approving the Sale(s) (the "Sale Order"); and

(e)     Not later than two (2) Business Days after the Sale Order is entered, the closing of the Bankruptcy Court-approved Sale(s) shall have occurred.

Debtor confirms, acknowledges and agrees that notwithstanding anything to the contrary contained in the Credit Agreement, any failure to comply with the requirements set forth in this Section 5.7 shall constitute an additional immediate Event of Default under the Financing Agreements.

5.8     <u>Appointment of Chief Restructuring Officer</u>.

(a)     Company shall retain, at all times during which the Indebtedness remain outstanding, on terms and conditions acceptable to Wells Fargo and at the sole cost and expense of Company, Toby Kreidler of Calibre Consulting, or such other Person acceptable to Wells Fargo as its chief restructuring officer (the "CRO").  The CRO shall assume in all respects the management of the businesses and properties of the Company and shall, among other things, assist Company in the preparation of and compliance with, on an ongoing basis, the Budget and compliance with the terms and conditions set forth in the Financing Agreements.  The CRO shall report directly to the Board of Directors of Company.

(b)     Company hereby irrevocably authorizes and directs the CRO to consult with Wells Fargo and to share with Wells Fargo all budgets, records, projections, financial information, reports and other information prepared by or in the possession of the CRO relating to the Collateral, or the financial condition or operations of the business of Company.  Company agrees to provide the CRO with complete access to and supervision over all of the books and records of Company, all of the premises of Company and to all management and employees of Company as and when deemed necessary by the CRO.

(c)     At any time prior to the indefeasible payment in full of all Indebtedness in accordance with the terms and conditions contained in the Credit Agreement, Financing Agreements and Financing Orders, Company shall not amend, modify or terminate the retention agreement with the CRO without the prior written consent of Wells Fargo.  Company acknowledges and agrees that Company shall cause the CRO to keep Wells Fargo (1) fully informed of the progress of the business and operations of Company and respond fully to any inquiries of Wells Fargo regarding the business and operations of Company, and (2) communicate and fully cooperate with Wells Fargo and share all information with Wells Fargo regarding Company, and the business and operations of Company.

(d)     If the CRO resigns, Company shall immediately notify Wells Fargo in writing and provide Wells Fargo with a copy of any notice of resignation immediately

upon the sending of such notice by such CRO.  Any replacement or successor CRO shall be acceptable to Wells Fargo and shall be retained pursuant to a new retention agreement on terms and conditions acceptable to Wells Fargo within five (5) Business Days immediately following the notice of resignation of the resigning CRO, or within such longer period of time as Wells Fargo may agree in writing.  Failure to comply with the terms and conditions of this Section shall constitute an Event of Default.

5.9    Baghouse Inventory Swap Program Budget.

(a)    Company has prepared and delivered to Wells Fargo a Swap Program Flow of Material & Cash (the "Baghouse Swap Budget") covering the period commencing with the week beginning on  July 22, 2016 and ending on October 22, 2016; provided that the Baghouse Swap Budget may be amended (to the extent such amended Budget is approved by Wells Fargo in writing).  The Baghouse Swap Budget has been thoroughly reviewed by Company, its management and its restructuring advisors and sets forth, for the periods covered thereby, projected weekly shipments of product, costs of conversion and accounts receivable from Customer 1 and Customer 2.

(b)    Not later than 5:00 p.m. (Eastern time) on the Monday of each week commencing on August 5, 2016, Company shall furnish to Wells Fargo, in form and substance satisfactory to Wells Fargo, a report (the "Baghouse Swap Budget Compliance Report") that sets forth, on a two (2) week rolling basis through the end of the immediately preceding week, a comparison of (i) the actual weight of product shipped to the projected weight of product shipped, (ii) the actual cost of conversion of product to the projected cost of conversion, (iii) accounts receivable from Customer 1 to the projected accounts receivable from Customer 1 and (iv) accounts receivable from Customer 2 to the projected accounts receivable from Customer 2, each as set forth in the Baghouse Swap Budget for such measurement period, together with a certification from the Company's Chief Restructuring Officer that no Material Baghouse Swap Budget Deviation (as defined below) has occurred.

