**Hearing Date and Time:**
**August 11, 2916, 11:30 a.m**.

**PEPPER HAMILTON LLP**
Todd Feinsmith (*pro hac vice*)
125 High Street
19th Floor, High Street Tower
Boston, MA 02110-2736
Tel: (617) 204-5100
feinsmitht@pepperlaw.com

Deborah Kovsky-Apap (*pro hac vice*)
4000 Town Center, Suite 1800
Southfield, Michigan 48075
(248) 359-7300
kovskyd@pepperlaw.com

*Counsel for the Official Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| **HI-TEMP SPECIALTY METALS, INC.,** | : | Case No. 16-72767-LAS |
|  | : |  |
| Debtor. | : |  |
|  | : |  |
|  | : |  |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO THE DEBTOR'S MOTION FOR ENTRY OF A
FINAL ORDER (I) AUTHORIZING DEBTOR AND DEBTOR-IN-POSSESSION TO
OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND
SUPERPRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO
PRE-PETITION SECURED LENDER, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Hi-Temp Specialty Metals, Inc., ("Hi-Temp" or the "Debtor"), has continued to work diligently with counsel for the Debtor and Wells Fargo (the "Bank") to reach agreement, to the extent possible, on a final debtor-in-possession financing order. While the parties are previously reached or are

close to agreement on certain issues, it is clear that others will not be resolved consensually, necessitating this objection.

In addition, despite multiple requests, the Committee did not receive a draft of the Final DIP Order sufficiently in advance of the objection deadline to allow the Committee meaningful time to review it. Indeed, as of 2:30 p.m. on Monday, August 8 – just ninety minutes before the objection deadline – the Committee still had not seen the proposed Final DIP Order. The Committee is informed that the proposed Final DIP Order is modeled on the proposed interim order that was filed with the Motion at Docket No. 50, with the following exceptions: (i) the increased notice period of 7 business days relative to the lifting of the automatic stay and the Bank's exercise of enforcement rights, as set forth in the Interim DIP Order entered by the Court, will remain in the final order; (ii) the Carve Out amounts will remain the same as those set forth in the Interim DIP Order entered by the Court; (iii) all references to section 4.1 concerning the Committee's challenge rights, and the revised language of section 4.1 itself regarding those challenge rights, will remain as set forth in the Interim DIP Order entered by the Court; and (iv) the Bank's legal fees will remain subject to review for reasonableness, as in the Interim DIP Order entered by the Court. For purposes of this objection, the Committee assumes that the foregoing is accurate. However, the Committee reserves the right to raise additional objections after it has had an opportunity to review the actual proposed Final DIP Order.

## I.     SUMMARY OF THE COMMITTEE'S OBJECTIONS

The following is summary of the Committee's specific objection points raised herein, with references to the relevant section of the Interim DIP Order or Ratification Agreement, as applicable:

- Impermissible granting of liens and superpriority claims on avoidance actions, which are previously unencumbered assets. (*Sections 2.1 and 2.2 of the Interim DIP Order*)

- Need for clarification of scope of the Challenge Period and grant of standing to the Committee to pursue potential claims against the Bank. (*Section 4.1 of the Interim DIP Order*)

- Inadequate budget for professional fees and expenses. (*DIP Budget*)

- Improper attempt to waive the requirements of section 506(b). (*Sections 1.4-1.5 of the Interim DIP Order*)

- Improper attempt to waive estate claims under section 506(c) of the Bankruptcy Code. (*Section 4.3 of the Interim DIP Order*)

- Improper attempt to waive equitable remedies under section 552(b). (*Section 5.9 of the Interim DIP Order*)

- Overly aggressive sale milestones that may chill bidding. (*Section 5.7 of the Ratification Agreement*)

- No provision made under the DIP Facility or in the Budget for post-sale wind-down expenses.

## II. OBJECTION

### A. The Debtor Bears the Burden of Demonstrating that Secured, Superpriority DIP Financing Is Warranted and Appropriate

The Debtor seeks authorization to obtain secured, superpriority post-petition financing under 11 U.S.C. § 364(c), and therefore bears the burden of showing that the proposed financing complies with the requirements of Bankruptcy Code. Courts generally apply a three-part test to assess debtor in possession financing requests under section 364(c), requiring a showing that (1) the debtor cannot obtain credit unencumbered or without superpriority status under section 364(b), (2) the credit transaction is necessary to preserve the assets of the estate, and (3) the terms of the transactions are fair, reasonable and adequate, given the circumstances. *See, e.g., In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (citing *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988)).