(c)    Commencing with the Monday following the week ending August 4, 2016, and continuing each Monday thereafter, the information provided in the Baghouse Swap Budget Compliance Report shall be compared against the Baghouse Swap Budget for the week ending two weeks prior (the "Swap Measurement Period"). For the avoidance of doubt, commencing on Monday, August 8, 2016, the information provided in the Baghouse Swap Budget Compliance Report for the week ending July 28, 2016 shall be tested. It shall constitute a Material Baghouse Swap Budget Deviation and an additional Event of Default under the Credit Agreement if (i) the actual weight of product shipped during the Swap Measurement Period is less than ninety percent (90%) of the projected weight of product shipped set forth in the Baghouse Swap Budget for Swap Measurement Period; (ii) actual aggregate cost of conversion of product for such Swap Measurement Period is more than one hundred and twenty-five percent (125%) of the projected aggregate cash disbursements set forth in the Baghouse Swap Budget for such Swap Measurement Period; (iii) accounts receivable from Customer 1 for such Swap Measurement Period on an aggregate cumulative basis is less than ninety percent (90%) of the projected aggregate accounts receivable from Customer 1 for such Swap Measurement Period set forth in the Baghouse Swap Budget, and (iv) accounts receivable from Customer 2 for such Swap Measurement Period on an aggregate cumulative basis is less than ninety percent (90%) of

the projected aggregate accounts receivable from Customer 2 for such Swap Measurement Period set forth in the Baghouse Swap Budget. It shall also constitute a Material Baghouse Swap Budget Deviation if any amount projected in the Baghouse Swap Budget does not occur within fourteen (14) days of the date projected in the Baghouse Swap Budget. Notwithstanding the foregoing, Company shall have fourteen (14) days following the applicable Swap Measurement Period to achieve the budgeted amounts, within the permitted acceptable range.

(d)     Debtor hereby confirms, acknowledges and agrees that, unless waived in writing by Wells Fargo, (i) a failure to maintain the deviations in the Baghouse Swap Budget as set forth in Section 5.9(c) hereof shall constitute a material deviation from the Baghouse Swap Budget and an additional Event of Default (each, a "Material Baghouse Swap Budget Deviation") and (ii) the failure to deliver any reports with respect to any Baghouse Swap Budget, in form and substance satisfactory to Wells Fargo, as provided in Section 5.9(b) hereof shall constitute an Event of Default.

5.10    <u>Payments to Valerie Realty Ventures, Inc</u>. Company shall not make any payments to Valerie Realty Ventures, Inc.  ("<u>Valerie Ventures</u>") except as follows:

(a)     Payments of rent in an amount not to exceed the minimum mortgage payment of Valerie Ventures on a non-defaulted, non-accelerated basis, as evidenced by documentation, in form and substance acceptable to Wells Fargo in its sole discretion, confirming the amount of such non-defaulted, non-accelerated minimum mortgage payment. Any incremental increase from the non-defaulted, non-accelerated monthly mortgage payment may not exceed $5,000.

5.11    <u>Bank Accounts</u>. Company hereby represents that it does not have any bank accounts other than the bank accounts listed on Exhibit 3 hereto. Company further covenants that, within thirty (30) days of the Ratification Effective Date, it will either (i) close any bank accounts not maintained with Wells Fargo or (ii) enter into a deposit account control agreement, in form and substance satisfactory to Wells Fargo in its sole discretion, with respect to any such non-Wells Fargo accounts; <u>provided</u>, that the Debtor may maintain the following two bank accounts subject to the following terms: (1) a payroll account to be maintained at TD Bank, provided that the amount deposited in such payroll account at any time shall not exceed one weeks-worth of payroll obligations of the Debtor and (2) an account with TD Bank to maintain a utility deposit in an amount acceptable to the bank and not to exceed the deposit requirements set forth in any order of the Court allowing for such security deposits; <u>provided</u> that the Debtor shall provide monthly reporting to Wells Fargo on all activity in such accounts referenced in (1) and (2) above.

6.      <u>AMENDMENTS TO EXISTING FINANCING AGREEMENTS</u>.