Courts also consider additional factors for purposes of sections 364(c), including whether (1) the proposed financing is an exercise of sound and reasonable business judgment, (2) the financing is in the best interests of the estate and its creditors, (3) any better offers or bids were proposed, and (4) the financing agreement was negotiated in good faith and at arm's length. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 879–80 (Bankr. W.D. Mo. 2003) (citing *In re Crouse Grp., Inc.*, 71 B.R. 544, 547 (Bankr. E.D. Pa. 1987); *In re Worldcom, Inc.*, No. 02-13533, 2002 WL 1732646, at *3 (Bankr. S.D.N.Y. 2002)).

Recognizing the imbalance of power between an insolvent debtor and its secured lender, courts are cautious not to approve financing terms that are so one-sided that they harm the debtor's estate and its creditors. *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992) ("Debtors in possession generally enjoy little negotiating power with a proposed lender, particularly when the lender has a pre-petition lien on cash collateral."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

In this case, the terms of the DIP financing, including the roll-up and the sale milestones, appear to be designed solely for the benefit of the Bank and are neither fair nor reasonable. To the contrary, the proposed DIP facility incorporates a number of provisions that (i) prejudice the rights and powers that the Bankruptcy Code confers on the Court, the Debtor and the Committee, (ii) unjustifiably benefit the Bank at the expense of the Debtor's estate and its unsecured creditors, and (iii) are likely to give the Bank undue control over this case.

Accordingly, the Debtor has failed to meet its burden under section 364(c) and the DIP facility, as proposed, should be denied or modified as set forth herein.

    **B.    The Terms of the Proposed DIP Facility Do Not Meet the Standard for Approval Under Section 364(c)**

        *1.    The Bank Should Not Be Granted Liens on the Debtor's Chapter 5 Avoidance Causes of Action or Their Proceeds*

Sections 2.1(a) and 2.2 of the Interim DIP Order contemplates that the Bank will automatically and retroactively be granted a post-petition lien on and superpriority administrative expense claims against Avoidance Actions upon entry of the Final DIP Order. The granting of liens, security interests and superpriority claims in previously unencumbered assets in favor of the Bank is overreaching and prejudices the rights of creditors against the Debtors.

Under no circumstances should the Debtor's obligations to the Bank be secured by the proceeds of Avoidance Actions. Such actions are distinct creatures of bankruptcy law designed to ensure equality of distribution among general unsecured creditors. Numerous courts severely restrict a debtor-in-possession's ability to pledge avoidance actions as security. *See, e.g., Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics Corp.),* 1993 WL 408366, *3-4 (N.D. Ill., Sept. 22, 1993) (vacating bankruptcy court order approving post-petition financing to the extent that the order assigned to the bank a security interest in the debtor's preference actions). This is because avoidance actions are not property of a debtor's estate. *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics, Corp.),* 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of the estate, but are essentially rights held by the estate for the benefit of creditors*); In re Sweetwater*, 55 B.R. 724, 731 (D. Utah 1985*), rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989) ("The avoiding powers are not 'property' but a statutorily created power to recover property").

-5-

Because of the unique nature of avoidance actions, courts have recognized that, at least with respect to proceeds recovered pursuant to section 544(b) of the Bankruptcy Code, "empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors." *Cybergenics*, 226 F.3d at 244; *see also Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("[w]hen recovery is sought under § 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer").

Because chapter 5 causes of action are not property of the Debtors' estates, there is no legal basis for the Court to grant the Bank liens and security interests in, or a superpriority administrative expense claim on, Avoidance Actions or the proceeds thereof. More fundamentally, it is unfair to allow the Bank to receive liens and superpriority interests in what may be one of the only sources of recovery for general unsecured creditors in these cases. At this juncture, it is entirely possible that general unsecured creditors are "out of the money" based on the value of the Debtor's assets. Therefore, to deprive general unsecured creditors of any recoveries from Avoidance Actions is unfair and inappropriate.