6.1     Borrowing Base. Section 1.2(a) of the Credit Agreement is hereby amended and restated as follows:

"(a)                        <u>Borrowing Base</u>. The borrowing base (the "Borrowing Base") is an amount equal to:

(i)      the sum of (1) 85% of the net amount of Eligible Accounts, other than Eligible Accounts which arise from sales prior to account debtors located outside of the United States or which are otherwise covered by clauses (2), (3) or (4), plus (2) 90% of the net amount of Eligible Accounts which are covered by a credit insurance policy acceptable to Wells Fargo in its sole discretion and which policy has been assigned to Wells Fargo, in form and substance acceptable to Wells Fargo, plus (3) for thirty (30) days following the Ratification Effective Date, 90% of the net amount of Eligible Accounts from sales to account debtors located inside the United States that were covered by an acceptable credit insurance policy prior to the Petition Date but, solely as a result of the commencement of the Chapter 11 Case, such credit insurance policy was terminated, plus (4) for sixty (60) days following the Ratification Effective Date, 90% of the net amount of Eligible Accounts from sales to account debtors located outside the United States that were covered by an acceptable credit insurance policy prior to the Petition Date but, solely as a result of the commencement of the Chapter 11 Case, such credit insurance policy was terminated; provided that these advance rates may be reduced at any time by Wells Fargo's in its sole discretion by one (1) percent for each percentage point by which Dilution on the date of determination is in excess of five percent (5.0%), plus

(ii)      the lesser of (1) the Inventory Sublimit, (2) the Inventory Advance Rate times Eligible Inventory, or (3) 85% of the Net Orderly Liquidation Value of Eligible Inventory; provided, however, at no time shall advances against (w) Eligible Consigned Inventory exceed $3,000,000 (x) at no time shall advances against Eligible In-Transit Inventory exceed the Eligible In-Transit Inventory Sublimit (y) at no time shall advances against Baghouse Inventory exceed the Baghouse Inventory Sublimit and (z) at no time shall advances against Slow Moving Inventory exceed the Slow Moving Inventory Sublimit, plus

(iii)      the Temporary Overadvance Amount, less

(iii)      the Borrowing Base Reserve, less

(iv)      the Availability Reserve, less

(v)      Indebtedness that Company owes Wells Fargo that has not been advanced on the Revolving Note, less

(vi)      Indebtedness that is not otherwise described in Section 1, including Indebtedness that Wells Fargo in its sole discretion finds on the date of determination to be equal to Wells Fargo's net credit exposure with respect to any Rate Hedge Agreement, derivative, foreign exchange, deposit, treasury management or similar transaction or arrangement extended to Company by Wells Fargo and any Indebtedness owed by Company to Wells Fargo Merchant Services, L.L.C."

6.2      Maturity Date.   Section 1.1(b) of the Credit Agreement is amended by deleting clause (i) and substituting therefor: "(i) May 31, 2017 the ("Maturity Date"),"

6.3      Issuance of Letters of Credit; Amount.   Section 1.11(a) of the Credit Agreement is amended by deleting "$1,000,000" and substituting "$100,000" therefor.

6.4     <u>Temporary Overadvance Amount Interest</u>. Section 1.7(b) of the Credit Agreement is hereby amended and restated as follows: "(b) <u>Temporary Overadvance Amount Interest</u>.  Notwithstanding anything contained to the contrary in interest Section 1.7(a), Company shall pay interest on any Temporary Overadvance Amount at a rate of (i) Daily Three Month LIBOR <u>plus</u> (ii) 4.5%."

6.5     <u>Supplemental Reports</u>. Section 5.1(e) of the Credit Agreement is hereby amended and restated as follows:  "(e)       <u>Supplemental Reports</u>.  On each Business Day, or more frequently if Wells Fargo requests during any Default Period, Wells Fargo's standard form of "daily collateral report", together with receivables schedules, collection reports, and copies of invoices in excess of $10,000, shipment documents and delivery receipts for goods sold to account debtors in excess of $500,000."

6.6     <u>Collateral Exams and Inspections</u>. Section 5.10(c) of the Credit Agreement is hereby amended and restated as follows: "(c)       At all times during normal business hours, Wells Fargo shall have full access to and the right to audit, check, inspect and make abstracts and copies from Company's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of Company's business.  Wells Fargo and its agents may enter upon any premises of Company at any time during business hours and at any other reasonable time, and from time to time, for the purpose of conducting field examinations of and inspecting the Collateral and any and all records pertaining thereto and the operation of Company's business; provided that (a) no more than four (4) field examinations shall be conducted during any consecutive twelve (12) month period in which an Event of Default does not exist and (b) if an Event of Default exists, and notwithstanding anything to the contrary in the foregoing clause (a) there shall be no limitation on the number or frequency of field examinations; <u>provided</u>, however, any Confidential Information received by Wells Fargo and its agents shall be subject to the provisions of Section 7.11."