A successful reorganization of the Debtors' businesses requires the cooperation of and a shared risk by all parties in interest. Granting the Bank liens and superpriority claims in Avoidance Actions would place an inequitable amount of that risk on unsecured creditors solely to provide additional benefits to the Bank—which is already receiving substantial protections, including the roll-up of its pre-petition debt, replacement liens and superpriority claims on all other assets, and broad releases from the Debtor. Accordingly, proceeds of Avoidance Actions

should not be subject to any liens, but should be preserved solely for the benefit of the Debtors' general unsecured creditors.

### 2. *The Challenge Period Must Be Clarified and the Committee Should Be Granted Standing to Pursue Claims Against the Bank*

The Committee seeks clarification that the Challenge Period set forth in section 4.1 limits only challenges to the nature, extent, validity and priority of the Bank's pre-petition liens and security interests, not to the amount and/or value of the Debtors' assets that allegedly secure those purported liens or security interests, or to the Bank's pre-petition conduct. The lien review period should be limited to challenges to the alleged prepetition liens and not all claims and causes of action that could be brought against the Bank. The Committee's rights to assert or prosecute any claims and causes of action against the Bank should not be restricted in any way. The Committee also respectfully submits that the Final DIP Order should expressly grant the Committee standing to challenge the Bank's alleged liens and security interests or bring other claims and causes of action against the Bank without the need to file a motion for standing at a later date.

### 3. *The Budget Must Adequately Provide for the Fees of the Committee's Professionals*

Under the interim DIP Budget, the Debtor has limited the Committee's professionals to $7500 per week for 13 weeks, for a cumulative total of $97,500. In stark contrast to this inadequate allocation to the Committee, the Debtor proposes to pay nearly *five times* as much – $450,000 – to Calibre Group, the CRO chosen by Bank, and an additional $225,000 to the Bank's counsel. This gross imbalance hamstrings the Committee, which represents the real stakeholders in the case, in performing its fiduciary duties, while ensuring that the Bank's professionals and CRO are fully compensated.

Throughout the course of the case, the Committee's professionals must (among other things) analyze and negotiate the terms of DIP financing, review and weigh in on proposed bid procedures, participate in the sale process, file objections when necessary, attend hearings, negotiate a plan of reorganization with the Debtor and other parties in interest, and advise and update the members of the Committee. It is completely unrealistic to expect that the Committee's professionals can do so under the proposed Budget. The Debtor and the Bank have chosen to avail themselves of the benefits and protections in Chapter 11. In order to remain in Chapter 11, the case needs to be adequately funded – which the Budget does not accomplish.

    **4.**    ***The Payment of the Bank's Pre-Petition Professional Fees, Expenses, and Pendency Interest is Improper at this Juncture***

The Debtors propose to pay the Bank's pre-petition fees and expenses, and apparently pendency interest, notwithstanding the Bank's representations to this Court that it is undersecured. *See Wells Fargo's Objection to Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Scheduling a Final Hearing* [Docket No. 20] ("On information and belief, Wells Fargo's secured position is undersecured at present. It is without doubt that the requested use of cash collateral, if granted by this Court, will irrevocably harm the Bank's interest in the collateral, and will permanently reduce the secured portion of the Bank's claim against the Debtor."). There is no basis for paying those amounts from estate funds absent the Debtor's presentation of evidence demonstrating that the Bank is oversecured in its pre-petition collateral. Claiming that they are "adequate protection" or burying the costs in a roll-up does not avoid that reality.

The Bankruptcy Code outlines specific and limited circumstances in which a party may look to the bankruptcy estate to have professional fees paid. Generally, a professional can be paid by the estate only under sections 330 and 331 of the Bankruptcy Code. In certain

#40339596 v1

-8-

limited circumstances, a non-estate professional may also be paid under sections 506(b) or 503(b) of the Bankruptcy Code. That is it. The filing of the bankruptcy petition relieves a debtor of non-bankruptcy obligations to pay professional fees to third parties unless, and then only to the extent, that such payment is provided for in the Bankruptcy Code. *In re Loewen Group International, Inc.,* 274 B.R. 427, 445, n.36 (Bankr. D. Del. 2002) ("Although a contractual provision providing for the recovery of attorneys' fees and costs may enable an unsecured creditor to pursue recovery of such fees and costs in an action in state court, in the context of bankruptcy, the creditor's right to assert such claims is limited by the provisions of the Bankruptcy Code.").