6.7     <u>Collateral Appraisals</u>. Section 5.10(d) of the Credit Agreement is hereby amended and restated as follows: "(d)       Wells Fargo may, in its sole discretion, at any time and from time to time, engage the services of an independent appraisal firm or firms of reputable standing, reasonably satisfactory to the Wells Fargo, for the purpose of appraising the then current values of Company's Equipment ; <u>provided</u>, <u>that</u>, as long as no Event of Default exists, the Wells Fargo shall not conduct more than two such appraisals per consecutive twelve (12) month period; <u>provided, further</u>, that there shall be no limitation on the number or frequency of such appraisals, at Company's expense, if requested by Company or if an Event of Default has occurred and is continuing."

6.8     <u>Reserves</u>.  The definition of "Reserves" set forth in Schedule 1.1 of the Credit Agreement is hereby amended by (i) deleting the reference to the word "and" at the end of clause (a) of such definition; (ii) deleting the reference to the word "." at the end of clause (b) of such definition; and (iii) adding the following clause (c) at the end of the last sentence:

> "; and (c) to reflect reserves provided for in the Financing Order, including, without limitation, in respect of the Professional Fee Carve Out and the other Carve Out Expenses (as each term is defined in the Financing Order)"

17

6.9    Indebtedness.  Notwithstanding anything to the contrary contained in Section 5.4 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Financing Agreements, Company will not, after the date hereof, create, incur, assume, guarantee, or otherwise become directly or indirectly, liable with respect to any Indebtedness (other than (a) Permitted Indebtedness existing as of the Petition Date, (b) Indebtedness evidenced by the Credit Agreement and the other Financing Agreements and (c) Permitted Indebtedness incurred after the Petition Date, provided, that, all such Permitted Indebtedness incurred after the Petition Date is specifically provided for in the Budget), without in each case the prior written consent of Wells Fargo (and no such consent shall be implied, from any other action, inaction or acquiescence by Wells Fargo).

6.10    Encumbrances.  Notwithstanding anything to the contrary contained in Section 5.3 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Financing Agreements, Company will not, after the date hereof, create, incur, assume or suffer to exist, directly or indirectly, any lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom (other than (a) Permitted Liens existing on the Petition Date, (b) liens securing the Indebtedness, (c) liens arising after the Petition Date; provided, that, the priority of such liens are junior and subordinate to the priority of all liens securing the Indebtedness, and (d) any lien granted or permitted pursuant to the Financing Orders.

6.11    Sale of Assets.  Notwithstanding anything to the contrary contained in Section 5.18 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Financing Agreements, Company may not convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any portion of Company's Collateral or other assets including without limitation, assume, reject or assign any leasehold interest or enter into any agreement to return Inventory to vendor, whether pursuant to section 546 of the Bankruptcy Code or otherwise (other than (a) Permitted Dispositions, provided that such sales are permitted by Section 5.7 of the Ratification Agreement and are in accordance with the Budget) without in each case the prior written consent of Wells Fargo (and no such consent shall be implied, from any other action , inaction or acquiescence by Wells Fargo).

6.12    Restricted Payments.  Notwithstanding anything to the contrary contained in Section 5.7 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Financing Agreements, Company shall not, directly or indirectly, declare or pay any dividends on account of any shares of any class of stock of Company now or hereafter outstanding, or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of stock (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the foregoing, without in each case the prior written consent of Wells Fargo (and no such consent shall be implied, from any other action, inaction or acquiescence by Wells Fargo).

6.13    Investments and Subsidiaries.  Notwithstanding anything to the contrary contained in Section 5.6 of the Credit Agreement or any other provision of the Credit Agreement

18

or any of the other Financing Agreements, Company will not after the date hereof, directly or indirectly, make or acquire any investment or incur any liabilities (including contingent obligations) for or in connection with any investment, without in each case the prior written consent of Wells Fargo (and no such consent shall be implied, from any other action, inaction or acquiescence by Wells Fargo), except to the extent specifically set forth in the Budget.

6.14    <u>Outstanding Loans</u>.  Notwithstanding anything to the contrary contained in the Credit Agreement or otherwise, Wells Fargo shall have no obligation whatsoever to make any Loan to the Company to the extent that, immediately after giving effect to the making of such Loan, the then aggregate outstanding amount of Loans and other Indebtedness would exceed $14,700,000 as determined by Wells Fargo in its sole discretion.