In addition, claims of "adequate protection" cannot be used in a manner that would vitiate basic bankruptcy tenets. In *United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, the Supreme Court denied post-petition interest sought as adequate protection by an undersecured creditor. 484 U.S. 365 (1988). The *Timbers* Court observed that allowing post-petition interest to undersecured creditors, under the guise of adequate protection, would render section 506(b) totally meaningless, which could not have been Congress's intent:

> If the Code had meant to give the undersecured creditor, who is thus denied interest on his claim, interest on the value of his collateral, surely this is where that disposition would have been set forth, and not obscured within the "adequate protection" provision of § 362(d)(1). Instead of the intricate phraseology set forth above, § 506(b) would simply have said that the secured creditor is entitled to interest "on his allowed claim, or on the value of the property securing his allowed claim, whichever is lesser." Petitioner's interpretation of § 362(d)(1) must be regarded as contradicting the carefully drawn disposition of § 506(b).

*Id*. at 372; *see also Baybank-Middlesex v. Ralar Distributions, Inc. et al.*, 63 F.3d 1200, 1203 (1st Cir. 1995) (where creditor challenged sufficiency of adequate protection and

sought payment of post-petition interest and fees, court held: "We need not determine whether there was a failure of adequate protection because . . . *Baybank*, as an undersecured creditor, is not entitled to post-petition interest and fees under § 506(b) . . .").

In *In re Nair*, an undersecured creditor, Triad, moved for relief from the automatic stay, and upon reaching an agreement with the debtor, submitted a proposed consent order resolving its motion wherein the debtor agreed to pay the creditor's attorney's fees. 320 B.R. 119 (Bankr. S.D. Tex. 2004), *aff'd*, 2006 U.S. App. LEXIS 25829 (5th Cir. Oct. 18, 2006). The bankruptcy court declined to enter the consent order and instead sanctioned Triad's counsel for submitting a consent order with frivolous provisions. The court held:

> Section 506(b) allows an ***oversecured*** creditor to obtain full payment of its attorney's fees ***to the extent that it is oversecured***. Triad seeks to avoid the effect of § 506 by the submission of an agreed order that directly conflicts with § 506 and that has no other basis in the Bankruptcy Code. . . Triad offers no substantive basis in the Bankruptcy Code that provides for the payment of its attorney's fees.

*Id*. at 128 (emphasis added). As its sanction, the court prohibited Triad's counsel from ever again "filing any pleading or proposed order . . . seeking an award of attorney's fees for a creditor that: A. Holds a lien on a vehicle or other personal property; and B. Is undersecured." *Id.* at 129.

The payments the Debtor seeks to provide to the Bank ignore the clear and limited bases for paying non-estate professionals under the Bankruptcy Code, thereby "contradicting the carefully drawn disposition of section 506(b)." If the Bank is undersecured (and the Court has no competent evidence one way or the other at this early juncture) then it is not entitled to adequate protection, and even if it were, that adequate protection cannot take a form that would render meaningless clear provisions of the Bankruptcy Code.

### 5.     *Waiver of Estates' Rights Under 11 U.S.C. § 506(c) is Inappropriate*

Pursuant to Section 4.3 of the Interim DIP Order, the Debtor will seek at the Final DIP Hearing to waive its rights under section 506(c) of the Bankruptcy Code. This provision should be removed from the Final DIP Order.

Congress' intent in enacting section 506(c) of the Bankruptcy Code was to ensure that a debtor-in-possession would be entitled to recover expenses from its secured lender to the extent that those expenses are necessarily and reasonably associated with preserving or disposing of a lender's collateral. *Precision Steel Shearing, Inc: v. Fremont Fin. Corp. (In re Visual Industries, Inc.),* 57 F.3d 321, 325-26 (3d Cir. 1995). Section 506(c) of the Bankruptcy Code is thus designed to prevent "a windfall to the secured creditor at the expense of the claimant." *Id.* (citing *IRS v. Boatmen's First Nat'l Bank of Kansas City*, 5 F.3d 1157, 1159 (8th Cir. 1993)).