6.15    <u>Events of Default</u>.  Section 6 of the Credit Agreement is hereby amended by adding the following the following:

"(u)  <u>Financing Order</u>.

(i) The occurrence of any condition or event which permits Wells Fargo to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in the Financing Order);

(ii)  the termination or non-renewal of the Financing Agreements as provided for in the Financing Order;

(iii)  any act, condition or event occurring after the Petition Date that has or would reasonably expect to result in the occurrence of a Material Adverse Effect upon the assets of Company, or the Collateral, or the ability of Debtor to perform under and comply with the Budget in accordance with the terms and conditions hereof, or the rights and remedies of Wells Fargo under the Credit Agreement or any other Financing Agreements or the Financing Order;

(iv)  conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(v)  dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(vi)  the grant of a lien on or other interest in any property of Company, other than a lien permitted under Section 9.8 hereof or a lien or encumbrance permitted by the Financing Order, which is superior to or ranks in parity with Wells Fargo's security interest in or lien upon the Collateral;

(vii)  the grant of an administrative expense claim in the Chapter 11 Case, other than such administrative expense claim

permitted by the Financing Order or the Ratification Agreement, which is superior to or ranks in parity with Wells Fargo's Superpriority Claim (as defined in the Financing Order);

(viii)  the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Wells Fargo (and no such consent shall be implied from any other authorization or acquiescence by Wells Fargo);

(ix)  the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(x)  the appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

(xi)  the filing of a plan of reorganization or liquidation by or on behalf of Company, to which Wells Fargo has not consented in writing, which does not provide for payment in full in cash of all Indebtedness on the effective date thereof in accordance with the terms and conditions contained herein;

(xii)  the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case, to which Wells Fargo has not consented to in writing, which does not provide for payment in full in cash of all Indebtedness on the effective date thereof in accordance with the terms and conditions contained herein;

(xiii)  entry of an order granting relief from the automatic stay to the holder or holders of security interests to permit foreclosures (or granting similar relief) on any property of the Debtor having a value in excess of $100,000 without the prior written consent of Wells Fargo;

(xiv)  the filing of a motion by Debtor (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or Wells Fargo directly) any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise); or

(xv) If Company suspends or discontinues or is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of Company, taken as a whole, or a trustee, receiver or custodian is appointed for Company, or any of their respective properties, except to the extent such suspension or discontinuance of business

20

occurs in accordance with the terms of the Ratification Agreement;"

6.16    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver. Section 7.15 of the Credit Agreement is hereby amended by deleting the period and adding the following at the end thereof:  ", except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing."

6.18    Financial Covenants. Upon the Ratification Effective Date and during the pendency of the Chapter 11 Case, the financial covenants set forth in Section 5.2(a) of the Credit Agreement (Minimum Tangible Net Worth) and in Section 5.2(d) of the Credit Agreement (Fixed Charge Coverage Ratio) shall be suspended and shall not be tested.

7.    RELEASE.

7.1    Release of Pre-Petition Claims.

(a)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of Wells Fargo contained herein and the making of any Loans by Wells Fargo, Company, pursuant to the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Wells Fargo and its respective successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Wells Fargo and all such other parties, in their capacities as such, being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Company, or any of its respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Ratification Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Credit Agreement, as amended and supplemented through the date hereof, and the other Financing Agreements.

(b)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, Company, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released

21

Claim released, remised and discharged by Company pursuant to this Section 8.1.  If Company violates the foregoing covenant, Company agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

      7.2    <u>Release of Post-Petition Claims</u>. Upon (a) the receipt Wells Fargo, of payment in full of all Indebtedness in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to Wells Fargo to secure any Indebtedness that survives or continues beyond the termination of the Financing Agreements, and (b) the termination of the Financing Agreements (the "Payment Date"), in consideration of the agreements of Wells Fargo contained herein and the making of any Loans by Wells Fargo, Company hereby covenants and agrees to execute and deliver in favor of Wells Fargo a valid and binding termination and release agreement, in form and substance satisfactory to Wells Fargo.  If Company violates such covenant, Company agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

      7.3    <u>Indebtedness Satisfaction Accommodation</u>. If on or before August 8, 2016, Wells Fargo receives in cash, payment in full of all Indebtedness, on terms and conditions accept to Wells Fargo, including, without limitation, a release of all claims, obligations, liabilities, causes of action of any kind, in connection with or related to the financing arrangements, upon such repayment of all Indebtedness, Wells Fargo will agree to reduce the outstanding principal amount of such Indebtedness by an amount equal to $1,000,000.