By waiving its rights under section 506(c) of the Bankruptcy Code, the Debtor is agreeing to pay for any and all expenses associated with the preservation of the prepetition collateral for the sole benefit of the Bank. The waiver covers all expenses that the Debtors can show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure." *Brookfield Prod. Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984). The Supreme Court has held that section 506(c) of the Bankruptcy Code waivers should never be lightly granted, nor may the management of a debtor-in-possession agree to such a waiver for any but the most compelling of reasons, because provisions such as these are binding on all parties in interest. *Hartford Underwriters Ins. v. Union Planters Bank N.A.*, 530 U.S. 1, 12 (2000) (debtor's decision to waive rights under Bankruptcy Code § 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").

The Bank's insistence upon a waiver of surcharge rights under section 506(c) of

the Bankruptcy Code is particularly objectionable in the present case because the proposed Budget reflects significant fees and expenses associated with the Bank's professionals. It is unreasonable for the Bank to impose upon the Debtors a budget that consists in significant part of professional fees to be paid on behalf of the Bank, and then preclude the Debtor from exercising its section 506(c) rights if the Budget proves to be inadequate and the Debtor is forced to expend additional funds to preserve the Bank's collateral.

Furthermore, the Bank had already agreed to what is in effect a $1 million surcharge by agreeing to reduce its principal and leave that amount behind as a benefit to the estate if its debt were retired by August 8. There is no reasoned basis to completely abrogate that arrangement if the debt is retired, through refinancing or a section 363 sale, within a short time after August 8.

**6.    *The Debtor's Proposed Waiver of the "Equities of the Case" Exception to Section 552(b) Should Be Stricken From the Final DIP Order***

Section 5.9 of the Interim DIP Order provides that the Debtor will seek, in the Final DIP Order, to waive the "equities of the case" exception under Bankruptcy Code section 552(b). If not for such waiver, section 552(b) would allow the Debtor, the Committee and other parties-in-interest to assert that equitable considerations warrant the exclusion of post-petition proceeds from the Collateral securing the Debtor's pre-petition obligations. Notwithstanding the narrow manner in which section 552(b) is sometimes interpreted, it is a potentially extremely powerful tool that the Court may employ to achieve equity in the case. As the court in *Sprint* explained, declining to impose a narrow construction on section 552(b), numerous courts have observed that the "equities of the case" doctrine may have broad application. *Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re Terrestar Networks, Inc.)*, 457 B.R. 254, 270-273 (Bankr. S.D.N.Y. 2011). The court collected some of the cases taking that approach:

-12-

>> *In re 680 Fifth Ave. Assocs.*, 154 B.R. 38, 41 (Bankr. S.D.N.Y. 1993) ("**[T]here is no one scenario to which application of the equities doctrine is limited. Rather, the examples provided by the courts and treatises are but a few of what surely can be deemed a non-exhaustive list**. The theme that rings true to all of the examples, however, is that the exception offers a bankruptcy court, essentially a court of equity, considerable latitude in balancing the rights of competing creditor entities with the overall rehabilitative scheme of bankruptcy law. . . .") . . . (citation omitted); *see also Patio & Porch Sys.*, 194 B.R. at 575 ("552(b) grants the court broad equitable powers in determining the extent of the security interest Creditor may be allowed to maintain post-petition."); *In re Mullen*, 172 B.R. 473, 479 (Bankr. D. Mass. 1994) ("As demonstrated by the statements on the floor of both branches, Congress was concerned about the situation where the estate spends money and thereby causes an enhancement in proceeds or rents which improves the position of the secured party. It had foremost in mind the conversion of raw materials to inventory or inventory to accounts. But Congress obviously did not wish to limit the exception to those circumstances. **The standard for application of the exception—'the equities of the case'—gives the court the broadest possible charter**.") (footnote omitted); . . . *In re Trans-Texas Petroleum Corp.*, 33 B.R. 67, 69 (Bankr. N.D. Tex. 1983) ("552(b) grants this court discretion, on equitable grounds, to modify or alter the security interest defined by state law.") (citation omitted).

*Id*. (emphases added).