      8.    Releases Generally.

      (a)    Company  understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 hereof  may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

      (b)    Company agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

      9.    <u>CONDITIONS PRECEDENT</u>.

In addition to any other conditions contained herein or the Credit Agreement, as in effect immediately prior to the Petition Date, with respect to the Loans and other financial accommodations available to Company (all of which conditions, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Loans and be applicable to other financial accommodations available to Company), the following are conditions to Wells Fargo's obligation to extend any Loans or other advances or financial accommodations to Company pursuant to the Credit Agreement:

9.1.    Company shall furnish to Wells Fargo all financial information, projections, budgets, business plans, cash flows and such other information as Wells Fargo shall reasonably request from time to time;

9.2.    as of the Petition Date, the Existing Financing Agreements shall not have been terminated;

9.3.    no trustee, examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code or receiver or the like shall have been appointed or designated with respect to Company, as Debtor and Debtor-in-Possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief;

9.4.    the execution and delivery of this Ratification Agreement and all other Financing Agreements by the Company and Wells Fargo, and the payment to Wells Fargo by Company of the DIP Facility Fee;

9.5.    the Interim Financing Order or other Order(s) of the Bankruptcy Court shall ratify and amend the deposit account arrangements of the Company to reflect the commencement of the Chapter 11 Case, that Debtor, as Debtor and Debtor-in-Possession, is the successor in interest to Company, that the Indebtedness includes both the Pre-Petition Obligations and the Post-Petition Obligations, and that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in this Ratification Agreement;

9.6.    the execution or delivery to Wells Fargo of all other Financing Agreements, and other agreements, documents and instruments which, in the good faith judgment, of Wells Fargo are necessary or appropriate, and the implementation of the terms of this Ratification Agreement and the other Financing Agreements, as modified pursuant to this Ratification Agreement, all of which contain provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Wells Fargo and its counsel;

9.7.    Company shall comply in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner prescribed by the Bankruptcy Code and the applicable Bankruptcy Rules, and an Interim Financing Order shall have been entered by the Bankruptcy Court (the "Interim Financing Order") authorizing the secured financing under the Financing Agreements as ratified and amended hereunder on the terms and conditions set forth in this Ratification Agreement and, among other things, modifying the automatic stay, authorizing and granting the senior security interest in liens in favor of Wells Fargo described in this Ratification Agreement and in the Financing Order, and granting super-priority expense claims to Wells Fargo with respect to all obligations due Wells Fargo.  The Interim Financing Order shall authorize post-petition financing under the terms set forth in this Ratification Agreement in an amount consistent with the Budget, and it shall contain such other terms or provisions as Wells Fargo and its counsel shall require;

9.8.    with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall

have entered a Permanent Financing Order authorizing the secured financing on the terms and conditions set forth in this Ratification Agreement, granting to Wells Fargo the senior security interests and liens described above and super-priority administrative expense claims described above (except as otherwise specifically provided in the Interim Financing Order), and modifying the automatic stay and other provisions required by Wells Fargo and its counsel (the "Permanent Financing Order"). Wells Fargo shall not provide any Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order with respect to which an effective stay exists;

9.9.    other than the voluntary commencement of the Chapter 11 Case, no material impairment of the priority of Wells Fargo's security interest in the Collateral shall have occurred from the date of the latest field examinations of Wells Fargo to the Petition Date; and

9.10.    no Event of Default other than the Specified Defaults shall have occurred or be existing under any of the Existing Financing Agreements, as modified pursuant hereto, and assumed by Company.

10.    MISCELLANEOUS.

10.1.    Amendments and Waivers.  Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

10.2.    Further Assurances.  Company shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Wells Fargo of all the rights and remedies hereunder, under any of the other Financing Agreements, any Financing Order or applicable law with respect to the Collateral, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Wells Fargo's opinion to evidence, perfect, maintain and enforce the security interests of Wells Fargo, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other  Financing Agreements or the Financing Order.  Upon the request of Wells Fargo, at any time and from time to time, Company shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Wells Fargo with respect to the Intellectual Property with the United States Patent and Trademark Office, the financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Wells Fargo such instruments evidencing items of Collateral as may be requested by Wells Fargo.