As recoveries for the Debtor's unsecured creditors are uncertain at this time, it is wholly inappropriate for the Court to enter a prospective finding that the "equities of the case" exception contained in section 552(b) is waived. *See In re Metaldyne*, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. 2009) (holding, in the context of a proposed 552(b) waiver, that "the waiver of an equitable rule is not a finding of fact…and the Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make."); *In re iGPS Co. LLC*, 2013 WL 4777667, at *5 (Bankr. D. Del. 2013) (no waiver of the "equities of the case" exception with respect to creditors committee); *In re Namco, LLC*, 2013 WL 1332581 (Bankr. D. Del. 2013) (same). Therefore, the Committee requests that section 5.9 be stricken from the Final DIP Order.

### 7. *The DIP Credit Agreement's Sale Milestones Are Overly Aggressive and Will Hinder the Debtor's Ability to Maximize the Value of Its Estate for the Benefit of the Unsecured Creditors*

Section 5.7 of the Ratification Agreement contains aggressive milestones for the sale of the Debtor's assets that may not provide sufficient time for the Debtor to market and sell its assets and thus may inhibit the Debtor's ability to maximize the value of its estate for the benefit of the unsecured creditors. These milestones provide (a) thirty (30) days from entry of the Interim DIP Order for the Debtor to obtain a court order approving bidding procedures, (b) fifteen (15) days from the entry of the bidding procedures order for the Debtor to enter into a definitive sale agreement with a stalking horse bidder, and (c) twenty-five (25) days from the stalking horse deadline to seek competitive bidders and hold an auction. This truncated timeline may prove to be insufficient to create a robust, competitive sale process and maximize value of the Debtor's assets. The Committee suggests that the Debtor instead have the ability to extend all sale milestones by an additional thirty (30) days if the Debtor, its investment banker and the Committee believe that doing so would benefit the estate.

In addition, the Ratification Agreement provides that the Debtor's failure to comply with section 5.7 constitutes an immediate Event of Default. The sale milestones should be revised so that, if the Debtor is unable timely to find a stalking horse bidder "reasonably acceptable to Wells Fargo," that would not constitute an Event of Default and the Debtor would instead be permitted to proceed with a naked auction of its assets.

### 8. *The DIP Facility and Budget Must Make Some Provision for Funding the Debtor's Post-Sale Wind-Down Costs*

The DIP Facility terminates upon "[t]he earlier of (i) the Maturity Date, (ii) the confirmation of a plan of reorganization for the Debtor, (iii) the consummation of the sale or sales of all or substantially all of the Debtor's assets and properties or of all equity interests in

Debtor, and (iv) the occurrence of an Event of Default (the earliest of those dates being the "Termination Date"). *See* Motion at 7. Accordingly, once a sale of the Debtor's assets is consummated, unless the sale results in significant proceeds over and above the Bank's debt, there will be no cash available to fund the case wind-down activities. Accordingly, the Committee submits that the details and conditions of the Debtor's wind-down budget be addressed at the hearing on the Final DIP Order and that the Final DIP Order reflect that funds from the DIP facility be budgeted to cover the Debtor's reasonable post-sale wind-down expenses.

### III. RESERVATION OF RIGHTS

This Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights to supplement and amend this Objection and introduce evidence at any hearing relating to this Objection, without in any way limiting any other rights of the Committee to further object to the Motion, on any grounds, as may be appropriate.

### IV. CONCLUSION

WHEREFORE, the Committee requests that the Court (i) deny the Motion or, alternatively, enter Final DIP Order that addresses the Committee's objections set forth above; and (ii) provide the Committee such other and further relief as the Court may deem just, proper and equitable.

**[signature page follows]**

Dated: August 8, 2016

**PEPPER HAMILTON LLP**

/s/ Todd A. Feinsmith
PEPPER HAMILTON LLP
Todd A. Feinsmith (admitted *pro hac vice*)
125 High Street
19th Floor, High Street Tower
Boston, MA 02110-2736
Tel: (617) 204-5100
feinsmitht@pepperlaw.com

Deborah Kovsky-Apap (*pro hac vice*)
4000 Town Center
Suite 1800
Southfield, Michigan 48075
(248) 359-7300
kovskyd@pepperlaw.com

*Counsel to the Official Committee of Unsecured Creditors*