10.3.    Headings.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

10.4.    <u>Counterparts</u>.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart this Ratification Agreement by telefacsimile or other electronic method of transmission shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

10.5.    <u>Additional Events of Default</u>.  The parties hereto acknowledge, confirm and agree that the failure of Company to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by Company in connection herewith shall constitute an immediate Event of Default under the Financing Agreements.

10.6.    <u>Costs and Expenses</u>.  Company shall pay to Wells Fargo on demand all costs and expenses that Wells Fargo pay or incur in connection with the negotiation, preparation, consummation, administration, enforcement, defense (whether in connection with any adversary proceeding or otherwise) and termination of this Ratification Agreement and the other Financing Agreements and the Financing Order, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to, and reasonable fees and expenses of consultants, accountants and other professionals retained by, Wells Fargo; (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Ratification Agreement, the other Financing Agreements, the Financing Order and the transactions contemplated thereby; (c) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Wells Fargo in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of Company under the Financing Agreements or the Financing Order that Company fail to pay or take; (e) costs of appraisals, inspections and verifications of the Collateral and including reasonable travel, lodging, and meals for inspections of the Collateral and the Debtor's operations by Wells Fargo or its agent and to attend court hearings or otherwise in connection with the Chapter 11 Case; (f) costs and expenses of preserving and protecting the Collateral; (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Wells Fargo during the course of periodic field examinations of the Collateral and Debtor's operations, plus a per diem charge at the rate of $950 per person per day for Wells Fargo's examiners in the field and office; and (h) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Indebtedness, enforce the security interests and liens of Wells Fargo, sell or otherwise realize upon the Collateral, defend against, or respond in connection with, any action or proceeding relating to the Debtor, the Financing Agreements or the Financing Order, and otherwise enforce the provisions of this Ratification Agreement, the other Financing Agreements and the Financing Order, or to

defend any claims made or threatened against Wells Fargo arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters).  The foregoing shall not be construed to limit any other provisions of the Financing Agreements regarding costs and expenses to be paid by Company.  All sums provided for in this Section 10.6 shall be part of the Indebtedness, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Financing Agreements.  Wells Fargo is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Wells Fargo with respect to Company.

10.7.   <u>Effectiveness</u>.  This Ratification Agreement shall become effective upon the execution hereof by Company and Wells Fargo and the entry of the Interim Financing Order.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

4496597.9

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

**HI-TEMP SPECIALTY METALS, INC.**

By:    _____

Name: _____

Title:  _____

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By:    _____

Name: _____

Title:  _____

**CERTAIN EXHIBITS HAVE NOT BEEN COMPLETED AS OF THE FILING AND WILL BE FILED AT A LATER TIME.  TO THE EXTENT THE EXHIBITS CONTAIN CONFIDENTIAL INFORMATION, THE DEBTOR RESERVES THE RIGHT TO SEEK AN ORDER PROTECTING THE FILING OR DISSEMINATION OF CONFIDENTIAL INFORMATION**

## **Schedule 1.1**

Commercial Tort Claims

[None]

## Exhibit 1

**Specified Defaults**

# Exhibit 2

**Baghouse Swap Budget**

## Exhibit 3

**Bank Accounts**

## Exhibit 3
## Bank Accounts

BANK INFORMATION
**Bank Name:** TD Bank
**Bank Address:** 1806 Route 112
Medford, NY 94104USA
**Title of Account:** Hi-Temp Specialty Metals Inc. Operating Account DIP CASE NO. 16-72767
**Credit to Account:** 4330619797 **Wire Routing Transit/ABA #:**026013673 **SWIFT Code:**
NRTHUS3XXX

**Bank Name:** TD Bank
**Bank Address:** 1806 Route 112
Medford, NY 94104USA
**Title of Account:** Hi-Temp Specialty Metals Inc. Payroll Account DIP CASE NO. 16-72767
**Credit to Account:** 4330619804 **Wire Routing Transit/ABA #:**026013673 SWIFT Code:
NRTHUS3XXX

## Exhibit 3

**Slow Moving Inventory SKUs**